# EXHIBIT 68

## AFFIDAVIT OF DEFENSE TO CREDITOR

To City:    City of Chicago – Public Vehicle Operations Division
            Department of Business Affairs and Consumer Protection
            2350 W. Ogden Avenue, 1st Floor
            Chicago, IL 60608
            Attention: Monique Davids

To Creditor: Capital One Equipment Finance Corp., f/k/a All Points Capital Corp.,
            d/b/a Capital One Taxi Medallion Finance
            c/o Troutman Sanders LLP
            Att'n: Andrew L. Buck
            875 Third Avenue
            New York, NY 10022

RE: PUBLIC PASSENGER LICENSE NUMBER(s) <u>2346TX, 1949TX, 1907TX & 1683TX</u>

LICENSEE NAME: <u>Bonus Taxi Inc.</u>

I, ___Symon GARBER___, hereby swear that I own Taxicab Medallion License
        <small>Debtor Individual Name</small>

Number(s) <u>2346TX, 1949TX, 1907TX & 1683TX</u> either individually or through a company that I own and I have a

defense to the foreclosure of these licenses. I understand that this license(s) was sold at a foreclosure

sale on or about ___August 9, 2018___ and that sale is contingent upon approval by the Department of Business Affairs
            <small>List Date of Foreclosure Sale</small>
and Consumer Protection.

My defense to this foreclosure is: (Use additional pages if needed) _____

_____see attached Defense Document_____

_____

Signature: _____

Print Name: ___Sherwin Edward___

Relationship to Medallion License/Title ___Vp and authorized signature agent___

Address: ___2017 S. Wabash Ave Chicago IL 60616___

Phone: ___312 791-1255___

Email Address: ___edwards@chicagocarriagecab.com___.

Subscribed and Sworn to before me

this ___22___ day of ___Aug___, 20 _18_.

_____ Notary Public

JANET DAVIS
Official Seal
Notary Public - State of Illinois
My Commission Expires Sep 20, 2019

<small>Version Date June 5, 2018</small>

## AFFIDAVIT OF DEFENSE TO CREDITOR

### DEFENSE DOCUMENT

In support of its Affidavit of Defense to Creditor, Licensee asserts the following defenses in opposition to the Creditor's ("Creditor" or "Capital One") request to transfer public passenger vehicle license upon foreclosure and to the foreclosure sale: (1) Capital One has no right to foreclose on the medallions at issue; (2) Licensee does not owe the amount claimed by Capital One and has not defaulted on the agreement at issue with Capital One; (3) the foreclosure resulted in an improper foreclosure sale purchase that violated the BACP Taxi Rules; (4) Capital One instituted an improper foreclosure sale process; (5) Capital One breached its fiduciary duty to Licensee; (6) Capital One breached the implied covenant of good faith and fair dealing; (7) Capital One's claim of breach of contract / default is barred by the doctrines of estoppel, waiver, ratification and/or acquiescence. Because Licensee has timely submitted a completed Affidavit of Defense, pursuant to the BACP Taxi Rules, no transfer upon foreclosure may be allowed except pursuant to an order of a court having jurisdiction. Therefore, Licensee respectfully requests that the BACP deny Creditor's Request to Transfer Taxicab Medallion License Upon Foreclosure.

### FACTUAL BACKGROUND

1.      Symon Garber formed Tri Global Financial Services, Inc. ("Tri Global") in 2004, along with Roman Sapino and others, to provide capital to taxicab medallion owners. Tri Global's principal, Roman Sapino, also has many years of experience in the taxicab financing industry and has been involved in successful taxicab enterprises in New York and Chicago. Tri Global's co-owners include Galina Garber-Sheinin and Valentina Zubok. Irene Gans and Maya Zubok are related to an owner of Tri Global.

2.      Tri Global is a corporation formed and existing under the laws of the State of

Illinois, maintaining offices at 2617 S. Wabash Avenue, Chicago, Illinois 60616. Tri Global is engaged in the business of financing and servicing Chicago-based taxi medallion loans as well as offering second-position financing to the taxi industry.

3.      Upon information and belief, Capital One is a corporation formed and existing under the laws of the State of New York, maintaining a principal place of business at 265 Broadhollow Road, Melville, New York 11747.

4.      Tri Global was formed to provide loans to purchasers of public passenger vehicle licenses and medallions in the Chicago market, which confers the right to operate a taxicab in Chicago pursuant to the regulations issued and regulated by the City of Chicago Department of Business Affairs and Consumer Protection ("BACP").

5.      Tri Global offered medallion and other financing to a wide-variety of borrowers, including taxicab businesses that rely on the medallion-secured loans to earn their livelihoods. Tri Global primarily focused its business on servicing taxi medallion loans for various lenders and also offered second-position financing to the taxi industry. In or around 2006 Tri Global was approached by North Fork Bank, which expressed interest in partnering with Tri Global to expand the scope of its lending platform.

6.      Over the next several years, Tri Global and North Fork Bank entered into numerous successful loan participations. When North Fork Bank was acquired by Capital One in or about 2006/2007, this practice continued with Capital One.

7.      Capital One was even more eager than North Fork Bank to capitalize upon Tri Global's contacts in the Chicago marketplace and strongly encouraged Tri Global to aggressively seek prospects for additional medallion loans. Capital One and Tri Global participated in the loans on a loan-by-loan basis for several years.

8.      In 2010, Capital One requested that Tri Global enter into a more formal arrangement by way of a master participation agreement, to which Tri Global agreed. The terms and conditions governing that relationship and Capital One's senior participation interests in the loans are more particularly set forth in a certain Master Joint Participation Agreement, dated August 2, 2010 (the "MJPA" or the "Tri Global MJPA").

9.      In connection with the Tri Global MJPA, Symon Garber, Roman Sapino, Ruben Giacomozzi, Valentina Zubok, and Galina Garber-Sheinin signed the Tri Global Guaranty, dated August 2, 2010.

10.     Pursuant to the terms of the MJPA, Tri Global generated business, handled collections, serviced the loans and remitted monthly payments to Capital One in accordance with the amount of its participation in each underlying loan while Capital One held senior participation interests in the various loans made and serviced by Tri Global to owners of Chicago taxicab medallions (the "Loans"). The Tri Global MJPA contemplates the sale of senior participation interests in loans issued and/or originated by Tri Global to owners and operators of taxi medallions. As reflected in the Tri Global MJPA, after Tri Global sells a participation interest, it continues to service the debt owed thereunder. In exchange for its services, Tri Global receives a servicing fee that is paid from the debt-service payments remitted to Tri Global each month.

11.     Since the inception of the Tri Global/Capital One relationship, the parties have participated in many loans. Although Tri Global originated the medallion-secured loans and served as the official loan servicer for the loan portfolio, Tri Global relied on and trusted Capital One and its commercial finance expertise. This relationship was often characterized by Capital One as a "team" and "partnership" and its officers and representatives, including David Cin ("Cin") and others, regularly commented that the success of the portfolio was the product of a "team effort."

12.    Although Capital One historically had no real presence in the Chicago medallion market, Capital One was eager to exploit Tri Global's connections to the taxicab medallion market and capitalize upon Tri Global's market dominance in the Chicago taxi-medallion economy. Capital One strongly encouraged Tri Global to aggressively acquire additional Chicago-based medallion loans.

13.    As the value of Chicago taxi medallion loans continued to rise, Capital One continued to aggressively press Tri Global to originate new loans so that Capital One could further capitalize on its market position and emerge as a leading taxi medallion lender in Chicago.

14.    Throughout the course of the Master Joint Participation Agreement, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin – whose interests were closely aligned with those of Capital One – worked with Capital One to maximize the return on the medallion loans.

15.    Tri Global originated the agreement/loan at issue between Licensee and Capital One based on Tri Global's relationship with Capital One.

16.    Despite its long-standing business venture with Tri Global, Capital One engaged in intentional and systematic efforts to line its own pockets to the detriment of Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin. As explained below, Capital One engaged in irreconcilable conflicts of interest, bad faith business practices, and intentionally disregarded its duty of good faith to Licensee and Tri Global when it partnered with a major taxi-industry competitor, Uber Technologies, Inc. ("Uber").

17.    In or about late 2013 and early 2014, and unbeknownst to Licensee and Tri Global (and many other Capital One loan participants and medallion-secured borrowers), Capital One began secretly planning to change course and exit the medallion market to partner with the

industry's most ominous competitor, Uber. Notwithstanding this new partnership, Capital One, either intentionally or recklessly, continued to encourage Tri Global to cultivate new medallion-secured loans while concealing its intention to partner with Uber.

18.     News of Capital One's partnership with Uber surfaced in approximately mid-2014, and was followed by an aggressive nationwide marketing campaign launched by Capital One. The marketing campaign and promotions touted Capital One's "unique new partnership" with Uber and underscored the "common focus" of both companies.

19.     Capital One began offering significant incentives to its consumers to choose Uber vehicles over properly licensed and regulated taxis – including offering free and discounted Uber rides and other similar promotions such as a 20% discount on all Uber rides when paid with a Capital One "Quicksilver" credit card. Capital One offered new customers two free Uber rides worth up to $60.00. Capital One created a new website promoting these incentives and further signaling its collaboration with Uber: "capitalone.com/uber".

20.     Capital One's partnership with Uber came as a great shock to Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin as the partnership was never disclosed to them prior to the 2014 marketing blitz. At no point in the parties' relationship was it ever contemplated that Capital One would undertake any action to undermine the taxi industry, the agreement at issue, or the value of Tri Global's and Capital One's loan portfolio.

21.     In partnering with and promoting Uber's ride-share services, Capital One and Uber's assault on the taxi industry has been instrumental in bringing about the destabilization of the Chicago taxi medallion market.

22.     In 2014, when Capital One began its partnership with Uber, the Chicago market softened dramatically. Sometime during mid-2014, funding to the medallion industry came to a

total halt. This was clearly tied to Capital One's partnership with Uber.

23.     By 2015, Uber reported that taxi usage nationwide had precipitously decreased while the number of customers using Uber increased correspondingly.

24.     The disruption of the taxi industry resulting from Capital One's partnership with Uber contributed to the reduction in value of the Chicago taxi medallions securing the loans.

25.     In short, Capital One has caused the price of the Chicago taxi medallions that secure the loans to plummet.

26.     Moreover, Capital One has sabotaged Tri Global, Symon Garber, Valentina Zubok, Galina Garber-Sheinin and Licensee's efforts to favorably restructure and/or modify the medallion-secured loans at issue.

27.     Accordingly, Capital One has materially breached the credit agreement and Licensee is not liable for the amount allegedly owed pursuant to the credit agreement.

### FIRST DEFENSE
**(No Right to Foreclose)**

28.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

29.     Capital One, through its partnership with Uber, precipitated the collapse of the Chicago taxi medallion industry and the medallion industry nationwide, in addition to the corresponding decline in the value of the taxi medallions at issue.

30.     Based on Capital One's willful misconduct, breach of contract, malfeasance, wrongdoing and/or other intentional and/or reckless conduct, Capital One has no right to foreclose on the medallions at issue.

## SECOND DEFENSE
### (No Default by Licensee)

31.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

32.     Licensee does not owe the amount claimed by Capital One and has not defaulted on the agreement at issue with Capital One.

33.     Therefore, Capital One has no right to foreclose on the medallions at issue.

## THIRD DEFENSE
### (Improper Foreclosure Sale Purchase)

34.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

35.     On August 9, 2018, to start the foreclosure, Capital One opened the auction with an initial credit bid of $23,000.00.

36.     Capital One won the foreclosure auction with its initial $23,000.00 credit bid.

37.     Pursuant to Rule TX13.03(b), "[t]he [foreclosure] purchaser must meet all the criteria for licensing as set out in the Municipal Code of Chicago and [the BACP's] rules and regulations, including payment of the license transfer fee, license fees and any other fees, fines or taxes due and owing to the City." Rule TX13.03(b).

38.     Pursuant to Rule TX13.04(d), "[t]he taxicab medallion license must be sold to a person believed to be a qualified applicant . . ." Rule TX13.04(d); *see also* TX13.06(a).

39.     Upon information and belief, Capital One is not a qualified applicant and has no intention of ever seeking licensure under the Municipal Code of Chicago or BACP Taxi Rules.

40.     The purpose behind the BACP Taxi Rules' foreclosure process is to facilitate keeping medallions operating on the street. If Capital One is allowed to purchase the medallions,

with no intention of ever becoming licensed by the BACP, Capital One would be allowed to cause further harm to the taxicab industry and further benefit Uber.

41.     Therefore, the foreclosure sale did not comply with Rules TX13.03 and TX13.04 and the foreclosure auction resulted in an improper sale/purchase that violated the BACP Taxi Rules.

42.     Moreover, Capital One's intent behind the foreclosure sale is to destroy and cause further harm to Licensee, Tri Global, and Tri Global's owners and guarantors. Capital One has filed multiple actions against Licensee, Tri Global, and/or Tri Global's owners and guarantors and instead of allowing any of these cases to reach their natural conclusion, Capital One instead seeks to implement destructive tactics by foreclosing on the medallions in order to further destroy the medallion market by setting the prices and discouraging bids, all in violation of the Taxi Rules simply to inflict maximum damage and cause irreparable harm. In a recent case that was filed in the Circuit Court of Cook County, *Capital One Equipment Finance Corp. v. Chicago Elite Cab Corp., et al.*, No. 17 L 998, the Honorable Margaret A. Brennan dismissed Capital One's complaint but allowed Capital One leave to re-file its cause of action in another case currently pending in New York. That New York Action is *Capital One Equipment Finance Corp. v. The OSG Corp., Tri Global Financial Services, Inc. et al.*, No. 600749/2017. But, rather than re-file its case in the New York Action and pursue its alleged causes of action, Capital One instead chose to do an end run around the litigation process and seeks to foreclose on the medallions at issue in an attempt to destroy Licensee, Tri Global and Tri Global's owners and guarantors. Capital One did not re-file its Chicago cause of action in the New York Action because it knows that counterclaims would be filed against it, which would expose Capital One's bad faith conduct in abusing its partnership with Tri Global and expose Capital One's bad faith relationship with Uber. The reality is that

Capital One has filed numerous unsuccessful complaints in courts in New York and Chicago and, because these lawsuits have not been successful, Capital One is now attempting to cause as much harm as possible to Licensee and Tri Global before the counterclaims against Capital One are proven true and Capital One's bad faith is exposed.

## FOURTH DEFENSE
### (Improper Foreclosure Sale Process)

43.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

44.     On August 9, 2018, to start the foreclosure, Capital One opened the auction with an initial credit bid of $23,000.00.

45.     During the beginning part of the foreclosure auction, it became clear that no individuals were going to bid on the medallions because a foreclosure purchaser would have been liable for any and all liens on the medallions and such liability was unknown at the time of the auction. Capital One then stopped the foreclosure auction and announced to the individuals attending the auction that Capital One would work with any potential foreclosure purchasers and the bank to work out a deal on any liens on the medallion(s) bought at the auction. Capital One further stated that if the foreclosure purchaser and the bank could not work out an agreement concerning any liens on the medallions bought at the auction, Capital One would refund the foreclosure purchaser's money as if the foreclosure sale never took place. After this announcement, Capital One resumed the auction.

46.     By instituting this type of foreclosure auction, Capital One created an improper foreclosure process that created false values and did not bind the foreclosure purchasers.

### FIFTH DEFENSE
#### (Breach of Fiduciary Duty)

47.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

48.     As set forth above, Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin relied heavily on and trusted Capital One.

49.     By virtue of the parties' business relationship as set forth above, and by reason of the demonstrable level of trust and confidence upon which Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin depended and which Capital One knowingly accepted, Capital One owes certain fiduciary duties to Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin including, without limitation, a duty of good faith.

50.     As explained herein, for years Tri Global relied on Capital One to guide certain aspects of its taxi-medallion loan origination and servicing business. Although the Tri Global MJPA provided discretion to Capital One, that discretion did not include a right to abandon the lending market or purposely advance competing interests to destabilize the industry upon which the very loans that were being serviced were based.

51.     Ultimately, Capital One repudiated its commitments to Licensee and abandoned the Chicago medallion lending market so that it could pursue a competing venture with Uber.

52.     Capital One breached its duty of good faith, and the trust and confidence of Licensee by, among other things: precipitating, through its partnership with Uber, the collapse of the Chicago taxi medallion industry and the medallion industry nationwide, in addition to the corresponding decline in the value of the taxi medallions at issue.

53.     Capital One engaged in an intentional course of wrongful conduct orchestrated to harm Licensee.

54.     Capital One's conduct was willful, wanton and in reckless disregard of the Licensee's contractual rights and was otherwise wrongful.

55.     As a direct and proximate result of Capital One's breach of its fiduciary duties, Licensee has suffered, and will continue to suffer, substantial damages.

## SIXTH DEFENSE
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

56.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

57.     Pursuant to the covenant of good faith and fair dealing, Capital One could not undertake any action that has the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

58.     As explained herein, Capital One breached the duty of good faith and fair dealing implied in the contract with Licensee by, among other things: precipitating, through its partnership with Uber, the collapse of the taxi medallion industry and concomitant decline in the value of the taxi medallions at issue.

59.     As a direct and proximate result of Capital One's breach of the implied covenant of good faith and fair dealing thereunder, Licensee has suffered, and will continue to suffer, substantial damages.

## SEVENTH DEFENSE
### (Estoppel, Waiver, Ratification and/or Acquiescence)

60.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

61.     Capital One's claim of breach of contract / default is barred by the doctrines of estoppel, waiver, ratification and/or acquiescence.

## **CONCLUSION**

WHEREFORE, based upon the foregoing allegations and defenses and all reasons appearing of record, Licensee has timely submitted a completed Affidavit of Defense and, pursuant to the BACP Taxi Rules, no transfer upon foreclosure may be allowed except pursuant to an order of a court having jurisdiction. Licensee respectfully requests that the BACP deny Creditor's Request to Transfer Taxicab Medallion License Upon Foreclosure.

# AFFIDAVIT OF DEFENSE TO CREDITOR

To City:    City of Chicago – Public Vehicle Operations Division
Department of Business Affairs and Consumer Protection
2350 W. Ogden Avenue, 1st Floor
Chicago, IL 60608
Attention: Monique Davids

To Creditor:    Capital One Equipment Finance Corp., f/k/a All Points Capital Corp.,
d/b/a Capital One Taxi Medallion Finance
c/o Troutman Sanders LLP
Att'n: Andrew L. Buck
875 Third Avenue
New York, NY 10022

RE: PUBLIC PASSENGER LICENSE NUMBER(s) <u>1632TX</u>

LICENSEE NAME: <u>Bonus Taxi Inc.</u>

I,    <u>Symon GARBER</u>, hereby swear that I own Taxicab Medallion License
<span style="font-size:smaller">Debtor Individual Name</span>

Number(s) <u>1632TX</u> either individually or through a company that I own and I have a defense to the foreclosure of these

licenses. I understand that this license(s) was sold at a foreclosure

sale on or about    <u>August 9, 2018</u>    and that sale is contingent upon approval by the Department of Business Affairs
<span style="font-size:smaller">List Date of Foreclosure Sale</span>
and Consumer Protection.

My defense to this foreclosure is: (Use additional pages if needed) _____

_____ *see attached Defense Document* _____

_____

_____

Signature: _____

Print Name: _____ *Sherwin Edward* _____

Relationship to Medallion License/Title _____ *VP and authorized signature agent* _____

Address: _____ *2617 S. Wabash Ave Chicago IL 60616* _____

Phone: _____ *312 791-1255* _____

Email Address: _____ *edward@chicagocarriagecab.com* _____

Subscribed and Sworn to before me

this _22_ day of _Aug_ , 20 _18_ .

_____    Notary Public

JANET DAVIS
Official Seal
Notary Public - State of Illinois
My Commission Expires Sep 20, 2019

Version Date June 5, 2018

## AFFIDAVIT OF DEFENSE TO CREDITOR

## DEFENSE DOCUMENT

In support of its Affidavit of Defense to Creditor, Licensee asserts the following defenses in opposition to the Creditor's ("Creditor" or "Capital One") request to transfer public passenger vehicle license upon foreclosure and to the foreclosure sale: (1) Capital One has no right to foreclose on the medallion at issue; (2) Licensee does not owe the amount claimed by Capital One and has not defaulted on the agreement at issue with Capital One; (3) the foreclosure resulted in an improper foreclosure sale purchase that violated the BACP Taxi Rules; (4) Capital One instituted an improper foreclosure sale process; (5) Capital One breached its fiduciary duty to Licensee; (6) Capital One breached the implied covenant of good faith and fair dealing; (7) Capital One's claim of breach of contract / default is barred by the doctrines of estoppel, waiver, ratification and/or acquiescence. Because Licensee has timely submitted a completed Affidavit of Defense, pursuant to the BACP Taxi Rules, no transfer upon foreclosure may be allowed except pursuant to an order of a court having jurisdiction. Therefore, Licensee respectfully requests that the BACP deny Creditor's Request to Transfer Taxicab Medallion License Upon Foreclosure.

## FACTUAL BACKGROUND

1.      Symon Garber formed Tri Global Financial Services, Inc. ("Tri Global") in 2004, along with Roman Sapino and others, to provide capital to taxicab medallion owners. Tri Global's principal, Roman Sapino, also has many years of experience in the taxicab financing industry and has been involved in successful taxicab enterprises in New York and Chicago. Tri Global's co-owners include Galina Garber-Sheinin and Valentina Zubok. Irene Gans and Maya Zubok are related to an owner of Tri Global.

2.      Tri Global is a corporation formed and existing under the laws of the State of

Illinois, maintaining offices at 2617 S. Wabash Avenue, Chicago, Illinois 60616. Tri Global is engaged in the business of financing and servicing Chicago-based taxi medallion loans as well as offering second-position financing to the taxi industry.

3.      Upon information and belief, Capital One is a corporation formed and existing under the laws of the State of New York, maintaining a principal place of business at 265 Broadhollow Road, Melville, New York 11747.

4.      Tri Global was formed to provide loans to purchasers of public passenger vehicle licenses and medallions in the Chicago market, which confers the right to operate a taxicab in Chicago pursuant to the regulations issued and regulated by the City of Chicago Department of Business Affairs and Consumer Protection ("BACP").

5.      Tri Global offered medallion and other financing to a wide-variety of borrowers, including taxicab businesses that rely on the medallion-secured loans to earn their livelihoods. Tri Global primarily focused its business on servicing taxi medallion loans for various lenders and also offered second-position financing to the taxi industry. In or around 2006 Tri Global was approached by North Fork Bank, which expressed interest in partnering with Tri Global to expand the scope of its lending platform.

6.      Over the next several years, Tri Global and North Fork Bank entered into numerous successful loan participations. When North Fork Bank was acquired by Capital One in or about 2006/2007, this practice continued with Capital One.

7.      Capital One was even more eager than North Fork Bank to capitalize upon Tri Global's contacts in the Chicago marketplace and strongly encouraged Tri Global to aggressively seek prospects for additional medallion loans. Capital One and Tri Global participated in the loans on a loan-by-loan basis for several years.

8.     In 2010, Capital One requested that Tri Global enter into a more formal arrangement by way of a master participation agreement, to which Tri Global agreed. The terms and conditions governing that relationship and Capital One's senior participation interests in the loans are more particularly set forth in a certain Master Joint Participation Agreement, dated August 2, 2010 (the "MJPA" or the "Tri Global MJPA").

9.     In connection with the Tri Global MJPA, Symon Garber, Roman Sapino, Ruben Giacomozzi, Valentina Zubok, and Galina Garber-Sheinin signed the Tri Global Guaranty, dated August 2, 2010.

10.    Pursuant to the terms of the MJPA, Tri Global generated business, handled collections, serviced the loans and remitted monthly payments to Capital One in accordance with the amount of its participation in each underlying loan while Capital One held senior participation interests in the various loans made and serviced by Tri Global to owners of Chicago taxicab medallions (the "Loans"). The Tri Global MJPA contemplates the sale of senior participation interests in loans issued and/or originated by Tri Global to owners and operators of taxi medallions. As reflected in the Tri Global MJPA, after Tri Global sells a participation interest, it continues to service the debt owed thereunder. In exchange for its services, Tri Global receives a servicing fee that is paid from the debt-service payments remitted to Tri Global each month.

11.    Since the inception of the Tri Global/Capital One relationship, the parties have participated in many loans. Although Tri Global originated the medallion-secured loans and served as the official loan servicer for the loan portfolio, Tri Global relied on and trusted Capital One and its commercial finance expertise. This relationship was often characterized by Capital One as a "team" and "partnership" and its officers and representatives, including David Cin ("Cin") and others, regularly commented that the success of the portfolio was the product of a "team effort."

12.     Although Capital One historically had no real presence in the Chicago medallion market, Capital One was eager to exploit Tri Global's connections to the taxicab medallion market and capitalize upon Tri Global's market dominance in the Chicago taxi-medallion economy. Capital One strongly encouraged Tri Global to aggressively acquire additional Chicago-based medallion loans.

13.     As the value of Chicago taxi medallion loans continued to rise, Capital One continued to aggressively press Tri Global to originate new loans so that Capital One could further capitalize on its market position and emerge as a leading taxi medallion lender in Chicago.

14.     Throughout the course of the Master Joint Participation Agreement, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin – whose interests were closely aligned with those of Capital One – worked with Capital One to maximize the return on the medallion loans.

15.     Tri Global originated the agreement/loan at issue between Licensee and Capital One based on Tri Global's relationship with Capital One.

16.     Despite its long-standing business venture with Tri Global, Capital One engaged in intentional and systematic efforts to line its own pockets to the detriment of Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin. As explained below, Capital One engaged in irreconcilable conflicts of interest, bad faith business practices, and intentionally disregarded its duty of good faith to Licensee and Tri Global when it partnered with a major taxi-industry competitor, Uber Technologies, Inc. ("Uber").

17.     In or about late 2013 and early 2014, and unbeknownst to Licensee and Tri Global (and many other Capital One loan participants and medallion-secured borrowers), Capital One began secretly planning to change course and exit the medallion market to partner with the

industry's most ominous competitor, Uber. Notwithstanding this new partnership, Capital One, either intentionally or recklessly, continued to encourage Tri Global to cultivate new medallion-secured loans while concealing its intention to partner with Uber.

18.     News of Capital One's partnership with Uber surfaced in approximately mid-2014, and was followed by an aggressive nationwide marketing campaign launched by Capital One. The marketing campaign and promotions touted Capital One's "unique new partnership" with Uber and underscored the "common focus" of both companies.

19.     Capital One began offering significant incentives to its consumers to choose Uber vehicles over properly licensed and regulated taxis – including offering free and discounted Uber rides and other similar promotions such as a 20% discount on all Uber rides when paid with a Capital One "Quicksilver" credit card. Capital One offered new customers two free Uber rides worth up to $60.00. Capital One created a new website promoting these incentives and further signaling its collaboration with Uber: "capitalone.com/uber".

20.     Capital One's partnership with Uber came as a great shock to Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin as the partnership was never disclosed to them prior to the 2014 marketing blitz. At no point in the parties' relationship was it ever contemplated that Capital One would undertake any action to undermine the taxi industry, the agreement at issue, or the value of Tri Global's and Capital One's loan portfolio.

21.     In partnering with and promoting Uber's ride-share services, Capital One and Uber's assault on the taxi industry has been instrumental in bringing about the destabilization of the Chicago taxi medallion market.

22.     In 2014, when Capital One began its partnership with Uber, the Chicago market softened dramatically. Sometime during mid-2014, funding to the medallion industry came to a

total halt. This was clearly tied to Capital One's partnership with Uber.

23.     By 2015, Uber reported that taxi usage nationwide had precipitously decreased while the number of customers using Uber increased correspondingly.

24.     The disruption of the taxi industry resulting from Capital One's partnership with Uber contributed to the reduction in value of the Chicago taxi medallions securing the loans.

25.     In short, Capital One has caused the price of the Chicago taxi medallions that secure the loans to plummet.

26.     Moreover, Capital One has sabotaged Tri Global, Symon Garber, Valentina Zubok, Galina Garber-Sheinin and Licensee's efforts to favorably restructure and/or modify the medallion-secured loans at issue.

27.     Accordingly, Capital One has materially breached the credit agreement and Licensee is not liable for the amount allegedly owed pursuant to the credit agreement.

### FIRST DEFENSE
**(No Right to Foreclose)**

28.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

29.     Capital One, through its partnership with Uber, precipitated the collapse of the Chicago taxi medallion industry and the medallion industry nationwide, in addition to the corresponding decline in the value of the taxi medallions at issue.

30.     Based on Capital One's willful misconduct, breach of contract, malfeasance, wrongdoing and/or other intentional and/or reckless conduct, Capital One has no right to foreclose on the medallions at issue.

## SECOND DEFENSE
### (No Default by Licensee)

31.    Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

32.    Licensee does not owe the amount claimed by Capital One and has not defaulted on the agreement at issue with Capital One.

33.    Therefore, Capital One has no right to foreclose on the medallions at issue.

## THIRD DEFENSE
### (Improper Foreclosure Sale Purchase)

34.    Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

35.    On August 9, 2018, to start the foreclosure, Capital One opened the auction with an initial credit bid of $23,000.00.

36.    An individual won the foreclosure auction with a bid of approximately $23,100.00.

37.    Pursuant to Rule TX13.03(b), "[t]he [foreclosure] purchaser must meet all the criteria for licensing as set out in the Municipal Code of Chicago and [the BACP's] rules and regulations, including payment of the license transfer fee, license fees and any other fees, fines or taxes due and owing to the City." Rule TX13.03(b).

38.    Pursuant to Rule TX13.04(d), "[t]he taxicab medallion license must be sold to a person believed to be a qualified applicant . . ." Rule TX13.04(d); *see also* TX13.06(a).

39.    It is unclear if the individual purchaser of the medallion at the foreclosure auction is a qualified applicant under the Municipal Code of Chicago or BACP Taxi Rules. Regardless, because of the improper auction process instituted by Capital One, there is a strong likelihood that the individual purchaser will ultimately decide not to go forward with the foreclosure sale, thus

making Capital One the potential purchaser.

40.     Upon information and belief, Capital One is not a qualified applicant and has no intention of ever seeking licensure under the Municipal Code of Chicago or BACP Taxi Rules.

41.     The purpose behind the BACP Taxi Rules' foreclosure process is to facilitate keeping medallions operating on the street. If Capital One is allowed to purchase the medallions, with no intention of ever becoming licensed by the BACP, Capital One would be allowed to cause further harm to the taxicab industry and further benefit Uber.

42.     Therefore, the foreclosure sale did not comply with Rules TX13.03 and TX13.04 and the foreclosure auction resulted in an improper sale/purchase that violated the BACP Taxi Rules.

43.     Moreover, Capital One's intent behind the foreclosure sale is to destroy and cause further harm to Licensee, Tri Global, and Tri Global's owners and guarantors. Capital One has filed multiple actions against Licensee, Tri Global, and/or Tri Global's owners and guarantors and instead of allowing any of these cases to reach their natural conclusion, Capital One instead seeks to implement destructive tactics by foreclosing on the medallions in order to further destroy the medallion market by setting the prices and discouraging bids, all in violation of the Taxi Rules simply to inflict maximum damage and cause irreparable harm. In a recent case that was filed in the Circuit Court of Cook County, *Capital One Equipment Finance Corp. v. Chicago Elite Cab Corp., et al.*, No. 17 L 998, the Honorable Margaret A. Brennan dismissed Capital One's complaint but allowed Capital One leave to re-file its cause of action in another case currently pending in New York. That New York Action is *Capital One Equipment Finance Corp. v. The OSG Corp., Tri Global Financial Services, Inc. et al.*, No. 600749/2017. But, rather than re-file its case in the New York Action and pursue its alleged causes of action, Capital One instead chose to do an end

run around the litigation process and seeks to foreclose on the medallions at issue in an attempt to destroy Licensee, Tri Global and Tri Global's owners and guarantors. Capital One did not re-file its Chicago cause of action in the New York Action because it knows that counterclaims would be filed against it, which would expose Capital One's bad faith conduct in abusing its partnership with Tri Global and expose Capital One's bad faith relationship with Uber. The reality is that Capital One has filed numerous unsuccessful complaints in courts in New York and Chicago and, because these lawsuits have not been successful, Capital One is now attempting to cause as much harm as possible to Licensee and Tri Global before the counterclaims against Capital One are proven true and Capital One's bad faith is exposed.

## FOURTH DEFENSE
### (Improper Foreclosure Sale Process)

44.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

45.     On August 9, 2018, to start the foreclosure, Capital One opened the auction with an initial credit bid of $23,000.00.

46.     During the beginning part of the foreclosure auction, it became clear that no individuals were going to bid on the medallions because a foreclosure purchaser would have been liable for any and all liens on the medallions and such liability was unknown at the time of the auction. Capital One then stopped the foreclosure auction and announced to the individuals attending the auction that Capital One would work with any potential foreclosure purchasers and the bank to work out a deal on any liens on the medallion(s) bought at the auction. Capital One further stated that if the foreclosure purchaser and the bank could not work out an agreement concerning any liens on the medallions bought at the auction, Capital One would refund the foreclosure purchaser's money as if the foreclosure sale never took place. After this announcement,

Capital One resumed the auction.

47.     By instituting this type of foreclosure auction, Capital One created an improper foreclosure process that created false values and did not bind the foreclosure purchasers.

**FIFTH DEFENSE**
**(Breach of Fiduciary Duty)**

48.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

49.     As set forth above, Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin relied heavily on and trusted Capital One.

50.     By virtue of the parties' business relationship as set forth above, and by reason of the demonstrable level of trust and confidence upon which Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin depended and which Capital One knowingly accepted, Capital One owes certain fiduciary duties to Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin including, without limitation, a duty of good faith.

51.     As explained herein, for years Tri Global relied on Capital One to guide certain aspects of its taxi-medallion loan origination and servicing business. Although the Tri Global MJPA provided discretion to Capital One, that discretion did not include a right to abandon the lending market or purposely advance competing interests to destabilize the industry upon which the very loans that were being serviced were based.

52.     Ultimately, Capital One repudiated its commitments to Licensee and abandoned the Chicago medallion lending market so that it could pursue a competing venture with Uber.

53.     Capital One breached its duty of good faith, and the trust and confidence of Licensee by, among other things: precipitating, through its partnership with Uber, the collapse of the Chicago taxi medallion industry and the medallion industry nationwide, in addition to the

corresponding decline in the value of the taxi medallions at issue.

54.    Capital One engaged in an intentional course of wrongful conduct orchestrated to harm Licensee.

55.    Capital One's conduct was willful, wanton and in reckless disregard of the Licensee's contractual rights and was otherwise wrongful.

56.    As a direct and proximate result of Capital One's breach of its fiduciary duties, Licensee has suffered, and will continue to suffer, substantial damages.

<u>**SIXTH DEFENSE**</u>
**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

57.    Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

58.    Pursuant to the covenant of good faith and fair dealing, Capital One could not undertake any action that has the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

59.    As explained herein, Capital One breached the duty of good faith and fair dealing implied in the contract with Licensee by, among other things: precipitating, through its partnership with Uber, the collapse of the taxi medallion industry and concomitant decline in the value of the taxi medallions at issue.

60.    As a direct and proximate result of Capital One's breach of the implied covenant of good faith and fair dealing thereunder, Licensee has suffered, and will continue to suffer, substantial damages.

## SEVENTH DEFENSE
### (Estoppel, Waiver, Ratification and/or Acquiescence)

61.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

62.     Capital One's claim of breach of contract / default is barred by the doctrines of estoppel, waiver, ratification and/or acquiescence.

## CONCLUSION

WHEREFORE, based upon the foregoing allegations and defenses and all reasons appearing of record, Licensee has timely submitted a completed Affidavit of Defense and, pursuant to the BACP Taxi Rules, no transfer upon foreclosure may be allowed except pursuant to an order of a court having jurisdiction. Licensee respectfully requests that the BACP deny Creditor's Request to Transfer Taxicab Medallion License Upon Foreclosure.

# AFFIDAVIT OF DEFENSE TO CREDITOR

**To City:**  City of Chicago – Public Vehicle Operations Division
     Department of Business Affairs and Consumer Protection
     2350 W. Ogden Avenue, 1st Floor
     Chicago, IL 60608
     Attention: Monique Davids

**To Creditor:** Capital One Equipment Finance Corp., f/k/a All Points Capital Corp.,
     d/b/a Capital One Taxi Medallion Finance
     c/o Troutman Sanders LLP
     Att'n: Andrew L. Buck
     875 Third Avenue
     New York, NY 10022

**RE: PUBLIC PASSENGER LICENSE NUMBER(s) <u>1106TX, 2550TX, 6607TX, 6608TX & 6609TX</u>**

**LICENSEE NAME: <u>Chicago Polo I, Inc.</u>**

I, _<u>Symon Garber</u>_ , hereby swear that I own Taxicab Medallion License
<span style="font-size:smaller">Debtor Individual Name</span>

Number(s) <u>1106TX, 2550TX, 6607TX, 6608TX & 6609TX</u> either individually or through a company that I own and I

have a defense to the foreclosure of these licenses. I understand that this license(s) was sold at a foreclosure

sale on or about _____<u>August 9, 2018</u>_____ and that sale is contingent upon approval by the Department of Business Affairs
<span style="font-size:smaller">List Date of Foreclosure Sale</span>
and Consumer Protection.

My defense to this foreclosure is: (Use additional pages if needed)_____

_____ See attached Defense. _____

_____

_____

Signature: _____

Print Name: __Sherin Edward__

Relationship to Medallion License/Title __Vice President & Authorized Agent__

Address: __2617 S Wabash. Chicago IL 60616__

Phone: __312.791.1255__

Email Address: __edwards@chicagocarriagecab.com.__

Subscribed and Sworn to before me

this _22_ day of _Aug_ , 20_18_.

_____
             Notary Public

JANET DAVIS
Official Seal
Notary Public · State of ...
My Commission Expires Sep ... 2019

Version Date June 5, 2018

## AFFIDAVIT OF DEFENSE TO CREDITOR

## DEFENSE DOCUMENT

In support of its Affidavit of Defense to Creditor, Licensee asserts the following defenses in opposition to the Creditor's ("Creditor" or "Capital One") request to transfer public passenger vehicle license upon foreclosure and to the foreclosure sale: (1) Capital One has no right to foreclose on the medallions at issue; (2) Licensee does not owe the amount claimed by Capital One and has not defaulted on the agreement at issue with Capital One; (3) the foreclosure resulted in an improper foreclosure sale purchase that violated the BACP Taxi Rules; (4) Capital One instituted an improper foreclosure sale process; (5) Capital One breached its fiduciary duty to Licensee; (6) Capital One breached the implied covenant of good faith and fair dealing; (7) Capital One's claim of breach of contract / default is barred by the doctrines of estoppel, waiver, ratification and/or acquiescence. Because Licensee has timely submitted a completed Affidavit of Defense, pursuant to the BACP Taxi Rules, no transfer upon foreclosure may be allowed except pursuant to an order of a court having jurisdiction. Therefore, Licensee respectfully requests that the BACP deny Creditor's Request to Transfer Taxicab Medallion License Upon Foreclosure.

## FACTUAL BACKGROUND

1.     Symon Garber formed Tri Global Financial Services, Inc. ("Tri Global") in 2004, along with Roman Sapino and others, to provide capital to taxicab medallion owners. Tri Global's principal, Roman Sapino, also has many years of experience in the taxicab financing industry and has been involved in successful taxicab enterprises in New York and Chicago. Tri Global's co-owners include Galina Garber-Sheinin and Valentina Zubok. Irene Gans and Maya Zubok are related to an owner of Tri Global.

2.     Tri Global is a corporation formed and existing under the laws of the State of

Illinois, maintaining offices at 2617 S. Wabash Avenue, Chicago, Illinois 60616. Tri Global is engaged in the business of financing and servicing Chicago-based taxi medallion loans as well as offering second-position financing to the taxi industry.

3.     Upon information and belief, Capital One is a corporation formed and existing under the laws of the State of New York, maintaining a principal place of business at 265 Broadhollow Road, Melville, New York 11747.

4.     Tri Global was formed to provide loans to purchasers of public passenger vehicle licenses and medallions in the Chicago market, which confers the right to operate a taxicab in Chicago pursuant to the regulations issued and regulated by the City of Chicago Department of Business Affairs and Consumer Protection ("BACP").

5.     Tri Global offered medallion and other financing to a wide-variety of borrowers, including taxicab businesses that rely on the medallion-secured loans to earn their livelihoods. Tri Global primarily focused its business on servicing taxi medallion loans for various lenders and also offered second-position financing to the taxi industry. In or around 2006 Tri Global was approached by North Fork Bank, which expressed interest in partnering with Tri Global to expand the scope of its lending platform.

6.     Over the next several years, Tri Global and North Fork Bank entered into numerous successful loan participations. When North Fork Bank was acquired by Capital One in or about 2006/2007, this practice continued with Capital One.

7.     Capital One was even more eager than North Fork Bank to capitalize upon Tri Global's contacts in the Chicago marketplace and strongly encouraged Tri Global to aggressively seek prospects for additional medallion loans. Capital One and Tri Global participated in the loans on a loan-by-loan basis for several years.

8. In 2010, Capital One requested that Tri Global enter into a more formal arrangement by way of a master participation agreement, to which Tri Global agreed. The terms and conditions governing that relationship and Capital One's senior participation interests in the loans are more particularly set forth in a certain Master Joint Participation Agreement, dated August 2, 2010 (the "MJPA" or the "Tri Global MJPA").

9. In connection with the Tri Global MJPA, Symon Garber, Roman Sapino, Ruben Giacomozzi, Valentina Zubok, and Galina Garber-Sheinin signed the Tri Global Guaranty, dated August 2, 2010.

10. Pursuant to the terms of the MJPA, Tri Global generated business, handled collections, serviced the loans and remitted monthly payments to Capital One in accordance with the amount of its participation in each underlying loan while Capital One held senior participation interests in the various loans made and serviced by Tri Global to owners of Chicago taxicab medallions (the "Loans"). The Tri Global MJPA contemplates the sale of senior participation interests in loans issued and/or originated by Tri Global to owners and operators of taxi medallions. As reflected in the Tri Global MJPA, after Tri Global sells a participation interest, it continues to service the debt owed thereunder. In exchange for its services, Tri Global receives a servicing fee that is paid from the debt-service payments remitted to Tri Global each month.

11. Since the inception of the Tri Global/Capital One relationship, the parties have participated in many loans. Although Tri Global originated the medallion-secured loans and served as the official loan servicer for the loan portfolio, Tri Global relied on and trusted Capital One and its commercial finance expertise. This relationship was often characterized by Capital One as a "team" and "partnership" and its officers and representatives, including David Cin ("Cin") and others, regularly commented that the success of the portfolio was the product of a "team effort."

12.     Although Capital One historically had no real presence in the Chicago medallion market, Capital One was eager to exploit Tri Global's connections to the taxicab medallion market and capitalize upon Tri Global's market dominance in the Chicago taxi-medallion economy. Capital One strongly encouraged Tri Global to aggressively acquire additional Chicago-based medallion loans.

13.     As the value of Chicago taxi medallion loans continued to rise, Capital One continued to aggressively press Tri Global to originate new loans so that Capital One could further capitalize on its market position and emerge as a leading taxi medallion lender in Chicago.

14.     Throughout the course of the Master Joint Participation Agreement, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin – whose interests were closely aligned with those of Capital One – worked with Capital One to maximize the return on the medallion loans.

15.     Tri Global originated the agreement/loan at issue between Licensee and Capital One based on Tri Global's relationship with Capital One.

16.     Despite its long-standing business venture with Tri Global, Capital One engaged in intentional and systematic efforts to line its own pockets to the detriment of Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin. As explained below, Capital One engaged in irreconcilable conflicts of interest, bad faith business practices, and intentionally disregarded its duty of good faith to Licensee and Tri Global when it partnered with a major taxi-industry competitor, Uber Technologies, Inc. ("Uber").

17.     In or about late 2013 and early 2014, and unbeknownst to Licensee and Tri Global (and many other Capital One loan participants and medallion-secured borrowers), Capital One began secretly planning to change course and exit the medallion market to partner with the

industry's most ominous competitor, Uber. Notwithstanding this new partnership, Capital One, either intentionally or recklessly, continued to encourage Tri Global to cultivate new medallion-secured loans while concealing its intention to partner with Uber.

18.     News of Capital One's partnership with Uber surfaced in approximately mid-2014, and was followed by an aggressive nationwide marketing campaign launched by Capital One. The marketing campaign and promotions touted Capital One's "unique new partnership" with Uber and underscored the "common focus" of both companies.

19.     Capital One began offering significant incentives to its consumers to choose Uber vehicles over properly licensed and regulated taxis – including offering free and discounted Uber rides and other similar promotions such as a 20% discount on all Uber rides when paid with a Capital One "Quicksilver" credit card. Capital One offered new customers two free Uber rides worth up to $60.00. Capital One created a new website promoting these incentives and further signaling its collaboration with Uber: "capitalone.com/uber".

20.     Capital One's partnership with Uber came as a great shock to Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin as the partnership was never disclosed to them prior to the 2014 marketing blitz. At no point in the parties' relationship was it ever contemplated that Capital One would undertake any action to undermine the taxi industry, the agreement at issue, or the value of Tri Global's and Capital One's loan portfolio.

21.     In partnering with and promoting Uber's ride-share services, Capital One and Uber's assault on the taxi industry has been instrumental in bringing about the destabilization of the Chicago taxi medallion market.

22.     In 2014, when Capital One began its partnership with Uber, the Chicago market softened dramatically. Sometime during mid-2014, funding to the medallion industry came to a

total halt. This was clearly tied to Capital One's partnership with Uber.

23.     By 2015, Uber reported that taxi usage nationwide had precipitously decreased while the number of customers using Uber increased correspondingly.

24.     The disruption of the taxi industry resulting from Capital One's partnership with Uber contributed to the reduction in value of the Chicago taxi medallions securing the loans.

25.     In short, Capital One has caused the price of the Chicago taxi medallions that secure the loans to plummet.

26.     Moreover, Capital One has sabotaged Tri Global, Symon Garber, Valentina Zubok, Galina Garber-Sheinin and Licensee's efforts to favorably restructure and/or modify the medallion-secured loans at issue.

27.     Accordingly, Capital One has materially breached the credit agreement and Licensee is not liable for the amount allegedly owed pursuant to the credit agreement.

## FIRST DEFENSE
### (No Right to Foreclose)

28.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

29.     Capital One, through its partnership with Uber, precipitated the collapse of the Chicago taxi medallion industry and the medallion industry nationwide, in addition to the corresponding decline in the value of the taxi medallions at issue.

30.     Based on Capital One's willful misconduct, breach of contract, malfeasance, wrongdoing and/or other intentional and/or reckless conduct, Capital One has no right to foreclose on the medallions at issue.

## SECOND DEFENSE
### (No Default by Licensee)

31.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

32.     Licensee does not owe the amount claimed by Capital One and has not defaulted on the agreement at issue with Capital One.

33.     Therefore, Capital One has no right to foreclose on the medallions at issue.

## THIRD DEFENSE
### (Improper Foreclosure Sale Purchase)

34.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

35.     On August 9, 2018, to start the foreclosure, Capital One opened the auction with an initial credit bid of $23,000.00.

36.     Capital One won the foreclosure auction with its initial $23,000.00 credit bid.

37.     Pursuant to Rule TX13.03(b), "[t]he [foreclosure] purchaser must meet all the criteria for licensing as set out in the Municipal Code of Chicago and [the BACP's] rules and regulations, including payment of the license transfer fee, license fees and any other fees, fines or taxes due and owing to the City." Rule TX13.03(b).

38.     Pursuant to Rule TX13.04(d), "[t]he taxicab medallion license must be sold to a person believed to be a qualified applicant . . ." Rule TX13.04(d); *see also* TX13.06(a).

39.     Upon information and belief, Capital One is not a qualified applicant and has no intention of ever seeking licensure under the Municipal Code of Chicago or BACP Taxi Rules.

40.     The purpose behind the BACP Taxi Rules' foreclosure process is to facilitate keeping medallions operating on the street. If Capital One is allowed to purchase the medallions,

with no intention of ever becoming licensed by the BACP, Capital One would be allowed to cause further harm to the taxicab industry and further benefit Uber.

41.     Therefore, the foreclosure sale did not comply with Rules TX13.03 and TX13.04 and the foreclosure auction resulted in an improper sale/purchase that violated the BACP Taxi Rules.

42.     Moreover, Capital One's intent behind the foreclosure sale is to destroy and cause further harm to Licensee, Tri Global, and Tri Global's owners and guarantors. Capital One has filed multiple actions against Licensee, Tri Global, and/or Tri Global's owners and guarantors and instead of allowing any of these cases to reach their natural conclusion, Capital One instead seeks to implement destructive tactics by foreclosing on the medallions in order to further destroy the medallion market by setting the prices and discouraging bids, all in violation of the Taxi Rules simply to inflict maximum damage and cause irreparable harm. In a recent case that was filed in the Circuit Court of Cook County, *Capital One Equipment Finance Corp. v. Chicago Elite Cab Corp., et al.*, No. 17 L 998, the Honorable Margaret A. Brennan dismissed Capital One's complaint but allowed Capital One leave to re-file its cause of action in another case currently pending in New York. That New York Action is *Capital One Equipment Finance Corp. v. The OSG Corp., Tri Global Financial Services, Inc. et al.*, No. 600749/2017. But, rather than re-file its case in the New York Action and pursue its alleged causes of action, Capital One instead chose to do an end run around the litigation process and seeks to foreclose on the medallions at issue in an attempt to destroy Licensee, Tri Global and Tri Global's owners and guarantors. Capital One did not re-file its Chicago cause of action in the New York Action because it knows that counterclaims would be filed against it, which would expose Capital One's bad faith conduct in abusing its partnership with Tri Global and expose Capital One's bad faith relationship with Uber. The reality is that

Capital One has filed numerous unsuccessful complaints in courts in New York and Chicago and, because these lawsuits have not been successful, Capital One is now attempting to cause as much harm as possible to Licensee and Tri Global before the counterclaims against Capital One are proven true and Capital One's bad faith is exposed.

### FOURTH DEFENSE
### (Improper Foreclosure Sale Process)

43. Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

44. On August 9, 2018, to start the foreclosure, Capital One opened the auction with an initial credit bid of $23,000.00.

45. During the beginning part of the foreclosure auction, it became clear that no individuals were going to bid on the medallions because a foreclosure purchaser would have been liable for any and all liens on the medallions and such liability was unknown at the time of the auction. Capital One then stopped the foreclosure auction and announced to the individuals attending the auction that Capital One would work with any potential foreclosure purchasers and the bank to work out a deal on any liens on the medallion(s) bought at the auction. Capital One further stated that if the foreclosure purchaser and the bank could not work out an agreement concerning any liens on the medallions bought at the auction, Capital One would refund the foreclosure purchaser's money as if the foreclosure sale never took place. After this announcement, Capital One resumed the auction.

46. By instituting this type of foreclosure auction, Capital One created an improper foreclosure process that created false values and did not bind the foreclosure purchasers.

## FIFTH DEFENSE
### (Breach of Fiduciary Duty)

47.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

48.     As set forth above, Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin relied heavily on and trusted Capital One.

49.     By virtue of the parties' business relationship as set forth above, and by reason of the demonstrable level of trust and confidence upon which Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin depended and which Capital One knowingly accepted, Capital One owes certain fiduciary duties to Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin including, without limitation, a duty of good faith.

50.     As explained herein, for years Tri Global relied on Capital One to guide certain aspects of its taxi-medallion loan origination and servicing business. Although the Tri Global MJPA provided discretion to Capital One, that discretion did not include a right to abandon the lending market or purposely advance competing interests to destabilize the industry upon which the very loans that were being serviced were based.

51.     Ultimately, Capital One repudiated its commitments to Licensee and abandoned the Chicago medallion lending market so that it could pursue a competing venture with Uber.

52.     Capital One breached its duty of good faith, and the trust and confidence of Licensee by, among other things: precipitating, through its partnership with Uber, the collapse of the Chicago taxi medallion industry and the medallion industry nationwide, in addition to the corresponding decline in the value of the taxi medallions at issue.

53.     Capital One engaged in an intentional course of wrongful conduct orchestrated to harm Licensee.

54.     Capital One's conduct was willful, wanton and in reckless disregard of the Licensee's contractual rights and was otherwise wrongful.

55.     As a direct and proximate result of Capital One's breach of its fiduciary duties, Licensee has suffered, and will continue to suffer, substantial damages.

## SIXTH DEFENSE
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

56.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

57.     Pursuant to the covenant of good faith and fair dealing, Capital One could not undertake any action that has the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

58.     As explained herein, Capital One breached the duty of good faith and fair dealing implied in the contract with Licensee by, among other things: precipitating, through its partnership with Uber, the collapse of the taxi medallion industry and concomitant decline in the value of the taxi medallions at issue.

59.     As a direct and proximate result of Capital One's breach of the implied covenant of good faith and fair dealing thereunder, Licensee has suffered, and will continue to suffer, substantial damages.

## SEVENTH DEFENSE
### (Estoppel, Waiver, Ratification and/or Acquiescence)

60.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

61.     Capital One's claim of breach of contract / default is barred by the doctrines of estoppel, waiver, ratification and/or acquiescence.

## **CONCLUSION**

WHEREFORE, based upon the foregoing allegations and defenses and all reasons appearing of record, Licensee has timely submitted a completed Affidavit of Defense and, pursuant to the BACP Taxi Rules, no transfer upon foreclosure may be allowed except pursuant to an order of a court having jurisdiction. Licensee respectfully requests that the BACP deny Creditor's Request to Transfer Taxicab Medallion License Upon Foreclosure.

## AFFIDAVIT OF DEFENSE TO CREDITOR

To City:      City of Chicago – Public Vehicle Operations Division
              Department of Business Affairs and Consumer Protection
              2350 W. Ogden Avenue, 1st Floor
              Chicago, IL 60608
              Attention: Monique Davids

To Creditor:  Capital One Equipment Finance Corp., f/k/a All Points Capital Corp.,
              d/b/a Capital One Taxi Medallion Finance
              c/o Troutman Sanders LLP
              Att'n: Andrew L. Buck
              875 Third Avenue
              New York, NY 10022

RE: PUBLIC PASSENGER LICENSE NUMBER(s) <u>6610TX</u>

LICENSEE NAME: <u>Chicago Polo I, Inc.</u>

I, _____<u>Symon GARBER</u>_____, hereby swear that I own Taxicab Medallion License
　　　　　Debtor Individual Name

Number(s) <u>6610TX</u> either individually or through a company that I own and I have a defense to the foreclosure of these

licenses. I understand that this license(s) was sold at a foreclosure

sale on or about _____<u>August 9, 2018</u>_____ and that sale is contingent upon approval by the Department of Business Affairs
　　　　　　　　　　List Date of Foreclosure Sale
and Consumer Protection.

My defense to this foreclosure is: (Use additional pages if needed)_____

_____ _see attached Defense Document_____

_____

_____

Signature: _____

Print Name: _____ Sherwin Edward _____

Relationship to Medallion License/Title ___ VP and authorized signature agent ___

Address: __ 2617 S. Wabash Ave Chicago I __

Phone: __ 312 791-1255 __

Email Address: __ edwards@chicagocarriagecab.com __

Subscribed and Sworn to before me

this __22__ day of __Aug_____, 20 __18__.

_____
　　　　　　　　　　　　　　　　Notary Public

JANET DAVIS
Official Seal
Notary Public - State of Illinois
My Commission Expires Sep 20, 2019

## AFFIDAVIT OF DEFENSE TO CREDITOR

## DEFENSE DOCUMENT

In support of its Affidavit of Defense to Creditor, Licensee asserts the following defenses in opposition to the Creditor's ("Creditor" or "Capital One") request to transfer public passenger vehicle license upon foreclosure and to the foreclosure sale: (1) Capital One has no right to foreclose on the medallion at issue; (2) Licensee does not owe the amount claimed by Capital One and has not defaulted on the agreement at issue with Capital One; (3) the foreclosure resulted in an improper foreclosure sale purchase that violated the BACP Taxi Rules; (4) Capital One instituted an improper foreclosure sale process; (5) Capital One breached its fiduciary duty to Licensee; (6) Capital One breached the implied covenant of good faith and fair dealing; (7) Capital One's claim of breach of contract / default is barred by the doctrines of estoppel, waiver, ratification and/or acquiescence. Because Licensee has timely submitted a completed Affidavit of Defense, pursuant to the BACP Taxi Rules, no transfer upon foreclosure may be allowed except pursuant to an order of a court having jurisdiction. Therefore, Licensee respectfully requests that the BACP deny Creditor's Request to Transfer Taxicab Medallion License Upon Foreclosure.

## FACTUAL BACKGROUND

1.      Symon Garber formed Tri Global Financial Services, Inc. ("Tri Global") in 2004, along with Roman Sapino and others, to provide capital to taxicab medallion owners. Tri Global's principal, Roman Sapino, also has many years of experience in the taxicab financing industry and has been involved in successful taxicab enterprises in New York and Chicago. Tri Global's co-owners include Galina Garber-Sheinin and Valentina Zubok. Irene Gans and Maya Zubok are related to an owner of Tri Global.

2.      Tri Global is a corporation formed and existing under the laws of the State of

Illinois, maintaining offices at 2617 S. Wabash Avenue, Chicago, Illinois 60616. Tri Global is engaged in the business of financing and servicing Chicago-based taxi medallion loans as well as offering second-position financing to the taxi industry.

3.      Upon information and belief, Capital One is a corporation formed and existing under the laws of the State of New York, maintaining a principal place of business at 265 Broadhollow Road, Melville, New York 11747.

4.      Tri Global was formed to provide loans to purchasers of public passenger vehicle licenses and medallions in the Chicago market, which confers the right to operate a taxicab in Chicago pursuant to the regulations issued and regulated by the City of Chicago Department of Business Affairs and Consumer Protection ("BACP").

5.      Tri Global offered medallion and other financing to a wide-variety of borrowers, including taxicab businesses that rely on the medallion-secured loans to earn their livelihoods. Tri Global primarily focused its business on servicing taxi medallion loans for various lenders and also offered second-position financing to the taxi industry. In or around 2006 Tri Global was approached by North Fork Bank, which expressed interest in partnering with Tri Global to expand the scope of its lending platform.

6.      Over the next several years, Tri Global and North Fork Bank entered into numerous successful loan participations. When North Fork Bank was acquired by Capital One in or about 2006/2007, this practice continued with Capital One.

7.      Capital One was even more eager than North Fork Bank to capitalize upon Tri Global's contacts in the Chicago marketplace and strongly encouraged Tri Global to aggressively seek prospects for additional medallion loans. Capital One and Tri Global participated in the loans on a loan-by-loan basis for several years.

8.   In 2010, Capital One requested that Tri Global enter into a more formal arrangement by way of a master participation agreement, to which Tri Global agreed. The terms and conditions governing that relationship and Capital One's senior participation interests in the loans are more particularly set forth in a certain Master Joint Participation Agreement, dated August 2, 2010 (the "MJPA" or the "Tri Global MJPA").

9.   In connection with the Tri Global MJPA, Symon Garber, Roman Sapino, Ruben Giacomozzi, Valentina Zubok, and Galina Garber-Sheinin signed the Tri Global Guaranty, dated August 2, 2010.

10.   Pursuant to the terms of the MJPA, Tri Global generated business, handled collections, serviced the loans and remitted monthly payments to Capital One in accordance with the amount of its participation in each underlying loan while Capital One held senior participation interests in the various loans made and serviced by Tri Global to owners of Chicago taxicab medallions (the "Loans"). The Tri Global MJPA contemplates the sale of senior participation interests in loans issued and/or originated by Tri Global to owners and operators of taxi medallions. As reflected in the Tri Global MJPA, after Tri Global sells a participation interest, it continues to service the debt owed thereunder. In exchange for its services, Tri Global receives a servicing fee that is paid from the debt-service payments remitted to Tri Global each month.

11.   Since the inception of the Tri Global/Capital One relationship, the parties have participated in many loans. Although Tri Global originated the medallion-secured loans and served as the official loan servicer for the loan portfolio, Tri Global relied on and trusted Capital One and its commercial finance expertise. This relationship was often characterized by Capital One as a "team" and "partnership" and its officers and representatives, including David Cin ("Cin") and others, regularly commented that the success of the portfolio was the product of a "team effort."

12. Although Capital One historically had no real presence in the Chicago medallion market, Capital One was eager to exploit Tri Global's connections to the taxicab medallion market and capitalize upon Tri Global's market dominance in the Chicago taxi-medallion economy. Capital One strongly encouraged Tri Global to aggressively acquire additional Chicago-based medallion loans.

13. As the value of Chicago taxi medallion loans continued to rise, Capital One continued to aggressively press Tri Global to originate new loans so that Capital One could further capitalize on its market position and emerge as a leading taxi medallion lender in Chicago.

14. Throughout the course of the Master Joint Participation Agreement, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin – whose interests were closely aligned with those of Capital One – worked with Capital One to maximize the return on the medallion loans.

15. Tri Global originated the agreement/loan at issue between Licensee and Capital One based on Tri Global's relationship with Capital One.

16. Despite its long-standing business venture with Tri Global, Capital One engaged in intentional and systematic efforts to line its own pockets to the detriment of Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin. As explained below, Capital One engaged in irreconcilable conflicts of interest, bad faith business practices, and intentionally disregarded its duty of good faith to Licensee and Tri Global when it partnered with a major taxi-industry competitor, Uber Technologies, Inc. ("Uber").

17. In or about late 2013 and early 2014, and unbeknownst to Licensee and Tri Global (and many other Capital One loan participants and medallion-secured borrowers), Capital One began secretly planning to change course and exit the medallion market to partner with the

industry's most ominous competitor, Uber. Notwithstanding this new partnership, Capital One, either intentionally or recklessly, continued to encourage Tri Global to cultivate new medallion-secured loans while concealing its intention to partner with Uber.

18.     News of Capital One's partnership with Uber surfaced in approximately mid-2014, and was followed by an aggressive nationwide marketing campaign launched by Capital One. The marketing campaign and promotions touted Capital One's "unique new partnership" with Uber and underscored the "common focus" of both companies.

19.     Capital One began offering significant incentives to its consumers to choose Uber vehicles over properly licensed and regulated taxis – including offering free and discounted Uber rides and other similar promotions such as a 20% discount on all Uber rides when paid with a Capital One "Quicksilver" credit card. Capital One offered new customers two free Uber rides worth up to $60.00. Capital One created a new website promoting these incentives and further signaling its collaboration with Uber: "capitalone.com/uber".

20.     Capital One's partnership with Uber came as a great shock to Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin as the partnership was never disclosed to them prior to the 2014 marketing blitz. At no point in the parties' relationship was it ever contemplated that Capital One would undertake any action to undermine the taxi industry, the agreement at issue, or the value of Tri Global's and Capital One's loan portfolio.

21.     In partnering with and promoting Uber's ride-share services, Capital One and Uber's assault on the taxi industry has been instrumental in bringing about the destabilization of the Chicago taxi medallion market.

22.     In 2014, when Capital One began its partnership with Uber, the Chicago market softened dramatically. Sometime during mid-2014, funding to the medallion industry came to a

total halt. This was clearly tied to Capital One's partnership with Uber.

23.    By 2015, Uber reported that taxi usage nationwide had precipitously decreased while the number of customers using Uber increased correspondingly.

24.    The disruption of the taxi industry resulting from Capital One's partnership with Uber contributed to the reduction in value of the Chicago taxi medallions securing the loans.

25.    In short, Capital One has caused the price of the Chicago taxi medallions that secure the loans to plummet.

26.    Moreover, Capital One has sabotaged Tri Global, Symon Garber, Valentina Zubok, Galina Garber-Sheinin and Licensee's efforts to favorably restructure and/or modify the medallion-secured loans at issue.

27.    Accordingly, Capital One has materially breached the credit agreement and Licensee is not liable for the amount allegedly owed pursuant to the credit agreement.

## FIRST DEFENSE
### (No Right to Foreclose)

28.    Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

29.    Capital One, through its partnership with Uber, precipitated the collapse of the Chicago taxi medallion industry and the medallion industry nationwide, in addition to the corresponding decline in the value of the taxi medallions at issue.

30.    Based on Capital One's willful misconduct, breach of contract, malfeasance, wrongdoing and/or other intentional and/or reckless conduct, Capital One has no right to foreclose on the medallions at issue.

## SECOND DEFENSE
### (No Default by Licensee)

31.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

32.     Licensee does not owe the amount claimed by Capital One and has not defaulted on the agreement at issue with Capital One.

33.     Therefore, Capital One has no right to foreclose on the medallions at issue.

## THIRD DEFENSE
### (Improper Foreclosure Sale Purchase)

34.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

35.     On August 9, 2018, to start the foreclosure, Capital One opened the auction with an initial credit bid of $23,000.00.

36.     An individual won the foreclosure auction with a bid of approximately $23,100.00.

37.     Pursuant to Rule TX13.03(b), "[t]he [foreclosure] purchaser must meet all the criteria for licensing as set out in the Municipal Code of Chicago and [the BACP's] rules and regulations, including payment of the license transfer fee, license fees and any other fees, fines or taxes due and owing to the City." Rule TX13.03(b).

38.     Pursuant to Rule TX13.04(d), "[t]he taxicab medallion license must be sold to a person believed to be a qualified applicant . . ." Rule TX13.04(d); *see also* TX13.06(a).

39.     It is unclear if the individual purchaser of the medallion at the foreclosure auction is a qualified applicant under the Municipal Code of Chicago or BACP Taxi Rules. Regardless, because of the improper auction process instituted by Capital One, there is a strong likelihood that the individual purchaser will ultimately decide not to go forward with the foreclosure sale, thus

making Capital One the potential purchaser.

40.     Upon information and belief, Capital One is not a qualified applicant and has no intention of ever seeking licensure under the Municipal Code of Chicago or BACP Taxi Rules.

41.     The purpose behind the BACP Taxi Rules' foreclosure process is to facilitate keeping medallions operating on the street. If Capital One is allowed to purchase the medallions, with no intention of ever becoming licensed by the BACP, Capital One would be allowed to cause further harm to the taxicab industry and further benefit Uber.

42.     Therefore, the foreclosure sale did not comply with Rules TX13.03 and TX13.04 and the foreclosure auction resulted in an improper sale/purchase that violated the BACP Taxi Rules.

43.     Moreover, Capital One's intent behind the foreclosure sale is to destroy and cause further harm to Licensee, Tri Global, and Tri Global's owners and guarantors. Capital One has filed multiple actions against Licensee, Tri Global, and/or Tri Global's owners and guarantors and instead of allowing any of these cases to reach their natural conclusion, Capital One instead seeks to implement destructive tactics by foreclosing on the medallions in order to further destroy the medallion market by setting the prices and discouraging bids, all in violation of the Taxi Rules simply to inflict maximum damage and cause irreparable harm. In a recent case that was filed in the Circuit Court of Cook County, *Capital One Equipment Finance Corp. v. Chicago Elite Cab Corp., et al.*, No. 17 L 998, the Honorable Margaret A. Brennan dismissed Capital One's complaint but allowed Capital One leave to re-file its cause of action in another case currently pending in New York. That New York Action is *Capital One Equipment Finance Corp. v. The OSG Corp., Tri Global Financial Services, Inc. et al.*, No. 600749/2017. But, rather than re-file its case in the New York Action and pursue its alleged causes of action, Capital One instead chose to do an end

run around the litigation process and seeks to foreclose on the medallions at issue in an attempt to destroy Licensee, Tri Global and Tri Global's owners and guarantors. Capital One did not re-file its Chicago cause of action in the New York Action because it knows that counterclaims would be filed against it, which would expose Capital One's bad faith conduct in abusing its partnership with Tri Global and expose Capital One's bad faith relationship with Uber. The reality is that Capital One has filed numerous unsuccessful complaints in courts in New York and Chicago and, because these lawsuits have not been successful, Capital One is now attempting to cause as much harm as possible to Licensee and Tri Global before the counterclaims against Capital One are proven true and Capital One's bad faith is exposed.

## FOURTH DEFENSE
### (Improper Foreclosure Sale Process)

44.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

45.     On August 9, 2018, to start the foreclosure, Capital One opened the auction with an initial credit bid of $23,000.00.

46.     During the beginning part of the foreclosure auction, it became clear that no individuals were going to bid on the medallions because a foreclosure purchaser would have been liable for any and all liens on the medallions and such liability was unknown at the time of the auction. Capital One then stopped the foreclosure auction and announced to the individuals attending the auction that Capital One would work with any potential foreclosure purchasers and the bank to work out a deal on any liens on the medallion(s) bought at the auction. Capital One further stated that if the foreclosure purchaser and the bank could not work out an agreement concerning any liens on the medallions bought at the auction, Capital One would refund the foreclosure purchaser's money as if the foreclosure sale never took place. After this announcement,

Capital One resumed the auction.

47.     By instituting this type of foreclosure auction, Capital One created an improper foreclosure process that created false values and did not bind the foreclosure purchasers.

## FIFTH DEFENSE
### (Breach of Fiduciary Duty)

48.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

49.     As set forth above, Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin relied heavily on and trusted Capital One.

50.     By virtue of the parties' business relationship as set forth above, and by reason of the demonstrable level of trust and confidence upon which Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin depended and which Capital One knowingly accepted, Capital One owes certain fiduciary duties to Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin including, without limitation, a duty of good faith.

51.     As explained herein, for years Tri Global relied on Capital One to guide certain aspects of its taxi-medallion loan origination and servicing business. Although the Tri Global MJPA provided discretion to Capital One, that discretion did not include a right to abandon the lending market or purposely advance competing interests to destabilize the industry upon which the very loans that were being serviced were based.

52.     Ultimately, Capital One repudiated its commitments to Licensee and abandoned the Chicago medallion lending market so that it could pursue a competing venture with Uber.

53.     Capital One breached its duty of good faith, and the trust and confidence of Licensee by, among other things: precipitating, through its partnership with Uber, the collapse of the Chicago taxi medallion industry and the medallion industry nationwide, in addition to the

corresponding decline in the value of the taxi medallions at issue.

54.     Capital One engaged in an intentional course of wrongful conduct orchestrated to harm Licensee.

55.     Capital One's conduct was willful, wanton and in reckless disregard of the Licensee's contractual rights and was otherwise wrongful.

56.     As a direct and proximate result of Capital One's breach of its fiduciary duties, Licensee has suffered, and will continue to suffer, substantial damages.

**SIXTH DEFENSE**
**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

57.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

58.     Pursuant to the covenant of good faith and fair dealing, Capital One could not undertake any action that has the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

59.     As explained herein, Capital One breached the duty of good faith and fair dealing implied in the contract with Licensee by, among other things: precipitating, through its partnership with Uber, the collapse of the taxi medallion industry and concomitant decline in the value of the taxi medallions at issue.

60.     As a direct and proximate result of Capital One's breach of the implied covenant of good faith and fair dealing thereunder, Licensee has suffered, and will continue to suffer, substantial damages.

### SEVENTH DEFENSE
#### (Estoppel, Waiver, Ratification and/or Acquiescence)

61.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

62.     Capital One's claim of breach of contract / default is barred by the doctrines of estoppel, waiver, ratification and/or acquiescence.

### CONCLUSION

WHEREFORE, based upon the foregoing allegations and defenses and all reasons appearing of record, Licensee has timely submitted a completed Affidavit of Defense and, pursuant to the BACP Taxi Rules, no transfer upon foreclosure may be allowed except pursuant to an order of a court having jurisdiction. Licensee respectfully requests that the BACP deny Creditor's Request to Transfer Taxicab Medallion License Upon Foreclosure.

## AFFIDAVIT OF DEFENSE TO CREDITOR

To City:     **City of Chicago – Public Vehicle Operations Division**
             **Department of Business Affairs and Consumer Protection**
             **2350 W. Ogden Avenue, 1st Floor**
             **Chicago, IL 60608**
             **Attention: Monique Davids**

To Creditor:  **Capital One Equipment Finance Corp., f/k/a All Points Capital Corp.,**
             **d/b/a Capital One Taxi Medallion Finance**
             **c/o Troutman Sanders LLP**
             **Att'n: Andrew L. Buck**
             **875 Third Avenue**
             **New York, NY 10022**

RE: PUBLIC PASSENGER LICENSE NUMBER(s) <u>6612TX, 6613TX, 6614TX, 6615TX</u>

LICENSEE NAME: <u>Chicago Polo II, Inc.</u>

I, _____*Symon GARBER*_____, hereby swear that I own Taxicab Medallion License
     <small>Debtor Individual Name</small>
Number(s) <u>6612TX, 6613TX, 6614TX, 6615TX</u> either individually or through a company that I own and I have a defense

to the foreclosure of these licenses. I understand that this license(s) was sold at a foreclosure

sale on or about _____August 9, 2018_____ and that sale is contingent upon approval by the Department of Business Affairs
        <small>List Date of Foreclosure Sale</small>
and Consumer Protection.

My defense to this foreclosure is: (Use additional pages if needed)_____

_____*See attached Defense Document*_____

_____

_____

Signature: _____

Print Name: _____*Sherwin Edward*_____

Relationship to Medallion License/Title ___*VP and authorized signature agent*___

Address: ___*2617 S. Wabash Ave Chicago IL 60616*___

Phone: ___*312 791-1255*___

Email Address: ___*Edwards@chicagocarriagecab.com*___

                  Subscribed and Sworn to before me

          this _22_ day of _Aug_____, 20_18_.

                                Notary Public

JANET DAVIS
Official Seal
Notary Public - State of Illinois
My Commission Expires Sep 20, 2019

## AFFIDAVIT OF DEFENSE TO CREDITOR

## DEFENSE DOCUMENT

In support of its Affidavit of Defense to Creditor, Licensee asserts the following defenses in opposition to the Creditor's ("Creditor" or "Capital One") request to transfer public passenger vehicle license upon foreclosure and to the foreclosure sale: (1) Capital One has no right to foreclose on the medallions at issue; (2) Licensee does not owe the amount claimed by Capital One and has not defaulted on the agreement at issue with Capital One; (3) the foreclosure resulted in an improper foreclosure sale purchase that violated the BACP Taxi Rules; (4) Capital One instituted an improper foreclosure sale process; (5) Capital One breached its fiduciary duty to Licensee; (6) Capital One breached the implied covenant of good faith and fair dealing; (7) Capital One's claim of breach of contract / default is barred by the doctrines of estoppel, waiver, ratification and/or acquiescence. Because Licensee has timely submitted a completed Affidavit of Defense, pursuant to the BACP Taxi Rules, no transfer upon foreclosure may be allowed except pursuant to an order of a court having jurisdiction. Therefore, Licensee respectfully requests that the BACP deny Creditor's Request to Transfer Taxicab Medallion License Upon Foreclosure.

## FACTUAL BACKGROUND

1.      Symon Garber formed Tri Global Financial Services, Inc. ("Tri Global") in 2004, along with Roman Sapino and others, to provide capital to taxicab medallion owners. Tri Global's principal, Roman Sapino, also has many years of experience in the taxicab financing industry and has been involved in successful taxicab enterprises in New York and Chicago. Tri Global's co-owners include Galina Garber-Sheinin and Valentina Zubok. Irene Gans and Maya Zubok are related to an owner of Tri Global.

2.      Tri Global is a corporation formed and existing under the laws of the State of

Illinois, maintaining offices at 2617 S. Wabash Avenue, Chicago, Illinois 60616. Tri Global is engaged in the business of financing and servicing Chicago-based taxi medallion loans as well as offering second-position financing to the taxi industry.

3.      Upon information and belief, Capital One is a corporation formed and existing under the laws of the State of New York, maintaining a principal place of business at 265 Broadhollow Road, Melville, New York 11747.

4.      Tri Global was formed to provide loans to purchasers of public passenger vehicle licenses and medallions in the Chicago market, which confers the right to operate a taxicab in Chicago pursuant to the regulations issued and regulated by the City of Chicago Department of Business Affairs and Consumer Protection ("BACP").

5.      Tri Global offered medallion and other financing to a wide-variety of borrowers, including taxicab businesses that rely on the medallion-secured loans to earn their livelihoods. Tri Global primarily focused its business on servicing taxi medallion loans for various lenders and also offered second-position financing to the taxi industry. In or around 2006 Tri Global was approached by North Fork Bank, which expressed interest in partnering with Tri Global to expand the scope of its lending platform.

6.      Over the next several years, Tri Global and North Fork Bank entered into numerous successful loan participations. When North Fork Bank was acquired by Capital One in or about 2006/2007, this practice continued with Capital One.

7.      Capital One was even more eager than North Fork Bank to capitalize upon Tri Global's contacts in the Chicago marketplace and strongly encouraged Tri Global to aggressively seek prospects for additional medallion loans. Capital One and Tri Global participated in the loans on a loan-by-loan basis for several years.

8.     In 2010, Capital One requested that Tri Global enter into a more formal arrangement by way of a master participation agreement, to which Tri Global agreed. The terms and conditions governing that relationship and Capital One's senior participation interests in the loans are more particularly set forth in a certain Master Joint Participation Agreement, dated August 2, 2010 (the "MJPA" or the "Tri Global MJPA").

9.     In connection with the Tri Global MJPA, Symon Garber, Roman Sapino, Ruben Giacomozzi, Valentina Zubok, and Galina Garber-Sheinin signed the Tri Global Guaranty, dated August 2, 2010.

10.     Pursuant to the terms of the MJPA, Tri Global generated business, handled collections, serviced the loans and remitted monthly payments to Capital One in accordance with the amount of its participation in each underlying loan while Capital One held senior participation interests in the various loans made and serviced by Tri Global to owners of Chicago taxicab medallions (the "Loans"). The Tri Global MJPA contemplates the sale of senior participation interests in loans issued and/or originated by Tri Global to owners and operators of taxi medallions. As reflected in the Tri Global MJPA, after Tri Global sells a participation interest, it continues to service the debt owed thereunder. In exchange for its services, Tri Global receives a servicing fee that is paid from the debt-service payments remitted to Tri Global each month.

11.     Since the inception of the Tri Global/Capital One relationship, the parties have participated in many loans. Although Tri Global originated the medallion-secured loans and served as the official loan servicer for the loan portfolio, Tri Global relied on and trusted Capital One and its commercial finance expertise. This relationship was often characterized by Capital One as a "team" and "partnership" and its officers and representatives, including David Cin ("Cin") and others, regularly commented that the success of the portfolio was the product of a "team effort."

12.     Although Capital One historically had no real presence in the Chicago medallion market, Capital One was eager to exploit Tri Global's connections to the taxicab medallion market and capitalize upon Tri Global's market dominance in the Chicago taxi-medallion economy. Capital One strongly encouraged Tri Global to aggressively acquire additional Chicago-based medallion loans.

13.     As the value of Chicago taxi medallion loans continued to rise, Capital One continued to aggressively press Tri Global to originate new loans so that Capital One could further capitalize on its market position and emerge as a leading taxi medallion lender in Chicago.

14.     Throughout the course of the Master Joint Participation Agreement, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin – whose interests were closely aligned with those of Capital One – worked with Capital One to maximize the return on the medallion loans.

15.     Tri Global originated the agreement/loan at issue between Licensee and Capital One based on Tri Global's relationship with Capital One.

16.     Despite its long-standing business venture with Tri Global, Capital One engaged in intentional and systematic efforts to line its own pockets to the detriment of Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin. As explained below, Capital One engaged in irreconcilable conflicts of interest, bad faith business practices, and intentionally disregarded its duty of good faith to Licensee and Tri Global when it partnered with a major taxi-industry competitor, Uber Technologies, Inc. ("Uber").

17.     In or about late 2013 and early 2014, and unbeknownst to Licensee and Tri Global (and many other Capital One loan participants and medallion-secured borrowers), Capital One began secretly planning to change course and exit the medallion market to partner with the

industry's most ominous competitor, Uber. Notwithstanding this new partnership, Capital One, either intentionally or recklessly, continued to encourage Tri Global to cultivate new medallion-secured loans while concealing its intention to partner with Uber.

18.     News of Capital One's partnership with Uber surfaced in approximately mid-2014, and was followed by an aggressive nationwide marketing campaign launched by Capital One. The marketing campaign and promotions touted Capital One's "unique new partnership" with Uber and underscored the "common focus" of both companies.

19.     Capital One began offering significant incentives to its consumers to choose Uber vehicles over properly licensed and regulated taxis – including offering free and discounted Uber rides and other similar promotions such as a 20% discount on all Uber rides when paid with a Capital One "Quicksilver" credit card. Capital One offered new customers two free Uber rides worth up to $60.00. Capital One created a new website promoting these incentives and further signaling its collaboration with Uber: "capitalone.com/uber".

20.     Capital One's partnership with Uber came as a great shock to Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin as the partnership was never disclosed to them prior to the 2014 marketing blitz. At no point in the parties' relationship was it ever contemplated that Capital One would undertake any action to undermine the taxi industry, the agreement at issue, or the value of Tri Global's and Capital One's loan portfolio.

21.     In partnering with and promoting Uber's ride-share services, Capital One and Uber's assault on the taxi industry has been instrumental in bringing about the destabilization of the Chicago taxi medallion market.

22.     In 2014, when Capital One began its partnership with Uber, the Chicago market softened dramatically. Sometime during mid-2014, funding to the medallion industry came to a

total halt. This was clearly tied to Capital One's partnership with Uber.

23.     By 2015, Uber reported that taxi usage nationwide had precipitously decreased while the number of customers using Uber increased correspondingly.

24.     The disruption of the taxi industry resulting from Capital One's partnership with Uber contributed to the reduction in value of the Chicago taxi medallions securing the loans.

25.     In short, Capital One has caused the price of the Chicago taxi medallions that secure the loans to plummet.

26.     Moreover, Capital One has sabotaged Tri Global, Symon Garber, Valentina Zubok, Galina Garber-Sheinin and Licensee's efforts to favorably restructure and/or modify the medallion-secured loans at issue.

27.     Accordingly, Capital One has materially breached the credit agreement and Licensee is not liable for the amount allegedly owed pursuant to the credit agreement.

## FIRST DEFENSE
### (No Right to Foreclose)

28.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

29.     Capital One, through its partnership with Uber, precipitated the collapse of the Chicago taxi medallion industry and the medallion industry nationwide, in addition to the corresponding decline in the value of the taxi medallions at issue.

30.     Based on Capital One's willful misconduct, breach of contract, malfeasance, wrongdoing and/or other intentional and/or reckless conduct, Capital One has no right to foreclose on the medallions at issue.

## SECOND DEFENSE
### (No Default by Licensee)

31.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

32.     Licensee does not owe the amount claimed by Capital One and has not defaulted on the agreement at issue with Capital One.

33.     Therefore, Capital One has no right to foreclose on the medallions at issue.

## THIRD DEFENSE
### (Improper Foreclosure Sale Purchase)

34.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

35.     On August 9, 2018, to start the foreclosure, Capital One opened the auction with an initial credit bid of $23,000.00.

36.     Capital One won the foreclosure auction with its initial $23,000.00 credit bid.

37.     Pursuant to Rule TX13.03(b), "[t]he [foreclosure] purchaser must meet all the criteria for licensing as set out in the Municipal Code of Chicago and [the BACP's] rules and regulations, including payment of the license transfer fee, license fees and any other fees, fines or taxes due and owing to the City." Rule TX13.03(b).

38.     Pursuant to Rule TX13.04(d), "[t]he taxicab medallion license must be sold to a person believed to be a qualified applicant . . ." Rule TX13.04(d); *see also* TX13.06(a).

39.     Upon information and belief, Capital One is not a qualified applicant and has no intention of ever seeking licensure under the Municipal Code of Chicago or BACP Taxi Rules.

40.     The purpose behind the BACP Taxi Rules' foreclosure process is to facilitate keeping medallions operating on the street. If Capital One is allowed to purchase the medallions,

with no intention of ever becoming licensed by the BACP, Capital One would be allowed to cause further harm to the taxicab industry and further benefit Uber.

41.     Therefore, the foreclosure sale did not comply with Rules TX13.03 and TX13.04 and the foreclosure auction resulted in an improper sale/purchase that violated the BACP Taxi Rules.

42.     Moreover, Capital One's intent behind the foreclosure sale is to destroy and cause further harm to Licensee, Tri Global, and Tri Global's owners and guarantors. Capital One has filed multiple actions against Licensee, Tri Global, and/or Tri Global's owners and guarantors and instead of allowing any of these cases to reach their natural conclusion, Capital One instead seeks to implement destructive tactics by foreclosing on the medallions in order to further destroy the medallion market by setting the prices and discouraging bids, all in violation of the Taxi Rules simply to inflict maximum damage and cause irreparable harm. In a recent case that was filed in the Circuit Court of Cook County, *Capital One Equipment Finance Corp. v. Chicago Elite Cab Corp., et al.*, No. 17 L 998, the Honorable Margaret A. Brennan dismissed Capital One's complaint but allowed Capital One leave to re-file its cause of action in another case currently pending in New York. That New York Action is *Capital One Equipment Finance Corp. v. The OSG Corp., Tri Global Financial Services, Inc. et al.*, No. 600749/2017. But, rather than re-file its case in the New York Action and pursue its alleged causes of action, Capital One instead chose to do an end run around the litigation process and seeks to foreclose on the medallions at issue in an attempt to destroy Licensee, Tri Global and Tri Global's owners and guarantors. Capital One did not re-file its Chicago cause of action in the New York Action because it knows that counterclaims would be filed against it, which would expose Capital One's bad faith conduct in abusing its partnership with Tri Global and expose Capital One's bad faith relationship with Uber. The reality is that

Capital One has filed numerous unsuccessful complaints in courts in New York and Chicago and, because these lawsuits have not been successful, Capital One is now attempting to cause as much harm as possible to Licensee and Tri Global before the counterclaims against Capital One are proven true and Capital One's bad faith is exposed.

## FOURTH DEFENSE
### (Improper Foreclosure Sale Process)

43.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

44.     On August 9, 2018, to start the foreclosure, Capital One opened the auction with an initial credit bid of $23,000.00.

45.     During the beginning part of the foreclosure auction, it became clear that no individuals were going to bid on the medallions because a foreclosure purchaser would have been liable for any and all liens on the medallions and such liability was unknown at the time of the auction. Capital One then stopped the foreclosure auction and announced to the individuals attending the auction that Capital One would work with any potential foreclosure purchasers and the bank to work out a deal on any liens on the medallion(s) bought at the auction. Capital One further stated that if the foreclosure purchaser and the bank could not work out an agreement concerning any liens on the medallions bought at the auction, Capital One would refund the foreclosure purchaser's money as if the foreclosure sale never took place. After this announcement, Capital One resumed the auction.

46.     By instituting this type of foreclosure auction, Capital One created an improper foreclosure process that created false values and did not bind the foreclosure purchasers.

## FIFTH DEFENSE
### (Breach of Fiduciary Duty)

47.    Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

48.    As set forth above, Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin relied heavily on and trusted Capital One.

49.    By virtue of the parties' business relationship as set forth above, and by reason of the demonstrable level of trust and confidence upon which Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin depended and which Capital One knowingly accepted, Capital One owes certain fiduciary duties to Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin including, without limitation, a duty of good faith.

50.    As explained herein, for years Tri Global relied on Capital One to guide certain aspects of its taxi-medallion loan origination and servicing business. Although the Tri Global MJPA provided discretion to Capital One, that discretion did not include a right to abandon the lending market or purposely advance competing interests to destabilize the industry upon which the very loans that were being serviced were based.

51.    Ultimately, Capital One repudiated its commitments to Licensee and abandoned the Chicago medallion lending market so that it could pursue a competing venture with Uber.

52.    Capital One breached its duty of good faith, and the trust and confidence of Licensee by, among other things: precipitating, through its partnership with Uber, the collapse of the Chicago taxi medallion industry and the medallion industry nationwide, in addition to the corresponding decline in the value of the taxi medallions at issue.

53.    Capital One engaged in an intentional course of wrongful conduct orchestrated to harm Licensee.

54.     Capital One's conduct was willful, wanton and in reckless disregard of the Licensee's contractual rights and was otherwise wrongful.

55.     As a direct and proximate result of Capital One's breach of its fiduciary duties, Licensee has suffered, and will continue to suffer, substantial damages.

## SIXTH DEFENSE
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

56.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

57.     Pursuant to the covenant of good faith and fair dealing, Capital One could not undertake any action that has the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

58.     As explained herein, Capital One breached the duty of good faith and fair dealing implied in the contract with Licensee by, among other things: precipitating, through its partnership with Uber, the collapse of the taxi medallion industry and concomitant decline in the value of the taxi medallions at issue.

59.     As a direct and proximate result of Capital One's breach of the implied covenant of good faith and fair dealing thereunder, Licensee has suffered, and will continue to suffer, substantial damages.

## SEVENTH DEFENSE
### (Estoppel, Waiver, Ratification and/or Acquiescence)

60.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

61.     Capital One's claim of breach of contract / default is barred by the doctrines of estoppel, waiver, ratification and/or acquiescence.

## **CONCLUSION**

WHEREFORE, based upon the foregoing allegations and defenses and all reasons appearing of record, Licensee has timely submitted a completed Affidavit of Defense and, pursuant to the BACP Taxi Rules, no transfer upon foreclosure may be allowed except pursuant to an order of a court having jurisdiction. Licensee respectfully requests that the BACP deny Creditor's Request to Transfer Taxicab Medallion License Upon Foreclosure.

## AFFIDAVIT OF DEFENSE TO CREDITOR

**To City:**  City of Chicago – Public Vehicle Operations Division
Department of Business Affairs and Consumer Protection
2350 W. Ogden Avenue, 1st Floor
Chicago, IL 60608
Attention: Monique Davids

**To Creditor:**  Capital One Equipment Finance Corp., f/k/a All Points Capital Corp.,
d/b/a Capital One Taxi Medallion Finance
c/o Troutman Sanders LLP
Att'n: Andrew L. Buck
875 Third Avenue
New York, NY 10022

RE: PUBLIC PASSENGER LICENSE NUMBER(s) <u>6616TX</u>

LICENSEE NAME: <u>Chicago Polo II, Inc.</u>

I, _Symon Garber_ , hereby swear that I own Taxicab Medallion License
<span style="font-size:smaller">Debtor Individual Name</span>

Number(s) <u>6616TX</u> either individually or through a company that I own and I have a defense to the foreclosure of these

licenses. I understand that this license(s) was sold at a foreclosure

sale on or about _____August 9, 2018_____ and that sale is contingent upon approval by the Department of Business Affairs
<span style="font-size:smaller">List Date of Foreclosure Sale</span>
and Consumer Protection.

My defense to this foreclosure is: (Use additional pages if needed)_____

_____See attached Defense Document_____

_____

_____

Signature: _____

Print Name: _Sheinin Edward_

Relationship to Medallion License/Title _Vice President & Authorized Agent_

Address: _2611 S Wabash Ave Chicago, IL 60616_

Phone: _312.791.1255_

Email Address: _edwards@chicagocarriagecab.com_

Subscribed and Sworn to before me

this _22_ day of _Aug_____, 20 _18_ .

_____
Notary Public

JANET DAVIS
Official Seal
Notary Public - State of Illinois
My Commission Expires Sep ..., 2019

## AFFIDAVIT OF DEFENSE TO CREDITOR

### DEFENSE DOCUMENT

In support of its Affidavit of Defense to Creditor, Licensee asserts the following defenses in opposition to the Creditor's ("Creditor" or "Capital One") request to transfer public passenger vehicle license upon foreclosure and to the foreclosure sale: (1) Capital One has no right to foreclose on the medallion at issue; (2) Licensee does not owe the amount claimed by Capital One and has not defaulted on the agreement at issue with Capital One; (3) the foreclosure resulted in an improper foreclosure sale purchase that violated the BACP Taxi Rules; (4) Capital One instituted an improper foreclosure sale process; (5) Capital One breached its fiduciary duty to Licensee; (6) Capital One breached the implied covenant of good faith and fair dealing; (7) Capital One's claim of breach of contract / default is barred by the doctrines of estoppel, waiver, ratification and/or acquiescence. Because Licensee has timely submitted a completed Affidavit of Defense, pursuant to the BACP Taxi Rules, no transfer upon foreclosure may be allowed except pursuant to an order of a court having jurisdiction. Therefore, Licensee respectfully requests that the BACP deny Creditor's Request to Transfer Taxicab Medallion License Upon Foreclosure.

### FACTUAL BACKGROUND

1.    Symon Garber formed Tri Global Financial Services, Inc. ("Tri Global") in 2004, along with Roman Sapino and others, to provide capital to taxicab medallion owners. Tri Global's principal, Roman Sapino, also has many years of experience in the taxicab financing industry and has been involved in successful taxicab enterprises in New York and Chicago. Tri Global's co-owners include Galina Garber-Sheinin and Valentina Zubok. Irene Gans and Maya Zubok are related to an owner of Tri Global.

2.    Tri Global is a corporation formed and existing under the laws of the State of

Illinois, maintaining offices at 2617 S. Wabash Avenue, Chicago, Illinois 60616. Tri Global is engaged in the business of financing and servicing Chicago-based taxi medallion loans as well as offering second-position financing to the taxi industry.

3.     Upon information and belief, Capital One is a corporation formed and existing under the laws of the State of New York, maintaining a principal place of business at 265 Broadhollow Road, Melville, New York 11747.

4.     Tri Global was formed to provide loans to purchasers of public passenger vehicle licenses and medallions in the Chicago market, which confers the right to operate a taxicab in Chicago pursuant to the regulations issued and regulated by the City of Chicago Department of Business Affairs and Consumer Protection ("BACP").

5.     Tri Global offered medallion and other financing to a wide-variety of borrowers, including taxicab businesses that rely on the medallion-secured loans to earn their livelihoods. Tri Global primarily focused its business on servicing taxi medallion loans for various lenders and also offered second-position financing to the taxi industry. In or around 2006 Tri Global was approached by North Fork Bank, which expressed interest in partnering with Tri Global to expand the scope of its lending platform.

6.     Over the next several years, Tri Global and North Fork Bank entered into numerous successful loan participations. When North Fork Bank was acquired by Capital One in or about 2006/2007, this practice continued with Capital One.

7.     Capital One was even more eager than North Fork Bank to capitalize upon Tri Global's contacts in the Chicago marketplace and strongly encouraged Tri Global to aggressively seek prospects for additional medallion loans. Capital One and Tri Global participated in the loans on a loan-by-loan basis for several years.

62106750.v1                                  2

8.     In 2010, Capital One requested that Tri Global enter into a more formal arrangement by way of a master participation agreement, to which Tri Global agreed. The terms and conditions governing that relationship and Capital One's senior participation interests in the loans are more particularly set forth in a certain Master Joint Participation Agreement, dated August 2, 2010 (the "MJPA" or the "Tri Global MJPA").

9.     In connection with the Tri Global MJPA, Symon Garber, Roman Sapino, Ruben Giacomozzi, Valentina Zubok, and Galina Garber-Sheinin signed the Tri Global Guaranty, dated August 2, 2010.

10.     Pursuant to the terms of the MJPA, Tri Global generated business, handled collections, serviced the loans and remitted monthly payments to Capital One in accordance with the amount of its participation in each underlying loan while Capital One held senior participation interests in the various loans made and serviced by Tri Global to owners of Chicago taxicab medallions (the "Loans"). The Tri Global MJPA contemplates the sale of senior participation interests in loans issued and/or originated by Tri Global to owners and operators of taxi medallions. As reflected in the Tri Global MJPA, after Tri Global sells a participation interest, it continues to service the debt owed thereunder. In exchange for its services, Tri Global receives a servicing fee that is paid from the debt-service payments remitted to Tri Global each month.

11.     Since the inception of the Tri Global/Capital One relationship, the parties have participated in many loans. Although Tri Global originated the medallion-secured loans and served as the official loan servicer for the loan portfolio, Tri Global relied on and trusted Capital One and its commercial finance expertise. This relationship was often characterized by Capital One as a "team" and "partnership" and its officers and representatives, including David Cin ("Cin") and others, regularly commented that the success of the portfolio was the product of a "team effort."

12.     Although Capital One historically had no real presence in the Chicago medallion market, Capital One was eager to exploit Tri Global's connections to the taxicab medallion market and capitalize upon Tri Global's market dominance in the Chicago taxi-medallion economy. Capital One strongly encouraged Tri Global to aggressively acquire additional Chicago-based medallion loans.

13.     As the value of Chicago taxi medallion loans continued to rise, Capital One continued to aggressively press Tri Global to originate new loans so that Capital One could further capitalize on its market position and emerge as a leading taxi medallion lender in Chicago.

14.     Throughout the course of the Master Joint Participation Agreement, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin – whose interests were closely aligned with those of Capital One – worked with Capital One to maximize the return on the medallion loans.

15.     Tri Global originated the agreement/loan at issue between Licensee and Capital One based on Tri Global's relationship with Capital One.

16.     Despite its long-standing business venture with Tri Global, Capital One engaged in intentional and systematic efforts to line its own pockets to the detriment of Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin. As explained below, Capital One engaged in irreconcilable conflicts of interest, bad faith business practices, and intentionally disregarded its duty of good faith to Licensee and Tri Global when it partnered with a major taxi-industry competitor, Uber Technologies, Inc. ("Uber").

17.     In or about late 2013 and early 2014, and unbeknownst to Licensee and Tri Global (and many other Capital One loan participants and medallion-secured borrowers), Capital One began secretly planning to change course and exit the medallion market to partner with the

industry's most ominous competitor, Uber. Notwithstanding this new partnership, Capital One, either intentionally or recklessly, continued to encourage Tri Global to cultivate new medallion-secured loans while concealing its intention to partner with Uber.

18.     News of Capital One's partnership with Uber surfaced in approximately mid-2014, and was followed by an aggressive nationwide marketing campaign launched by Capital One. The marketing campaign and promotions touted Capital One's "unique new partnership" with Uber and underscored the "common focus" of both companies.

19.     Capital One began offering significant incentives to its consumers to choose Uber vehicles over properly licensed and regulated taxis – including offering free and discounted Uber rides and other similar promotions such as a 20% discount on all Uber rides when paid with a Capital One "Quicksilver" credit card. Capital One offered new customers two free Uber rides worth up to $60.00. Capital One created a new website promoting these incentives and further signaling its collaboration with Uber: "capitalone.com/uber".

20.     Capital One's partnership with Uber came as a great shock to Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin as the partnership was never disclosed to them prior to the 2014 marketing blitz. At no point in the parties' relationship was it ever contemplated that Capital One would undertake any action to undermine the taxi industry, the agreement at issue, or the value of Tri Global's and Capital One's loan portfolio.

21.     In partnering with and promoting Uber's ride-share services, Capital One and Uber's assault on the taxi industry has been instrumental in bringing about the destabilization of the Chicago taxi medallion market.

22.     In 2014, when Capital One began its partnership with Uber, the Chicago market softened dramatically. Sometime during mid-2014, funding to the medallion industry came to a

total halt. This was clearly tied to Capital One's partnership with Uber.

23.     By 2015, Uber reported that taxi usage nationwide had precipitously decreased while the number of customers using Uber increased correspondingly.

24.     The disruption of the taxi industry resulting from Capital One's partnership with Uber contributed to the reduction in value of the Chicago taxi medallions securing the loans.

25.     In short, Capital One has caused the price of the Chicago taxi medallions that secure the loans to plummet.

26.     Moreover, Capital One has sabotaged Tri Global, Symon Garber, Valentina Zubok, Galina Garber-Sheinin and Licensee's efforts to favorably restructure and/or modify the medallion-secured loans at issue.

27.     Accordingly, Capital One has materially breached the credit agreement and Licensee is not liable for the amount allegedly owed pursuant to the credit agreement.

### FIRST DEFENSE
### (No Right to Foreclose)

28.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

29.     Capital One, through its partnership with Uber, precipitated the collapse of the Chicago taxi medallion industry and the medallion industry nationwide, in addition to the corresponding decline in the value of the taxi medallions at issue.

30.     Based on Capital One's willful misconduct, breach of contract, malfeasance, wrongdoing and/or other intentional and/or reckless conduct, Capital One has no right to foreclose on the medallions at issue.

## SECOND DEFENSE
### (No Default by Licensee)

31.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

32.     Licensee does not owe the amount claimed by Capital One and has not defaulted on the agreement at issue with Capital One.

33.     Therefore, Capital One has no right to foreclose on the medallions at issue.

## THIRD DEFENSE
### (Improper Foreclosure Sale Purchase)

34.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

35.     On August 9, 2018, to start the foreclosure, Capital One opened the auction with an initial credit bid of $23,000.00.

36.     An individual won the foreclosure auction with a bid of approximately $23,100.00.

37.     Pursuant to Rule TX13.03(b), "[t]he [foreclosure] purchaser must meet all the criteria for licensing as set out in the Municipal Code of Chicago and [the BACP's] rules and regulations, including payment of the license transfer fee, license fees and any other fees, fines or taxes due and owing to the City." Rule TX13.03(b).

38.     Pursuant to Rule TX13.04(d), "[t]he taxicab medallion license must be sold to a person believed to be a qualified applicant . . ." Rule TX13.04(d); *see also* TX13.06(a).

39.     It is unclear if the individual purchaser of the medallion at the foreclosure auction is a qualified applicant under the Municipal Code of Chicago or BACP Taxi Rules. Regardless, because of the improper auction process instituted by Capital One, there is a strong likelihood that the individual purchaser will ultimately decide not to go forward with the foreclosure sale, thus

making Capital One the potential purchaser.

40.     Upon information and belief, Capital One is not a qualified applicant and has no intention of ever seeking licensure under the Municipal Code of Chicago or BACP Taxi Rules.

41.     The purpose behind the BACP Taxi Rules' foreclosure process is to facilitate keeping medallions operating on the street. If Capital One is allowed to purchase the medallions, with no intention of ever becoming licensed by the BACP, Capital One would be allowed to cause further harm to the taxicab industry and further benefit Uber.

42.     Therefore, the foreclosure sale did not comply with Rules TX13.03 and TX13.04 and the foreclosure auction resulted in an improper sale/purchase that violated the BACP Taxi Rules.

43.     Moreover, Capital One's intent behind the foreclosure sale is to destroy and cause further harm to Licensee, Tri Global, and Tri Global's owners and guarantors. Capital One has filed multiple actions against Licensee, Tri Global, and/or Tri Global's owners and guarantors and instead of allowing any of these cases to reach their natural conclusion, Capital One instead seeks to implement destructive tactics by foreclosing on the medallions in order to further destroy the medallion market by setting the prices and discouraging bids, all in violation of the Taxi Rules simply to inflict maximum damage and cause irreparable harm. In a recent case that was filed in the Circuit Court of Cook County, *Capital One Equipment Finance Corp. v. Chicago Elite Cab Corp., et al.*, No. 17 L 998, the Honorable Margaret A. Brennan dismissed Capital One's complaint but allowed Capital One leave to re-file its cause of action in another case currently pending in New York. That New York Action is *Capital One Equipment Finance Corp. v. The OSG Corp., Tri Global Financial Services, Inc. et al.*, No. 600749/2017. But, rather than re-file its case in the New York Action and pursue its alleged causes of action, Capital One instead chose to do an end

run around the litigation process and seeks to foreclose on the medallions at issue in an attempt to destroy Licensee, Tri Global and Tri Global's owners and guarantors. Capital One did not re-file its Chicago cause of action in the New York Action because it knows that counterclaims would be filed against it, which would expose Capital One's bad faith conduct in abusing its partnership with Tri Global and expose Capital One's bad faith relationship with Uber. The reality is that Capital One has filed numerous unsuccessful complaints in courts in New York and Chicago and, because these lawsuits have not been successful, Capital One is now attempting to cause as much harm as possible to Licensee and Tri Global before the counterclaims against Capital One are proven true and Capital One's bad faith is exposed.

## FOURTH DEFENSE
### (Improper Foreclosure Sale Process)

44.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

45.     On August 9, 2018, to start the foreclosure, Capital One opened the auction with an initial credit bid of $23,000.00.

46.     During the beginning part of the foreclosure auction, it became clear that no individuals were going to bid on the medallions because a foreclosure purchaser would have been liable for any and all liens on the medallions and such liability was unknown at the time of the auction. Capital One then stopped the foreclosure auction and announced to the individuals attending the auction that Capital One would work with any potential foreclosure purchasers and the bank to work out a deal on any liens on the medallion(s) bought at the auction. Capital One further stated that if the foreclosure purchaser and the bank could not work out an agreement concerning any liens on the medallions bought at the auction, Capital One would refund the foreclosure purchaser's money as if the foreclosure sale never took place. After this announcement,

Capital One resumed the auction.

47.     By instituting this type of foreclosure auction, Capital One created an improper foreclosure process that created false values and did not bind the foreclosure purchasers.

## FIFTH DEFENSE
### (Breach of Fiduciary Duty)

48.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

49.     As set forth above, Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin relied heavily on and trusted Capital One.

50.     By virtue of the parties' business relationship as set forth above, and by reason of the demonstrable level of trust and confidence upon which Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin depended and which Capital One knowingly accepted, Capital One owes certain fiduciary duties to Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin including, without limitation, a duty of good faith.

51.     As explained herein, for years Tri Global relied on Capital One to guide certain aspects of its taxi-medallion loan origination and servicing business. Although the Tri Global MJPA provided discretion to Capital One, that discretion did not include a right to abandon the lending market or purposely advance competing interests to destabilize the industry upon which the very loans that were being serviced were based.

52.     Ultimately, Capital One repudiated its commitments to Licensee and abandoned the Chicago medallion lending market so that it could pursue a competing venture with Uber.

53.     Capital One breached its duty of good faith, and the trust and confidence of Licensee by, among other things: precipitating, through its partnership with Uber, the collapse of the Chicago taxi medallion industry and the medallion industry nationwide, in addition to the

corresponding decline in the value of the taxi medallions at issue.

54. Capital One engaged in an intentional course of wrongful conduct orchestrated to harm Licensee.

55. Capital One's conduct was willful, wanton and in reckless disregard of the Licensee's contractual rights and was otherwise wrongful.

56. As a direct and proximate result of Capital One's breach of its fiduciary duties, Licensee has suffered, and will continue to suffer, substantial damages.

**SIXTH DEFENSE**
**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

57. Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

58. Pursuant to the covenant of good faith and fair dealing, Capital One could not undertake any action that has the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

59. As explained herein, Capital One breached the duty of good faith and fair dealing implied in the contract with Licensee by, among other things: precipitating, through its partnership with Uber, the collapse of the taxi medallion industry and concomitant decline in the value of the taxi medallions at issue.

60. As a direct and proximate result of Capital One's breach of the implied covenant of good faith and fair dealing thereunder, Licensee has suffered, and will continue to suffer, substantial damages.

## SEVENTH DEFENSE
### (Estoppel, Waiver, Ratification and/or Acquiescence)

61.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

62.     Capital One's claim of breach of contract / default is barred by the doctrines of estoppel, waiver, ratification and/or acquiescence.

## CONCLUSION

WHEREFORE, based upon the foregoing allegations and defenses and all reasons appearing of record, Licensee has timely submitted a completed Affidavit of Defense and, pursuant to the BACP Taxi Rules, no transfer upon foreclosure may be allowed except pursuant to an order of a court having jurisdiction. Licensee respectfully requests that the BACP deny Creditor's Request to Transfer Taxicab Medallion License Upon Foreclosure.

## AFFIDAVIT OF DEFENSE TO CREDITOR

To City:      City of Chicago – Public Vehicle Operations Division
                Department of Business Affairs and Consumer Protection
                2350 W. Ogden Avenue, 1st Floor
                Chicago, IL 60608
                Attention: Monique Davids

To Creditor:   Capital One Equipment Finance Corp., f/k/a All Points Capital Corp.,
                d/b/a Capital One Taxi Medallion Finance
                c/o Troutman Sanders LLP
                Att'n: Andrew L. Buck
                875 Third Avenue
                New York, NY 10022

RE: PUBLIC PASSENGER LICENSE NUMBER(s) <u>6611TX</u>

LICENSEE NAME: <u>Chicago Polo II, Inc.</u>

I, _Symon GARBER_, hereby swear that I own Taxicab Medallion License
    <small>Debtor Individual Name</small>

Number(s) <u>6611TX</u> either individually or through a company that I own and I have a defense to the foreclosure of these

licenses. I understand that this license(s) was sold at a foreclosure

sale on or about _____August 9, 2018_____ and that sale is contingent upon approval by the Department of Business Affairs
                  <small>List Date of Foreclosure Sale</small>
and Consumer Protection.

My defense to this foreclosure is: (Use additional pages if needed)_____

_____ _see attached Defense Document_ _____

_____

_____

Signature: _____

Print Name: ___Sheimin Edward_____

Relationship to Medallion License/Title ___VP and authorized signature agent___

Address: ___2617 S. Wabash Ave Chicago IL 60616___

Phone: ___312 791-1255___

Email Address: ___edwards@chicagocarriagecab.com___

Subscribed and Sworn to before me

this _22_ day of _Aug_____, 20_18_.

_____
                               Notary Public

> JANET DAVIS
> Official Seal
> Notary Public - State of Illinois
> My Commission Expires Sep 20, 2019

Version Date June 5, 2018

## AFFIDAVIT OF DEFENSE TO CREDITOR

## DEFENSE DOCUMENT

In support of its Affidavit of Defense to Creditor, Licensee asserts the following defenses in opposition to the Creditor's ("Creditor" or "Capital One") request to transfer public passenger vehicle license upon foreclosure and to the foreclosure sale: (1) Capital One has no right to foreclose on the medallion at issue; (2) Licensee does not owe the amount claimed by Capital One and has not defaulted on the agreement at issue with Capital One; (3) the foreclosure resulted in an improper foreclosure sale purchase that violated the BACP Taxi Rules; (4) Capital One instituted an improper foreclosure sale process; (5) Capital One breached its fiduciary duty to Licensee; (6) Capital One breached the implied covenant of good faith and fair dealing; (7) Capital One's claim of breach of contract / default is barred by the doctrines of estoppel, waiver, ratification and/or acquiescence. Because Licensee has timely submitted a completed Affidavit of Defense, pursuant to the BACP Taxi Rules, no transfer upon foreclosure may be allowed except pursuant to an order of a court having jurisdiction. Therefore, Licensee respectfully requests that the BACP deny Creditor's Request to Transfer Taxicab Medallion License Upon Foreclosure.

## FACTUAL BACKGROUND

1.      Symon Garber formed Tri Global Financial Services, Inc. ("Tri Global") in 2004, along with Roman Sapino and others, to provide capital to taxicab medallion owners. Tri Global's principal, Roman Sapino, also has many years of experience in the taxicab financing industry and has been involved in successful taxicab enterprises in New York and Chicago. Tri Global's co-owners include Galina Garber-Sheinin and Valentina Zubok. Irene Gans and Maya Zubok are related to an owner of Tri Global.

2.      Tri Global is a corporation formed and existing under the laws of the State of

Illinois, maintaining offices at 2617 S. Wabash Avenue, Chicago, Illinois 60616. Tri Global is engaged in the business of financing and servicing Chicago-based taxi medallion loans as well as offering second-position financing to the taxi industry.

3.    Upon information and belief, Capital One is a corporation formed and existing under the laws of the State of New York, maintaining a principal place of business at 265 Broadhollow Road, Melville, New York 11747.

4.    Tri Global was formed to provide loans to purchasers of public passenger vehicle licenses and medallions in the Chicago market, which confers the right to operate a taxicab in Chicago pursuant to the regulations issued and regulated by the City of Chicago Department of Business Affairs and Consumer Protection ("BACP").

5.    Tri Global offered medallion and other financing to a wide-variety of borrowers, including taxicab businesses that rely on the medallion-secured loans to earn their livelihoods. Tri Global primarily focused its business on servicing taxi medallion loans for various lenders and also offered second-position financing to the taxi industry. In or around 2006 Tri Global was approached by North Fork Bank, which expressed interest in partnering with Tri Global to expand the scope of its lending platform.

6.    Over the next several years, Tri Global and North Fork Bank entered into numerous successful loan participations. When North Fork Bank was acquired by Capital One in or about 2006/2007, this practice continued with Capital One.

7.    Capital One was even more eager than North Fork Bank to capitalize upon Tri Global's contacts in the Chicago marketplace and strongly encouraged Tri Global to aggressively seek prospects for additional medallion loans. Capital One and Tri Global participated in the loans on a loan-by-loan basis for several years.

8.    In 2010, Capital One requested that Tri Global enter into a more formal arrangement by way of a master participation agreement, to which Tri Global agreed. The terms and conditions governing that relationship and Capital One's senior participation interests in the loans are more particularly set forth in a certain Master Joint Participation Agreement, dated August 2, 2010 (the "MJPA" or the "Tri Global MJPA").

9.    In connection with the Tri Global MJPA, Symon Garber, Roman Sapino, Ruben Giacomozzi, Valentina Zubok, and Galina Garber-Sheinin signed the Tri Global Guaranty, dated August 2, 2010.

10.    Pursuant to the terms of the MJPA, Tri Global generated business, handled collections, serviced the loans and remitted monthly payments to Capital One in accordance with the amount of its participation in each underlying loan while Capital One held senior participation interests in the various loans made and serviced by Tri Global to owners of Chicago taxicab medallions (the "Loans"). The Tri Global MJPA contemplates the sale of senior participation interests in loans issued and/or originated by Tri Global to owners and operators of taxi medallions. As reflected in the Tri Global MJPA, after Tri Global sells a participation interest, it continues to service the debt owed thereunder. In exchange for its services, Tri Global receives a servicing fee that is paid from the debt-service payments remitted to Tri Global each month.

11.    Since the inception of the Tri Global/Capital One relationship, the parties have participated in many loans. Although Tri Global originated the medallion-secured loans and served as the official loan servicer for the loan portfolio, Tri Global relied on and trusted Capital One and its commercial finance expertise. This relationship was often characterized by Capital One as a "team" and "partnership" and its officers and representatives, including David Cin ("Cin") and others, regularly commented that the success of the portfolio was the product of a "team effort."

12.     Although Capital One historically had no real presence in the Chicago medallion market, Capital One was eager to exploit Tri Global's connections to the taxicab medallion market and capitalize upon Tri Global's market dominance in the Chicago taxi-medallion economy. Capital One strongly encouraged Tri Global to aggressively acquire additional Chicago-based medallion loans.

13.     As the value of Chicago taxi medallion loans continued to rise, Capital One continued to aggressively press Tri Global to originate new loans so that Capital One could further capitalize on its market position and emerge as a leading taxi medallion lender in Chicago.

14.     Throughout the course of the Master Joint Participation Agreement, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin – whose interests were closely aligned with those of Capital One – worked with Capital One to maximize the return on the medallion loans.

15.     Tri Global originated the agreement/loan at issue between Licensee and Capital One based on Tri Global's relationship with Capital One.

16.     Despite its long-standing business venture with Tri Global, Capital One engaged in intentional and systematic efforts to line its own pockets to the detriment of Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin. As explained below, Capital One engaged in irreconcilable conflicts of interest, bad faith business practices, and intentionally disregarded its duty of good faith to Licensee and Tri Global when it partnered with a major taxi-industry competitor, Uber Technologies, Inc. ("Uber").

17.     In or about late 2013 and early 2014, and unbeknownst to Licensee and Tri Global (and many other Capital One loan participants and medallion-secured borrowers), Capital One began secretly planning to change course and exit the medallion market to partner with the

industry's most ominous competitor, Uber. Notwithstanding this new partnership, Capital One, either intentionally or recklessly, continued to encourage Tri Global to cultivate new medallion-secured loans while concealing its intention to partner with Uber.

18.     News of Capital One's partnership with Uber surfaced in approximately mid-2014, and was followed by an aggressive nationwide marketing campaign launched by Capital One. The marketing campaign and promotions touted Capital One's "unique new partnership" with Uber and underscored the "common focus" of both companies.

19.     Capital One began offering significant incentives to its consumers to choose Uber vehicles over properly licensed and regulated taxis – including offering free and discounted Uber rides and other similar promotions such as a 20% discount on all Uber rides when paid with a Capital One "Quicksilver" credit card. Capital One offered new customers two free Uber rides worth up to $60.00. Capital One created a new website promoting these incentives and further signaling its collaboration with Uber: "capitalone.com/uber".

20.     Capital One's partnership with Uber came as a great shock to Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin as the partnership was never disclosed to them prior to the 2014 marketing blitz. At no point in the parties' relationship was it ever contemplated that Capital One would undertake any action to undermine the taxi industry, the agreement at issue, or the value of Tri Global's and Capital One's loan portfolio.

21.     In partnering with and promoting Uber's ride-share services, Capital One and Uber's assault on the taxi industry has been instrumental in bringing about the destabilization of the Chicago taxi medallion market.

22.     In 2014, when Capital One began its partnership with Uber, the Chicago market softened dramatically. Sometime during mid-2014, funding to the medallion industry came to a

total halt. This was clearly tied to Capital One's partnership with Uber.

23.     By 2015, Uber reported that taxi usage nationwide had precipitously decreased while the number of customers using Uber increased correspondingly.

24.     The disruption of the taxi industry resulting from Capital One's partnership with Uber contributed to the reduction in value of the Chicago taxi medallions securing the loans.

25.     In short, Capital One has caused the price of the Chicago taxi medallions that secure the loans to plummet.

26.     Moreover, Capital One has sabotaged Tri Global, Symon Garber, Valentina Zubok, Galina Garber-Sheinin and Licensee's efforts to favorably restructure and/or modify the medallion-secured loans at issue.

27.     Accordingly, Capital One has materially breached the credit agreement and Licensee is not liable for the amount allegedly owed pursuant to the credit agreement.

## **FIRST DEFENSE**
### (No Right to Foreclose)

28.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

29.     Capital One, through its partnership with Uber, precipitated the collapse of the Chicago taxi medallion industry and the medallion industry nationwide, in addition to the corresponding decline in the value of the taxi medallions at issue.

30.     Based on Capital One's willful misconduct, breach of contract, malfeasance, wrongdoing and/or other intentional and/or reckless conduct, Capital One has no right to foreclose on the medallions at issue.

## SECOND DEFENSE
### (No Default by Licensee)

31.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

32.     Licensee does not owe the amount claimed by Capital One and has not defaulted on the agreement at issue with Capital One.

33.     Therefore, Capital One has no right to foreclose on the medallions at issue.

## THIRD DEFENSE
### (Improper Foreclosure Sale Purchase)

34.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

35.     On August 9, 2018, to start the foreclosure, Capital One opened the auction with an initial credit bid of $23,000.00.

36.     An individual won the foreclosure auction with a bid of approximately $23,100.00.

37.     Pursuant to Rule TX13.03(b), "[t]he [foreclosure] purchaser must meet all the criteria for licensing as set out in the Municipal Code of Chicago and [the BACP's] rules and regulations, including payment of the license transfer fee, license fees and any other fees, fines or taxes due and owing to the City." Rule TX13.03(b).

38.     Pursuant to Rule TX13.04(d), "[t]he taxicab medallion license must be sold to a person believed to be a qualified applicant . . ." Rule TX13.04(d); *see also* TX13.06(a).

39.     It is unclear if the individual purchaser of the medallion at the foreclosure auction is a qualified applicant under the Municipal Code of Chicago or BACP Taxi Rules. Regardless, because of the improper auction process instituted by Capital One, there is a strong likelihood that the individual purchaser will ultimately decide not to go forward with the foreclosure sale, thus

making Capital One the potential purchaser.

40.     Upon information and belief, Capital One is not a qualified applicant and has no intention of ever seeking licensure under the Municipal Code of Chicago or BACP Taxi Rules.

41.     The purpose behind the BACP Taxi Rules' foreclosure process is to facilitate keeping medallions operating on the street. If Capital One is allowed to purchase the medallions, with no intention of ever becoming licensed by the BACP, Capital One would be allowed to cause further harm to the taxicab industry and further benefit Uber.

42.     Therefore, the foreclosure sale did not comply with Rules TX13.03 and TX13.04 and the foreclosure auction resulted in an improper sale/purchase that violated the BACP Taxi Rules.

43.     Moreover, Capital One's intent behind the foreclosure sale is to destroy and cause further harm to Licensee, Tri Global, and Tri Global's owners and guarantors. Capital One has filed multiple actions against Licensee, Tri Global, and/or Tri Global's owners and guarantors and instead of allowing any of these cases to reach their natural conclusion, Capital One instead seeks to implement destructive tactics by foreclosing on the medallions in order to further destroy the medallion market by setting the prices and discouraging bids, all in violation of the Taxi Rules simply to inflict maximum damage and cause irreparable harm. In a recent case that was filed in the Circuit Court of Cook County, *Capital One Equipment Finance Corp. v. Chicago Elite Cab Corp., et al.*, No. 17 L 998, the Honorable Margaret A. Brennan dismissed Capital One's complaint but allowed Capital One leave to re-file its cause of action in another case currently pending in New York. That New York Action is *Capital One Equipment Finance Corp. v. The OSG Corp., Tri Global Financial Services, Inc. et al.*, No. 600749/2017. But, rather than re-file its case in the New York Action and pursue its alleged causes of action, Capital One instead chose to do an end

run around the litigation process and seeks to foreclose on the medallions at issue in an attempt to destroy Licensee, Tri Global and Tri Global's owners and guarantors. Capital One did not re-file its Chicago cause of action in the New York Action because it knows that counterclaims would be filed against it, which would expose Capital One's bad faith conduct in abusing its partnership with Tri Global and expose Capital One's bad faith relationship with Uber. The reality is that Capital One has filed numerous unsuccessful complaints in courts in New York and Chicago and, because these lawsuits have not been successful, Capital One is now attempting to cause as much harm as possible to Licensee and Tri Global before the counterclaims against Capital One are proven true and Capital One's bad faith is exposed.

## FOURTH DEFENSE
### (Improper Foreclosure Sale Process)

44.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

45.     On August 9, 2018, to start the foreclosure, Capital One opened the auction with an initial credit bid of $23,000.00.

46.     During the beginning part of the foreclosure auction, it became clear that no individuals were going to bid on the medallions because a foreclosure purchaser would have been liable for any and all liens on the medallions and such liability was unknown at the time of the auction. Capital One then stopped the foreclosure auction and announced to the individuals attending the auction that Capital One would work with any potential foreclosure purchasers and the bank to work out a deal on any liens on the medallion(s) bought at the auction. Capital One further stated that if the foreclosure purchaser and the bank could not work out an agreement concerning any liens on the medallions bought at the auction, Capital One would refund the foreclosure purchaser's money as if the foreclosure sale never took place. After this announcement,

Capital One resumed the auction.

47.     By instituting this type of foreclosure auction, Capital One created an improper foreclosure process that created false values and did not bind the foreclosure purchasers.

**FIFTH DEFENSE**
**(Breach of Fiduciary Duty)**

48.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

49.     As set forth above, Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin relied heavily on and trusted Capital One.

50.     By virtue of the parties' business relationship as set forth above, and by reason of the demonstrable level of trust and confidence upon which Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin depended and which Capital One knowingly accepted, Capital One owes certain fiduciary duties to Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin including, without limitation, a duty of good faith.

51.     As explained herein, for years Tri Global relied on Capital One to guide certain aspects of its taxi-medallion loan origination and servicing business. Although the Tri Global MJPA provided discretion to Capital One, that discretion did not include a right to abandon the lending market or purposely advance competing interests to destabilize the industry upon which the very loans that were being serviced were based.

52.     Ultimately, Capital One repudiated its commitments to Licensee and abandoned the Chicago medallion lending market so that it could pursue a competing venture with Uber.

53.     Capital One breached its duty of good faith, and the trust and confidence of Licensee by, among other things: precipitating, through its partnership with Uber, the collapse of the Chicago taxi medallion industry and the medallion industry nationwide, in addition to the

corresponding decline in the value of the taxi medallions at issue.

54.     Capital One engaged in an intentional course of wrongful conduct orchestrated to harm Licensee.

55.     Capital One's conduct was willful, wanton and in reckless disregard of the Licensee's contractual rights and was otherwise wrongful.

56.     As a direct and proximate result of Capital One's breach of its fiduciary duties, Licensee has suffered, and will continue to suffer, substantial damages.

## SIXTH DEFENSE
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

57.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

58.     Pursuant to the covenant of good faith and fair dealing, Capital One could not undertake any action that has the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

59.     As explained herein, Capital One breached the duty of good faith and fair dealing implied in the contract with Licensee by, among other things: precipitating, through its partnership with Uber, the collapse of the taxi medallion industry and concomitant decline in the value of the taxi medallions at issue.

60.     As a direct and proximate result of Capital One's breach of the implied covenant of good faith and fair dealing thereunder, Licensee has suffered, and will continue to suffer, substantial damages.

**SEVENTH DEFENSE**
**(Estoppel, Waiver, Ratification and/or Acquiescence)**

61.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

62.     Capital One's claim of breach of contract / default is barred by the doctrines of estoppel, waiver, ratification and/or acquiescence.

## CONCLUSION

WHEREFORE, based upon the foregoing allegations and defenses and all reasons appearing of record, Licensee has timely submitted a completed Affidavit of Defense and, pursuant to the BACP Taxi Rules, no transfer upon foreclosure may be allowed except pursuant to an order of a court having jurisdiction. Licensee respectfully requests that the BACP deny Creditor's Request to Transfer Taxicab Medallion License Upon Foreclosure.

## AFFIDAVIT OF DEFENSE TO CREDITOR

To City:     City of Chicago – Public Vehicle Operations Division
             Department of Business Affairs and Consumer Protection
             2350 W. Ogden Avenue, 1st Floor
             Chicago, IL 60608
             Attention: Monique Davids

To Creditor: Capital One Equipment Finance Corp., f/k/a All Points Capital Corp.,
             d/b/a Capital One Taxi Medallion Finance
             c/o Troutman Sanders LLP
             Att'n: Andrew L. Buck
             875 Third Avenue
             New York, NY 10022

RE: PUBLIC PASSENGER LICENSE NUMBER(s) <u>6267TX, 6279TX, 6220TX, 6208TX, 5414TX & 1128TX</u>

LICENSEE NAME: <u>Chicago Polo III, Inc.</u>

I, _____Symon GARBER_____, hereby swear that I own Taxicab Medallion License
         <span style="font-size:smaller">Debtor Individual Name</span>

Number(s) <u>6267TX, 6279TX, 6220TX, 6208TX, 5414TX & 1128TX</u> either individually or through a company that I own

and I have a defense to the foreclosure of these licenses. I understand that this license(s) was sold at a foreclosure

sale on or about _____August 9, 2018_____ and that sale is contingent upon approval by the Department of Business Affairs
               <span style="font-size:smaller">List Date of Foreclosure Sale</span>

and Consumer Protection.

My defense to this foreclosure is: (Use additional pages if needed)_____

_____see attached Defense Document_____

_____

Signature: _____

Print Name: _____Sheimin Edward_____

Relationship to Medallion License/Title ___VP and authorized signature agent___

Address: __2617 S Wabash Ave Chicago ILL 60616__

Phone: __312 791-1255__

Email Address: __edward5@chicagocarriagecab.com__

Subscribed and Sworn to before me

this __22__ day of __Aug_____, 20__18__.

_____
Notary Public

JANET DAVIS
Notary Public - State of Illinois
Official Seal
My Commission Expires Sep 20 2019

Version Date June 5, 2018

## AFFIDAVIT OF DEFENSE TO CREDITOR

## DEFENSE DOCUMENT

In support of its Affidavit of Defense to Creditor, Licensee asserts the following defenses in opposition to the Creditor's ("Creditor" or "Capital One") request to transfer public passenger vehicle license upon foreclosure and to the foreclosure sale: (1) Capital One has no right to foreclose on the medallions at issue; (2) Licensee does not owe the amount claimed by Capital One and has not defaulted on the agreement at issue with Capital One; (3) the foreclosure resulted in an improper foreclosure sale purchase that violated the BACP Taxi Rules; (4) Capital One instituted an improper foreclosure sale process; (5) Capital One breached its fiduciary duty to Licensee; (6) Capital One breached the implied covenant of good faith and fair dealing; (7) Capital One's claim of breach of contract / default is barred by the doctrines of estoppel, waiver, ratification and/or acquiescence. Because Licensee has timely submitted a completed Affidavit of Defense, pursuant to the BACP Taxi Rules, no transfer upon foreclosure may be allowed except pursuant to an order of a court having jurisdiction. Therefore, Licensee respectfully requests that the BACP deny Creditor's Request to Transfer Taxicab Medallion License Upon Foreclosure.

## FACTUAL BACKGROUND

1.     Symon Garber formed Tri Global Financial Services, Inc. ("Tri Global") in 2004, along with Roman Sapino and others, to provide capital to taxicab medallion owners. Tri Global's principal, Roman Sapino, also has many years of experience in the taxicab financing industry and has been involved in successful taxicab enterprises in New York and Chicago. Tri Global's co-owners include Galina Garber-Sheinin and Valentina Zubok. Irene Gans and Maya Zubok are related to an owner of Tri Global.

2.     Tri Global is a corporation formed and existing under the laws of the State of

Illinois, maintaining offices at 2617 S. Wabash Avenue, Chicago, Illinois 60616. Tri Global is engaged in the business of financing and servicing Chicago-based taxi medallion loans as well as offering second-position financing to the taxi industry.

3.     Upon information and belief, Capital One is a corporation formed and existing under the laws of the State of New York, maintaining a principal place of business at 265 Broadhollow Road, Melville, New York 11747.

4.     Tri Global was formed to provide loans to purchasers of public passenger vehicle licenses and medallions in the Chicago market, which confers the right to operate a taxicab in Chicago pursuant to the regulations issued and regulated by the City of Chicago Department of Business Affairs and Consumer Protection ("BACP").

5.     Tri Global offered medallion and other financing to a wide-variety of borrowers, including taxicab businesses that rely on the medallion-secured loans to earn their livelihoods. Tri Global primarily focused its business on servicing taxi medallion loans for various lenders and also offered second-position financing to the taxi industry. In or around 2006 Tri Global was approached by North Fork Bank, which expressed interest in partnering with Tri Global to expand the scope of its lending platform.

6.     Over the next several years, Tri Global and North Fork Bank entered into numerous successful loan participations. When North Fork Bank was acquired by Capital One in or about 2006/2007, this practice continued with Capital One.

7.     Capital One was even more eager than North Fork Bank to capitalize upon Tri Global's contacts in the Chicago marketplace and strongly encouraged Tri Global to aggressively seek prospects for additional medallion loans. Capital One and Tri Global participated in the loans on a loan-by-loan basis for several years.

8.      In 2010, Capital One requested that Tri Global enter into a more formal arrangement by way of a master participation agreement, to which Tri Global agreed. The terms and conditions governing that relationship and Capital One's senior participation interests in the loans are more particularly set forth in a certain Master Joint Participation Agreement, dated August 2, 2010 (the "MJPA" or the "Tri Global MJPA").

9.      In connection with the Tri Global MJPA, Symon Garber, Roman Sapino, Ruben Giacomozzi, Valentina Zubok, and Galina Garber-Sheinin signed the Tri Global Guaranty, dated August 2, 2010.

10.      Pursuant to the terms of the MJPA, Tri Global generated business, handled collections, serviced the loans and remitted monthly payments to Capital One in accordance with the amount of its participation in each underlying loan while Capital One held senior participation interests in the various loans made and serviced by Tri Global to owners of Chicago taxicab medallions (the "Loans"). The Tri Global MJPA contemplates the sale of senior participation interests in loans issued and/or originated by Tri Global to owners and operators of taxi medallions. As reflected in the Tri Global MJPA, after Tri Global sells a participation interest, it continues to service the debt owed thereunder. In exchange for its services, Tri Global receives a servicing fee that is paid from the debt-service payments remitted to Tri Global each month.

11.      Since the inception of the Tri Global/Capital One relationship, the parties have participated in many loans. Although Tri Global originated the medallion-secured loans and served as the official loan servicer for the loan portfolio, Tri Global relied on and trusted Capital One and its commercial finance expertise. This relationship was often characterized by Capital One as a "team" and "partnership" and its officers and representatives, including David Cin ("Cin") and others, regularly commented that the success of the portfolio was the product of a "team effort."

12.     Although Capital One historically had no real presence in the Chicago medallion market, Capital One was eager to exploit Tri Global's connections to the taxicab medallion market and capitalize upon Tri Global's market dominance in the Chicago taxi-medallion economy. Capital One strongly encouraged Tri Global to aggressively acquire additional Chicago-based medallion loans.

13.     As the value of Chicago taxi medallion loans continued to rise, Capital One continued to aggressively press Tri Global to originate new loans so that Capital One could further capitalize on its market position and emerge as a leading taxi medallion lender in Chicago.

14.     Throughout the course of the Master Joint Participation Agreement, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin – whose interests were closely aligned with those of Capital One – worked with Capital One to maximize the return on the medallion loans.

15.     Tri Global originated the agreement/loan at issue between Licensee and Capital One based on Tri Global's relationship with Capital One.

16.     Despite its long-standing business venture with Tri Global, Capital One engaged in intentional and systematic efforts to line its own pockets to the detriment of Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin. As explained below, Capital One engaged in irreconcilable conflicts of interest, bad faith business practices, and intentionally disregarded its duty of good faith to Licensee and Tri Global when it partnered with a major taxi-industry competitor, Uber Technologies, Inc. ("Uber").

17.     In or about late 2013 and early 2014, and unbeknownst to Licensee and Tri Global (and many other Capital One loan participants and medallion-secured borrowers), Capital One began secretly planning to change course and exit the medallion market to partner with the

industry's most ominous competitor, Uber. Notwithstanding this new partnership, Capital One, either intentionally or recklessly, continued to encourage Tri Global to cultivate new medallion-secured loans while concealing its intention to partner with Uber.

18. News of Capital One's partnership with Uber surfaced in approximately mid-2014, and was followed by an aggressive nationwide marketing campaign launched by Capital One. The marketing campaign and promotions touted Capital One's "unique new partnership" with Uber and underscored the "common focus" of both companies.

19. Capital One began offering significant incentives to its consumers to choose Uber vehicles over properly licensed and regulated taxis – including offering free and discounted Uber rides and other similar promotions such as a 20% discount on all Uber rides when paid with a Capital One "Quicksilver" credit card. Capital One offered new customers two free Uber rides worth up to $60.00. Capital One created a new website promoting these incentives and further signaling its collaboration with Uber: "capitalone.com/uber".

20. Capital One's partnership with Uber came as a great shock to Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin as the partnership was never disclosed to them prior to the 2014 marketing blitz. At no point in the parties' relationship was it ever contemplated that Capital One would undertake any action to undermine the taxi industry, the agreement at issue, or the value of Tri Global's and Capital One's loan portfolio.

21. In partnering with and promoting Uber's ride-share services, Capital One and Uber's assault on the taxi industry has been instrumental in bringing about the destabilization of the Chicago taxi medallion market.

22. In 2014, when Capital One began its partnership with Uber, the Chicago market softened dramatically. Sometime during mid-2014, funding to the medallion industry came to a

total halt. This was clearly tied to Capital One's partnership with Uber.

23.     By 2015, Uber reported that taxi usage nationwide had precipitously decreased while the number of customers using Uber increased correspondingly.

24.     The disruption of the taxi industry resulting from Capital One's partnership with Uber contributed to the reduction in value of the Chicago taxi medallions securing the loans.

25.     In short, Capital One has caused the price of the Chicago taxi medallions that secure the loans to plummet.

26.     Moreover, Capital One has sabotaged Tri Global, Symon Garber, Valentina Zubok, Galina Garber-Sheinin and Licensee's efforts to favorably restructure and/or modify the medallion-secured loans at issue.

27.     Accordingly, Capital One has materially breached the credit agreement and Licensee is not liable for the amount allegedly owed pursuant to the credit agreement.

## FIRST DEFENSE
### (No Right to Foreclose)

28.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

29.     Capital One, through its partnership with Uber, precipitated the collapse of the Chicago taxi medallion industry and the medallion industry nationwide, in addition to the corresponding decline in the value of the taxi medallions at issue.

30.     Based on Capital One's willful misconduct, breach of contract, malfeasance, wrongdoing and/or other intentional and/or reckless conduct, Capital One has no right to foreclose on the medallions at issue.

## SECOND DEFENSE
### (No Default by Licensee)

31.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

32.     Licensee does not owe the amount claimed by Capital One and has not defaulted on the agreement at issue with Capital One.

33.     Therefore, Capital One has no right to foreclose on the medallions at issue.

## THIRD DEFENSE
### (Improper Foreclosure Sale Purchase)

34.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

35.     On August 9, 2018, to start the foreclosure, Capital One opened the auction with an initial credit bid of $23,000.00.

36.     Capital One won the foreclosure auction with its initial $23,000.00 credit bid.

37.     Pursuant to Rule TX13.03(b), "[t]he [foreclosure] purchaser must meet all the criteria for licensing as set out in the Municipal Code of Chicago and [the BACP's] rules and regulations, including payment of the license transfer fee, license fees and any other fees, fines or taxes due and owing to the City." Rule TX13.03(b).

38.     Pursuant to Rule TX13.04(d), "[t]he taxicab medallion license must be sold to a person believed to be a qualified applicant . . ." Rule TX13.04(d); *see also* TX13.06(a).

39.     Upon information and belief, Capital One is not a qualified applicant and has no intention of ever seeking licensure under the Municipal Code of Chicago or BACP Taxi Rules.

40.     The purpose behind the BACP Taxi Rules' foreclosure process is to facilitate keeping medallions operating on the street. If Capital One is allowed to purchase the medallions,

with no intention of ever becoming licensed by the BACP, Capital One would be allowed to cause further harm to the taxicab industry and further benefit Uber.

41.     Therefore, the foreclosure sale did not comply with Rules TX13.03 and TX13.04 and the foreclosure auction resulted in an improper sale/purchase that violated the BACP Taxi Rules.

42.     Moreover, Capital One's intent behind the foreclosure sale is to destroy and cause further harm to Licensee, Tri Global, and Tri Global's owners and guarantors. Capital One has filed multiple actions against Licensee, Tri Global, and/or Tri Global's owners and guarantors and instead of allowing any of these cases to reach their natural conclusion, Capital One instead seeks to implement destructive tactics by foreclosing on the medallions in order to further destroy the medallion market by setting the prices and discouraging bids, all in violation of the Taxi Rules simply to inflict maximum damage and cause irreparable harm. In a recent case that was filed in the Circuit Court of Cook County, *Capital One Equipment Finance Corp. v. Chicago Elite Cab Corp., et al.*, No. 17 L 998, the Honorable Margaret A. Brennan dismissed Capital One's complaint but allowed Capital One leave to re-file its cause of action in another case currently pending in New York. That New York Action is *Capital One Equipment Finance Corp. v. The OSG Corp., Tri Global Financial Services, Inc. et al.*, No. 600749/2017. But, rather than re-file its case in the New York Action and pursue its alleged causes of action, Capital One instead chose to do an end run around the litigation process and seeks to foreclose on the medallions at issue in an attempt to destroy Licensee, Tri Global and Tri Global's owners and guarantors. Capital One did not re-file its Chicago cause of action in the New York Action because it knows that counterclaims would be filed against it, which would expose Capital One's bad faith conduct in abusing its partnership with Tri Global and expose Capital One's bad faith relationship with Uber. The reality is that

Capital One has filed numerous unsuccessful complaints in courts in New York and Chicago and, because these lawsuits have not been successful, Capital One is now attempting to cause as much harm as possible to Licensee and Tri Global before the counterclaims against Capital One are proven true and Capital One's bad faith is exposed.

## FOURTH DEFENSE
### (Improper Foreclosure Sale Process)

43.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

44.     On August 9, 2018, to start the foreclosure, Capital One opened the auction with an initial credit bid of $23,000.00.

45.     During the beginning part of the foreclosure auction, it became clear that no individuals were going to bid on the medallions because a foreclosure purchaser would have been liable for any and all liens on the medallions and such liability was unknown at the time of the auction. Capital One then stopped the foreclosure auction and announced to the individuals attending the auction that Capital One would work with any potential foreclosure purchasers and the bank to work out a deal on any liens on the medallion(s) bought at the auction. Capital One further stated that if the foreclosure purchaser and the bank could not work out an agreement concerning any liens on the medallions bought at the auction, Capital One would refund the foreclosure purchaser's money as if the foreclosure sale never took place. After this announcement, Capital One resumed the auction.

46.     By instituting this type of foreclosure auction, Capital One created an improper foreclosure process that created false values and did not bind the foreclosure purchasers.

**FIFTH DEFENSE**
**(Breach of Fiduciary Duty)**

47.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

48.     As set forth above, Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin relied heavily on and trusted Capital One.

49.     By virtue of the parties' business relationship as set forth above, and by reason of the demonstrable level of trust and confidence upon which Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin depended and which Capital One knowingly accepted, Capital One owes certain fiduciary duties to Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin including, without limitation, a duty of good faith.

50.     As explained herein, for years Tri Global relied on Capital One to guide certain aspects of its taxi-medallion loan origination and servicing business. Although the Tri Global MJPA provided discretion to Capital One, that discretion did not include a right to abandon the lending market or purposely advance competing interests to destabilize the industry upon which the very loans that were being serviced were based.

51.     Ultimately, Capital One repudiated its commitments to Licensee and abandoned the Chicago medallion lending market so that it could pursue a competing venture with Uber.

52.     Capital One breached its duty of good faith, and the trust and confidence of Licensee by, among other things: precipitating, through its partnership with Uber, the collapse of the Chicago taxi medallion industry and the medallion industry nationwide, in addition to the corresponding decline in the value of the taxi medallions at issue.

53.     Capital One engaged in an intentional course of wrongful conduct orchestrated to harm Licensee.

54. Capital One's conduct was willful, wanton and in reckless disregard of the Licensee's contractual rights and was otherwise wrongful.

55. As a direct and proximate result of Capital One's breach of its fiduciary duties, Licensee has suffered, and will continue to suffer, substantial damages.

**SIXTH DEFENSE**
**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

56. Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

57. Pursuant to the covenant of good faith and fair dealing, Capital One could not undertake any action that has the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

58. As explained herein, Capital One breached the duty of good faith and fair dealing implied in the contract with Licensee by, among other things: precipitating, through its partnership with Uber, the collapse of the taxi medallion industry and concomitant decline in the value of the taxi medallions at issue.

59. As a direct and proximate result of Capital One's breach of the implied covenant of good faith and fair dealing thereunder, Licensee has suffered, and will continue to suffer, substantial damages.

**SEVENTH DEFENSE**
**(Estoppel, Waiver, Ratification and/or Acquiescence)**

60. Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

61. Capital One's claim of breach of contract / default is barred by the doctrines of estoppel, waiver, ratification and/or acquiescence.

**<u>CONCLUSION</u>**

WHEREFORE, based upon the foregoing allegations and defenses and all reasons appearing of record, Licensee has timely submitted a completed Affidavit of Defense and, pursuant to the BACP Taxi Rules, no transfer upon foreclosure may be allowed except pursuant to an order of a court having jurisdiction. Licensee respectfully requests that the BACP deny Creditor's Request to Transfer Taxicab Medallion License Upon Foreclosure.

## AFFIDAVIT OF DEFENSE TO CREDITOR

To City:    City of Chicago – Public Vehicle Operations Division
            Department of Business Affairs and Consumer Protection
            2350 W. Ogden Avenue, 1st Floor
            Chicago, IL 60608
            Attention: Monique Davids

To Creditor:  Capital One Equipment Finance Corp., f/k/a All Points Capital Corp.,
              d/b/a Capital One Taxi Medallion Finance
              c/o Troutman Sanders LLP
              Att'n: Andrew L. Buck
              875 Third Avenue
              New York, NY 10022

RE: PUBLIC PASSENGER LICENSE NUMBER(s) <u>2848TX, 3454TX, 3678TX, 3700TX, 5795TX & 6014TX</u>

LICENSEE NAME: <u>Chicago Polo IV, Inc.</u>

I, _____Symon GARBER_____, hereby swear that I own Taxicab Medallion License
          <sub>Debtor Individual Name</sub>

Number(s) <u>2848TX, 3454TX, 3678TX, 3700TX, 5795TX & 6014TX</u> either individually or through a company that I own

and I have a defense to the foreclosure of these licenses. I understand that this license(s) was sold at a foreclosure

sale on or about _____August 9, 2018_____ and that sale is contingent upon approval by the Department of Business Affairs
                   List Date of Foreclosure Sale
and Consumer Protection.

My defense to this foreclosure is: (Use additional pages if needed)_____

_____ see attached Defense Document _____

_____

Signature: _____

Print Name: _____ Sherwin Edward _____

Relationship to Medallion License/Title _____ VP and authorized signature agent _____

Address: _____ 2617 S. Wabash Ave Chicago IL 60616 _____

Phone: _____ 312 791-1255 _____

Email Address: _____ edwardsD@chicagocarriagecab.com _____

Subscribed and Sworn to before me

this 22 day of Aug, 20 18.

_____ Notary Public

JANET DAVIS
Official Seal
Notary Public - State of Illinois
My Commission Expires Sep 20, 2019

Version Date June 5, 2018

## AFFIDAVIT OF DEFENSE TO CREDITOR

## DEFENSE DOCUMENT

In support of its Affidavit of Defense to Creditor, Licensee asserts the following defenses in opposition to the Creditor's ("Creditor" or "Capital One") request to transfer public passenger vehicle license upon foreclosure and to the foreclosure sale: (1) Capital One has no right to foreclose on the medallions at issue; (2) Licensee does not owe the amount claimed by Capital One and has not defaulted on the agreement at issue with Capital One; (3) the foreclosure resulted in an improper foreclosure sale purchase that violated the BACP Taxi Rules; (4) Capital One instituted an improper foreclosure sale process; (5) Capital One breached its fiduciary duty to Licensee; (6) Capital One breached the implied covenant of good faith and fair dealing; (7) Capital One's claim of breach of contract / default is barred by the doctrines of estoppel, waiver, ratification and/or acquiescence. Because Licensee has timely submitted a completed Affidavit of Defense, pursuant to the BACP Taxi Rules, no transfer upon foreclosure may be allowed except pursuant to an order of a court having jurisdiction. Therefore, Licensee respectfully requests that the BACP deny Creditor's Request to Transfer Taxicab Medallion License Upon Foreclosure.

## FACTUAL BACKGROUND

1.    Symon Garber formed Tri Global Financial Services, Inc. ("Tri Global") in 2004, along with Roman Sapino and others, to provide capital to taxicab medallion owners. Tri Global's principal, Roman Sapino, also has many years of experience in the taxicab financing industry and has been involved in successful taxicab enterprises in New York and Chicago. Tri Global's co-owners include Galina Garber-Sheinin and Valentina Zubok. Irene Gans and Maya Zubok are related to an owner of Tri Global.

2.    Tri Global is a corporation formed and existing under the laws of the State of

Illinois, maintaining offices at 2617 S. Wabash Avenue, Chicago, Illinois 60616. Tri Global is engaged in the business of financing and servicing Chicago-based taxi medallion loans as well as offering second-position financing to the taxi industry.

3.    Upon information and belief, Capital One is a corporation formed and existing under the laws of the State of New York, maintaining a principal place of business at 265 Broadhollow Road, Melville, New York 11747.

4.    Tri Global was formed to provide loans to purchasers of public passenger vehicle licenses and medallions in the Chicago market, which confers the right to operate a taxicab in Chicago pursuant to the regulations issued and regulated by the City of Chicago Department of Business Affairs and Consumer Protection ("BACP").

5.    Tri Global offered medallion and other financing to a wide-variety of borrowers, including taxicab businesses that rely on the medallion-secured loans to earn their livelihoods. Tri Global primarily focused its business on servicing taxi medallion loans for various lenders and also offered second-position financing to the taxi industry. In or around 2006 Tri Global was approached by North Fork Bank, which expressed interest in partnering with Tri Global to expand the scope of its lending platform.

6.    Over the next several years, Tri Global and North Fork Bank entered into numerous successful loan participations. When North Fork Bank was acquired by Capital One in or about 2006/2007, this practice continued with Capital One.

7.    Capital One was even more eager than North Fork Bank to capitalize upon Tri Global's contacts in the Chicago marketplace and strongly encouraged Tri Global to aggressively seek prospects for additional medallion loans. Capital One and Tri Global participated in the loans on a loan-by-loan basis for several years.

8. In 2010, Capital One requested that Tri Global enter into a more formal arrangement by way of a master participation agreement, to which Tri Global agreed. The terms and conditions governing that relationship and Capital One's senior participation interests in the loans are more particularly set forth in a certain Master Joint Participation Agreement, dated August 2, 2010 (the "MJPA" or the "Tri Global MJPA").

9. In connection with the Tri Global MJPA, Symon Garber, Roman Sapino, Ruben Giacomozzi, Valentina Zubok, and Galina Garber-Sheinin signed the Tri Global Guaranty, dated August 2, 2010.

10. Pursuant to the terms of the MJPA, Tri Global generated business, handled collections, serviced the loans and remitted monthly payments to Capital One in accordance with the amount of its participation in each underlying loan while Capital One held senior participation interests in the various loans made and serviced by Tri Global to owners of Chicago taxicab medallions (the "Loans"). The Tri Global MJPA contemplates the sale of senior participation interests in loans issued and/or originated by Tri Global to owners and operators of taxi medallions. As reflected in the Tri Global MJPA, after Tri Global sells a participation interest, it continues to service the debt owed thereunder. In exchange for its services, Tri Global receives a servicing fee that is paid from the debt-service payments remitted to Tri Global each month.

11. Since the inception of the Tri Global/Capital One relationship, the parties have participated in many loans. Although Tri Global originated the medallion-secured loans and served as the official loan servicer for the loan portfolio, Tri Global relied on and trusted Capital One and its commercial finance expertise. This relationship was often characterized by Capital One as a "team" and "partnership" and its officers and representatives, including David Cin ("Cin") and others, regularly commented that the success of the portfolio was the product of a "team effort."

12.     Although Capital One historically had no real presence in the Chicago medallion market, Capital One was eager to exploit Tri Global's connections to the taxicab medallion market and capitalize upon Tri Global's market dominance in the Chicago taxi-medallion economy. Capital One strongly encouraged Tri Global to aggressively acquire additional Chicago-based medallion loans.

13.     As the value of Chicago taxi medallion loans continued to rise, Capital One continued to aggressively press Tri Global to originate new loans so that Capital One could further capitalize on its market position and emerge as a leading taxi medallion lender in Chicago.

14.     Throughout the course of the Master Joint Participation Agreement, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin – whose interests were closely aligned with those of Capital One – worked with Capital One to maximize the return on the medallion loans.

15.     Tri Global originated the agreement/loan at issue between Licensee and Capital One based on Tri Global's relationship with Capital One.

16.     Despite its long-standing business venture with Tri Global, Capital One engaged in intentional and systematic efforts to line its own pockets to the detriment of Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin. As explained below, Capital One engaged in irreconcilable conflicts of interest, bad faith business practices, and intentionally disregarded its duty of good faith to Licensee and Tri Global when it partnered with a major taxi-industry competitor, Uber Technologies, Inc. ("Uber").

17.     In or about late 2013 and early 2014, and unbeknownst to Licensee and Tri Global (and many other Capital One loan participants and medallion-secured borrowers), Capital One began secretly planning to change course and exit the medallion market to partner with the

industry's most ominous competitor, Uber. Notwithstanding this new partnership, Capital One, either intentionally or recklessly, continued to encourage Tri Global to cultivate new medallion-secured loans while concealing its intention to partner with Uber.

18.     News of Capital One's partnership with Uber surfaced in approximately mid-2014, and was followed by an aggressive nationwide marketing campaign launched by Capital One. The marketing campaign and promotions touted Capital One's "unique new partnership" with Uber and underscored the "common focus" of both companies.

19.     Capital One began offering significant incentives to its consumers to choose Uber vehicles over properly licensed and regulated taxis – including offering free and discounted Uber rides and other similar promotions such as a 20% discount on all Uber rides when paid with a Capital One "Quicksilver" credit card. Capital One offered new customers two free Uber rides worth up to $60.00. Capital One created a new website promoting these incentives and further signaling its collaboration with Uber: "capitalone.com/uber".

20.     Capital One's partnership with Uber came as a great shock to Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin as the partnership was never disclosed to them prior to the 2014 marketing blitz. At no point in the parties' relationship was it ever contemplated that Capital One would undertake any action to undermine the taxi industry, the agreement at issue, or the value of Tri Global's and Capital One's loan portfolio.

21.     In partnering with and promoting Uber's ride-share services, Capital One and Uber's assault on the taxi industry has been instrumental in bringing about the destabilization of the Chicago taxi medallion market.

22.     In 2014, when Capital One began its partnership with Uber, the Chicago market softened dramatically. Sometime during mid-2014, funding to the medallion industry came to a

total halt. This was clearly tied to Capital One's partnership with Uber.

23.     By 2015, Uber reported that taxi usage nationwide had precipitously decreased while the number of customers using Uber increased correspondingly.

24.     The disruption of the taxi industry resulting from Capital One's partnership with Uber contributed to the reduction in value of the Chicago taxi medallions securing the loans.

25.     In short, Capital One has caused the price of the Chicago taxi medallions that secure the loans to plummet.

26.     Moreover, Capital One has sabotaged Tri Global, Symon Garber, Valentina Zubok, Galina Garber-Sheinin and Licensee's efforts to favorably restructure and/or modify the medallion-secured loans at issue.

27.     Accordingly, Capital One has materially breached the credit agreement and Licensee is not liable for the amount allegedly owed pursuant to the credit agreement.

## FIRST DEFENSE
### (No Right to Foreclose)

28.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

29.     Capital One, through its partnership with Uber, precipitated the collapse of the Chicago taxi medallion industry and the medallion industry nationwide, in addition to the corresponding decline in the value of the taxi medallions at issue.

30.     Based on Capital One's willful misconduct, breach of contract, malfeasance, wrongdoing and/or other intentional and/or reckless conduct, Capital One has no right to foreclose on the medallions at issue.

## SECOND DEFENSE
### (No Default by Licensee)

31.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

32.     Licensee does not owe the amount claimed by Capital One and has not defaulted on the agreement at issue with Capital One.

33.     Therefore, Capital One has no right to foreclose on the medallions at issue.

## THIRD DEFENSE
### (Improper Foreclosure Sale Purchase)

34.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

35.     On August 9, 2018, to start the foreclosure, Capital One opened the auction with an initial credit bid of $23,000.00.

36.     Capital One won the foreclosure auction with its initial $23,000.00 credit bid.

37.     Pursuant to Rule TX13.03(b), "[t]he [foreclosure] purchaser must meet all the criteria for licensing as set out in the Municipal Code of Chicago and [the BACP's] rules and regulations, including payment of the license transfer fee, license fees and any other fees, fines or taxes due and owing to the City." Rule TX13.03(b).

38.     Pursuant to Rule TX13.04(d), "[t]he taxicab medallion license must be sold to a person believed to be a qualified applicant . . ." Rule TX13.04(d); *see also* TX13.06(a).

39.     Upon information and belief, Capital One is not a qualified applicant and has no intention of ever seeking licensure under the Municipal Code of Chicago or BACP Taxi Rules.

40.     The purpose behind the BACP Taxi Rules' foreclosure process is to facilitate keeping medallions operating on the street. If Capital One is allowed to purchase the medallions,

with no intention of ever becoming licensed by the BACP, Capital One would be allowed to cause further harm to the taxicab industry and further benefit Uber.

41.     Therefore, the foreclosure sale did not comply with Rules TX13.03 and TX13.04 and the foreclosure auction resulted in an improper sale/purchase that violated the BACP Taxi Rules.

42.     Moreover, Capital One's intent behind the foreclosure sale is to destroy and cause further harm to Licensee, Tri Global, and Tri Global's owners and guarantors. Capital One has filed multiple actions against Licensee, Tri Global, and/or Tri Global's owners and guarantors and instead of allowing any of these cases to reach their natural conclusion, Capital One instead seeks to implement destructive tactics by foreclosing on the medallions in order to further destroy the medallion market by setting the prices and discouraging bids, all in violation of the Taxi Rules simply to inflict maximum damage and cause irreparable harm. In a recent case that was filed in the Circuit Court of Cook County, *Capital One Equipment Finance Corp. v. Chicago Elite Cab Corp., et al.*, No. 17 L 998, the Honorable Margaret A. Brennan dismissed Capital One's complaint but allowed Capital One leave to re-file its cause of action in another case currently pending in New York. That New York Action is *Capital One Equipment Finance Corp. v. The OSG Corp., Tri Global Financial Services, Inc. et al.*, No. 600749/2017. But, rather than re-file its case in the New York Action and pursue its alleged causes of action, Capital One instead chose to do an end run around the litigation process and seeks to foreclose on the medallions at issue in an attempt to destroy Licensee, Tri Global and Tri Global's owners and guarantors. Capital One did not re-file its Chicago cause of action in the New York Action because it knows that counterclaims would be filed against it, which would expose Capital One's bad faith conduct in abusing its partnership with Tri Global and expose Capital One's bad faith relationship with Uber. The reality is that

Capital One has filed numerous unsuccessful complaints in courts in New York and Chicago and, because these lawsuits have not been successful, Capital One is now attempting to cause as much harm as possible to Licensee and Tri Global before the counterclaims against Capital One are proven true and Capital One's bad faith is exposed.

## FOURTH DEFENSE
### (Improper Foreclosure Sale Process)

43.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

44.     On August 9, 2018, to start the foreclosure, Capital One opened the auction with an initial credit bid of $23,000.00.

45.     During the beginning part of the foreclosure auction, it became clear that no individuals were going to bid on the medallions because a foreclosure purchaser would have been liable for any and all liens on the medallions and such liability was unknown at the time of the auction. Capital One then stopped the foreclosure auction and announced to the individuals attending the auction that Capital One would work with any potential foreclosure purchasers and the bank to work out a deal on any liens on the medallion(s) bought at the auction. Capital One further stated that if the foreclosure purchaser and the bank could not work out an agreement concerning any liens on the medallions bought at the auction, Capital One would refund the foreclosure purchaser's money as if the foreclosure sale never took place. After this announcement, Capital One resumed the auction.

46.     By instituting this type of foreclosure auction, Capital One created an improper foreclosure process that created false values and did not bind the foreclosure purchasers.

## FIFTH DEFENSE
### (Breach of Fiduciary Duty)

47.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

48.     As set forth above, Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin relied heavily on and trusted Capital One.

49.     By virtue of the parties' business relationship as set forth above, and by reason of the demonstrable level of trust and confidence upon which Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin depended and which Capital One knowingly accepted, Capital One owes certain fiduciary duties to Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin including, without limitation, a duty of good faith.

50.     As explained herein, for years Tri Global relied on Capital One to guide certain aspects of its taxi-medallion loan origination and servicing business. Although the Tri Global MJPA provided discretion to Capital One, that discretion did not include a right to abandon the lending market or purposely advance competing interests to destabilize the industry upon which the very loans that were being serviced were based.

51.     Ultimately, Capital One repudiated its commitments to Licensee and abandoned the Chicago medallion lending market so that it could pursue a competing venture with Uber.

52.     Capital One breached its duty of good faith, and the trust and confidence of Licensee by, among other things: precipitating, through its partnership with Uber, the collapse of the Chicago taxi medallion industry and the medallion industry nationwide, in addition to the corresponding decline in the value of the taxi medallions at issue.

53.     Capital One engaged in an intentional course of wrongful conduct orchestrated to harm Licensee.

54.     Capital One's conduct was willful, wanton and in reckless disregard of the Licensee's contractual rights and was otherwise wrongful.

55.     As a direct and proximate result of Capital One's breach of its fiduciary duties, Licensee has suffered, and will continue to suffer, substantial damages.

## SIXTH DEFENSE
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

56.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

57.     Pursuant to the covenant of good faith and fair dealing, Capital One could not undertake any action that has the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

58.     As explained herein, Capital One breached the duty of good faith and fair dealing implied in the contract with Licensee by, among other things: precipitating, through its partnership with Uber, the collapse of the taxi medallion industry and concomitant decline in the value of the taxi medallions at issue.

59.     As a direct and proximate result of Capital One's breach of the implied covenant of good faith and fair dealing thereunder, Licensee has suffered, and will continue to suffer, substantial damages.

## SEVENTH DEFENSE
### (Estoppel, Waiver, Ratification and/or Acquiescence)

60.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

61.     Capital One's claim of breach of contract / default is barred by the doctrines of estoppel, waiver, ratification and/or acquiescence.

## **CONCLUSION**

WHEREFORE, based upon the foregoing allegations and defenses and all reasons appearing of record, Licensee has timely submitted a completed Affidavit of Defense and, pursuant to the BACP Taxi Rules, no transfer upon foreclosure may be allowed except pursuant to an order of a court having jurisdiction. Licensee respectfully requests that the BACP deny Creditor's Request to Transfer Taxicab Medallion License Upon Foreclosure.

## AFFIDAVIT OF DEFENSE TO CREDITOR

**To City:**      City of Chicago – Public Vehicle Operations Division
                Department of Business Affairs and Consumer Protection
                2350 W. Ogden Avenue, 1st Floor
                Chicago, IL 60608
                Attention: Monique Davids

**To Creditor:**    Capital One Equipment Finance Corp., f/k/a All Points Capital Corp.,
                d/b/a Capital One Taxi Medallion Finance
                c/o Troutman Sanders LLP
                Att'n: Andrew L. Buck
                875 Third Avenue
                New York, NY 10022

RE: PUBLIC PASSENGER LICENSE NUMBER(s) <u>1535TX, 1550TX, 1589TX, 1599TX</u>

LICENSEE NAME: <u>Chicago Polo XII, Inc.</u>

I, _<u>Symon GARBER</u>_ , hereby swear that I own Taxicab Medallion License
             <small>Debtor Individual Name</small>

Number(s) <u>1535TX, 1550TX, 1589TX, 1599TX</u> either individually or through a company that I own and I have a defense

to the foreclosure of these licenses. I understand that this license(s) was sold at a foreclosure

sale on or about _____<u>August 9, 2018</u>_____ and that sale is contingent upon approval by the Department of Business Affairs
                 <small>List Date of Foreclosure Sale</small>

and Consumer Protection.

My defense to this foreclosure is: (Use additional pages if needed)_____

_____*see attached Defense Document*_____

_____

Signature: _____

Print Name: _____*Sherwin Edward*_____

Relationship to Medallion License/Title *VP and authorized signature agent*

Address: *2617. S. Wabash Ave Chicago IL 60616*

Phone: *312 791-1215*

Email Address: *edwards@chicagocarriagecab.com*

Subscribed and Sworn to before me

this _22_ day of _Aug_____ , 20_18_ .

_____      Notary Public

Version Date June 5, 2018

## AFFIDAVIT OF DEFENSE TO CREDITOR

### DEFENSE DOCUMENT

In support of its Affidavit of Defense to Creditor, Licensee asserts the following defenses in opposition to the Creditor's ("Creditor" or "Capital One") request to transfer public passenger vehicle license upon foreclosure and to the foreclosure sale: (1) Capital One has no right to foreclose on the medallions at issue; (2) Licensee does not owe the amount claimed by Capital One and has not defaulted on the agreement at issue with Capital One; (3) the foreclosure resulted in an improper foreclosure sale purchase that violated the BACP Taxi Rules; (4) Capital One instituted an improper foreclosure sale process; (5) Capital One breached its fiduciary duty to Licensee; (6) Capital One breached the implied covenant of good faith and fair dealing; (7) Capital One's claim of breach of contract / default is barred by the doctrines of estoppel, waiver, ratification and/or acquiescence. Because Licensee has timely submitted a completed Affidavit of Defense, pursuant to the BACP Taxi Rules, no transfer upon foreclosure may be allowed except pursuant to an order of a court having jurisdiction. Therefore, Licensee respectfully requests that the BACP deny Creditor's Request to Transfer Taxicab Medallion License Upon Foreclosure.

### FACTUAL BACKGROUND

1.      Symon Garber formed Tri Global Financial Services, Inc. ("Tri Global") in 2004, along with Roman Sapino and others, to provide capital to taxicab medallion owners. Tri Global's principal, Roman Sapino, also has many years of experience in the taxicab financing industry and has been involved in successful taxicab enterprises in New York and Chicago. Tri Global's co-owners include Galina Garber-Sheinin and Valentina Zubok. Irene Gans and Maya Zubok are related to an owner of Tri Global.

2.      Tri Global is a corporation formed and existing under the laws of the State of

Illinois, maintaining offices at 2617 S. Wabash Avenue, Chicago, Illinois 60616. Tri Global is engaged in the business of financing and servicing Chicago-based taxi medallion loans as well as offering second-position financing to the taxi industry.

3.     Upon information and belief, Capital One is a corporation formed and existing under the laws of the State of New York, maintaining a principal place of business at 265 Broadhollow Road, Melville, New York 11747.

4.     Tri Global was formed to provide loans to purchasers of public passenger vehicle licenses and medallions in the Chicago market, which confers the right to operate a taxicab in Chicago pursuant to the regulations issued and regulated by the City of Chicago Department of Business Affairs and Consumer Protection ("BACP").

5.     Tri Global offered medallion and other financing to a wide-variety of borrowers, including taxicab businesses that rely on the medallion-secured loans to earn their livelihoods. Tri Global primarily focused its business on servicing taxi medallion loans for various lenders and also offered second-position financing to the taxi industry. In or around 2006 Tri Global was approached by North Fork Bank, which expressed interest in partnering with Tri Global to expand the scope of its lending platform.

6.     Over the next several years, Tri Global and North Fork Bank entered into numerous successful loan participations. When North Fork Bank was acquired by Capital One in or about 2006/2007, this practice continued with Capital One.

7.     Capital One was even more eager than North Fork Bank to capitalize upon Tri Global's contacts in the Chicago marketplace and strongly encouraged Tri Global to aggressively seek prospects for additional medallion loans. Capital One and Tri Global participated in the loans on a loan-by-loan basis for several years.

8. In 2010, Capital One requested that Tri Global enter into a more formal arrangement by way of a master participation agreement, to which Tri Global agreed. The terms and conditions governing that relationship and Capital One's senior participation interests in the loans are more particularly set forth in a certain Master Joint Participation Agreement, dated August 2, 2010 (the "MJPA" or the "Tri Global MJPA").

9. In connection with the Tri Global MJPA, Symon Garber, Roman Sapino, Ruben Giacomozzi, Valentina Zubok, and Galina Garber-Sheinin signed the Tri Global Guaranty, dated August 2, 2010.

10. Pursuant to the terms of the MJPA, Tri Global generated business, handled collections, serviced the loans and remitted monthly payments to Capital One in accordance with the amount of its participation in each underlying loan while Capital One held senior participation interests in the various loans made and serviced by Tri Global to owners of Chicago taxicab medallions (the "Loans"). The Tri Global MJPA contemplates the sale of senior participation interests in loans issued and/or originated by Tri Global to owners and operators of taxi medallions. As reflected in the Tri Global MJPA, after Tri Global sells a participation interest, it continues to service the debt owed thereunder. In exchange for its services, Tri Global receives a servicing fee that is paid from the debt-service payments remitted to Tri Global each month.

11. Since the inception of the Tri Global/Capital One relationship, the parties have participated in many loans. Although Tri Global originated the medallion-secured loans and served as the official loan servicer for the loan portfolio, Tri Global relied on and trusted Capital One and its commercial finance expertise. This relationship was often characterized by Capital One as a "team" and "partnership" and its officers and representatives, including David Cin ("Cin") and others, regularly commented that the success of the portfolio was the product of a "team effort."

12.     Although Capital One historically had no real presence in the Chicago medallion market, Capital One was eager to exploit Tri Global's connections to the taxicab medallion market and capitalize upon Tri Global's market dominance in the Chicago taxi-medallion economy. Capital One strongly encouraged Tri Global to aggressively acquire additional Chicago-based medallion loans.

13.     As the value of Chicago taxi medallion loans continued to rise, Capital One continued to aggressively press Tri Global to originate new loans so that Capital One could further capitalize on its market position and emerge as a leading taxi medallion lender in Chicago.

14.     Throughout the course of the Master Joint Participation Agreement, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin – whose interests were closely aligned with those of Capital One – worked with Capital One to maximize the return on the medallion loans.

15.     Tri Global originated the agreement/loan at issue between Licensee and Capital One based on Tri Global's relationship with Capital One.

16.     Despite its long-standing business venture with Tri Global, Capital One engaged in intentional and systematic efforts to line its own pockets to the detriment of Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin. As explained below, Capital One engaged in irreconcilable conflicts of interest, bad faith business practices, and intentionally disregarded its duty of good faith to Licensee and Tri Global when it partnered with a major taxi-industry competitor, Uber Technologies, Inc. ("Uber").

17.     In or about late 2013 and early 2014, and unbeknownst to Licensee and Tri Global (and many other Capital One loan participants and medallion-secured borrowers), Capital One began secretly planning to change course and exit the medallion market to partner with the

industry's most ominous competitor, Uber. Notwithstanding this new partnership, Capital One, either intentionally or recklessly, continued to encourage Tri Global to cultivate new medallion-secured loans while concealing its intention to partner with Uber.

18.     News of Capital One's partnership with Uber surfaced in approximately mid-2014, and was followed by an aggressive nationwide marketing campaign launched by Capital One. The marketing campaign and promotions touted Capital One's "unique new partnership" with Uber and underscored the "common focus" of both companies.

19.     Capital One began offering significant incentives to its consumers to choose Uber vehicles over properly licensed and regulated taxis – including offering free and discounted Uber rides and other similar promotions such as a 20% discount on all Uber rides when paid with a Capital One "Quicksilver" credit card. Capital One offered new customers two free Uber rides worth up to $60.00. Capital One created a new website promoting these incentives and further signaling its collaboration with Uber: "capitalone.com/uber".

20.     Capital One's partnership with Uber came as a great shock to Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin as the partnership was never disclosed to them prior to the 2014 marketing blitz. At no point in the parties' relationship was it ever contemplated that Capital One would undertake any action to undermine the taxi industry, the agreement at issue, or the value of Tri Global's and Capital One's loan portfolio.

21.     In partnering with and promoting Uber's ride-share services, Capital One and Uber's assault on the taxi industry has been instrumental in bringing about the destabilization of the Chicago taxi medallion market.

22.     In 2014, when Capital One began its partnership with Uber, the Chicago market softened dramatically. Sometime during mid-2014, funding to the medallion industry came to a

total halt. This was clearly tied to Capital One's partnership with Uber.

23.    By 2015, Uber reported that taxi usage nationwide had precipitously decreased while the number of customers using Uber increased correspondingly.

24.    The disruption of the taxi industry resulting from Capital One's partnership with Uber contributed to the reduction in value of the Chicago taxi medallions securing the loans.

25.    In short, Capital One has caused the price of the Chicago taxi medallions that secure the loans to plummet.

26.    Moreover, Capital One has sabotaged Tri Global, Symon Garber, Valentina Zubok, Galina Garber-Sheinin and Licensee's efforts to favorably restructure and/or modify the medallion-secured loans at issue.

27.    Accordingly, Capital One has materially breached the credit agreement and Licensee is not liable for the amount allegedly owed pursuant to the credit agreement.

### FIRST DEFENSE
**(No Right to Foreclose)**

28.    Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

29.    Capital One, through its partnership with Uber, precipitated the collapse of the Chicago taxi medallion industry and the medallion industry nationwide, in addition to the corresponding decline in the value of the taxi medallions at issue.

30.    Based on Capital One's willful misconduct, breach of contract, malfeasance, wrongdoing and/or other intentional and/or reckless conduct, Capital One has no right to foreclose on the medallions at issue.

### SECOND DEFENSE
### (No Default by Licensee)

31.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

32.     Licensee does not owe the amount claimed by Capital One and has not defaulted on the agreement at issue with Capital One.

33.     Therefore, Capital One has no right to foreclose on the medallions at issue.

### THIRD DEFENSE
### (Improper Foreclosure Sale Purchase)

34.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

35.     On August 9, 2018, to start the foreclosure, Capital One opened the auction with an initial credit bid of $23,000.00.

36.     Capital One won the foreclosure auction with its initial $23,000.00 credit bid.

37.     Pursuant to Rule TX13.03(b), "[t]he [foreclosure] purchaser must meet all the criteria for licensing as set out in the Municipal Code of Chicago and [the BACP's] rules and regulations, including payment of the license transfer fee, license fees and any other fees, fines or taxes due and owing to the City." Rule TX13.03(b).

38.     Pursuant to Rule TX13.04(d), "[t]he taxicab medallion license must be sold to a person believed to be a qualified applicant . . ." Rule TX13.04(d); *see also* TX13.06(a).

39.     Upon information and belief, Capital One is not a qualified applicant and has no intention of ever seeking licensure under the Municipal Code of Chicago or BACP Taxi Rules.

40.     The purpose behind the BACP Taxi Rules' foreclosure process is to facilitate keeping medallions operating on the street. If Capital One is allowed to purchase the medallions,

with no intention of ever becoming licensed by the BACP, Capital One would be allowed to cause further harm to the taxicab industry and further benefit Uber.

41.    Therefore, the foreclosure sale did not comply with Rules TX13.03 and TX13.04 and the foreclosure auction resulted in an improper sale/purchase that violated the BACP Taxi Rules.

42.    Moreover, Capital One's intent behind the foreclosure sale is to destroy and cause further harm to Licensee, Tri Global, and Tri Global's owners and guarantors. Capital One has filed multiple actions against Licensee, Tri Global, and/or Tri Global's owners and guarantors and instead of allowing any of these cases to reach their natural conclusion, Capital One instead seeks to implement destructive tactics by foreclosing on the medallions in order to further destroy the medallion market by setting the prices and discouraging bids, all in violation of the Taxi Rules simply to inflict maximum damage and cause irreparable harm. In a recent case that was filed in the Circuit Court of Cook County, *Capital One Equipment Finance Corp. v. Chicago Elite Cab Corp., et al.*, No. 17 L 998, the Honorable Margaret A. Brennan dismissed Capital One's complaint but allowed Capital One leave to re-file its cause of action in another case currently pending in New York. That New York Action is *Capital One Equipment Finance Corp. v. The OSG Corp., Tri Global Financial Services, Inc. et al.*, No. 600749/2017. But, rather than re-file its case in the New York Action and pursue its alleged causes of action, Capital One instead chose to do an end run around the litigation process and seeks to foreclose on the medallions at issue in an attempt to destroy Licensee, Tri Global and Tri Global's owners and guarantors. Capital One did not re-file its Chicago cause of action in the New York Action because it knows that counterclaims would be filed against it, which would expose Capital One's bad faith conduct in abusing its partnership with Tri Global and expose Capital One's bad faith relationship with Uber. The reality is that

Capital One has filed numerous unsuccessful complaints in courts in New York and Chicago and, because these lawsuits have not been successful, Capital One is now attempting to cause as much harm as possible to Licensee and Tri Global before the counterclaims against Capital One are proven true and Capital One's bad faith is exposed.

## FOURTH DEFENSE
### (Improper Foreclosure Sale Process)

43.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

44.     On August 9, 2018, to start the foreclosure, Capital One opened the auction with an initial credit bid of $23,000.00.

45.     During the beginning part of the foreclosure auction, it became clear that no individuals were going to bid on the medallions because a foreclosure purchaser would have been liable for any and all liens on the medallions and such liability was unknown at the time of the auction. Capital One then stopped the foreclosure auction and announced to the individuals attending the auction that Capital One would work with any potential foreclosure purchasers and the bank to work out a deal on any liens on the medallion(s) bought at the auction. Capital One further stated that if the foreclosure purchaser and the bank could not work out an agreement concerning any liens on the medallions bought at the auction, Capital One would refund the foreclosure purchaser's money as if the foreclosure sale never took place. After this announcement, Capital One resumed the auction.

46.     By instituting this type of foreclosure auction, Capital One created an improper foreclosure process that created false values and did not bind the foreclosure purchasers.

## FIFTH DEFENSE
### (Breach of Fiduciary Duty)

47.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

48.     As set forth above, Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin relied heavily on and trusted Capital One.

49.     By virtue of the parties' business relationship as set forth above, and by reason of the demonstrable level of trust and confidence upon which Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin depended and which Capital One knowingly accepted, Capital One owes certain fiduciary duties to Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin including, without limitation, a duty of good faith.

50.     As explained herein, for years Tri Global relied on Capital One to guide certain aspects of its taxi-medallion loan origination and servicing business. Although the Tri Global MJPA provided discretion to Capital One, that discretion did not include a right to abandon the lending market or purposely advance competing interests to destabilize the industry upon which the very loans that were being serviced were based.

51.     Ultimately, Capital One repudiated its commitments to Licensee and abandoned the Chicago medallion lending market so that it could pursue a competing venture with Uber.

52.     Capital One breached its duty of good faith, and the trust and confidence of Licensee by, among other things: precipitating, through its partnership with Uber, the collapse of the Chicago taxi medallion industry and the medallion industry nationwide, in addition to the corresponding decline in the value of the taxi medallions at issue.

53.     Capital One engaged in an intentional course of wrongful conduct orchestrated to harm Licensee.

54. Capital One's conduct was willful, wanton and in reckless disregard of the Licensee's contractual rights and was otherwise wrongful.

55. As a direct and proximate result of Capital One's breach of its fiduciary duties, Licensee has suffered, and will continue to suffer, substantial damages.

## SIXTH DEFENSE
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

56. Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

57. Pursuant to the covenant of good faith and fair dealing, Capital One could not undertake any action that has the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

58. As explained herein, Capital One breached the duty of good faith and fair dealing implied in the contract with Licensee by, among other things: precipitating, through its partnership with Uber, the collapse of the taxi medallion industry and concomitant decline in the value of the taxi medallions at issue.

59. As a direct and proximate result of Capital One's breach of the implied covenant of good faith and fair dealing thereunder, Licensee has suffered, and will continue to suffer, substantial damages.

## SEVENTH DEFENSE
### (Estoppel, Waiver, Ratification and/or Acquiescence)

60. Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

61. Capital One's claim of breach of contract / default is barred by the doctrines of estoppel, waiver, ratification and/or acquiescence.

## **CONCLUSION**

WHEREFORE, based upon the foregoing allegations and defenses and all reasons appearing of record, Licensee has timely submitted a completed Affidavit of Defense and, pursuant to the BACP Taxi Rules, no transfer upon foreclosure may be allowed except pursuant to an order of a court having jurisdiction. Licensee respectfully requests that the BACP deny Creditor's Request to Transfer Taxicab Medallion License Upon Foreclosure.

# AFFIDAVIT OF DEFENSE TO CREDITOR

**To City:**  City of Chicago – Public Vehicle Operations Division
Department of Business Affairs and Consumer Protection
2350 W. Ogden Avenue, 1st Floor
Chicago, IL 60608
Attention: Monique Davids

**To Creditor:**  Capital One Equipment Finance Corp., f/k/a All Points Capital Corp.,
d/b/a Capital One Taxi Medallion Finance
c/o Troutman Sanders LLP
Att'n: Andrew L. Buck
875 Third Avenue
New York, NY 10022

RE: PUBLIC PASSENGER LICENSE NUMBER(s) <u>6461TX, 5756TX, 5313TX & 2460TX</u>

LICENSEE NAME: <u>Dolfina Taxi Inc.</u>

I, _<u>Sigman GARBER</u>_ , hereby swear that I own Taxicab Medallion License
<sub>Debtor Individual Name</sub>

Number(s) <u>6461TX, 5756TX, 5313TX & 2460TX</u> either individually or through a company that I own and I have a

defense to the foreclosure of these licenses. I understand that this license(s) was sold at a foreclosure

sale on or about _____<u>August 9, 2018</u>_____ and that sale is contingent upon approval by the Department of Business Affairs
<sub>List Date of Foreclosure Sale</sub>
and Consumer Protection.

My defense to this foreclosure is: (Use additional pages if needed)_____

_see attached Defense Document_

_____

Signature: _____

Print Name: ____ _Shimin Edward_ _____

Relationship to Medallion License/Title ___ _VP and authorized signature agent_ ___

Address: ___ _2617 S. Wabash Ave Chicago IL 60616_ ___

Phone: ___ _312 791-1255_ ___

Email Address: _edwards@chicagocarriagecab.com_

Subscribed and Sworn to before me

this _22_ day of _July_ , 20_18_.

_____ Notary Public

JANET DAVIS
Official Seal
Notary Public - State of Illinois
My Commission Expires Sep 4, 2019

Version Date June 5, 2018

## AFFIDAVIT OF DEFENSE TO CREDITOR

## DEFENSE DOCUMENT

In support of its Affidavit of Defense to Creditor, Licensee asserts the following defenses in opposition to the Creditor's ("Creditor" or "Capital One") request to transfer public passenger vehicle license upon foreclosure and to the foreclosure sale: (1) Capital One has no right to foreclose on the medallions at issue; (2) Licensee does not owe the amount claimed by Capital One and has not defaulted on the agreement at issue with Capital One; (3) the foreclosure resulted in an improper foreclosure sale purchase that violated the BACP Taxi Rules; (4) Capital One instituted an improper foreclosure sale process; (5) Capital One breached its fiduciary duty to Licensee; (6) Capital One breached the implied covenant of good faith and fair dealing; (7) Capital One's claim of breach of contract / default is barred by the doctrines of estoppel, waiver, ratification and/or acquiescence. Because Licensee has timely submitted a completed Affidavit of Defense, pursuant to the BACP Taxi Rules, no transfer upon foreclosure may be allowed except pursuant to an order of a court having jurisdiction. Therefore, Licensee respectfully requests that the BACP deny Creditor's Request to Transfer Taxicab Medallion License Upon Foreclosure.

## FACTUAL BACKGROUND

1. Symon Garber formed Tri Global Financial Services, Inc. ("Tri Global") in 2004, along with Roman Sapino and others, to provide capital to taxicab medallion owners. Tri Global's principal, Roman Sapino, also has many years of experience in the taxicab financing industry and has been involved in successful taxicab enterprises in New York and Chicago. Tri Global's co-owners include Galina Garber-Sheinin and Valentina Zubok. Irene Gans and Maya Zubok are related to an owner of Tri Global.

2. Tri Global is a corporation formed and existing under the laws of the State of

Illinois, maintaining offices at 2617 S. Wabash Avenue, Chicago, Illinois 60616. Tri Global is engaged in the business of financing and servicing Chicago-based taxi medallion loans as well as offering second-position financing to the taxi industry.

3.      Upon information and belief, Capital One is a corporation formed and existing under the laws of the State of New York, maintaining a principal place of business at 265 Broadhollow Road, Melville, New York 11747.

4.      Tri Global was formed to provide loans to purchasers of public passenger vehicle licenses and medallions in the Chicago market, which confers the right to operate a taxicab in Chicago pursuant to the regulations issued and regulated by the City of Chicago Department of Business Affairs and Consumer Protection ("BACP").

5.      Tri Global offered medallion and other financing to a wide-variety of borrowers, including taxicab businesses that rely on the medallion-secured loans to earn their livelihoods. Tri Global primarily focused its business on servicing taxi medallion loans for various lenders and also offered second-position financing to the taxi industry. In or around 2006 Tri Global was approached by North Fork Bank, which expressed interest in partnering with Tri Global to expand the scope of its lending platform.

6.      Over the next several years, Tri Global and North Fork Bank entered into numerous successful loan participations. When North Fork Bank was acquired by Capital One in or about 2006/2007, this practice continued with Capital One.

7.      Capital One was even more eager than North Fork Bank to capitalize upon Tri Global's contacts in the Chicago marketplace and strongly encouraged Tri Global to aggressively seek prospects for additional medallion loans. Capital One and Tri Global participated in the loans on a loan-by-loan basis for several years.

8.     In 2010, Capital One requested that Tri Global enter into a more formal arrangement by way of a master participation agreement, to which Tri Global agreed. The terms and conditions governing that relationship and Capital One's senior participation interests in the loans are more particularly set forth in a certain Master Joint Participation Agreement, dated August 2, 2010 (the "MJPA" or the "Tri Global MJPA").

9.     In connection with the Tri Global MJPA, Symon Garber, Roman Sapino, Ruben Giacomozzi, Valentina Zubok, and Galina Garber-Sheinin signed the Tri Global Guaranty, dated August 2, 2010.

10.     Pursuant to the terms of the MJPA, Tri Global generated business, handled collections, serviced the loans and remitted monthly payments to Capital One in accordance with the amount of its participation in each underlying loan while Capital One held senior participation interests in the various loans made and serviced by Tri Global to owners of Chicago taxicab medallions (the "Loans"). The Tri Global MJPA contemplates the sale of senior participation interests in loans issued and/or originated by Tri Global to owners and operators of taxi medallions. As reflected in the Tri Global MJPA, after Tri Global sells a participation interest, it continues to service the debt owed thereunder. In exchange for its services, Tri Global receives a servicing fee that is paid from the debt-service payments remitted to Tri Global each month.

11.     Since the inception of the Tri Global/Capital One relationship, the parties have participated in many loans. Although Tri Global originated the medallion-secured loans and served as the official loan servicer for the loan portfolio, Tri Global relied on and trusted Capital One and its commercial finance expertise. This relationship was often characterized by Capital One as a "team" and "partnership" and its officers and representatives, including David Cin ("Cin") and others, regularly commented that the success of the portfolio was the product of a "team effort."

12.     Although Capital One historically had no real presence in the Chicago medallion market, Capital One was eager to exploit Tri Global's connections to the taxicab medallion market and capitalize upon Tri Global's market dominance in the Chicago taxi-medallion economy. Capital One strongly encouraged Tri Global to aggressively acquire additional Chicago-based medallion loans.

13.     As the value of Chicago taxi medallion loans continued to rise, Capital One continued to aggressively press Tri Global to originate new loans so that Capital One could further capitalize on its market position and emerge as a leading taxi medallion lender in Chicago.

14.     Throughout the course of the Master Joint Participation Agreement, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin – whose interests were closely aligned with those of Capital One – worked with Capital One to maximize the return on the medallion loans.

15.     Tri Global originated the agreement/loan at issue between Licensee and Capital One based on Tri Global's relationship with Capital One.

16.     Despite its long-standing business venture with Tri Global, Capital One engaged in intentional and systematic efforts to line its own pockets to the detriment of Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin. As explained below, Capital One engaged in irreconcilable conflicts of interest, bad faith business practices, and intentionally disregarded its duty of good faith to Licensee and Tri Global when it partnered with a major taxi-industry competitor, Uber Technologies, Inc. ("Uber").

17.     In or about late 2013 and early 2014, and unbeknownst to Licensee and Tri Global (and many other Capital One loan participants and medallion-secured borrowers), Capital One began secretly planning to change course and exit the medallion market to partner with the

industry's most ominous competitor, Uber. Notwithstanding this new partnership, Capital One, either intentionally or recklessly, continued to encourage Tri Global to cultivate new medallion-secured loans while concealing its intention to partner with Uber.

18.     News of Capital One's partnership with Uber surfaced in approximately mid-2014, and was followed by an aggressive nationwide marketing campaign launched by Capital One. The marketing campaign and promotions touted Capital One's "unique new partnership" with Uber and underscored the "common focus" of both companies.

19.     Capital One began offering significant incentives to its consumers to choose Uber vehicles over properly licensed and regulated taxis – including offering free and discounted Uber rides and other similar promotions such as a 20% discount on all Uber rides when paid with a Capital One "Quicksilver" credit card. Capital One offered new customers two free Uber rides worth up to $60.00. Capital One created a new website promoting these incentives and further signaling its collaboration with Uber: "capitalone.com/uber".

20.     Capital One's partnership with Uber came as a great shock to Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin as the partnership was never disclosed to them prior to the 2014 marketing blitz. At no point in the parties' relationship was it ever contemplated that Capital One would undertake any action to undermine the taxi industry, the agreement at issue, or the value of Tri Global's and Capital One's loan portfolio.

21.     In partnering with and promoting Uber's ride-share services, Capital One and Uber's assault on the taxi industry has been instrumental in bringing about the destabilization of the Chicago taxi medallion market.

22.     In 2014, when Capital One began its partnership with Uber, the Chicago market softened dramatically. Sometime during mid-2014, funding to the medallion industry came to a

total halt. This was clearly tied to Capital One's partnership with Uber.

23.     By 2015, Uber reported that taxi usage nationwide had precipitously decreased while the number of customers using Uber increased correspondingly.

24.     The disruption of the taxi industry resulting from Capital One's partnership with Uber contributed to the reduction in value of the Chicago taxi medallions securing the loans.

25.     In short, Capital One has caused the price of the Chicago taxi medallions that secure the loans to plummet.

26.     Moreover, Capital One has sabotaged Tri Global, Symon Garber, Valentina Zubok, Galina Garber-Sheinin and Licensee's efforts to favorably restructure and/or modify the medallion-secured loans at issue.

27.     Accordingly, Capital One has materially breached the credit agreement and Licensee is not liable for the amount allegedly owed pursuant to the credit agreement.

### FIRST DEFENSE
### (No Right to Foreclose)

28.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

29.     Capital One, through its partnership with Uber, precipitated the collapse of the Chicago taxi medallion industry and the medallion industry nationwide, in addition to the corresponding decline in the value of the taxi medallions at issue.

30.     Based on Capital One's willful misconduct, breach of contract, malfeasance, wrongdoing and/or other intentional and/or reckless conduct, Capital One has no right to foreclose on the medallions at issue.

**SECOND DEFENSE**
**(No Default by Licensee)**

31.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

32.     Licensee does not owe the amount claimed by Capital One and has not defaulted on the agreement at issue with Capital One.

33.     Therefore, Capital One has no right to foreclose on the medallions at issue.

**THIRD DEFENSE**
**(Improper Foreclosure Sale Purchase)**

34.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

35.     On August 9, 2018, to start the foreclosure, Capital One opened the auction with an initial credit bid of $23,000.00.

36.     Capital One won the foreclosure auction with its initial $23,000.00 credit bid.

37.     Pursuant to Rule TX13.03(b), "[t]he [foreclosure] purchaser must meet all the criteria for licensing as set out in the Municipal Code of Chicago and [the BACP's] rules and regulations, including payment of the license transfer fee, license fees and any other fees, fines or taxes due and owing to the City." Rule TX13.03(b).

38.     Pursuant to Rule TX13.04(d), "[t]he taxicab medallion license must be sold to a person believed to be a qualified applicant . . ." Rule TX13.04(d); *see also* TX13.06(a).

39.     Upon information and belief, Capital One is not a qualified applicant and has no intention of ever seeking licensure under the Municipal Code of Chicago or BACP Taxi Rules.

40.     The purpose behind the BACP Taxi Rules' foreclosure process is to facilitate keeping medallions operating on the street. If Capital One is allowed to purchase the medallions,

with no intention of ever becoming licensed by the BACP, Capital One would be allowed to cause further harm to the taxicab industry and further benefit Uber.

41.     Therefore, the foreclosure sale did not comply with Rules TX13.03 and TX13.04 and the foreclosure auction resulted in an improper sale/purchase that violated the BACP Taxi Rules.

42.     Moreover, Capital One's intent behind the foreclosure sale is to destroy and cause further harm to Licensee, Tri Global, and Tri Global's owners and guarantors. Capital One has filed multiple actions against Licensee, Tri Global, and/or Tri Global's owners and guarantors and instead of allowing any of these cases to reach their natural conclusion, Capital One instead seeks to implement destructive tactics by foreclosing on the medallions in order to further destroy the medallion market by setting the prices and discouraging bids, all in violation of the Taxi Rules simply to inflict maximum damage and cause irreparable harm. In a recent case that was filed in the Circuit Court of Cook County, *Capital One Equipment Finance Corp. v. Chicago Elite Cab Corp., et al.*, No. 17 L 998, the Honorable Margaret A. Brennan dismissed Capital One's complaint but allowed Capital One leave to re-file its cause of action in another case currently pending in New York. That New York Action is *Capital One Equipment Finance Corp. v. The OSG Corp., Tri Global Financial Services, Inc. et al.*, No. 600749/2017. But, rather than re-file its case in the New York Action and pursue its alleged causes of action, Capital One instead chose to do an end run around the litigation process and seeks to foreclose on the medallions at issue in an attempt to destroy Licensee, Tri Global and Tri Global's owners and guarantors. Capital One did not re-file its Chicago cause of action in the New York Action because it knows that counterclaims would be filed against it, which would expose Capital One's bad faith conduct in abusing its partnership with Tri Global and expose Capital One's bad faith relationship with Uber. The reality is that

Capital One has filed numerous unsuccessful complaints in courts in New York and Chicago and, because these lawsuits have not been successful, Capital One is now attempting to cause as much harm as possible to Licensee and Tri Global before the counterclaims against Capital One are proven true and Capital One's bad faith is exposed.

## FOURTH DEFENSE
### (Improper Foreclosure Sale Process)

43. Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

44. On August 9, 2018, to start the foreclosure, Capital One opened the auction with an initial credit bid of $23,000.00.

45. During the beginning part of the foreclosure auction, it became clear that no individuals were going to bid on the medallions because a foreclosure purchaser would have been liable for any and all liens on the medallions and such liability was unknown at the time of the auction. Capital One then stopped the foreclosure auction and announced to the individuals attending the auction that Capital One would work with any potential foreclosure purchasers and the bank to work out a deal on any liens on the medallion(s) bought at the auction. Capital One further stated that if the foreclosure purchaser and the bank could not work out an agreement concerning any liens on the medallions bought at the auction, Capital One would refund the foreclosure purchaser's money as if the foreclosure sale never took place. After this announcement, Capital One resumed the auction.

46. By instituting this type of foreclosure auction, Capital One created an improper foreclosure process that created false values and did not bind the foreclosure purchasers.

## FIFTH DEFENSE
### (Breach of Fiduciary Duty)

47.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

48.     As set forth above, Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin relied heavily on and trusted Capital One.

49.     By virtue of the parties' business relationship as set forth above, and by reason of the demonstrable level of trust and confidence upon which Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin depended and which Capital One knowingly accepted, Capital One owes certain fiduciary duties to Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin including, without limitation, a duty of good faith.

50.     As explained herein, for years Tri Global relied on Capital One to guide certain aspects of its taxi-medallion loan origination and servicing business. Although the Tri Global MJPA provided discretion to Capital One, that discretion did not include a right to abandon the lending market or purposely advance competing interests to destabilize the industry upon which the very loans that were being serviced were based.

51.     Ultimately, Capital One repudiated its commitments to Licensee and abandoned the Chicago medallion lending market so that it could pursue a competing venture with Uber.

52.     Capital One breached its duty of good faith, and the trust and confidence of Licensee by, among other things: precipitating, through its partnership with Uber, the collapse of the Chicago taxi medallion industry and the medallion industry nationwide, in addition to the corresponding decline in the value of the taxi medallions at issue.

53.     Capital One engaged in an intentional course of wrongful conduct orchestrated to harm Licensee.

54. Capital One's conduct was willful, wanton and in reckless disregard of the Licensee's contractual rights and was otherwise wrongful.

55. As a direct and proximate result of Capital One's breach of its fiduciary duties, Licensee has suffered, and will continue to suffer, substantial damages.

## SIXTH DEFENSE
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

56. Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

57. Pursuant to the covenant of good faith and fair dealing, Capital One could not undertake any action that has the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

58. As explained herein, Capital One breached the duty of good faith and fair dealing implied in the contract with Licensee by, among other things: precipitating, through its partnership with Uber, the collapse of the taxi medallion industry and concomitant decline in the value of the taxi medallions at issue.

59. As a direct and proximate result of Capital One's breach of the implied covenant of good faith and fair dealing thereunder, Licensee has suffered, and will continue to suffer, substantial damages.

## SEVENTH DEFENSE
### (Estoppel, Waiver, Ratification and/or Acquiescence)

60. Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

61. Capital One's claim of breach of contract / default is barred by the doctrines of estoppel, waiver, ratification and/or acquiescence.

## **CONCLUSION**

WHEREFORE, based upon the foregoing allegations and defenses and all reasons appearing of record, Licensee has timely submitted a completed Affidavit of Defense and, pursuant to the BACP Taxi Rules, no transfer upon foreclosure may be allowed except pursuant to an order of a court having jurisdiction. Licensee respectfully requests that the BACP deny Creditor's Request to Transfer Taxicab Medallion License Upon Foreclosure.

## AFFIDAVIT OF DEFENSE TO CREDITOR

**To City:**    City of Chicago – Public Vehicle Operations Division
Department of Business Affairs and Consumer Protection
2350 W. Ogden Avenue, 1st Floor
Chicago, IL 60608
Attention: Monique Davids

**To Creditor:**    Capital One Equipment Finance Corp., f/k/a All Points Capital Corp.,
d/b/a Capital One Taxi Medallion Finance
c/o Troutman Sanders LLP
Att'n: Andrew L. Buck
875 Third Avenue
New York, NY 10022

RE: PUBLIC PASSENGER LICENSE NUMBER(s) <u>3688TX, 2080TX, 2053TX & 2027TX</u>

LICENSEE NAME: <u>Enetochka Taxi Inc.</u>

I, _Symon GARBER_ , hereby swear that I own Taxicab Medallion License
<span style="font-size:smaller">Debtor Individual Name</span>
Number(s) <u>3688TX, 2080TX, 2053TX & 2027TX</u> either individually or through a company that I own and I have a

defense to the foreclosure of these licenses. I understand that this license(s) was sold at a foreclosure

sale on or about ____August 9, 2018____ and that sale is contingent upon approval by the Department of Business Affairs
<span style="font-size:smaller">List Date of Foreclosure Sale</span>
and Consumer Protection.

My defense to this foreclosure is: (Use additional pages if needed) _____

___see attached Defense Document___

_____

Signature: _____

Print Name: _____Shivin Edward_____

Relationship to Medallion License/Title _VP and authorized signature agent_

Address: __2617 S. Wabash Ave Chicago IL__

Phone: __312 791-1255__

Email Address: _edwards@chicagocarriage.com_

Subscribed and Sworn to before me

this __22__ day of __Aug__ , 20 __18__ .

_____
Notary Public

JANET DAVIS
Official Seal
Notary Public - State of Illinois
My Commission Expires Sep 10, 2019

Version Date June 5, 2018

## AFFIDAVIT OF DEFENSE TO CREDITOR

## DEFENSE DOCUMENT

In support of its Affidavit of Defense to Creditor, Licensee asserts the following defenses in opposition to the Creditor's ("Creditor" or "Capital One") request to transfer public passenger vehicle license upon foreclosure and to the foreclosure sale: (1) Capital One has no right to foreclose on the medallions at issue; (2) Licensee does not owe the amount claimed by Capital One and has not defaulted on the agreement at issue with Capital One; (3) the foreclosure resulted in an improper foreclosure sale purchase that violated the BACP Taxi Rules; (4) Capital One instituted an improper foreclosure sale process; (5) Capital One breached its fiduciary duty to Licensee; (6) Capital One breached the implied covenant of good faith and fair dealing; (7) Capital One's claim of breach of contract / default is barred by the doctrines of estoppel, waiver, ratification and/or acquiescence. Because Licensee has timely submitted a completed Affidavit of Defense, pursuant to the BACP Taxi Rules, no transfer upon foreclosure may be allowed except pursuant to an order of a court having jurisdiction. Therefore, Licensee respectfully requests that the BACP deny Creditor's Request to Transfer Taxicab Medallion License Upon Foreclosure.

## FACTUAL BACKGROUND

1.      Symon Garber formed Tri Global Financial Services, Inc. ("Tri Global") in 2004, along with Roman Sapino and others, to provide capital to taxicab medallion owners. Tri Global's principal, Roman Sapino, also has many years of experience in the taxicab financing industry and has been involved in successful taxicab enterprises in New York and Chicago. Tri Global's co-owners include Galina Garber-Sheinin and Valentina Zubok. Irene Gans and Maya Zubok are related to an owner of Tri Global.

2.      Tri Global is a corporation formed and existing under the laws of the State of

Illinois, maintaining offices at 2617 S. Wabash Avenue, Chicago, Illinois 60616. Tri Global is engaged in the business of financing and servicing Chicago-based taxi medallion loans as well as offering second-position financing to the taxi industry.

3.      Upon information and belief, Capital One is a corporation formed and existing under the laws of the State of New York, maintaining a principal place of business at 265 Broadhollow Road, Melville, New York 11747.

4.      Tri Global was formed to provide loans to purchasers of public passenger vehicle licenses and medallions in the Chicago market, which confers the right to operate a taxicab in Chicago pursuant to the regulations issued and regulated by the City of Chicago Department of Business Affairs and Consumer Protection ("BACP").

5.      Tri Global offered medallion and other financing to a wide-variety of borrowers, including taxicab businesses that rely on the medallion-secured loans to earn their livelihoods. Tri Global primarily focused its business on servicing taxi medallion loans for various lenders and also offered second-position financing to the taxi industry. In or around 2006 Tri Global was approached by North Fork Bank, which expressed interest in partnering with Tri Global to expand the scope of its lending platform.

6.      Over the next several years, Tri Global and North Fork Bank entered into numerous successful loan participations. When North Fork Bank was acquired by Capital One in or about 2006/2007, this practice continued with Capital One.

7.      Capital One was even more eager than North Fork Bank to capitalize upon Tri Global's contacts in the Chicago marketplace and strongly encouraged Tri Global to aggressively seek prospects for additional medallion loans. Capital One and Tri Global participated in the loans on a loan-by-loan basis for several years.

8.    In 2010, Capital One requested that Tri Global enter into a more formal arrangement by way of a master participation agreement, to which Tri Global agreed. The terms and conditions governing that relationship and Capital One's senior participation interests in the loans are more particularly set forth in a certain Master Joint Participation Agreement, dated August 2, 2010 (the "MJPA" or the "Tri Global MJPA").

9.    In connection with the Tri Global MJPA, Symon Garber, Roman Sapino, Ruben Giacomozzi, Valentina Zubok, and Galina Garber-Sheinin signed the Tri Global Guaranty, dated August 2, 2010.

10.    Pursuant to the terms of the MJPA, Tri Global generated business, handled collections, serviced the loans and remitted monthly payments to Capital One in accordance with the amount of its participation in each underlying loan while Capital One held senior participation interests in the various loans made and serviced by Tri Global to owners of Chicago taxicab medallions (the "Loans"). The Tri Global MJPA contemplates the sale of senior participation interests in loans issued and/or originated by Tri Global to owners and operators of taxi medallions. As reflected in the Tri Global MJPA, after Tri Global sells a participation interest, it continues to service the debt owed thereunder. In exchange for its services, Tri Global receives a servicing fee that is paid from the debt-service payments remitted to Tri Global each month.

11.    Since the inception of the Tri Global/Capital One relationship, the parties have participated in many loans. Although Tri Global originated the medallion-secured loans and served as the official loan servicer for the loan portfolio, Tri Global relied on and trusted Capital One and its commercial finance expertise. This relationship was often characterized by Capital One as a "team" and "partnership" and its officers and representatives, including David Cin ("Cin") and others, regularly commented that the success of the portfolio was the product of a "team effort."

12.     Although Capital One historically had no real presence in the Chicago medallion market, Capital One was eager to exploit Tri Global's connections to the taxicab medallion market and capitalize upon Tri Global's market dominance in the Chicago taxi-medallion economy. Capital One strongly encouraged Tri Global to aggressively acquire additional Chicago-based medallion loans.

13.     As the value of Chicago taxi medallion loans continued to rise, Capital One continued to aggressively press Tri Global to originate new loans so that Capital One could further capitalize on its market position and emerge as a leading taxi medallion lender in Chicago.

14.     Throughout the course of the Master Joint Participation Agreement, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin – whose interests were closely aligned with those of Capital One – worked with Capital One to maximize the return on the medallion loans.

15.     Tri Global originated the agreement/loan at issue between Licensee and Capital One based on Tri Global's relationship with Capital One.

16.     Despite its long-standing business venture with Tri Global, Capital One engaged in intentional and systematic efforts to line its own pockets to the detriment of Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin. As explained below, Capital One engaged in irreconcilable conflicts of interest, bad faith business practices, and intentionally disregarded its duty of good faith to Licensee and Tri Global when it partnered with a major taxi-industry competitor, Uber Technologies, Inc. ("Uber").

17.     In or about late 2013 and early 2014, and unbeknownst to Licensee and Tri Global (and many other Capital One loan participants and medallion-secured borrowers), Capital One began secretly planning to change course and exit the medallion market to partner with the

industry's most ominous competitor, Uber. Notwithstanding this new partnership, Capital One, either intentionally or recklessly, continued to encourage Tri Global to cultivate new medallion-secured loans while concealing its intention to partner with Uber.

18.     News of Capital One's partnership with Uber surfaced in approximately mid-2014, and was followed by an aggressive nationwide marketing campaign launched by Capital One. The marketing campaign and promotions touted Capital One's "unique new partnership" with Uber and underscored the "common focus" of both companies.

19.     Capital One began offering significant incentives to its consumers to choose Uber vehicles over properly licensed and regulated taxis – including offering free and discounted Uber rides and other similar promotions such as a 20% discount on all Uber rides when paid with a Capital One "Quicksilver" credit card. Capital One offered new customers two free Uber rides worth up to $60.00. Capital One created a new website promoting these incentives and further signaling its collaboration with Uber: "capitalone.com/uber".

20.     Capital One's partnership with Uber came as a great shock to Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin as the partnership was never disclosed to them prior to the 2014 marketing blitz. At no point in the parties' relationship was it ever contemplated that Capital One would undertake any action to undermine the taxi industry, the agreement at issue, or the value of Tri Global's and Capital One's loan portfolio.

21.     In partnering with and promoting Uber's ride-share services, Capital One and Uber's assault on the taxi industry has been instrumental in bringing about the destabilization of the Chicago taxi medallion market.

22.     In 2014, when Capital One began its partnership with Uber, the Chicago market softened dramatically. Sometime during mid-2014, funding to the medallion industry came to a

total halt. This was clearly tied to Capital One's partnership with Uber.

23.    By 2015, Uber reported that taxi usage nationwide had precipitously decreased while the number of customers using Uber increased correspondingly.

24.    The disruption of the taxi industry resulting from Capital One's partnership with Uber contributed to the reduction in value of the Chicago taxi medallions securing the loans.

25.    In short, Capital One has caused the price of the Chicago taxi medallions that secure the loans to plummet.

26.    Moreover, Capital One has sabotaged Tri Global, Symon Garber, Valentina Zubok, Galina Garber-Sheinin and Licensee's efforts to favorably restructure and/or modify the medallion-secured loans at issue.

27.    Accordingly, Capital One has materially breached the credit agreement and Licensee is not liable for the amount allegedly owed pursuant to the credit agreement.

## FIRST DEFENSE
### (No Right to Foreclose)

28.    Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

29.    Capital One, through its partnership with Uber, precipitated the collapse of the Chicago taxi medallion industry and the medallion industry nationwide, in addition to the corresponding decline in the value of the taxi medallions at issue.

30.    Based on Capital One's willful misconduct, breach of contract, malfeasance, wrongdoing and/or other intentional and/or reckless conduct, Capital One has no right to foreclose on the medallions at issue.

## SECOND DEFENSE
### (No Default by Licensee)

31.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

32.     Licensee does not owe the amount claimed by Capital One and has not defaulted on the agreement at issue with Capital One.

33.     Therefore, Capital One has no right to foreclose on the medallions at issue.

## THIRD DEFENSE
### (Improper Foreclosure Sale Purchase)

34.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

35.     On August 9, 2018, to start the foreclosure, Capital One opened the auction with an initial credit bid of $23,000.00.

36.     Capital One won the foreclosure auction with its initial $23,000.00 credit bid.

37.     Pursuant to Rule TX13.03(b), "[t]he [foreclosure] purchaser must meet all the criteria for licensing as set out in the Municipal Code of Chicago and [the BACP's] rules and regulations, including payment of the license transfer fee, license fees and any other fees, fines or taxes due and owing to the City." Rule TX13.03(b).

38.     Pursuant to Rule TX13.04(d), "[t]he taxicab medallion license must be sold to a person believed to be a qualified applicant . . ." Rule TX13.04(d); *see also* TX13.06(a).

39.     Upon information and belief, Capital One is not a qualified applicant and has no intention of ever seeking licensure under the Municipal Code of Chicago or BACP Taxi Rules.

40.     The purpose behind the BACP Taxi Rules' foreclosure process is to facilitate keeping medallions operating on the street. If Capital One is allowed to purchase the medallions,

with no intention of ever becoming licensed by the BACP, Capital One would be allowed to cause further harm to the taxicab industry and further benefit Uber.

41.     Therefore, the foreclosure sale did not comply with Rules TX13.03 and TX13.04 and the foreclosure auction resulted in an improper sale/purchase that violated the BACP Taxi Rules.

42.     Moreover, Capital One's intent behind the foreclosure sale is to destroy and cause further harm to Licensee, Tri Global, and Tri Global's owners and guarantors. Capital One has filed multiple actions against Licensee, Tri Global, and/or Tri Global's owners and guarantors and instead of allowing any of these cases to reach their natural conclusion, Capital One instead seeks to implement destructive tactics by foreclosing on the medallions in order to further destroy the medallion market by setting the prices and discouraging bids, all in violation of the Taxi Rules simply to inflict maximum damage and cause irreparable harm. In a recent case that was filed in the Circuit Court of Cook County, *Capital One Equipment Finance Corp. v. Chicago Elite Cab Corp., et al.*, No. 17 L 998, the Honorable Margaret A. Brennan dismissed Capital One's complaint but allowed Capital One leave to re-file its cause of action in another case currently pending in New York. That New York Action is *Capital One Equipment Finance Corp. v. The OSG Corp., Tri Global Financial Services, Inc. et al.*, No. 600749/2017. But, rather than re-file its case in the New York Action and pursue its alleged causes of action, Capital One instead chose to do an end run around the litigation process and seeks to foreclose on the medallions at issue in an attempt to destroy Licensee, Tri Global and Tri Global's owners and guarantors. Capital One did not re-file its Chicago cause of action in the New York Action because it knows that counterclaims would be filed against it, which would expose Capital One's bad faith conduct in abusing its partnership with Tri Global and expose Capital One's bad faith relationship with Uber. The reality is that

Capital One has filed numerous unsuccessful complaints in courts in New York and Chicago and, because these lawsuits have not been successful, Capital One is now attempting to cause as much harm as possible to Licensee and Tri Global before the counterclaims against Capital One are proven true and Capital One's bad faith is exposed.

## FOURTH DEFENSE
### (Improper Foreclosure Sale Process)

43.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

44.     On August 9, 2018, to start the foreclosure, Capital One opened the auction with an initial credit bid of $23,000.00.

45.     During the beginning part of the foreclosure auction, it became clear that no individuals were going to bid on the medallions because a foreclosure purchaser would have been liable for any and all liens on the medallions and such liability was unknown at the time of the auction. Capital One then stopped the foreclosure auction and announced to the individuals attending the auction that Capital One would work with any potential foreclosure purchasers and the bank to work out a deal on any liens on the medallion(s) bought at the auction. Capital One further stated that if the foreclosure purchaser and the bank could not work out an agreement concerning any liens on the medallions bought at the auction, Capital One would refund the foreclosure purchaser's money as if the foreclosure sale never took place. After this announcement, Capital One resumed the auction.

46.     By instituting this type of foreclosure auction, Capital One created an improper foreclosure process that created false values and did not bind the foreclosure purchasers.

## FIFTH DEFENSE
### (Breach of Fiduciary Duty)

47.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

48.     As set forth above, Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin relied heavily on and trusted Capital One.

49.     By virtue of the parties' business relationship as set forth above, and by reason of the demonstrable level of trust and confidence upon which Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin depended and which Capital One knowingly accepted, Capital One owes certain fiduciary duties to Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin including, without limitation, a duty of good faith.

50.     As explained herein, for years Tri Global relied on Capital One to guide certain aspects of its taxi-medallion loan origination and servicing business. Although the Tri Global MJPA provided discretion to Capital One, that discretion did not include a right to abandon the lending market or purposely advance competing interests to destabilize the industry upon which the very loans that were being serviced were based.

51.     Ultimately, Capital One repudiated its commitments to Licensee and abandoned the Chicago medallion lending market so that it could pursue a competing venture with Uber.

52.     Capital One breached its duty of good faith, and the trust and confidence of Licensee by, among other things: precipitating, through its partnership with Uber, the collapse of the Chicago taxi medallion industry and the medallion industry nationwide, in addition to the corresponding decline in the value of the taxi medallions at issue.

53.     Capital One engaged in an intentional course of wrongful conduct orchestrated to harm Licensee.

54.     Capital One's conduct was willful, wanton and in reckless disregard of the Licensee's contractual rights and was otherwise wrongful.

55.     As a direct and proximate result of Capital One's breach of its fiduciary duties, Licensee has suffered, and will continue to suffer, substantial damages.

**SIXTH DEFENSE**
**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

56.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

57.     Pursuant to the covenant of good faith and fair dealing, Capital One could not undertake any action that has the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

58.     As explained herein, Capital One breached the duty of good faith and fair dealing implied in the contract with Licensee by, among other things: precipitating, through its partnership with Uber, the collapse of the taxi medallion industry and concomitant decline in the value of the taxi medallions at issue.

59.     As a direct and proximate result of Capital One's breach of the implied covenant of good faith and fair dealing thereunder, Licensee has suffered, and will continue to suffer, substantial damages.

**SEVENTH DEFENSE**
**(Estoppel, Waiver, Ratification and/or Acquiescence)**

60.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

61.     Capital One's claim of breach of contract / default is barred by the doctrines of estoppel, waiver, ratification and/or acquiescence.

## <u>CONCLUSION</u>

WHEREFORE, based upon the foregoing allegations and defenses and all reasons appearing of record, Licensee has timely submitted a completed Affidavit of Defense and, pursuant to the BACP Taxi Rules, no transfer upon foreclosure may be allowed except pursuant to an order of a court having jurisdiction. Licensee respectfully requests that the BACP deny Creditor's Request to Transfer Taxicab Medallion License Upon Foreclosure.

## AFFIDAVIT OF DEFENSE TO CREDITOR

**To City:**   City of Chicago – Public Vehicle Operations Division
Department of Business Affairs and Consumer Protection
2350 W. Ogden Avenue, 1st Floor
Chicago, IL 60608
Attention: Monique Davids

**To Creditor:**   Capital One Equipment Finance Corp., f/k/a All Points Capital Corp.,
d/b/a Capital One Taxi Medallion Finance
c/o Troutman Sanders LLP
Att'n: Andrew L. Buck
875 Third Avenue
New York, NY 10022

RE: PUBLIC PASSENGER LICENSE NUMBER(s) <u>195TX, 202TX, 198TX & 203TX</u>

LICENSEE NAME: <u>Funny Monica In Chicago, Inc.</u>

I, <u>Galina Garber Sheinin</u>, hereby swear that I own Taxicab Medallion License
<span style="font-size:smaller">Debtor Individual Name</span>

Number(s) <u>195TX, 202TX, 198TX & 203TX</u> either individually or through a company that I own and I have a defense to

the foreclosure of these licenses. I understand that this license(s) was sold at a foreclosure

sale on or about _____<u>August 9, 2018</u>_____ and that sale is contingent upon approval by the Department of Business Affairs
<span style="font-size:smaller">List Date of Foreclosure Sale</span>
and Consumer Protection.

My defense to this foreclosure is: (Use additional pages if needed)_____

_____See attached Defense Document_____

_____

_____

Signature: _____

Print Name: _____Sheinin  Edward_____

Relationship to Medallion License/Title _Vice President & Authorized Agent_

Address: __2617 S Wabash Chicago IL 60616___

Phone: __312.791.1255_____

Email Address: __edwards@chicagocarriagecab.com.___

Subscribed and Sworn to before me

this __22__ day of __Aug__, 20__18__.

JANET DAVIS
Official Seal
Notary Public · State of Illinois
My Commission Expires Sep 20, 2019

_____ Notary Public

Version Date June 5, 2018

## AFFIDAVIT OF DEFENSE TO CREDITOR

## DEFENSE DOCUMENT

In support of its Affidavit of Defense to Creditor, Licensee asserts the following defenses in opposition to the Creditor's ("Creditor" or "Capital One") request to transfer public passenger vehicle license upon foreclosure and to the foreclosure sale: (1) Capital One has no right to foreclose on the medallions at issue; (2) Licensee does not owe the amount claimed by Capital One and has not defaulted on the agreement at issue with Capital One; (3) the foreclosure resulted in an improper foreclosure sale purchase that violated the BACP Taxi Rules; (4) Capital One instituted an improper foreclosure sale process; (5) Capital One breached its fiduciary duty to Licensee; (6) Capital One breached the implied covenant of good faith and fair dealing; (7) Capital One's claim of breach of contract / default is barred by the doctrines of estoppel, waiver, ratification and/or acquiescence. Because Licensee has timely submitted a completed Affidavit of Defense, pursuant to the BACP Taxi Rules, no transfer upon foreclosure may be allowed except pursuant to an order of a court having jurisdiction. Therefore, Licensee respectfully requests that the BACP deny Creditor's Request to Transfer Taxicab Medallion License Upon Foreclosure.

## FACTUAL BACKGROUND

1.      Symon Garber formed Tri Global Financial Services, Inc. ("Tri Global") in 2004, along with Roman Sapino and others, to provide capital to taxicab medallion owners. Tri Global's principal, Roman Sapino, also has many years of experience in the taxicab financing industry and has been involved in successful taxicab enterprises in New York and Chicago. Tri Global's co-owners include Galina Garber-Sheinin and Valentina Zubok. Irene Gans and Maya Zubok are related to an owner of Tri Global.

2.      Tri Global is a corporation formed and existing under the laws of the State of

Illinois, maintaining offices at 2617 S. Wabash Avenue, Chicago, Illinois 60616. Tri Global is engaged in the business of financing and servicing Chicago-based taxi medallion loans as well as offering second-position financing to the taxi industry.

3. Upon information and belief, Capital One is a corporation formed and existing under the laws of the State of New York, maintaining a principal place of business at 265 Broadhollow Road, Melville, New York 11747.

4. Tri Global was formed to provide loans to purchasers of public passenger vehicle licenses and medallions in the Chicago market, which confers the right to operate a taxicab in Chicago pursuant to the regulations issued and regulated by the City of Chicago Department of Business Affairs and Consumer Protection ("BACP").

5. Tri Global offered medallion and other financing to a wide-variety of borrowers, including taxicab businesses that rely on the medallion-secured loans to earn their livelihoods. Tri Global primarily focused its business on servicing taxi medallion loans for various lenders and also offered second-position financing to the taxi industry. In or around 2006 Tri Global was approached by North Fork Bank, which expressed interest in partnering with Tri Global to expand the scope of its lending platform.

6. Over the next several years, Tri Global and North Fork Bank entered into numerous successful loan participations. When North Fork Bank was acquired by Capital One in or about 2006/2007, this practice continued with Capital One.

7. Capital One was even more eager than North Fork Bank to capitalize upon Tri Global's contacts in the Chicago marketplace and strongly encouraged Tri Global to aggressively seek prospects for additional medallion loans. Capital One and Tri Global participated in the loans on a loan-by-loan basis for several years.

8. In 2010, Capital One requested that Tri Global enter into a more formal arrangement by way of a master participation agreement, to which Tri Global agreed. The terms and conditions governing that relationship and Capital One's senior participation interests in the loans are more particularly set forth in a certain Master Joint Participation Agreement, dated August 2, 2010 (the "MJPA" or the "Tri Global MJPA").

9. In connection with the Tri Global MJPA, Symon Garber, Roman Sapino, Ruben Giacomozzi, Valentina Zubok, and Galina Garber-Sheinin signed the Tri Global Guaranty, dated August 2, 2010.

10. Pursuant to the terms of the MJPA, Tri Global generated business, handled collections, serviced the loans and remitted monthly payments to Capital One in accordance with the amount of its participation in each underlying loan while Capital One held senior participation interests in the various loans made and serviced by Tri Global to owners of Chicago taxicab medallions (the "Loans"). The Tri Global MJPA contemplates the sale of senior participation interests in loans issued and/or originated by Tri Global to owners and operators of taxi medallions. As reflected in the Tri Global MJPA, after Tri Global sells a participation interest, it continues to service the debt owed thereunder. In exchange for its services, Tri Global receives a servicing fee that is paid from the debt-service payments remitted to Tri Global each month.

11. Since the inception of the Tri Global/Capital One relationship, the parties have participated in many loans. Although Tri Global originated the medallion-secured loans and served as the official loan servicer for the loan portfolio, Tri Global relied on and trusted Capital One and its commercial finance expertise. This relationship was often characterized by Capital One as a "team" and "partnership" and its officers and representatives, including David Cin ("Cin") and others, regularly commented that the success of the portfolio was the product of a "team effort."

12.     Although Capital One historically had no real presence in the Chicago medallion market, Capital One was eager to exploit Tri Global's connections to the taxicab medallion market and capitalize upon Tri Global's market dominance in the Chicago taxi-medallion economy. Capital One strongly encouraged Tri Global to aggressively acquire additional Chicago-based medallion loans.

13.     As the value of Chicago taxi medallion loans continued to rise, Capital One continued to aggressively press Tri Global to originate new loans so that Capital One could further capitalize on its market position and emerge as a leading taxi medallion lender in Chicago.

14.     Throughout the course of the Master Joint Participation Agreement, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin – whose interests were closely aligned with those of Capital One – worked with Capital One to maximize the return on the medallion loans.

15.     Tri Global originated the agreement/loan at issue between Licensee and Capital One based on Tri Global's relationship with Capital One.

16.     Despite its long-standing business venture with Tri Global, Capital One engaged in intentional and systematic efforts to line its own pockets to the detriment of Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin. As explained below, Capital One engaged in irreconcilable conflicts of interest, bad faith business practices, and intentionally disregarded its duty of good faith to Licensee and Tri Global when it partnered with a major taxi-industry competitor, Uber Technologies, Inc. ("Uber").

17.     In or about late 2013 and early 2014, and unbeknownst to Licensee and Tri Global (and many other Capital One loan participants and medallion-secured borrowers), Capital One began secretly planning to change course and exit the medallion market to partner with the

industry's most ominous competitor, Uber. Notwithstanding this new partnership, Capital One, either intentionally or recklessly, continued to encourage Tri Global to cultivate new medallion-secured loans while concealing its intention to partner with Uber.

18.     News of Capital One's partnership with Uber surfaced in approximately mid-2014, and was followed by an aggressive nationwide marketing campaign launched by Capital One. The marketing campaign and promotions touted Capital One's "unique new partnership" with Uber and underscored the "common focus" of both companies.

19.     Capital One began offering significant incentives to its consumers to choose Uber vehicles over properly licensed and regulated taxis – including offering free and discounted Uber rides and other similar promotions such as a 20% discount on all Uber rides when paid with a Capital One "Quicksilver" credit card. Capital One offered new customers two free Uber rides worth up to $60.00. Capital One created a new website promoting these incentives and further signaling its collaboration with Uber: "capitalone.com/uber".

20.     Capital One's partnership with Uber came as a great shock to Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin as the partnership was never disclosed to them prior to the 2014 marketing blitz. At no point in the parties' relationship was it ever contemplated that Capital One would undertake any action to undermine the taxi industry, the agreement at issue, or the value of Tri Global's and Capital One's loan portfolio.

21.     In partnering with and promoting Uber's ride-share services, Capital One and Uber's assault on the taxi industry has been instrumental in bringing about the destabilization of the Chicago taxi medallion market.

22.     In 2014, when Capital One began its partnership with Uber, the Chicago market softened dramatically. Sometime during mid-2014, funding to the medallion industry came to a

total halt. This was clearly tied to Capital One's partnership with Uber.

23.     By 2015, Uber reported that taxi usage nationwide had precipitously decreased while the number of customers using Uber increased correspondingly.

24.     The disruption of the taxi industry resulting from Capital One's partnership with Uber contributed to the reduction in value of the Chicago taxi medallions securing the loans.

25.     In short, Capital One has caused the price of the Chicago taxi medallions that secure the loans to plummet.

26.     Moreover, Capital One has sabotaged Tri Global, Symon Garber, Valentina Zubok, Galina Garber-Sheinin and Licensee's efforts to favorably restructure and/or modify the medallion-secured loans at issue.

27.     Accordingly, Capital One has materially breached the credit agreement and Licensee is not liable for the amount allegedly owed pursuant to the credit agreement.

**FIRST DEFENSE**
**(No Right to Foreclose)**

28.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

29.     Capital One, through its partnership with Uber, precipitated the collapse of the Chicago taxi medallion industry and the medallion industry nationwide, in addition to the corresponding decline in the value of the taxi medallions at issue.

30.     Based on Capital One's willful misconduct, breach of contract, malfeasance, wrongdoing and/or other intentional and/or reckless conduct, Capital One has no right to foreclose on the medallions at issue.

### SECOND DEFENSE
#### (No Default by Licensee)

31.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

32.     Licensee does not owe the amount claimed by Capital One and has not defaulted on the agreement at issue with Capital One.

33.     Therefore, Capital One has no right to foreclose on the medallions at issue.

### THIRD DEFENSE
#### (Improper Foreclosure Sale Purchase)

34.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

35.     On August 9, 2018, to start the foreclosure, Capital One opened the auction with an initial credit bid of $23,000.00.

36.     Capital One won the foreclosure auction with its initial $23,000.00 credit bid.

37.     Pursuant to Rule TX13.03(b), "[t]he [foreclosure] purchaser must meet all the criteria for licensing as set out in the Municipal Code of Chicago and [the BACP's] rules and regulations, including payment of the license transfer fee, license fees and any other fees, fines or taxes due and owing to the City." Rule TX13.03(b).

38.     Pursuant to Rule TX13.04(d), "[t]he taxicab medallion license must be sold to a person believed to be a qualified applicant . . ." Rule TX13.04(d); *see also* TX13.06(a).

39.     Upon information and belief, Capital One is not a qualified applicant and has no intention of ever seeking licensure under the Municipal Code of Chicago or BACP Taxi Rules.

40.     The purpose behind the BACP Taxi Rules' foreclosure process is to facilitate keeping medallions operating on the street. If Capital One is allowed to purchase the medallions,

with no intention of ever becoming licensed by the BACP, Capital One would be allowed to cause further harm to the taxicab industry and further benefit Uber.

41.     Therefore, the foreclosure sale did not comply with Rules TX13.03 and TX13.04 and the foreclosure auction resulted in an improper sale/purchase that violated the BACP Taxi Rules.

42.     Moreover, Capital One's intent behind the foreclosure sale is to destroy and cause further harm to Licensee, Tri Global, and Tri Global's owners and guarantors. Capital One has filed multiple actions against Licensee, Tri Global, and/or Tri Global's owners and guarantors and instead of allowing any of these cases to reach their natural conclusion, Capital One instead seeks to implement destructive tactics by foreclosing on the medallions in order to further destroy the medallion market by setting the prices and discouraging bids, all in violation of the Taxi Rules simply to inflict maximum damage and cause irreparable harm. In a recent case that was filed in the Circuit Court of Cook County, *Capital One Equipment Finance Corp. v. Chicago Elite Cab Corp., et al.*, No. 17 L 998, the Honorable Margaret A. Brennan dismissed Capital One's complaint but allowed Capital One leave to re-file its cause of action in another case currently pending in New York. That New York Action is *Capital One Equipment Finance Corp. v. The OSG Corp., Tri Global Financial Services, Inc. et al.*, No. 600749/2017. But, rather than re-file its case in the New York Action and pursue its alleged causes of action, Capital One instead chose to do an end run around the litigation process and seeks to foreclose on the medallions at issue in an attempt to destroy Licensee, Tri Global and Tri Global's owners and guarantors. Capital One did not re-file its Chicago cause of action in the New York Action because it knows that counterclaims would be filed against it, which would expose Capital One's bad faith conduct in abusing its partnership with Tri Global and expose Capital One's bad faith relationship with Uber. The reality is that

Capital One has filed numerous unsuccessful complaints in courts in New York and Chicago and, because these lawsuits have not been successful, Capital One is now attempting to cause as much harm as possible to Licensee and Tri Global before the counterclaims against Capital One are proven true and Capital One's bad faith is exposed.

## FOURTH DEFENSE
### (Improper Foreclosure Sale Process)

43. Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

44. On August 9, 2018, to start the foreclosure, Capital One opened the auction with an initial credit bid of $23,000.00.

45. During the beginning part of the foreclosure auction, it became clear that no individuals were going to bid on the medallions because a foreclosure purchaser would have been liable for any and all liens on the medallions and such liability was unknown at the time of the auction. Capital One then stopped the foreclosure auction and announced to the individuals attending the auction that Capital One would work with any potential foreclosure purchasers and the bank to work out a deal on any liens on the medallion(s) bought at the auction. Capital One further stated that if the foreclosure purchaser and the bank could not work out an agreement concerning any liens on the medallions bought at the auction, Capital One would refund the foreclosure purchaser's money as if the foreclosure sale never took place. After this announcement, Capital One resumed the auction.

46. By instituting this type of foreclosure auction, Capital One created an improper foreclosure process that created false values and did not bind the foreclosure purchasers.

## FIFTH DEFENSE
### (Breach of Fiduciary Duty)

47.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

48.     As set forth above, Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin relied heavily on and trusted Capital One.

49.     By virtue of the parties' business relationship as set forth above, and by reason of the demonstrable level of trust and confidence upon which Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin depended and which Capital One knowingly accepted, Capital One owes certain fiduciary duties to Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin including, without limitation, a duty of good faith.

50.     As explained herein, for years Tri Global relied on Capital One to guide certain aspects of its taxi-medallion loan origination and servicing business. Although the Tri Global MJPA provided discretion to Capital One, that discretion did not include a right to abandon the lending market or purposely advance competing interests to destabilize the industry upon which the very loans that were being serviced were based.

51.     Ultimately, Capital One repudiated its commitments to Licensee and abandoned the Chicago medallion lending market so that it could pursue a competing venture with Uber.

52.     Capital One breached its duty of good faith, and the trust and confidence of Licensee by, among other things: precipitating, through its partnership with Uber, the collapse of the Chicago taxi medallion industry and the medallion industry nationwide, in addition to the corresponding decline in the value of the taxi medallions at issue.

53.     Capital One engaged in an intentional course of wrongful conduct orchestrated to harm Licensee.

54.     Capital One's conduct was willful, wanton and in reckless disregard of the Licensee's contractual rights and was otherwise wrongful.

55.     As a direct and proximate result of Capital One's breach of its fiduciary duties, Licensee has suffered, and will continue to suffer, substantial damages.

## SIXTH DEFENSE
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

56.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

57.     Pursuant to the covenant of good faith and fair dealing, Capital One could not undertake any action that has the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

58.     As explained herein, Capital One breached the duty of good faith and fair dealing implied in the contract with Licensee by, among other things: precipitating, through its partnership with Uber, the collapse of the taxi medallion industry and concomitant decline in the value of the taxi medallions at issue.

59.     As a direct and proximate result of Capital One's breach of the implied covenant of good faith and fair dealing thereunder, Licensee has suffered, and will continue to suffer, substantial damages.

## SEVENTH DEFENSE
### (Estoppel, Waiver, Ratification and/or Acquiescence)

60.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

61.     Capital One's claim of breach of contract / default is barred by the doctrines of estoppel, waiver, ratification and/or acquiescence.

**CONCLUSION**

WHEREFORE, based upon the foregoing allegations and defenses and all reasons appearing of record, Licensee has timely submitted a completed Affidavit of Defense and, pursuant to the BACP Taxi Rules, no transfer upon foreclosure may be allowed except pursuant to an order of a court having jurisdiction. Licensee respectfully requests that the BACP deny Creditor's Request to Transfer Taxicab Medallion License Upon Foreclosure.

# AFFIDAVIT OF DEFENSE TO CREDITOR

**To City:** City of Chicago – Public Vehicle Operations Division
Department of Business Affairs and Consumer Protection
2350 W. Ogden Avenue, 1st Floor
Chicago, IL 60608
Attention: Monique Davids

**To Creditor:** Capital One Equipment Finance Corp., f/k/a All Points Capital Corp.,
d/b/a Capital One Taxi Medallion Finance
c/o Troutman Sanders LLP
Att'n: Andrew L. Buck
875 Third Avenue
New York, NY 10022

RE: PUBLIC PASSENGER LICENSE NUMBER(s) <u>5213TX, 5097TX, 2278TX, 5747TX, 5743TX & 5946TX</u>

LICENSEE NAME: <u>Galina Cab Corp.</u>

I, <u>Galina Garber Sheinin</u>, hereby swear that I own Taxicab Medallion License
<span style="font-size:smaller">Debtor Individual Name</span>

Number(s) <u>5213TX, 5097TX, 2278TX, 5747TX, 5743TX & 5946TX</u> either individually or through a company that I own

and I have a defense to the foreclosure of these licenses. I understand that this license(s) was sold at a foreclosure

sale on or about _____ <u>August 9, 2018</u> _____ and that sale is contingent upon approval by the Department of Business Affairs
<span style="font-size:smaller">List Date of Foreclosure Sale</span>

and Consumer Protection.

My defense to this foreclosure is: (Use additional pages if needed)_____

_____ See attached Defense Document. _____

_____

_____

Signature: _____

Print Name: <u>Edward Sheinin</u>

Relationship to Medallion License/Title <u>Vice President & Authorized Agent</u>

Address: <u>2617 S Wabash Chicago IL 60616</u>

Phone: <u>312.791.1255</u>

Email Address: <u>edwards@chicagocarriagecab.com.</u>

Subscribed and Sworn to before me

this <u>22</u> day of <u>Aug</u>, 20 <u>18</u>.

_____ Notary Public

JANET DAVIS
Official Seal
Notary Public - State of Illinois
My Commission Expires Sep...

## AFFIDAVIT OF DEFENSE TO CREDITOR

## DEFENSE DOCUMENT

In support of its Affidavit of Defense to Creditor, Licensee asserts the following defenses in opposition to the Creditor's ("Creditor" or "Capital One") request to transfer public passenger vehicle license upon foreclosure and to the foreclosure sale: (1) Capital One has no right to foreclose on the medallions at issue; (2) Licensee does not owe the amount claimed by Capital One and has not defaulted on the agreement at issue with Capital One; (3) the foreclosure resulted in an improper foreclosure sale purchase that violated the BACP Taxi Rules; (4) Capital One instituted an improper foreclosure sale process; (5) Capital One breached its fiduciary duty to Licensee; (6) Capital One breached the implied covenant of good faith and fair dealing; (7) Capital One's claim of breach of contract / default is barred by the doctrines of estoppel, waiver, ratification and/or acquiescence. Because Licensee has timely submitted a completed Affidavit of Defense, pursuant to the BACP Taxi Rules, no transfer upon foreclosure may be allowed except pursuant to an order of a court having jurisdiction. Therefore, Licensee respectfully requests that the BACP deny Creditor's Request to Transfer Taxicab Medallion License Upon Foreclosure.

## FACTUAL BACKGROUND

1. Symon Garber formed Tri Global Financial Services, Inc. ("Tri Global") in 2004, along with Roman Sapino and others, to provide capital to taxicab medallion owners. Tri Global's principal, Roman Sapino, also has many years of experience in the taxicab financing industry and has been involved in successful taxicab enterprises in New York and Chicago. Tri Global's co-owners include Galina Garber-Sheinin and Valentina Zubok. Irene Gans and Maya Zubok are related to an owner of Tri Global.

2. Tri Global is a corporation formed and existing under the laws of the State of

Illinois, maintaining offices at 2617 S. Wabash Avenue, Chicago, Illinois 60616. Tri Global is engaged in the business of financing and servicing Chicago-based taxi medallion loans as well as offering second-position financing to the taxi industry.

3. Upon information and belief, Capital One is a corporation formed and existing under the laws of the State of New York, maintaining a principal place of business at 265 Broadhollow Road, Melville, New York 11747.

4. Tri Global was formed to provide loans to purchasers of public passenger vehicle licenses and medallions in the Chicago market, which confers the right to operate a taxicab in Chicago pursuant to the regulations issued and regulated by the City of Chicago Department of Business Affairs and Consumer Protection ("BACP").

5. Tri Global offered medallion and other financing to a wide-variety of borrowers, including taxicab businesses that rely on the medallion-secured loans to earn their livelihoods. Tri Global primarily focused its business on servicing taxi medallion loans for various lenders and also offered second-position financing to the taxi industry. In or around 2006 Tri Global was approached by North Fork Bank, which expressed interest in partnering with Tri Global to expand the scope of its lending platform.

6. Over the next several years, Tri Global and North Fork Bank entered into numerous successful loan participations. When North Fork Bank was acquired by Capital One in or about 2006/2007, this practice continued with Capital One.

7. Capital One was even more eager than North Fork Bank to capitalize upon Tri Global's contacts in the Chicago marketplace and strongly encouraged Tri Global to aggressively seek prospects for additional medallion loans. Capital One and Tri Global participated in the loans on a loan-by-loan basis for several years.

61961691.v1                                           2

8.    In 2010, Capital One requested that Tri Global enter into a more formal arrangement by way of a master participation agreement, to which Tri Global agreed. The terms and conditions governing that relationship and Capital One's senior participation interests in the loans are more particularly set forth in a certain Master Joint Participation Agreement, dated August 2, 2010 (the "MJPA" or the "Tri Global MJPA").

9.    In connection with the Tri Global MJPA, Symon Garber, Roman Sapino, Ruben Giacomozzi, Valentina Zubok, and Galina Garber-Sheinin signed the Tri Global Guaranty, dated August 2, 2010.

10.    Pursuant to the terms of the MJPA, Tri Global generated business, handled collections, serviced the loans and remitted monthly payments to Capital One in accordance with the amount of its participation in each underlying loan while Capital One held senior participation interests in the various loans made and serviced by Tri Global to owners of Chicago taxicab medallions (the "Loans"). The Tri Global MJPA contemplates the sale of senior participation interests in loans issued and/or originated by Tri Global to owners and operators of taxi medallions. As reflected in the Tri Global MJPA, after Tri Global sells a participation interest, it continues to service the debt owed thereunder. In exchange for its services, Tri Global receives a servicing fee that is paid from the debt-service payments remitted to Tri Global each month.

11.    Since the inception of the Tri Global/Capital One relationship, the parties have participated in many loans. Although Tri Global originated the medallion-secured loans and served as the official loan servicer for the loan portfolio, Tri Global relied on and trusted Capital One and its commercial finance expertise. This relationship was often characterized by Capital One as a "team" and "partnership" and its officers and representatives, including David Cin ("Cin") and others, regularly commented that the success of the portfolio was the product of a "team effort."

12.     Although Capital One historically had no real presence in the Chicago medallion market, Capital One was eager to exploit Tri Global's connections to the taxicab medallion market and capitalize upon Tri Global's market dominance in the Chicago taxi-medallion economy. Capital One strongly encouraged Tri Global to aggressively acquire additional Chicago-based medallion loans.

13.     As the value of Chicago taxi medallion loans continued to rise, Capital One continued to aggressively press Tri Global to originate new loans so that Capital One could further capitalize on its market position and emerge as a leading taxi medallion lender in Chicago.

14.     Throughout the course of the Master Joint Participation Agreement, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin – whose interests were closely aligned with those of Capital One – worked with Capital One to maximize the return on the medallion loans.

15.     Tri Global originated the agreement/loan at issue between Licensee and Capital One based on Tri Global's relationship with Capital One.

16.     Despite its long-standing business venture with Tri Global, Capital One engaged in intentional and systematic efforts to line its own pockets to the detriment of Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin. As explained below, Capital One engaged in irreconcilable conflicts of interest, bad faith business practices, and intentionally disregarded its duty of good faith to Licensee and Tri Global when it partnered with a major taxi-industry competitor, Uber Technologies, Inc. ("Uber").

17.     In or about late 2013 and early 2014, and unbeknownst to Licensee and Tri Global (and many other Capital One loan participants and medallion-secured borrowers), Capital One began secretly planning to change course and exit the medallion market to partner with the

industry's most ominous competitor, Uber. Notwithstanding this new partnership, Capital One, either intentionally or recklessly, continued to encourage Tri Global to cultivate new medallion-secured loans while concealing its intention to partner with Uber.

18.     News of Capital One's partnership with Uber surfaced in approximately mid-2014, and was followed by an aggressive nationwide marketing campaign launched by Capital One. The marketing campaign and promotions touted Capital One's "unique new partnership" with Uber and underscored the "common focus" of both companies.

19.     Capital One began offering significant incentives to its consumers to choose Uber vehicles over properly licensed and regulated taxis – including offering free and discounted Uber rides and other similar promotions such as a 20% discount on all Uber rides when paid with a Capital One "Quicksilver" credit card. Capital One offered new customers two free Uber rides worth up to $60.00. Capital One created a new website promoting these incentives and further signaling its collaboration with Uber: "capitalone.com/uber".

20.     Capital One's partnership with Uber came as a great shock to Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin as the partnership was never disclosed to them prior to the 2014 marketing blitz. At no point in the parties' relationship was it ever contemplated that Capital One would undertake any action to undermine the taxi industry, the agreement at issue, or the value of Tri Global's and Capital One's loan portfolio.

21.     In partnering with and promoting Uber's ride-share services, Capital One and Uber's assault on the taxi industry has been instrumental in bringing about the destabilization of the Chicago taxi medallion market.

22.     In 2014, when Capital One began its partnership with Uber, the Chicago market softened dramatically. Sometime during mid-2014, funding to the medallion industry came to a

total halt. This was clearly tied to Capital One's partnership with Uber.

23.     By 2015, Uber reported that taxi usage nationwide had precipitously decreased while the number of customers using Uber increased correspondingly.

24.     The disruption of the taxi industry resulting from Capital One's partnership with Uber contributed to the reduction in value of the Chicago taxi medallions securing the loans.

25.     In short, Capital One has caused the price of the Chicago taxi medallions that secure the loans to plummet.

26.     Moreover, Capital One has sabotaged Tri Global, Symon Garber, Valentina Zubok, Galina Garber-Sheinin and Licensee's efforts to favorably restructure and/or modify the medallion-secured loans at issue.

27.     Accordingly, Capital One has materially breached the credit agreement and Licensee is not liable for the amount allegedly owed pursuant to the credit agreement.

### FIRST DEFENSE
### (No Right to Foreclose)

28.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

29.     Capital One, through its partnership with Uber, precipitated the collapse of the Chicago taxi medallion industry and the medallion industry nationwide, in addition to the corresponding decline in the value of the taxi medallions at issue.

30.     Based on Capital One's willful misconduct, breach of contract, malfeasance, wrongdoing and/or other intentional and/or reckless conduct, Capital One has no right to foreclose on the medallions at issue.

## SECOND DEFENSE
### (No Default by Licensee)

31.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

32.     Licensee does not owe the amount claimed by Capital One and has not defaulted on the agreement at issue with Capital One.

33.     Therefore, Capital One has no right to foreclose on the medallions at issue.

## THIRD DEFENSE
### (Improper Foreclosure Sale Purchase)

34.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

35.     On August 9, 2018, to start the foreclosure, Capital One opened the auction with an initial credit bid of $23,000.00.

36.     Capital One won the foreclosure auction with its initial $23,000.00 credit bid.

37.     Pursuant to Rule TX13.03(b), "[t]he [foreclosure] purchaser must meet all the criteria for licensing as set out in the Municipal Code of Chicago and [the BACP's] rules and regulations, including payment of the license transfer fee, license fees and any other fees, fines or taxes due and owing to the City." Rule TX13.03(b).

38.     Pursuant to Rule TX13.04(d), "[t]he taxicab medallion license must be sold to a person believed to be a qualified applicant . . ." Rule TX13.04(d); *see also* TX13.06(a).

39.     Upon information and belief, Capital One is not a qualified applicant and has no intention of ever seeking licensure under the Municipal Code of Chicago or BACP Taxi Rules.

40.     The purpose behind the BACP Taxi Rules' foreclosure process is to facilitate keeping medallions operating on the street. If Capital One is allowed to purchase the medallions,

with no intention of ever becoming licensed by the BACP, Capital One would be allowed to cause further harm to the taxicab industry and further benefit Uber.

41.     Therefore, the foreclosure sale did not comply with Rules TX13.03 and TX13.04 and the foreclosure auction resulted in an improper sale/purchase that violated the BACP Taxi Rules.

42.     Moreover, Capital One's intent behind the foreclosure sale is to destroy and cause further harm to Licensee, Tri Global, and Tri Global's owners and guarantors. Capital One has filed multiple actions against Licensee, Tri Global, and/or Tri Global's owners and guarantors and instead of allowing any of these cases to reach their natural conclusion, Capital One instead seeks to implement destructive tactics by foreclosing on the medallions in order to further destroy the medallion market by setting the prices and discouraging bids, all in violation of the Taxi Rules simply to inflict maximum damage and cause irreparable harm. In a recent case that was filed in the Circuit Court of Cook County, *Capital One Equipment Finance Corp. v. Chicago Elite Cab Corp., et al.*, No. 17 L 998, the Honorable Margaret A. Brennan dismissed Capital One's complaint but allowed Capital One leave to re-file its cause of action in another case currently pending in New York. That New York Action is *Capital One Equipment Finance Corp. v. The OSG Corp., Tri Global Financial Services, Inc. et al.*, No. 600749/2017. But, rather than re-file its case in the New York Action and pursue its alleged causes of action, Capital One instead chose to do an end run around the litigation process and seeks to foreclose on the medallions at issue in an attempt to destroy Licensee, Tri Global and Tri Global's owners and guarantors. Capital One did not re-file its Chicago cause of action in the New York Action because it knows that counterclaims would be filed against it, which would expose Capital One's bad faith conduct in abusing its partnership with Tri Global and expose Capital One's bad faith relationship with Uber. The reality is that

Capital One has filed numerous unsuccessful complaints in courts in New York and Chicago and, because these lawsuits have not been successful, Capital One is now attempting to cause as much harm as possible to Licensee and Tri Global before the counterclaims against Capital One are proven true and Capital One's bad faith is exposed.

**FOURTH DEFENSE**
**(Improper Foreclosure Sale Process)**

43.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

44.     On August 9, 2018, to start the foreclosure, Capital One opened the auction with an initial credit bid of $23,000.00.

45.     During the beginning part of the foreclosure auction, it became clear that no individuals were going to bid on the medallions because a foreclosure purchaser would have been liable for any and all liens on the medallions and such liability was unknown at the time of the auction. Capital One then stopped the foreclosure auction and announced to the individuals attending the auction that Capital One would work with any potential foreclosure purchasers and the bank to work out a deal on any liens on the medallion(s) bought at the auction. Capital One further stated that if the foreclosure purchaser and the bank could not work out an agreement concerning any liens on the medallions bought at the auction, Capital One would refund the foreclosure purchaser's money as if the foreclosure sale never took place. After this announcement, Capital One resumed the auction.

46.     By instituting this type of foreclosure auction, Capital One created an improper foreclosure process that created false values and did not bind the foreclosure purchasers.

## FIFTH DEFENSE
### (Breach of Fiduciary Duty)

47.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

48.     As set forth above, Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin relied heavily on and trusted Capital One.

49.     By virtue of the parties' business relationship as set forth above, and by reason of the demonstrable level of trust and confidence upon which Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin depended and which Capital One knowingly accepted, Capital One owes certain fiduciary duties to Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin including, without limitation, a duty of good faith.

50.     As explained herein, for years Tri Global relied on Capital One to guide certain aspects of its taxi-medallion loan origination and servicing business. Although the Tri Global MJPA provided discretion to Capital One, that discretion did not include a right to abandon the lending market or purposely advance competing interests to destabilize the industry upon which the very loans that were being serviced were based.

51.     Ultimately, Capital One repudiated its commitments to Licensee and abandoned the Chicago medallion lending market so that it could pursue a competing venture with Uber.

52.     Capital One breached its duty of good faith, and the trust and confidence of Licensee by, among other things: precipitating, through its partnership with Uber, the collapse of the Chicago taxi medallion industry and the medallion industry nationwide, in addition to the corresponding decline in the value of the taxi medallions at issue.

53.     Capital One engaged in an intentional course of wrongful conduct orchestrated to harm Licensee.

54.     Capital One's conduct was willful, wanton and in reckless disregard of the Licensee's contractual rights and was otherwise wrongful.

55.     As a direct and proximate result of Capital One's breach of its fiduciary duties, Licensee has suffered, and will continue to suffer, substantial damages.

## SIXTH DEFENSE
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

56.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

57.     Pursuant to the covenant of good faith and fair dealing, Capital One could not undertake any action that has the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

58.     As explained herein, Capital One breached the duty of good faith and fair dealing implied in the contract with Licensee by, among other things: precipitating, through its partnership with Uber, the collapse of the taxi medallion industry and concomitant decline in the value of the taxi medallions at issue.

59.     As a direct and proximate result of Capital One's breach of the implied covenant of good faith and fair dealing thereunder, Licensee has suffered, and will continue to suffer, substantial damages.

## SEVENTH DEFENSE
### (Estoppel, Waiver, Ratification and/or Acquiescence)

60.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

61.     Capital One's claim of breach of contract / default is barred by the doctrines of estoppel, waiver, ratification and/or acquiescence.

## CONCLUSION

WHEREFORE, based upon the foregoing allegations and defenses and all reasons appearing of record, Licensee has timely submitted a completed Affidavit of Defense and, pursuant to the BACP Taxi Rules, no transfer upon foreclosure may be allowed except pursuant to an order of a court having jurisdiction. Licensee respectfully requests that the BACP deny Creditor's Request to Transfer Taxicab Medallion License Upon Foreclosure.

# AFFIDAVIT OF DEFENSE TO CREDITOR

**To City:**    City of Chicago – Public Vehicle Operations Division
Department of Business Affairs and Consumer Protection
2350 W. Ogden Avenue, 1st Floor
Chicago, IL 60608
Attention: Monique Davids

**To Creditor:**    Capital One Equipment Finance Corp., f/k/a All Points Capital Corp.,
d/b/a Capital One Taxi Medallion Finance
c/o Troutman Sanders LLP
Att'n: Andrew L. Buck
875 Third Avenue
New York, NY 10022

RE: PUBLIC PASSENGER LICENSE NUMBER(s) <u>1561TX, 1650TX, 2793TX, 3615TX, 4933TX, 1716TX</u>

LICENSEE NAME: <u>Gap Cab Corp.</u>

I, <u>Valentini Zubok</u>, hereby swear that I own Taxicab Medallion License
Debtor Individual Name

Number(s) <u>1561TX, 1650TX, 2793TX, 3615TX, 4933TX, 1716TX</u> either individually or through a company that I own

and I have a defense to the foreclosure of these licenses. I understand that this license(s) was sold at a foreclosure

sale on or about <u>August 9, 2018</u> and that sale is contingent upon approval by the Department of Business Affairs
Last Date of Foreclosure Sale

and Consumer Protection.

My defense to this foreclosure is: (Use additional pages if needed) _____

_____ See attached Defense Document _____

_____

_____

Signature: _____

Print Name: <u>Shanin Edward</u>

Relationship to Medallion License/Title <u>Vice President & Authorized Agent</u>

Address: <u>2617 S Wabash Ave Chicago, IL 60616</u>

Phone: <u>312-791-1255</u>

Email Address: <u>edwards@chicagocarriagecab.com</u>

Subscribed and Sworn to before me

this <u>22</u> day of <u>Aug</u>, 20<u>18</u>.

_____
Notary Public

JANET DAVIS
Official Seal
Notary Public - State of Illinois
My Commission Expires Sep ... 19

## AFFIDAVIT OF DEFENSE TO CREDITOR

## DEFENSE DOCUMENT

In support of its Affidavit of Defense to Creditor, Licensee asserts the following defenses in opposition to the Creditor's ("Creditor" or "Capital One") request to transfer public passenger vehicle license upon foreclosure and to the foreclosure sale: (1) Capital One has no right to foreclose on the medallions at issue; (2) Licensee does not owe the amount claimed by Capital One and has not defaulted on the agreement at issue with Capital One; (3) the foreclosure resulted in an improper foreclosure sale purchase that violated the BACP Taxi Rules; (4) Capital One instituted an improper foreclosure sale process; (5) Capital One breached its fiduciary duty to Licensee; (6) Capital One breached the implied covenant of good faith and fair dealing; (7) Capital One's claim of breach of contract / default is barred by the doctrines of estoppel, waiver, ratification and/or acquiescence. Because Licensee has timely submitted a completed Affidavit of Defense, pursuant to the BACP Taxi Rules, no transfer upon foreclosure may be allowed except pursuant to an order of a court having jurisdiction. Therefore, Licensee respectfully requests that the BACP deny Creditor's Request to Transfer Taxicab Medallion License Upon Foreclosure.

## FACTUAL BACKGROUND

1.      Symon Garber formed Tri Global Financial Services, Inc. ("Tri Global") in 2004, along with Roman Sapino and others, to provide capital to taxicab medallion owners. Tri Global's principal, Roman Sapino, also has many years of experience in the taxicab financing industry and has been involved in successful taxicab enterprises in New York and Chicago. Tri Global's co-owners include Galina Garber-Sheinin and Valentina Zubok. Irene Gans and Maya Zubok are related to an owner of Tri Global.

2.      Tri Global is a corporation formed and existing under the laws of the State of

Illinois, maintaining offices at 2617 S. Wabash Avenue, Chicago, Illinois 60616. Tri Global is engaged in the business of financing and servicing Chicago-based taxi medallion loans as well as offering second-position financing to the taxi industry.

3.     Upon information and belief, Capital One is a corporation formed and existing under the laws of the State of New York, maintaining a principal place of business at 265 Broadhollow Road, Melville, New York 11747.

4.     Tri Global was formed to provide loans to purchasers of public passenger vehicle licenses and medallions in the Chicago market, which confers the right to operate a taxicab in Chicago pursuant to the regulations issued and regulated by the City of Chicago Department of Business Affairs and Consumer Protection ("BACP").

5.     Tri Global offered medallion and other financing to a wide-variety of borrowers, including taxicab businesses that rely on the medallion-secured loans to earn their livelihoods. Tri Global primarily focused its business on servicing taxi medallion loans for various lenders and also offered second-position financing to the taxi industry. In or around 2006 Tri Global was approached by North Fork Bank, which expressed interest in partnering with Tri Global to expand the scope of its lending platform.

6.     Over the next several years, Tri Global and North Fork Bank entered into numerous successful loan participations. When North Fork Bank was acquired by Capital One in or about 2006/2007, this practice continued with Capital One.

7.     Capital One was even more eager than North Fork Bank to capitalize upon Tri Global's contacts in the Chicago marketplace and strongly encouraged Tri Global to aggressively seek prospects for additional medallion loans. Capital One and Tri Global participated in the loans on a loan-by-loan basis for several years.

8.    In 2010, Capital One requested that Tri Global enter into a more formal arrangement by way of a master participation agreement, to which Tri Global agreed. The terms and conditions governing that relationship and Capital One's senior participation interests in the loans are more particularly set forth in a certain Master Joint Participation Agreement, dated August 2, 2010 (the "MJPA" or the "Tri Global MJPA").

9.    In connection with the Tri Global MJPA, Symon Garber, Roman Sapino, Ruben Giacomozzi, Valentina Zubok, and Galina Garber-Sheinin signed the Tri Global Guaranty, dated August 2, 2010.

10.    Pursuant to the terms of the MJPA, Tri Global generated business, handled collections, serviced the loans and remitted monthly payments to Capital One in accordance with the amount of its participation in each underlying loan while Capital One held senior participation interests in the various loans made and serviced by Tri Global to owners of Chicago taxicab medallions (the "Loans"). The Tri Global MJPA contemplates the sale of senior participation interests in loans issued and/or originated by Tri Global to owners and operators of taxi medallions. As reflected in the Tri Global MJPA, after Tri Global sells a participation interest, it continues to service the debt owed thereunder. In exchange for its services, Tri Global receives a servicing fee that is paid from the debt-service payments remitted to Tri Global each month.

11.    Since the inception of the Tri Global/Capital One relationship, the parties have participated in many loans. Although Tri Global originated the medallion-secured loans and served as the official loan servicer for the loan portfolio, Tri Global relied on and trusted Capital One and its commercial finance expertise. This relationship was often characterized by Capital One as a "team" and "partnership" and its officers and representatives, including David Cin ("Cin") and others, regularly commented that the success of the portfolio was the product of a "team effort."

12.    Although Capital One historically had no real presence in the Chicago medallion market, Capital One was eager to exploit Tri Global's connections to the taxicab medallion market and capitalize upon Tri Global's market dominance in the Chicago taxi-medallion economy. Capital One strongly encouraged Tri Global to aggressively acquire additional Chicago-based medallion loans.

13.    As the value of Chicago taxi medallion loans continued to rise, Capital One continued to aggressively press Tri Global to originate new loans so that Capital One could further capitalize on its market position and emerge as a leading taxi medallion lender in Chicago.

14.    Throughout the course of the Master Joint Participation Agreement, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin – whose interests were closely aligned with those of Capital One – worked with Capital One to maximize the return on the medallion loans.

15.    Tri Global originated the agreement/loan at issue between Licensee and Capital One based on Tri Global's relationship with Capital One.

16.    Despite its long-standing business venture with Tri Global, Capital One engaged in intentional and systematic efforts to line its own pockets to the detriment of Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin. As explained below, Capital One engaged in irreconcilable conflicts of interest, bad faith business practices, and intentionally disregarded its duty of good faith to Licensee and Tri Global when it partnered with a major taxi-industry competitor, Uber Technologies, Inc. ("Uber").

17.    In or about late 2013 and early 2014, and unbeknownst to Licensee and Tri Global (and many other Capital One loan participants and medallion-secured borrowers), Capital One began secretly planning to change course and exit the medallion market to partner with the

industry's most ominous competitor, Uber. Notwithstanding this new partnership, Capital One, either intentionally or recklessly, continued to encourage Tri Global to cultivate new medallion-secured loans while concealing its intention to partner with Uber.

18.    News of Capital One's partnership with Uber surfaced in approximately mid-2014, and was followed by an aggressive nationwide marketing campaign launched by Capital One. The marketing campaign and promotions touted Capital One's "unique new partnership" with Uber and underscored the "common focus" of both companies.

19.    Capital One began offering significant incentives to its consumers to choose Uber vehicles over properly licensed and regulated taxis – including offering free and discounted Uber rides and other similar promotions such as a 20% discount on all Uber rides when paid with a Capital One "Quicksilver" credit card. Capital One offered new customers two free Uber rides worth up to $60.00. Capital One created a new website promoting these incentives and further signaling its collaboration with Uber: "capitalone.com/uber".

20.    Capital One's partnership with Uber came as a great shock to Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin as the partnership was never disclosed to them prior to the 2014 marketing blitz. At no point in the parties' relationship was it ever contemplated that Capital One would undertake any action to undermine the taxi industry, the agreement at issue, or the value of Tri Global's and Capital One's loan portfolio.

21.    In partnering with and promoting Uber's ride-share services, Capital One and Uber's assault on the taxi industry has been instrumental in bringing about the destabilization of the Chicago taxi medallion market.

22.    In 2014, when Capital One began its partnership with Uber, the Chicago market softened dramatically. Sometime during mid-2014, funding to the medallion industry came to a

total halt. This was clearly tied to Capital One's partnership with Uber.

23.     By 2015, Uber reported that taxi usage nationwide had precipitously decreased while the number of customers using Uber increased correspondingly.

24.     The disruption of the taxi industry resulting from Capital One's partnership with Uber contributed to the reduction in value of the Chicago taxi medallions securing the loans.

25.     In short, Capital One has caused the price of the Chicago taxi medallions that secure the loans to plummet.

26.     Moreover, Capital One has sabotaged Tri Global, Symon Garber, Valentina Zubok, Galina Garber-Sheinin and Licensee's efforts to favorably restructure and/or modify the medallion-secured loans at issue.

27.     Accordingly, Capital One has materially breached the credit agreement and Licensee is not liable for the amount allegedly owed pursuant to the credit agreement.

## FIRST DEFENSE
### (No Right to Foreclose)

28.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

29.     Capital One, through its partnership with Uber, precipitated the collapse of the Chicago taxi medallion industry and the medallion industry nationwide, in addition to the corresponding decline in the value of the taxi medallions at issue.

30.     Based on Capital One's willful misconduct, breach of contract, malfeasance, wrongdoing and/or other intentional and/or reckless conduct, Capital One has no right to foreclose on the medallions at issue.

## SECOND DEFENSE
### (No Default by Licensee)

31.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

32.     Licensee does not owe the amount claimed by Capital One and has not defaulted on the agreement at issue with Capital One.

33.     Therefore, Capital One has no right to foreclose on the medallions at issue.

## THIRD DEFENSE
### (Improper Foreclosure Sale Purchase)

34.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

35.     On August 9, 2018, to start the foreclosure, Capital One opened the auction with an initial credit bid of $23,000.00.

36.     Capital One won the foreclosure auction with its initial $23,000.00 credit bid.

37.     Pursuant to Rule TX13.03(b), "[t]he [foreclosure] purchaser must meet all the criteria for licensing as set out in the Municipal Code of Chicago and [the BACP's] rules and regulations, including payment of the license transfer fee, license fees and any other fees, fines or taxes due and owing to the City." Rule TX13.03(b).

38.     Pursuant to Rule TX13.04(d), "[t]he taxicab medallion license must be sold to a person believed to be a qualified applicant . . ." Rule TX13.04(d); *see also* TX13.06(a).

39.     Upon information and belief, Capital One is not a qualified applicant and has no intention of ever seeking licensure under the Municipal Code of Chicago or BACP Taxi Rules.

40.     The purpose behind the BACP Taxi Rules' foreclosure process is to facilitate keeping medallions operating on the street. If Capital One is allowed to purchase the medallions,

with no intention of ever becoming licensed by the BACP, Capital One would be allowed to cause further harm to the taxicab industry and further benefit Uber.

41.     Therefore, the foreclosure sale did not comply with Rules TX13.03 and TX13.04 and the foreclosure auction resulted in an improper sale/purchase that violated the BACP Taxi Rules.

42.     Moreover, Capital One's intent behind the foreclosure sale is to destroy and cause further harm to Licensee, Tri Global, and Tri Global's owners and guarantors. Capital One has filed multiple actions against Licensee, Tri Global, and/or Tri Global's owners and guarantors and instead of allowing any of these cases to reach their natural conclusion, Capital One instead seeks to implement destructive tactics by foreclosing on the medallions in order to further destroy the medallion market by setting the prices and discouraging bids, all in violation of the Taxi Rules simply to inflict maximum damage and cause irreparable harm. In a recent case that was filed in the Circuit Court of Cook County, *Capital One Equipment Finance Corp. v. Chicago Elite Cab Corp., et al.*, No. 17 L 998, the Honorable Margaret A. Brennan dismissed Capital One's complaint but allowed Capital One leave to re-file its cause of action in another case currently pending in New York. That New York Action is *Capital One Equipment Finance Corp. v. The OSG Corp., Tri Global Financial Services, Inc. et al.*, No. 600749/2017. But, rather than re-file its case in the New York Action and pursue its alleged causes of action, Capital One instead chose to do an end run around the litigation process and seeks to foreclose on the medallions at issue in an attempt to destroy Licensee, Tri Global and Tri Global's owners and guarantors. Capital One did not re-file its Chicago cause of action in the New York Action because it knows that counterclaims would be filed against it, which would expose Capital One's bad faith conduct in abusing its partnership with Tri Global and expose Capital One's bad faith relationship with Uber. The reality is that

Capital One has filed numerous unsuccessful complaints in courts in New York and Chicago and, because these lawsuits have not been successful, Capital One is now attempting to cause as much harm as possible to Licensee and Tri Global before the counterclaims against Capital One are proven true and Capital One's bad faith is exposed.

## FOURTH DEFENSE
### (Improper Foreclosure Sale Process)

43.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

44.     On August 9, 2018, to start the foreclosure, Capital One opened the auction with an initial credit bid of $23,000.00.

45.     During the beginning part of the foreclosure auction, it became clear that no individuals were going to bid on the medallions because a foreclosure purchaser would have been liable for any and all liens on the medallions and such liability was unknown at the time of the auction. Capital One then stopped the foreclosure auction and announced to the individuals attending the auction that Capital One would work with any potential foreclosure purchasers and the bank to work out a deal on any liens on the medallion(s) bought at the auction. Capital One further stated that if the foreclosure purchaser and the bank could not work out an agreement concerning any liens on the medallions bought at the auction, Capital One would refund the foreclosure purchaser's money as if the foreclosure sale never took place. After this announcement, Capital One resumed the auction.

46.     By instituting this type of foreclosure auction, Capital One created an improper foreclosure process that created false values and did not bind the foreclosure purchasers.

**FIFTH DEFENSE**
**(Breach of Fiduciary Duty)**

47.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

48.     As set forth above, Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin relied heavily on and trusted Capital One.

49.     By virtue of the parties' business relationship as set forth above, and by reason of the demonstrable level of trust and confidence upon which Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin depended and which Capital One knowingly accepted, Capital One owes certain fiduciary duties to Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin including, without limitation, a duty of good faith.

50.     As explained herein, for years Tri Global relied on Capital One to guide certain aspects of its taxi-medallion loan origination and servicing business. Although the Tri Global MJPA provided discretion to Capital One, that discretion did not include a right to abandon the lending market or purposely advance competing interests to destabilize the industry upon which the very loans that were being serviced were based.

51.     Ultimately, Capital One repudiated its commitments to Licensee and abandoned the Chicago medallion lending market so that it could pursue a competing venture with Uber.

52.     Capital One breached its duty of good faith, and the trust and confidence of Licensee by, among other things: precipitating, through its partnership with Uber, the collapse of the Chicago taxi medallion industry and the medallion industry nationwide, in addition to the corresponding decline in the value of the taxi medallions at issue.

53.     Capital One engaged in an intentional course of wrongful conduct orchestrated to harm Licensee.

54.     Capital One's conduct was willful, wanton and in reckless disregard of the Licensee's contractual rights and was otherwise wrongful.

55.     As a direct and proximate result of Capital One's breach of its fiduciary duties, Licensee has suffered, and will continue to suffer, substantial damages.

## SIXTH DEFENSE
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

56.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

57.     Pursuant to the covenant of good faith and fair dealing, Capital One could not undertake any action that has the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

58.     As explained herein, Capital One breached the duty of good faith and fair dealing implied in the contract with Licensee by, among other things: precipitating, through its partnership with Uber, the collapse of the taxi medallion industry and concomitant decline in the value of the taxi medallions at issue.

59.     As a direct and proximate result of Capital One's breach of the implied covenant of good faith and fair dealing thereunder, Licensee has suffered, and will continue to suffer, substantial damages.

## SEVENTH DEFENSE
### (Estoppel, Waiver, Ratification and/or Acquiescence)

60.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

61.     Capital One's claim of breach of contract / default is barred by the doctrines of estoppel, waiver, ratification and/or acquiescence.

## CONCLUSION

WHEREFORE, based upon the foregoing allegations and defenses and all reasons appearing of record, Licensee has timely submitted a completed Affidavit of Defense and, pursuant to the BACP Taxi Rules, no transfer upon foreclosure may be allowed except pursuant to an order of a court having jurisdiction. Licensee respectfully requests that the BACP deny Creditor's Request to Transfer Taxicab Medallion License Upon Foreclosure.

# AFFIDAVIT OF DEFENSE TO CREDITOR

To City:     City of Chicago – Public Vehicle Operations Division
               Department of Business Affairs and Consumer Protection
               2350 W. Ogden Avenue, 1st Floor
               Chicago, IL 60608
               Attention: Monique Davids

To Creditor:     Capital One Equipment Finance Corp., f/k/a All Points Capital Corp.,
               d/b/a Capital One Taxi Medallion Finance
               c/o Troutman Sanders LLP
               Att'n: Andrew L. Buck
               875 Third Avenue
               New York, NY 10022

RE: PUBLIC PASSENGER LICENSE NUMBER(s) <u>4949TX, 4946TX, 4936TX, 4935TX, & 4923TX</u>

LICENSEE NAME: <u>Green Tea Cab Corp.</u>

I, _____*Maya Zubox*_____, hereby swear that I own Taxicab Medallion License
            <small>Debtor Individual Name</small>

Number(s) <u>4949TX, 4946TX, 4936TX, 4935TX, & 4923TX</u> either individually or through a company that I own and I

have a defense to the foreclosure of these licenses. I understand that this license(s) was sold at a foreclosure

sale on or about _____August 9, 2018_____ and that sale is contingent upon approval by the Department of Business Affairs
            <small>List Date of Foreclosure Sale</small>

and Consumer Protection.

My defense to this foreclosure is: (Use additional pages if needed)_____

_____*see attached Defense Document*_____

_____

_____

Signature: _____

Print Name: _____*Sherwin Edward*_____

Relationship to Medallion License/Title _____*VP and authorized signature agent*_____

Address: _____*2617 S. Wabash Ave Chicago IL 60616*_____

Phone: _____*312 791-1255*_____

Email Address: _____*edwards@chicagocarriagecab.com*_____

                         Subscribed and Sworn to before me

                         this 22 day of Aug _____, 20 18 .

                                             Notary Public

## AFFIDAVIT OF DEFENSE TO CREDITOR

## DEFENSE DOCUMENT

In support of its Affidavit of Defense to Creditor, Licensee asserts the following defenses in opposition to the Creditor's ("Creditor" or "Capital One") request to transfer public passenger vehicle license upon foreclosure and to the foreclosure sale: (1) Capital One has no right to foreclose on the medallions at issue; (2) Licensee does not owe the amount claimed by Capital One and has not defaulted on the agreement at issue with Capital One; (3) the foreclosure resulted in an improper foreclosure sale purchase that violated the BACP Taxi Rules; (4) Capital One instituted an improper foreclosure sale process; (5) Capital One breached its fiduciary duty to Licensee; (6) Capital One breached the implied covenant of good faith and fair dealing; (7) Capital One's claim of breach of contract / default is barred by the doctrines of estoppel, waiver, ratification and/or acquiescence. Because Licensee has timely submitted a completed Affidavit of Defense, pursuant to the BACP Taxi Rules, no transfer upon foreclosure may be allowed except pursuant to an order of a court having jurisdiction. Therefore, Licensee respectfully requests that the BACP deny Creditor's Request to Transfer Taxicab Medallion License Upon Foreclosure.

## FACTUAL BACKGROUND

1.      Symon Garber formed Tri Global Financial Services, Inc. ("Tri Global") in 2004, along with Roman Sapino and others, to provide capital to taxicab medallion owners. Tri Global's principal, Roman Sapino, also has many years of experience in the taxicab financing industry and has been involved in successful taxicab enterprises in New York and Chicago. Tri Global's co-owners include Galina Garber-Sheinin and Valentina Zubok. Irene Gans and Maya Zubok are related to an owner of Tri Global.

2.      Tri Global is a corporation formed and existing under the laws of the State of

Illinois, maintaining offices at 2617 S. Wabash Avenue, Chicago, Illinois 60616. Tri Global is engaged in the business of financing and servicing Chicago-based taxi medallion loans as well as offering second-position financing to the taxi industry.

3.     Upon information and belief, Capital One is a corporation formed and existing under the laws of the State of New York, maintaining a principal place of business at 265 Broadhollow Road, Melville, New York 11747.

4.     Tri Global was formed to provide loans to purchasers of public passenger vehicle licenses and medallions in the Chicago market, which confers the right to operate a taxicab in Chicago pursuant to the regulations issued and regulated by the City of Chicago Department of Business Affairs and Consumer Protection ("BACP").

5.     Tri Global offered medallion and other financing to a wide-variety of borrowers, including taxicab businesses that rely on the medallion-secured loans to earn their livelihoods. Tri Global primarily focused its business on servicing taxi medallion loans for various lenders and also offered second-position financing to the taxi industry. In or around 2006 Tri Global was approached by North Fork Bank, which expressed interest in partnering with Tri Global to expand the scope of its lending platform.

6.     Over the next several years, Tri Global and North Fork Bank entered into numerous successful loan participations. When North Fork Bank was acquired by Capital One in or about 2006/2007, this practice continued with Capital One.

7.     Capital One was even more eager than North Fork Bank to capitalize upon Tri Global's contacts in the Chicago marketplace and strongly encouraged Tri Global to aggressively seek prospects for additional medallion loans. Capital One and Tri Global participated in the loans on a loan-by-loan basis for several years.

8.      In 2010, Capital One requested that Tri Global enter into a more formal arrangement by way of a master participation agreement, to which Tri Global agreed. The terms and conditions governing that relationship and Capital One's senior participation interests in the loans are more particularly set forth in a certain Master Joint Participation Agreement, dated August 2, 2010 (the "MJPA" or the "Tri Global MJPA").

9.      In connection with the Tri Global MJPA, Symon Garber, Roman Sapino, Ruben Giacomozzi, Valentina Zubok, and Galina Garber-Sheinin signed the Tri Global Guaranty, dated August 2, 2010.

10.     Pursuant to the terms of the MJPA, Tri Global generated business, handled collections, serviced the loans and remitted monthly payments to Capital One in accordance with the amount of its participation in each underlying loan while Capital One held senior participation interests in the various loans made and serviced by Tri Global to owners of Chicago taxicab medallions (the "Loans"). The Tri Global MJPA contemplates the sale of senior participation interests in loans issued and/or originated by Tri Global to owners and operators of taxi medallions. As reflected in the Tri Global MJPA, after Tri Global sells a participation interest, it continues to service the debt owed thereunder. In exchange for its services, Tri Global receives a servicing fee that is paid from the debt-service payments remitted to Tri Global each month.

11.     Since the inception of the Tri Global/Capital One relationship, the parties have participated in many loans. Although Tri Global originated the medallion-secured loans and served as the official loan servicer for the loan portfolio, Tri Global relied on and trusted Capital One and its commercial finance expertise. This relationship was often characterized by Capital One as a "team" and "partnership" and its officers and representatives, including David Cin ("Cin") and others, regularly commented that the success of the portfolio was the product of a "team effort."

12.     Although Capital One historically had no real presence in the Chicago medallion market, Capital One was eager to exploit Tri Global's connections to the taxicab medallion market and capitalize upon Tri Global's market dominance in the Chicago taxi-medallion economy. Capital One strongly encouraged Tri Global to aggressively acquire additional Chicago-based medallion loans.

13.     As the value of Chicago taxi medallion loans continued to rise, Capital One continued to aggressively press Tri Global to originate new loans so that Capital One could further capitalize on its market position and emerge as a leading taxi medallion lender in Chicago.

14.     Throughout the course of the Master Joint Participation Agreement, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin – whose interests were closely aligned with those of Capital One – worked with Capital One to maximize the return on the medallion loans.

15.     Tri Global originated the agreement/loan at issue between Licensee and Capital One based on Tri Global's relationship with Capital One.

16.     Despite its long-standing business venture with Tri Global, Capital One engaged in intentional and systematic efforts to line its own pockets to the detriment of Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin. As explained below, Capital One engaged in irreconcilable conflicts of interest, bad faith business practices, and intentionally disregarded its duty of good faith to Licensee and Tri Global when it partnered with a major taxi-industry competitor, Uber Technologies, Inc. ("Uber").

17.     In or about late 2013 and early 2014, and unbeknownst to Licensee and Tri Global (and many other Capital One loan participants and medallion-secured borrowers), Capital One began secretly planning to change course and exit the medallion market to partner with the

industry's most ominous competitor, Uber. Notwithstanding this new partnership, Capital One, either intentionally or recklessly, continued to encourage Tri Global to cultivate new medallion-secured loans while concealing its intention to partner with Uber.

18.     News of Capital One's partnership with Uber surfaced in approximately mid-2014, and was followed by an aggressive nationwide marketing campaign launched by Capital One. The marketing campaign and promotions touted Capital One's "unique new partnership" with Uber and underscored the "common focus" of both companies.

19.     Capital One began offering significant incentives to its consumers to choose Uber vehicles over properly licensed and regulated taxis – including offering free and discounted Uber rides and other similar promotions such as a 20% discount on all Uber rides when paid with a Capital One "Quicksilver" credit card. Capital One offered new customers two free Uber rides worth up to $60.00. Capital One created a new website promoting these incentives and further signaling its collaboration with Uber: "capitalone.com/uber".

20.     Capital One's partnership with Uber came as a great shock to Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin as the partnership was never disclosed to them prior to the 2014 marketing blitz. At no point in the parties' relationship was it ever contemplated that Capital One would undertake any action to undermine the taxi industry, the agreement at issue, or the value of Tri Global's and Capital One's loan portfolio.

21.     In partnering with and promoting Uber's ride-share services, Capital One and Uber's assault on the taxi industry has been instrumental in bringing about the destabilization of the Chicago taxi medallion market.

22.     In 2014, when Capital One began its partnership with Uber, the Chicago market softened dramatically. Sometime during mid-2014, funding to the medallion industry came to a

total halt. This was clearly tied to Capital One's partnership with Uber.

23.     By 2015, Uber reported that taxi usage nationwide had precipitously decreased while the number of customers using Uber increased correspondingly.

24.     The disruption of the taxi industry resulting from Capital One's partnership with Uber contributed to the reduction in value of the Chicago taxi medallions securing the loans.

25.     In short, Capital One has caused the price of the Chicago taxi medallions that secure the loans to plummet.

26.     Moreover, Capital One has sabotaged Tri Global, Symon Garber, Valentina Zubok, Galina Garber-Sheinin and Licensee's efforts to favorably restructure and/or modify the medallion-secured loans at issue.

27.     Accordingly, Capital One has materially breached the credit agreement and Licensee is not liable for the amount allegedly owed pursuant to the credit agreement.

### FIRST DEFENSE
### (No Right to Foreclose)

28.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

29.     Capital One, through its partnership with Uber, precipitated the collapse of the Chicago taxi medallion industry and the medallion industry nationwide, in addition to the corresponding decline in the value of the taxi medallions at issue.

30.     Based on Capital One's willful misconduct, breach of contract, malfeasance, wrongdoing and/or other intentional and/or reckless conduct, Capital One has no right to foreclose on the medallions at issue.

## SECOND DEFENSE
### (No Default by Licensee)

31.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

32.     Licensee does not owe the amount claimed by Capital One and has not defaulted on the agreement at issue with Capital One.

33.     Therefore, Capital One has no right to foreclose on the medallions at issue.

## THIRD DEFENSE
### (Improper Foreclosure Sale Purchase)

34.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

35.     On August 9, 2018, to start the foreclosure, Capital One opened the auction with an initial credit bid of $23,000.00.

36.     Capital One won the foreclosure auction with its initial $23,000.00 credit bid.

37.     Pursuant to Rule TX13.03(b), "[t]he [foreclosure] purchaser must meet all the criteria for licensing as set out in the Municipal Code of Chicago and [the BACP's] rules and regulations, including payment of the license transfer fee, license fees and any other fees, fines or taxes due and owing to the City." Rule TX13.03(b).

38.     Pursuant to Rule TX13.04(d), "[t]he taxicab medallion license must be sold to a person believed to be a qualified applicant . . ." Rule TX13.04(d); *see also* TX13.06(a).

39.     Upon information and belief, Capital One is not a qualified applicant and has no intention of ever seeking licensure under the Municipal Code of Chicago or BACP Taxi Rules.

40.     The purpose behind the BACP Taxi Rules' foreclosure process is to facilitate keeping medallions operating on the street. If Capital One is allowed to purchase the medallions,

with no intention of ever becoming licensed by the BACP, Capital One would be allowed to cause further harm to the taxicab industry and further benefit Uber.

41.     Therefore, the foreclosure sale did not comply with Rules TX13.03 and TX13.04 and the foreclosure auction resulted in an improper sale/purchase that violated the BACP Taxi Rules.

42.     Moreover, Capital One's intent behind the foreclosure sale is to destroy and cause further harm to Licensee, Tri Global, and Tri Global's owners and guarantors. Capital One has filed multiple actions against Licensee, Tri Global, and/or Tri Global's owners and guarantors and instead of allowing any of these cases to reach their natural conclusion, Capital One instead seeks to implement destructive tactics by foreclosing on the medallions in order to further destroy the medallion market by setting the prices and discouraging bids, all in violation of the Taxi Rules simply to inflict maximum damage and cause irreparable harm. In a recent case that was filed in the Circuit Court of Cook County, *Capital One Equipment Finance Corp. v. Chicago Elite Cab Corp., et al.*, No. 17 L 998, the Honorable Margaret A. Brennan dismissed Capital One's complaint but allowed Capital One leave to re-file its cause of action in another case currently pending in New York. That New York Action is *Capital One Equipment Finance Corp. v. The OSG Corp., Tri Global Financial Services, Inc. et al.*, No. 600749/2017. But, rather than re-file its case in the New York Action and pursue its alleged causes of action, Capital One instead chose to do an end run around the litigation process and seeks to foreclose on the medallions at issue in an attempt to destroy Licensee, Tri Global and Tri Global's owners and guarantors. Capital One did not re-file its Chicago cause of action in the New York Action because it knows that counterclaims would be filed against it, which would expose Capital One's bad faith conduct in abusing its partnership with Tri Global and expose Capital One's bad faith relationship with Uber. The reality is that

Capital One has filed numerous unsuccessful complaints in courts in New York and Chicago and, because these lawsuits have not been successful, Capital One is now attempting to cause as much harm as possible to Licensee and Tri Global before the counterclaims against Capital One are proven true and Capital One's bad faith is exposed.

**FOURTH DEFENSE**
**(Improper Foreclosure Sale Process)**

43.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

44.     On August 9, 2018, to start the foreclosure, Capital One opened the auction with an initial credit bid of $23,000.00.

45.     During the beginning part of the foreclosure auction, it became clear that no individuals were going to bid on the medallions because a foreclosure purchaser would have been liable for any and all liens on the medallions and such liability was unknown at the time of the auction. Capital One then stopped the foreclosure auction and announced to the individuals attending the auction that Capital One would work with any potential foreclosure purchasers and the bank to work out a deal on any liens on the medallion(s) bought at the auction. Capital One further stated that if the foreclosure purchaser and the bank could not work out an agreement concerning any liens on the medallions bought at the auction, Capital One would refund the foreclosure purchaser's money as if the foreclosure sale never took place. After this announcement, Capital One resumed the auction.

46.     By instituting this type of foreclosure auction, Capital One created an improper foreclosure process that created false values and did not bind the foreclosure purchasers.

## FIFTH DEFENSE
### (Breach of Fiduciary Duty)

47.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

48.     As set forth above, Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin relied heavily on and trusted Capital One.

49.     By virtue of the parties' business relationship as set forth above, and by reason of the demonstrable level of trust and confidence upon which Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin depended and which Capital One knowingly accepted, Capital One owes certain fiduciary duties to Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin including, without limitation, a duty of good faith.

50.     As explained herein, for years Tri Global relied on Capital One to guide certain aspects of its taxi-medallion loan origination and servicing business. Although the Tri Global MJPA provided discretion to Capital One, that discretion did not include a right to abandon the lending market or purposely advance competing interests to destabilize the industry upon which the very loans that were being serviced were based.

51.     Ultimately, Capital One repudiated its commitments to Licensee and abandoned the Chicago medallion lending market so that it could pursue a competing venture with Uber.

52.     Capital One breached its duty of good faith, and the trust and confidence of Licensee by, among other things: precipitating, through its partnership with Uber, the collapse of the Chicago taxi medallion industry and the medallion industry nationwide, in addition to the corresponding decline in the value of the taxi medallions at issue.

53.     Capital One engaged in an intentional course of wrongful conduct orchestrated to harm Licensee.

54.     Capital One's conduct was willful, wanton and in reckless disregard of the Licensee's contractual rights and was otherwise wrongful.

55.     As a direct and proximate result of Capital One's breach of its fiduciary duties, Licensee has suffered, and will continue to suffer, substantial damages.

### SIXTH DEFENSE
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

56.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

57.     Pursuant to the covenant of good faith and fair dealing, Capital One could not undertake any action that has the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

58.     As explained herein, Capital One breached the duty of good faith and fair dealing implied in the contract with Licensee by, among other things: precipitating, through its partnership with Uber, the collapse of the taxi medallion industry and concomitant decline in the value of the taxi medallions at issue.

59.     As a direct and proximate result of Capital One's breach of the implied covenant of good faith and fair dealing thereunder, Licensee has suffered, and will continue to suffer, substantial damages.

### SEVENTH DEFENSE
### (Estoppel, Waiver, Ratification and/or Acquiescence)

60.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

61.     Capital One's claim of breach of contract / default is barred by the doctrines of estoppel, waiver, ratification and/or acquiescence.

## CONCLUSION

WHEREFORE, based upon the foregoing allegations and defenses and all reasons appearing of record, Licensee has timely submitted a completed Affidavit of Defense and, pursuant to the BACP Taxi Rules, no transfer upon foreclosure may be allowed except pursuant to an order of a court having jurisdiction. Licensee respectfully requests that the BACP deny Creditor's Request to Transfer Taxicab Medallion License Upon Foreclosure.

## AFFIDAVIT OF DEFENSE TO CREDITOR

To City:  City of Chicago – Public Vehicle Operations Division
Department of Business Affairs and Consumer Protection
2350 W. Ogden Avenue, 1st Floor
Chicago, IL 60608
Attention: Monique Davids

To Creditor:  Capital One Equipment Finance Corp., f/k/a All Points Capital Corp.,
d/b/a Capital One Taxi Medallion Finance
c/o Troutman Sanders LLP
Att'n: Andrew L. Buck
875 Third Avenue
New York, NY 10022

RE: PUBLIC PASSENGER LICENSE NUMBER(s) <u>2966TX, 2965TX & 2963TX</u>

LICENSEE NAME: <u>Jasmin Taxi Inc.</u>

I, <u>Galina Gaber-Shenin</u>, hereby swear that I own Taxicab Medallion License
<sub>Debtor Individual Name</sub>
Number(s) <u>2966TX, 2965TX & 2963TX</u> either individually or through a company that I own and I have a defense to the

foreclosure of these licenses. I understand that this license(s) was sold at a foreclosure

sale on or about _____<u>August 9, 2018</u>_____ and that sale is contingent upon approval by the Department of Business Affairs
<sub>List Date of Foreclosure Sale</sub>
and Consumer Protection.

My defense to this foreclosure is: (Use additional pages if needed)_____
See attachment Defense Document.

Signature: _____

Print Name: Shenin Edward

Relationship to Medallion License/Title: Vice President & Authorized Agent

Address: 2617 S Wabash Chicago Il 60616

Phone: 312-791-1255

Email Address: edwards@chicago-carriagecab.com

Subscribed and Sworn to before me

this 22 day of Aug , 20 18 .

_____ Notary Public

JANET DAVIS
Official Seal
Notary Public - State of ...
My Commission Expires Sep ... 019

Version Date June 5, 2018

## AFFIDAVIT OF DEFENSE TO CREDITOR

### DEFENSE DOCUMENT

In support of its Affidavit of Defense to Creditor, Licensee asserts the following defenses in opposition to the Creditor's ("Creditor" or "Capital One") request to transfer public passenger vehicle license upon foreclosure and to the foreclosure sale: (1) Capital One has no right to foreclose on the medallions at issue; (2) Licensee does not owe the amount claimed by Capital One and has not defaulted on the agreement at issue with Capital One; (3) the foreclosure resulted in an improper foreclosure sale purchase that violated the BACP Taxi Rules; (4) Capital One instituted an improper foreclosure sale process; (5) Capital One breached its fiduciary duty to Licensee; (6) Capital One breached the implied covenant of good faith and fair dealing; (7) Capital One's claim of breach of contract / default is barred by the doctrines of estoppel, waiver, ratification and/or acquiescence. Because Licensee has timely submitted a completed Affidavit of Defense, pursuant to the BACP Taxi Rules, no transfer upon foreclosure may be allowed except pursuant to an order of a court having jurisdiction. Therefore, Licensee respectfully requests that the BACP deny Creditor's Request to Transfer Taxicab Medallion License Upon Foreclosure.

### FACTUAL BACKGROUND

1.      Symon Garber formed Tri Global Financial Services, Inc. ("Tri Global") in 2004, along with Roman Sapino and others, to provide capital to taxicab medallion owners. Tri Global's principal, Roman Sapino, also has many years of experience in the taxicab financing industry and has been involved in successful taxicab enterprises in New York and Chicago. Tri Global's co-owners include Galina Garber-Sheinin and Valentina Zubok. Irene Gans and Maya Zubok are related to an owner of Tri Global.

2.      Tri Global is a corporation formed and existing under the laws of the State of

Illinois, maintaining offices at 2617 S. Wabash Avenue, Chicago, Illinois 60616. Tri Global is engaged in the business of financing and servicing Chicago-based taxi medallion loans as well as offering second-position financing to the taxi industry.

3.      Upon information and belief, Capital One is a corporation formed and existing under the laws of the State of New York, maintaining a principal place of business at 265 Broadhollow Road, Melville, New York 11747.

4.      Tri Global was formed to provide loans to purchasers of public passenger vehicle licenses and medallions in the Chicago market, which confers the right to operate a taxicab in Chicago pursuant to the regulations issued and regulated by the City of Chicago Department of Business Affairs and Consumer Protection ("BACP").

5.      Tri Global offered medallion and other financing to a wide-variety of borrowers, including taxicab businesses that rely on the medallion-secured loans to earn their livelihoods. Tri Global primarily focused its business on servicing taxi medallion loans for various lenders and also offered second-position financing to the taxi industry. In or around 2006 Tri Global was approached by North Fork Bank, which expressed interest in partnering with Tri Global to expand the scope of its lending platform.

6.      Over the next several years, Tri Global and North Fork Bank entered into numerous successful loan participations. When North Fork Bank was acquired by Capital One in or about 2006/2007, this practice continued with Capital One.

7.      Capital One was even more eager than North Fork Bank to capitalize upon Tri Global's contacts in the Chicago marketplace and strongly encouraged Tri Global to aggressively seek prospects for additional medallion loans. Capital One and Tri Global participated in the loans on a loan-by-loan basis for several years.

8. In 2010, Capital One requested that Tri Global enter into a more formal arrangement by way of a master participation agreement, to which Tri Global agreed. The terms and conditions governing that relationship and Capital One's senior participation interests in the loans are more particularly set forth in a certain Master Joint Participation Agreement, dated August 2, 2010 (the "MJPA" or the "Tri Global MJPA").

9. In connection with the Tri Global MJPA, Symon Garber, Roman Sapino, Ruben Giacomozzi, Valentina Zubok, and Galina Garber-Sheinin signed the Tri Global Guaranty, dated August 2, 2010.

10. Pursuant to the terms of the MJPA, Tri Global generated business, handled collections, serviced the loans and remitted monthly payments to Capital One in accordance with the amount of its participation in each underlying loan while Capital One held senior participation interests in the various loans made and serviced by Tri Global to owners of Chicago taxicab medallions (the "Loans"). The Tri Global MJPA contemplates the sale of senior participation interests in loans issued and/or originated by Tri Global to owners and operators of taxi medallions. As reflected in the Tri Global MJPA, after Tri Global sells a participation interest, it continues to service the debt owed thereunder. In exchange for its services, Tri Global receives a servicing fee that is paid from the debt-service payments remitted to Tri Global each month.

11. Since the inception of the Tri Global/Capital One relationship, the parties have participated in many loans. Although Tri Global originated the medallion-secured loans and served as the official loan servicer for the loan portfolio, Tri Global relied on and trusted Capital One and its commercial finance expertise. This relationship was often characterized by Capital One as a "team" and "partnership" and its officers and representatives, including David Cin ("Cin") and others, regularly commented that the success of the portfolio was the product of a "team effort."

12.     Although Capital One historically had no real presence in the Chicago medallion market, Capital One was eager to exploit Tri Global's connections to the taxicab medallion market and capitalize upon Tri Global's market dominance in the Chicago taxi-medallion economy. Capital One strongly encouraged Tri Global to aggressively acquire additional Chicago-based medallion loans.

13.     As the value of Chicago taxi medallion loans continued to rise, Capital One continued to aggressively press Tri Global to originate new loans so that Capital One could further capitalize on its market position and emerge as a leading taxi medallion lender in Chicago.

14.     Throughout the course of the Master Joint Participation Agreement, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin – whose interests were closely aligned with those of Capital One – worked with Capital One to maximize the return on the medallion loans.

15.     Tri Global originated the agreement/loan at issue between Licensee and Capital One based on Tri Global's relationship with Capital One.

16.     Despite its long-standing business venture with Tri Global, Capital One engaged in intentional and systematic efforts to line its own pockets to the detriment of Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin. As explained below, Capital One engaged in irreconcilable conflicts of interest, bad faith business practices, and intentionally disregarded its duty of good faith to Licensee and Tri Global when it partnered with a major taxi-industry competitor, Uber Technologies, Inc. ("Uber").

17.     In or about late 2013 and early 2014, and unbeknownst to Licensee and Tri Global (and many other Capital One loan participants and medallion-secured borrowers), Capital One began secretly planning to change course and exit the medallion market to partner with the

industry's most ominous competitor, Uber. Notwithstanding this new partnership, Capital One, either intentionally or recklessly, continued to encourage Tri Global to cultivate new medallion-secured loans while concealing its intention to partner with Uber.

18.     News of Capital One's partnership with Uber surfaced in approximately mid-2014, and was followed by an aggressive nationwide marketing campaign launched by Capital One. The marketing campaign and promotions touted Capital One's "unique new partnership" with Uber and underscored the "common focus" of both companies.

19.     Capital One began offering significant incentives to its consumers to choose Uber vehicles over properly licensed and regulated taxis – including offering free and discounted Uber rides and other similar promotions such as a 20% discount on all Uber rides when paid with a Capital One "Quicksilver" credit card. Capital One offered new customers two free Uber rides worth up to $60.00. Capital One created a new website promoting these incentives and further signaling its collaboration with Uber: "capitalone.com/uber".

20.     Capital One's partnership with Uber came as a great shock to Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin as the partnership was never disclosed to them prior to the 2014 marketing blitz. At no point in the parties' relationship was it ever contemplated that Capital One would undertake any action to undermine the taxi industry, the agreement at issue, or the value of Tri Global's and Capital One's loan portfolio.

21.     In partnering with and promoting Uber's ride-share services, Capital One and Uber's assault on the taxi industry has been instrumental in bringing about the destabilization of the Chicago taxi medallion market.

22.     In 2014, when Capital One began its partnership with Uber, the Chicago market softened dramatically. Sometime during mid-2014, funding to the medallion industry came to a

total halt. This was clearly tied to Capital One's partnership with Uber.

23. By 2015, Uber reported that taxi usage nationwide had precipitously decreased while the number of customers using Uber increased correspondingly.

24. The disruption of the taxi industry resulting from Capital One's partnership with Uber contributed to the reduction in value of the Chicago taxi medallions securing the loans.

25. In short, Capital One has caused the price of the Chicago taxi medallions that secure the loans to plummet.

26. Moreover, Capital One has sabotaged Tri Global, Symon Garber, Valentina Zubok, Galina Garber-Sheinin and Licensee's efforts to favorably restructure and/or modify the medallion-secured loans at issue.

27. Accordingly, Capital One has materially breached the credit agreement and Licensee is not liable for the amount allegedly owed pursuant to the credit agreement.

### FIRST DEFENSE
#### (No Right to Foreclose)

28. Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

29. Capital One, through its partnership with Uber, precipitated the collapse of the Chicago taxi medallion industry and the medallion industry nationwide, in addition to the corresponding decline in the value of the taxi medallions at issue.

30. Based on Capital One's willful misconduct, breach of contract, malfeasance, wrongdoing and/or other intentional and/or reckless conduct, Capital One has no right to foreclose on the medallions at issue.

## SECOND DEFENSE
### (No Default by Licensee)

31.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

32.     Licensee does not owe the amount claimed by Capital One and has not defaulted on the agreement at issue with Capital One.

33.     Therefore, Capital One has no right to foreclose on the medallions at issue.

## THIRD DEFENSE
### (Improper Foreclosure Sale Purchase)

34.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

35.     On August 9, 2018, to start the foreclosure, Capital One opened the auction with an initial credit bid of $23,000.00.

36.     Capital One won the foreclosure auction with its initial $23,000.00 credit bid.

37.     Pursuant to Rule TX13.03(b), "[t]he [foreclosure] purchaser must meet all the criteria for licensing as set out in the Municipal Code of Chicago and [the BACP's] rules and regulations, including payment of the license transfer fee, license fees and any other fees, fines or taxes due and owing to the City." Rule TX13.03(b).

38.     Pursuant to Rule TX13.04(d), "[t]he taxicab medallion license must be sold to a person believed to be a qualified applicant . . ." Rule TX13.04(d); *see also* TX13.06(a).

39.     Upon information and belief, Capital One is not a qualified applicant and has no intention of ever seeking licensure under the Municipal Code of Chicago or BACP Taxi Rules.

40.     The purpose behind the BACP Taxi Rules' foreclosure process is to facilitate keeping medallions operating on the street. If Capital One is allowed to purchase the medallions,

with no intention of ever becoming licensed by the BACP, Capital One would be allowed to cause further harm to the taxicab industry and further benefit Uber.

41.     Therefore, the foreclosure sale did not comply with Rules TX13.03 and TX13.04 and the foreclosure auction resulted in an improper sale/purchase that violated the BACP Taxi Rules.

42.     Moreover, Capital One's intent behind the foreclosure sale is to destroy and cause further harm to Licensee, Tri Global, and Tri Global's owners and guarantors. Capital One has filed multiple actions against Licensee, Tri Global, and/or Tri Global's owners and guarantors and instead of allowing any of these cases to reach their natural conclusion, Capital One instead seeks to implement destructive tactics by foreclosing on the medallions in order to further destroy the medallion market by setting the prices and discouraging bids, all in violation of the Taxi Rules simply to inflict maximum damage and cause irreparable harm. In a recent case that was filed in the Circuit Court of Cook County, *Capital One Equipment Finance Corp. v. Chicago Elite Cab Corp., et al.*, No. 17 L 998, the Honorable Margaret A. Brennan dismissed Capital One's complaint but allowed Capital One leave to re-file its cause of action in another case currently pending in New York. That New York Action is *Capital One Equipment Finance Corp. v. The OSG Corp., Tri Global Financial Services, Inc. et al.*, No. 600749/2017. But, rather than re-file its case in the New York Action and pursue its alleged causes of action, Capital One instead chose to do an end run around the litigation process and seeks to foreclose on the medallions at issue in an attempt to destroy Licensee, Tri Global and Tri Global's owners and guarantors. Capital One did not re-file its Chicago cause of action in the New York Action because it knows that counterclaims would be filed against it, which would expose Capital One's bad faith conduct in abusing its partnership with Tri Global and expose Capital One's bad faith relationship with Uber. The reality is that

Capital One has filed numerous unsuccessful complaints in courts in New York and Chicago and, because these lawsuits have not been successful, Capital One is now attempting to cause as much harm as possible to Licensee and Tri Global before the counterclaims against Capital One are proven true and Capital One's bad faith is exposed.

### FOURTH DEFENSE
**(Improper Foreclosure Sale Process)**

43.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

44.     On August 9, 2018, to start the foreclosure, Capital One opened the auction with an initial credit bid of $23,000.00.

45.     During the beginning part of the foreclosure auction, it became clear that no individuals were going to bid on the medallions because a foreclosure purchaser would have been liable for any and all liens on the medallions and such liability was unknown at the time of the auction. Capital One then stopped the foreclosure auction and announced to the individuals attending the auction that Capital One would work with any potential foreclosure purchasers and the bank to work out a deal on any liens on the medallion(s) bought at the auction. Capital One further stated that if the foreclosure purchaser and the bank could not work out an agreement concerning any liens on the medallions bought at the auction, Capital One would refund the foreclosure purchaser's money as if the foreclosure sale never took place. After this announcement, Capital One resumed the auction.

46.     By instituting this type of foreclosure auction, Capital One created an improper foreclosure process that created false values and did not bind the foreclosure purchasers.

## FIFTH DEFENSE
### (Breach of Fiduciary Duty)

47.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

48.     As set forth above, Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin relied heavily on and trusted Capital One.

49.     By virtue of the parties' business relationship as set forth above, and by reason of the demonstrable level of trust and confidence upon which Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin depended and which Capital One knowingly accepted, Capital One owes certain fiduciary duties to Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin including, without limitation, a duty of good faith.

50.     As explained herein, for years Tri Global relied on Capital One to guide certain aspects of its taxi-medallion loan origination and servicing business. Although the Tri Global MJPA provided discretion to Capital One, that discretion did not include a right to abandon the lending market or purposely advance competing interests to destabilize the industry upon which the very loans that were being serviced were based.

51.     Ultimately, Capital One repudiated its commitments to Licensee and abandoned the Chicago medallion lending market so that it could pursue a competing venture with Uber.

52.     Capital One breached its duty of good faith, and the trust and confidence of Licensee by, among other things: precipitating, through its partnership with Uber, the collapse of the Chicago taxi medallion industry and the medallion industry nationwide, in addition to the corresponding decline in the value of the taxi medallions at issue.

53.     Capital One engaged in an intentional course of wrongful conduct orchestrated to harm Licensee.

54. Capital One's conduct was willful, wanton and in reckless disregard of the Licensee's contractual rights and was otherwise wrongful.

55. As a direct and proximate result of Capital One's breach of its fiduciary duties, Licensee has suffered, and will continue to suffer, substantial damages.

## SIXTH DEFENSE
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

56. Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

57. Pursuant to the covenant of good faith and fair dealing, Capital One could not undertake any action that has the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

58. As explained herein, Capital One breached the duty of good faith and fair dealing implied in the contract with Licensee by, among other things: precipitating, through its partnership with Uber, the collapse of the taxi medallion industry and concomitant decline in the value of the taxi medallions at issue.

59. As a direct and proximate result of Capital One's breach of the implied covenant of good faith and fair dealing thereunder, Licensee has suffered, and will continue to suffer, substantial damages.

## SEVENTH DEFENSE
### (Estoppel, Waiver, Ratification and/or Acquiescence)

60. Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

61. Capital One's claim of breach of contract / default is barred by the doctrines of estoppel, waiver, ratification and/or acquiescence.

## **CONCLUSION**

WHEREFORE, based upon the foregoing allegations and defenses and all reasons appearing of record, Licensee has timely submitted a completed Affidavit of Defense and, pursuant to the BACP Taxi Rules, no transfer upon foreclosure may be allowed except pursuant to an order of a court having jurisdiction. Licensee respectfully requests that the BACP deny Creditor's Request to Transfer Taxicab Medallion License Upon Foreclosure.

# AFFIDAVIT OF DEFENSE TO CREDITOR

**To City:**    City of Chicago – Public Vehicle Operations Division
Department of Business Affairs and Consumer Protection
2350 W. Ogden Avenue, 1st Floor
Chicago, IL 60608
Attention: Monique Davids

**To Creditor:**    Capital One Equipment Finance Corp., f/k/a All Points Capital Corp.,
d/b/a Capital One Taxi Medallion Finance
c/o Troutman Sanders LLP
Att'n: Andrew L. Buck
875 Third Avenue
New York, NY 10022

**RE: PUBLIC PASSENGER LICENSE NUMBER(s) 2969TX**

**LICENSEE NAME: Jasmin Taxi Inc.**

I, Galina Garber Shenin , hereby swear that I own Taxicab Medallion License
    Debtor Individual Name

Number(s) 2969TX either individually or through a company that I own and I have a defense to the foreclosure of these

licenses. I understand that this license(s) was sold at a foreclosure

sale on or about     August 9, 2018     and that sale is contingent upon approval by the Department of Business Affairs
    List Date of Foreclosure Sale
and Consumer Protection.

My defense to this foreclosure is: (Use additional pages if needed)_____

_____See attached Document Defense_____

_____

_____

Signature: _____

Print Name: Shenin Edward

Relationship to Medallion License/Title Vice Presdent & Authorized Agent.

Address: 2617 S Wabash Ave Chicago IL 60616.

Phone: 312-791-1255.

Email Address: edwards@chicagocarriagecab.com.

Subscribed and Sworn to before me

this 22 day of Aug , 2018 .

JANET DAVIS
Official Seal
Notary Public - State of Illinois
My Commission Expires Sep 2019

Notary Public

## AFFIDAVIT OF DEFENSE TO CREDITOR

## DEFENSE DOCUMENT

In support of its Affidavit of Defense to Creditor, Licensee asserts the following defenses in opposition to the Creditor's ("Creditor" or "Capital One") request to transfer public passenger vehicle license upon foreclosure and to the foreclosure sale: (1) Capital One has no right to foreclose on the medallion at issue; (2) Licensee does not owe the amount claimed by Capital One and has not defaulted on the agreement at issue with Capital One; (3) the foreclosure resulted in an improper foreclosure sale purchase that violated the BACP Taxi Rules; (4) Capital One instituted an improper foreclosure sale process; (5) Capital One breached its fiduciary duty to Licensee; (6) Capital One breached the implied covenant of good faith and fair dealing; (7) Capital One's claim of breach of contract / default is barred by the doctrines of estoppel, waiver, ratification and/or acquiescence. Because Licensee has timely submitted a completed Affidavit of Defense, pursuant to the BACP Taxi Rules, no transfer upon foreclosure may be allowed except pursuant to an order of a court having jurisdiction. Therefore, Licensee respectfully requests that the BACP deny Creditor's Request to Transfer Taxicab Medallion License Upon Foreclosure.

## FACTUAL BACKGROUND

1.     Symon Garber formed Tri Global Financial Services, Inc. ("Tri Global") in 2004, along with Roman Sapino and others, to provide capital to taxicab medallion owners. Tri Global's principal, Roman Sapino, also has many years of experience in the taxicab financing industry and has been involved in successful taxicab enterprises in New York and Chicago. Tri Global's co-owners include Galina Garber-Sheinin and Valentina Zubok. Irene Gans and Maya Zubok are related to an owner of Tri Global.

2.     Tri Global is a corporation formed and existing under the laws of the State of

Illinois, maintaining offices at 2617 S. Wabash Avenue, Chicago, Illinois 60616. Tri Global is engaged in the business of financing and servicing Chicago-based taxi medallion loans as well as offering second-position financing to the taxi industry.

3.      Upon information and belief, Capital One is a corporation formed and existing under the laws of the State of New York, maintaining a principal place of business at 265 Broadhollow Road, Melville, New York 11747.

4.      Tri Global was formed to provide loans to purchasers of public passenger vehicle licenses and medallions in the Chicago market, which confers the right to operate a taxicab in Chicago pursuant to the regulations issued and regulated by the City of Chicago Department of Business Affairs and Consumer Protection ("BACP").

5.      Tri Global offered medallion and other financing to a wide-variety of borrowers, including taxicab businesses that rely on the medallion-secured loans to earn their livelihoods. Tri Global primarily focused its business on servicing taxi medallion loans for various lenders and also offered second-position financing to the taxi industry. In or around 2006 Tri Global was approached by North Fork Bank, which expressed interest in partnering with Tri Global to expand the scope of its lending platform.

6.      Over the next several years, Tri Global and North Fork Bank entered into numerous successful loan participations. When North Fork Bank was acquired by Capital One in or about 2006/2007, this practice continued with Capital One.

7.      Capital One was even more eager than North Fork Bank to capitalize upon Tri Global's contacts in the Chicago marketplace and strongly encouraged Tri Global to aggressively seek prospects for additional medallion loans. Capital One and Tri Global participated in the loans on a loan-by-loan basis for several years.

8.     In 2010, Capital One requested that Tri Global enter into a more formal arrangement by way of a master participation agreement, to which Tri Global agreed. The terms and conditions governing that relationship and Capital One's senior participation interests in the loans are more particularly set forth in a certain Master Joint Participation Agreement, dated August 2, 2010 (the "MJPA" or the "Tri Global MJPA").

9.     In connection with the Tri Global MJPA, Symon Garber, Roman Sapino, Ruben Giacomozzi, Valentina Zubok, and Galina Garber-Sheinin signed the Tri Global Guaranty, dated August 2, 2010.

10.     Pursuant to the terms of the MJPA, Tri Global generated business, handled collections, serviced the loans and remitted monthly payments to Capital One in accordance with the amount of its participation in each underlying loan while Capital One held senior participation interests in the various loans made and serviced by Tri Global to owners of Chicago taxicab medallions (the "Loans"). The Tri Global MJPA contemplates the sale of senior participation interests in loans issued and/or originated by Tri Global to owners and operators of taxi medallions. As reflected in the Tri Global MJPA, after Tri Global sells a participation interest, it continues to service the debt owed thereunder. In exchange for its services, Tri Global receives a servicing fee that is paid from the debt-service payments remitted to Tri Global each month.

11.     Since the inception of the Tri Global/Capital One relationship, the parties have participated in many loans. Although Tri Global originated the medallion-secured loans and served as the official loan servicer for the loan portfolio, Tri Global relied on and trusted Capital One and its commercial finance expertise. This relationship was often characterized by Capital One as a "team" and "partnership" and its officers and representatives, including David Cin ("Cin") and others, regularly commented that the success of the portfolio was the product of a "team effort."

12.     Although Capital One historically had no real presence in the Chicago medallion market, Capital One was eager to exploit Tri Global's connections to the taxicab medallion market and capitalize upon Tri Global's market dominance in the Chicago taxi-medallion economy. Capital One strongly encouraged Tri Global to aggressively acquire additional Chicago-based medallion loans.

13.     As the value of Chicago taxi medallion loans continued to rise, Capital One continued to aggressively press Tri Global to originate new loans so that Capital One could further capitalize on its market position and emerge as a leading taxi medallion lender in Chicago.

14.     Throughout the course of the Master Joint Participation Agreement, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin – whose interests were closely aligned with those of Capital One – worked with Capital One to maximize the return on the medallion loans.

15.     Tri Global originated the agreement/loan at issue between Licensee and Capital One based on Tri Global's relationship with Capital One.

16.     Despite its long-standing business venture with Tri Global, Capital One engaged in intentional and systematic efforts to line its own pockets to the detriment of Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin. As explained below, Capital One engaged in irreconcilable conflicts of interest, bad faith business practices, and intentionally disregarded its duty of good faith to Licensee and Tri Global when it partnered with a major taxi-industry competitor, Uber Technologies, Inc. ("Uber").

17.     In or about late 2013 and early 2014, and unbeknownst to Licensee and Tri Global (and many other Capital One loan participants and medallion-secured borrowers), Capital One began secretly planning to change course and exit the medallion market to partner with the

industry's most ominous competitor, Uber. Notwithstanding this new partnership, Capital One, either intentionally or recklessly, continued to encourage Tri Global to cultivate new medallion-secured loans while concealing its intention to partner with Uber.

18. News of Capital One's partnership with Uber surfaced in approximately mid-2014, and was followed by an aggressive nationwide marketing campaign launched by Capital One. The marketing campaign and promotions touted Capital One's "unique new partnership" with Uber and underscored the "common focus" of both companies.

19. Capital One began offering significant incentives to its consumers to choose Uber vehicles over properly licensed and regulated taxis – including offering free and discounted Uber rides and other similar promotions such as a 20% discount on all Uber rides when paid with a Capital One "Quicksilver" credit card. Capital One offered new customers two free Uber rides worth up to $60.00. Capital One created a new website promoting these incentives and further signaling its collaboration with Uber: "capitalone.com/uber".

20. Capital One's partnership with Uber came as a great shock to Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin as the partnership was never disclosed to them prior to the 2014 marketing blitz. At no point in the parties' relationship was it ever contemplated that Capital One would undertake any action to undermine the taxi industry, the agreement at issue, or the value of Tri Global's and Capital One's loan portfolio.

21. In partnering with and promoting Uber's ride-share services, Capital One and Uber's assault on the taxi industry has been instrumental in bringing about the destabilization of the Chicago taxi medallion market.

22. In 2014, when Capital One began its partnership with Uber, the Chicago market softened dramatically. Sometime during mid-2014, funding to the medallion industry came to a

total halt. This was clearly tied to Capital One's partnership with Uber.

23.     By 2015, Uber reported that taxi usage nationwide had precipitously decreased while the number of customers using Uber increased correspondingly.

24.     The disruption of the taxi industry resulting from Capital One's partnership with Uber contributed to the reduction in value of the Chicago taxi medallions securing the loans.

25.     In short, Capital One has caused the price of the Chicago taxi medallions that secure the loans to plummet.

26.     Moreover, Capital One has sabotaged Tri Global, Symon Garber, Valentina Zubok, Galina Garber-Sheinin and Licensee's efforts to favorably restructure and/or modify the medallion-secured loans at issue.

27.     Accordingly, Capital One has materially breached the credit agreement and Licensee is not liable for the amount allegedly owed pursuant to the credit agreement.

## FIRST DEFENSE
### (No Right to Foreclose)

28.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

29.     Capital One, through its partnership with Uber, precipitated the collapse of the Chicago taxi medallion industry and the medallion industry nationwide, in addition to the corresponding decline in the value of the taxi medallions at issue.

30.     Based on Capital One's willful misconduct, breach of contract, malfeasance, wrongdoing and/or other intentional and/or reckless conduct, Capital One has no right to foreclose on the medallions at issue.

## SECOND DEFENSE
### (No Default by Licensee)

31.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

32.     Licensee does not owe the amount claimed by Capital One and has not defaulted on the agreement at issue with Capital One.

33.     Therefore, Capital One has no right to foreclose on the medallions at issue.

## THIRD DEFENSE
### (Improper Foreclosure Sale Purchase)

34.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

35.     On August 9, 2018, to start the foreclosure, Capital One opened the auction with an initial credit bid of $23,000.00.

36.     An individual won the foreclosure auction with a bid of approximately $23,100.00.

37.     Pursuant to Rule TX13.03(b), "[t]he [foreclosure] purchaser must meet all the criteria for licensing as set out in the Municipal Code of Chicago and [the BACP's] rules and regulations, including payment of the license transfer fee, license fees and any other fees, fines or taxes due and owing to the City." Rule TX13.03(b).

38.     Pursuant to Rule TX13.04(d), "[t]he taxicab medallion license must be sold to a person believed to be a qualified applicant . . ." Rule TX13.04(d); *see also* TX13.06(a).

39.     It is unclear if the individual purchaser of the medallion at the foreclosure auction is a qualified applicant under the Municipal Code of Chicago or BACP Taxi Rules. Regardless, because of the improper auction process instituted by Capital One, there is a strong likelihood that the individual purchaser will ultimately decide not to go forward with the foreclosure sale, thus

making Capital One the potential purchaser.

40.    Upon information and belief, Capital One is not a qualified applicant and has no intention of ever seeking licensure under the Municipal Code of Chicago or BACP Taxi Rules.

41.    The purpose behind the BACP Taxi Rules' foreclosure process is to facilitate keeping medallions operating on the street. If Capital One is allowed to purchase the medallions, with no intention of ever becoming licensed by the BACP, Capital One would be allowed to cause further harm to the taxicab industry and further benefit Uber.

42.    Therefore, the foreclosure sale did not comply with Rules TX13.03 and TX13.04 and the foreclosure auction resulted in an improper sale/purchase that violated the BACP Taxi Rules.

43.    Moreover, Capital One's intent behind the foreclosure sale is to destroy and cause further harm to Licensee, Tri Global, and Tri Global's owners and guarantors. Capital One has filed multiple actions against Licensee, Tri Global, and/or Tri Global's owners and guarantors and instead of allowing any of these cases to reach their natural conclusion, Capital One instead seeks to implement destructive tactics by foreclosing on the medallions in order to further destroy the medallion market by setting the prices and discouraging bids, all in violation of the Taxi Rules simply to inflict maximum damage and cause irreparable harm. In a recent case that was filed in the Circuit Court of Cook County, *Capital One Equipment Finance Corp. v. Chicago Elite Cab Corp., et al.*, No. 17 L 998, the Honorable Margaret A. Brennan dismissed Capital One's complaint but allowed Capital One leave to re-file its cause of action in another case currently pending in New York. That New York Action is *Capital One Equipment Finance Corp. v. The OSG Corp., Tri Global Financial Services, Inc. et al.*, No. 600749/2017. But, rather than re-file its case in the New York Action and pursue its alleged causes of action, Capital One instead chose to do an end

run around the litigation process and seeks to foreclose on the medallions at issue in an attempt to destroy Licensee, Tri Global and Tri Global's owners and guarantors. Capital One did not re-file its Chicago cause of action in the New York Action because it knows that counterclaims would be filed against it, which would expose Capital One's bad faith conduct in abusing its partnership with Tri Global and expose Capital One's bad faith relationship with Uber. The reality is that Capital One has filed numerous unsuccessful complaints in courts in New York and Chicago and, because these lawsuits have not been successful, Capital One is now attempting to cause as much harm as possible to Licensee and Tri Global before the counterclaims against Capital One are proven true and Capital One's bad faith is exposed.

## FOURTH DEFENSE
### (Improper Foreclosure Sale Process)

44.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

45.     On August 9, 2018, to start the foreclosure, Capital One opened the auction with an initial credit bid of $23,000.00.

46.     During the beginning part of the foreclosure auction, it became clear that no individuals were going to bid on the medallions because a foreclosure purchaser would have been liable for any and all liens on the medallions and such liability was unknown at the time of the auction. Capital One then stopped the foreclosure auction and announced to the individuals attending the auction that Capital One would work with any potential foreclosure purchasers and the bank to work out a deal on any liens on the medallion(s) bought at the auction. Capital One further stated that if the foreclosure purchaser and the bank could not work out an agreement concerning any liens on the medallions bought at the auction, Capital One would refund the foreclosure purchaser's money as if the foreclosure sale never took place. After this announcement,

Capital One resumed the auction.

47.     By instituting this type of foreclosure auction, Capital One created an improper foreclosure process that created false values and did not bind the foreclosure purchasers.

## FIFTH DEFENSE
### (Breach of Fiduciary Duty)

48.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

49.     As set forth above, Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin relied heavily on and trusted Capital One.

50.     By virtue of the parties' business relationship as set forth above, and by reason of the demonstrable level of trust and confidence upon which Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin depended and which Capital One knowingly accepted, Capital One owes certain fiduciary duties to Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin including, without limitation, a duty of good faith.

51.     As explained herein, for years Tri Global relied on Capital One to guide certain aspects of its taxi-medallion loan origination and servicing business. Although the Tri Global MJPA provided discretion to Capital One, that discretion did not include a right to abandon the lending market or purposely advance competing interests to destabilize the industry upon which the very loans that were being serviced were based.

52.     Ultimately, Capital One repudiated its commitments to Licensee and abandoned the Chicago medallion lending market so that it could pursue a competing venture with Uber.

53.     Capital One breached its duty of good faith, and the trust and confidence of Licensee by, among other things: precipitating, through its partnership with Uber, the collapse of the Chicago taxi medallion industry and the medallion industry nationwide, in addition to the

corresponding decline in the value of the taxi medallions at issue.

54.     Capital One engaged in an intentional course of wrongful conduct orchestrated to harm Licensee.

55.     Capital One's conduct was willful, wanton and in reckless disregard of the Licensee's contractual rights and was otherwise wrongful.

56.     As a direct and proximate result of Capital One's breach of its fiduciary duties, Licensee has suffered, and will continue to suffer, substantial damages.

## SIXTH DEFENSE
**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

57.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

58.     Pursuant to the covenant of good faith and fair dealing, Capital One could not undertake any action that has the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

59.     As explained herein, Capital One breached the duty of good faith and fair dealing implied in the contract with Licensee by, among other things: precipitating, through its partnership with Uber, the collapse of the taxi medallion industry and concomitant decline in the value of the taxi medallions at issue.

60.     As a direct and proximate result of Capital One's breach of the implied covenant of good faith and fair dealing thereunder, Licensee has suffered, and will continue to suffer, substantial damages.

## SEVENTH DEFENSE
### (Estoppel, Waiver, Ratification and/or Acquiescence)

61.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

62.     Capital One's claim of breach of contract / default is barred by the doctrines of estoppel, waiver, ratification and/or acquiescence.

## CONCLUSION

WHEREFORE, based upon the foregoing allegations and defenses and all reasons appearing of record, Licensee has timely submitted a completed Affidavit of Defense and, pursuant to the BACP Taxi Rules, no transfer upon foreclosure may be allowed except pursuant to an order of a court having jurisdiction. Licensee respectfully requests that the BACP deny Creditor's Request to Transfer Taxicab Medallion License Upon Foreclosure.

# AFFIDAVIT OF DEFENSE TO CREDITOR

To City:   City of Chicago – Public Vehicle Operations Division
           Department of Business Affairs and Consumer Protection
           2350 W. Ogden Avenue, 1st Floor
           Chicago, IL 60608
           Attention: Monique Davids

To Creditor:   Capital One Equipment Finance Corp., f/k/a All Points Capital Corp.,
               d/b/a Capital One Taxi Medallion Finance
               c/o Troutman Sanders LLP
               Att'n: Andrew L. Buck
               875 Third Avenue
               New York, NY 10022

RE: PUBLIC PASSENGER LICENSE NUMBER(s) 2645TX, 2775TX, 3027TX, 3403TX, 4439TX & 5461TX

LICENSEE NAME: June Cab Corp.

I, _____Symon GARBER_____, hereby swear that I own Taxicab Medallion License
        Debtor Individual Name
Number(s) 2645TX, 2775TX, 3027TX, 3403TX, 4439TX & 5461TX either individually or through a company that I own

and I have a defense to the foreclosure of these licenses. I understand that this license(s) was sold at a foreclosure

sale on or about _____August 9, 2018_____ and that sale is contingent upon approval by the Department of Business Affairs
                  List Date of Foreclosure Sale
and Consumer Protection.

My defense to this foreclosure is: (Use additional pages if needed)_____

_____see attached Defense Document_____

_____

Signature: _____

Print Name: _____Sherwin Edward_____

Relationship to Medallion License/Title ___VP and authorized signature agent___

Address: ___2617 S. Wabash Ave Chicago IL. 60616___

Phone: ___312 791-1255___

Email Address: ___edwards@chicagocarriagecab.com___

Subscribed and Sworn to before me

this __22__ day of __Aug_____, 20_18_.

_____
Notary Public

JANET DAVIS
Official Seal
Notary Public - State of Illinois
My Commission Expires Sep 20, 2019

Version Date June 5, 2018

## AFFIDAVIT OF DEFENSE TO CREDITOR

## DEFENSE DOCUMENT

In support of its Affidavit of Defense to Creditor, Licensee asserts the following defenses in opposition to the Creditor's ("Creditor" or "Capital One") request to transfer public passenger vehicle license upon foreclosure and to the foreclosure sale: (1) Capital One has no right to foreclose on the medallions at issue; (2) Licensee does not owe the amount claimed by Capital One and has not defaulted on the agreement at issue with Capital One; (3) the foreclosure resulted in an improper foreclosure sale purchase that violated the BACP Taxi Rules; (4) Capital One instituted an improper foreclosure sale process; (5) Capital One breached its fiduciary duty to Licensee; (6) Capital One breached the implied covenant of good faith and fair dealing; (7) Capital One's claim of breach of contract / default is barred by the doctrines of estoppel, waiver, ratification and/or acquiescence. Because Licensee has timely submitted a completed Affidavit of Defense, pursuant to the BACP Taxi Rules, no transfer upon foreclosure may be allowed except pursuant to an order of a court having jurisdiction. Therefore, Licensee respectfully requests that the BACP deny Creditor's Request to Transfer Taxicab Medallion License Upon Foreclosure.

## FACTUAL BACKGROUND

1.     Symon Garber formed Tri Global Financial Services, Inc. ("Tri Global") in 2004, along with Roman Sapino and others, to provide capital to taxicab medallion owners. Tri Global's principal, Roman Sapino, also has many years of experience in the taxicab financing industry and has been involved in successful taxicab enterprises in New York and Chicago. Tri Global's co-owners include Galina Garber-Sheinin and Valentina Zubok. Irene Gans and Maya Zubok are related to an owner of Tri Global.

2.     Tri Global is a corporation formed and existing under the laws of the State of

Illinois, maintaining offices at 2617 S. Wabash Avenue, Chicago, Illinois 60616. Tri Global is engaged in the business of financing and servicing Chicago-based taxi medallion loans as well as offering second-position financing to the taxi industry.

3.      Upon information and belief, Capital One is a corporation formed and existing under the laws of the State of New York, maintaining a principal place of business at 265 Broadhollow Road, Melville, New York 11747.

4.      Tri Global was formed to provide loans to purchasers of public passenger vehicle licenses and medallions in the Chicago market, which confers the right to operate a taxicab in Chicago pursuant to the regulations issued and regulated by the City of Chicago Department of Business Affairs and Consumer Protection ("BACP").

5.      Tri Global offered medallion and other financing to a wide-variety of borrowers, including taxicab businesses that rely on the medallion-secured loans to earn their livelihoods. Tri Global primarily focused its business on servicing taxi medallion loans for various lenders and also offered second-position financing to the taxi industry. In or around 2006 Tri Global was approached by North Fork Bank, which expressed interest in partnering with Tri Global to expand the scope of its lending platform.

6.      Over the next several years, Tri Global and North Fork Bank entered into numerous successful loan participations. When North Fork Bank was acquired by Capital One in or about 2006/2007, this practice continued with Capital One.

7.      Capital One was even more eager than North Fork Bank to capitalize upon Tri Global's contacts in the Chicago marketplace and strongly encouraged Tri Global to aggressively seek prospects for additional medallion loans. Capital One and Tri Global participated in the loans on a loan-by-loan basis for several years.

8.  In 2010, Capital One requested that Tri Global enter into a more formal arrangement by way of a master participation agreement, to which Tri Global agreed. The terms and conditions governing that relationship and Capital One's senior participation interests in the loans are more particularly set forth in a certain Master Joint Participation Agreement, dated August 2, 2010 (the "MJPA" or the "Tri Global MJPA").

9.  In connection with the Tri Global MJPA, Symon Garber, Roman Sapino, Ruben Giacomozzi, Valentina Zubok, and Galina Garber-Sheinin signed the Tri Global Guaranty, dated August 2, 2010.

10.  Pursuant to the terms of the MJPA, Tri Global generated business, handled collections, serviced the loans and remitted monthly payments to Capital One in accordance with the amount of its participation in each underlying loan while Capital One held senior participation interests in the various loans made and serviced by Tri Global to owners of Chicago taxicab medallions (the "Loans"). The Tri Global MJPA contemplates the sale of senior participation interests in loans issued and/or originated by Tri Global to owners and operators of taxi medallions. As reflected in the Tri Global MJPA, after Tri Global sells a participation interest, it continues to service the debt owed thereunder. In exchange for its services, Tri Global receives a servicing fee that is paid from the debt-service payments remitted to Tri Global each month.

11.  Since the inception of the Tri Global/Capital One relationship, the parties have participated in many loans. Although Tri Global originated the medallion-secured loans and served as the official loan servicer for the loan portfolio, Tri Global relied on and trusted Capital One and its commercial finance expertise. This relationship was often characterized by Capital One as a "team" and "partnership" and its officers and representatives, including David Cin ("Cin") and others, regularly commented that the success of the portfolio was the product of a "team effort."

12.     Although Capital One historically had no real presence in the Chicago medallion market, Capital One was eager to exploit Tri Global's connections to the taxicab medallion market and capitalize upon Tri Global's market dominance in the Chicago taxi-medallion economy. Capital One strongly encouraged Tri Global to aggressively acquire additional Chicago-based medallion loans.

13.     As the value of Chicago taxi medallion loans continued to rise, Capital One continued to aggressively press Tri Global to originate new loans so that Capital One could further capitalize on its market position and emerge as a leading taxi medallion lender in Chicago.

14.     Throughout the course of the Master Joint Participation Agreement, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin – whose interests were closely aligned with those of Capital One – worked with Capital One to maximize the return on the medallion loans.

15.     Tri Global originated the agreement/loan at issue between Licensee and Capital One based on Tri Global's relationship with Capital One.

16.     Despite its long-standing business venture with Tri Global, Capital One engaged in intentional and systematic efforts to line its own pockets to the detriment of Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin. As explained below, Capital One engaged in irreconcilable conflicts of interest, bad faith business practices, and intentionally disregarded its duty of good faith to Licensee and Tri Global when it partnered with a major taxi-industry competitor, Uber Technologies, Inc. ("Uber").

17.     In or about late 2013 and early 2014, and unbeknownst to Licensee and Tri Global (and many other Capital One loan participants and medallion-secured borrowers), Capital One began secretly planning to change course and exit the medallion market to partner with the

industry's most ominous competitor, Uber. Notwithstanding this new partnership, Capital One, either intentionally or recklessly, continued to encourage Tri Global to cultivate new medallion-secured loans while concealing its intention to partner with Uber.

18.     News of Capital One's partnership with Uber surfaced in approximately mid-2014, and was followed by an aggressive nationwide marketing campaign launched by Capital One. The marketing campaign and promotions touted Capital One's "unique new partnership" with Uber and underscored the "common focus" of both companies.

19.     Capital One began offering significant incentives to its consumers to choose Uber vehicles over properly licensed and regulated taxis – including offering free and discounted Uber rides and other similar promotions such as a 20% discount on all Uber rides when paid with a Capital One "Quicksilver" credit card. Capital One offered new customers two free Uber rides worth up to $60.00. Capital One created a new website promoting these incentives and further signaling its collaboration with Uber: "capitalone.com/uber".

20.     Capital One's partnership with Uber came as a great shock to Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin as the partnership was never disclosed to them prior to the 2014 marketing blitz. At no point in the parties' relationship was it ever contemplated that Capital One would undertake any action to undermine the taxi industry, the agreement at issue, or the value of Tri Global's and Capital One's loan portfolio.

21.     In partnering with and promoting Uber's ride-share services, Capital One and Uber's assault on the taxi industry has been instrumental in bringing about the destabilization of the Chicago taxi medallion market.

22.     In 2014, when Capital One began its partnership with Uber, the Chicago market softened dramatically. Sometime during mid-2014, funding to the medallion industry came to a

total halt. This was clearly tied to Capital One's partnership with Uber.

23.     By 2015, Uber reported that taxi usage nationwide had precipitously decreased while the number of customers using Uber increased correspondingly.

24.     The disruption of the taxi industry resulting from Capital One's partnership with Uber contributed to the reduction in value of the Chicago taxi medallions securing the loans.

25.     In short, Capital One has caused the price of the Chicago taxi medallions that secure the loans to plummet.

26.     Moreover, Capital One has sabotaged Tri Global, Symon Garber, Valentina Zubok, Galina Garber-Sheinin and Licensee's efforts to favorably restructure and/or modify the medallion-secured loans at issue.

27.     Accordingly, Capital One has materially breached the credit agreement and Licensee is not liable for the amount allegedly owed pursuant to the credit agreement.

**FIRST DEFENSE**
**(No Right to Foreclose)**

28.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

29.     Capital One, through its partnership with Uber, precipitated the collapse of the Chicago taxi medallion industry and the medallion industry nationwide, in addition to the corresponding decline in the value of the taxi medallions at issue.

30.     Based on Capital One's willful misconduct, breach of contract, malfeasance, wrongdoing and/or other intentional and/or reckless conduct, Capital One has no right to foreclose on the medallions at issue.

**SECOND DEFENSE**
**(No Default by Licensee)**

31.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

32.     Licensee does not owe the amount claimed by Capital One and has not defaulted on the agreement at issue with Capital One.

33.     Therefore, Capital One has no right to foreclose on the medallions at issue.

**THIRD DEFENSE**
**(Improper Foreclosure Sale Purchase)**

34.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

35.     On August 9, 2018, to start the foreclosure, Capital One opened the auction with an initial credit bid of $23,000.00.

36.     Capital One won the foreclosure auction with its initial $23,000.00 credit bid.

37.     Pursuant to Rule TX13.03(b), "[t]he [foreclosure] purchaser must meet all the criteria for licensing as set out in the Municipal Code of Chicago and [the BACP's] rules and regulations, including payment of the license transfer fee, license fees and any other fees, fines or taxes due and owing to the City." Rule TX13.03(b).

38.     Pursuant to Rule TX13.04(d), "[t]he taxicab medallion license must be sold to a person believed to be a qualified applicant . . ." Rule TX13.04(d); *see also* TX13.06(a).

39.     Upon information and belief, Capital One is not a qualified applicant and has no intention of ever seeking licensure under the Municipal Code of Chicago or BACP Taxi Rules.

40.     The purpose behind the BACP Taxi Rules' foreclosure process is to facilitate keeping medallions operating on the street. If Capital One is allowed to purchase the medallions,

with no intention of ever becoming licensed by the BACP, Capital One would be allowed to cause further harm to the taxicab industry and further benefit Uber.

41.     Therefore, the foreclosure sale did not comply with Rules TX13.03 and TX13.04 and the foreclosure auction resulted in an improper sale/purchase that violated the BACP Taxi Rules.

42.     Moreover, Capital One's intent behind the foreclosure sale is to destroy and cause further harm to Licensee, Tri Global, and Tri Global's owners and guarantors. Capital One has filed multiple actions against Licensee, Tri Global, and/or Tri Global's owners and guarantors and instead of allowing any of these cases to reach their natural conclusion, Capital One instead seeks to implement destructive tactics by foreclosing on the medallions in order to further destroy the medallion market by setting the prices and discouraging bids, all in violation of the Taxi Rules simply to inflict maximum damage and cause irreparable harm. In a recent case that was filed in the Circuit Court of Cook County, *Capital One Equipment Finance Corp. v. Chicago Elite Cab Corp., et al.*, No. 17 L 998, the Honorable Margaret A. Brennan dismissed Capital One's complaint but allowed Capital One leave to re-file its cause of action in another case currently pending in New York. That New York Action is *Capital One Equipment Finance Corp. v. The OSG Corp., Tri Global Financial Services, Inc. et al.*, No. 600749/2017. But, rather than re-file its case in the New York Action and pursue its alleged causes of action, Capital One instead chose to do an end run around the litigation process and seeks to foreclose on the medallions at issue in an attempt to destroy Licensee, Tri Global and Tri Global's owners and guarantors. Capital One did not re-file its Chicago cause of action in the New York Action because it knows that counterclaims would be filed against it, which would expose Capital One's bad faith conduct in abusing its partnership with Tri Global and expose Capital One's bad faith relationship with Uber. The reality is that

Capital One has filed numerous unsuccessful complaints in courts in New York and Chicago and, because these lawsuits have not been successful, Capital One is now attempting to cause as much harm as possible to Licensee and Tri Global before the counterclaims against Capital One are proven true and Capital One's bad faith is exposed.

**FOURTH DEFENSE**
**(Improper Foreclosure Sale Process)**

43.      Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

44.      On August 9, 2018, to start the foreclosure, Capital One opened the auction with an initial credit bid of $23,000.00.

45.      During the beginning part of the foreclosure auction, it became clear that no individuals were going to bid on the medallions because a foreclosure purchaser would have been liable for any and all liens on the medallions and such liability was unknown at the time of the auction. Capital One then stopped the foreclosure auction and announced to the individuals attending the auction that Capital One would work with any potential foreclosure purchasers and the bank to work out a deal on any liens on the medallion(s) bought at the auction. Capital One further stated that if the foreclosure purchaser and the bank could not work out an agreement concerning any liens on the medallions bought at the auction, Capital One would refund the foreclosure purchaser's money as if the foreclosure sale never took place. After this announcement, Capital One resumed the auction.

46.      By instituting this type of foreclosure auction, Capital One created an improper foreclosure process that created false values and did not bind the foreclosure purchasers.

## FIFTH DEFENSE
### (Breach of Fiduciary Duty)

47.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

48.     As set forth above, Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin relied heavily on and trusted Capital One.

49.     By virtue of the parties' business relationship as set forth above, and by reason of the demonstrable level of trust and confidence upon which Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin depended and which Capital One knowingly accepted, Capital One owes certain fiduciary duties to Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin including, without limitation, a duty of good faith.

50.     As explained herein, for years Tri Global relied on Capital One to guide certain aspects of its taxi-medallion loan origination and servicing business. Although the Tri Global MJPA provided discretion to Capital One, that discretion did not include a right to abandon the lending market or purposely advance competing interests to destabilize the industry upon which the very loans that were being serviced were based.

51.     Ultimately, Capital One repudiated its commitments to Licensee and abandoned the Chicago medallion lending market so that it could pursue a competing venture with Uber.

52.     Capital One breached its duty of good faith, and the trust and confidence of Licensee by, among other things: precipitating, through its partnership with Uber, the collapse of the Chicago taxi medallion industry and the medallion industry nationwide, in addition to the corresponding decline in the value of the taxi medallions at issue.

53.     Capital One engaged in an intentional course of wrongful conduct orchestrated to harm Licensee.

54.     Capital One's conduct was willful, wanton and in reckless disregard of the Licensee's contractual rights and was otherwise wrongful.

55.     As a direct and proximate result of Capital One's breach of its fiduciary duties, Licensee has suffered, and will continue to suffer, substantial damages.

**SIXTH DEFENSE**
**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

56.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

57.     Pursuant to the covenant of good faith and fair dealing, Capital One could not undertake any action that has the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

58.     As explained herein, Capital One breached the duty of good faith and fair dealing implied in the contract with Licensee by, among other things: precipitating, through its partnership with Uber, the collapse of the taxi medallion industry and concomitant decline in the value of the taxi medallions at issue.

59.     As a direct and proximate result of Capital One's breach of the implied covenant of good faith and fair dealing thereunder, Licensee has suffered, and will continue to suffer, substantial damages.

**SEVENTH DEFENSE**
**(Estoppel, Waiver, Ratification and/or Acquiescence)**

60.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

61.     Capital One's claim of breach of contract / default is barred by the doctrines of estoppel, waiver, ratification and/or acquiescence.

## CONCLUSION

WHEREFORE, based upon the foregoing allegations and defenses and all reasons appearing of record, Licensee has timely submitted a completed Affidavit of Defense and, pursuant to the BACP Taxi Rules, no transfer upon foreclosure may be allowed except pursuant to an order of a court having jurisdiction. Licensee respectfully requests that the BACP deny Creditor's Request to Transfer Taxicab Medallion License Upon Foreclosure.

# AFFIDAVIT OF DEFENSE TO CREDITOR

**To City:**   City of Chicago – Public Vehicle Operations Division
Department of Business Affairs and Consumer Protection
2350 W. Ogden Avenue, 1st Floor
Chicago, IL 60608
Attention: Monique Davids

**To Creditor:**   Capital One Equipment Finance Corp., f/k/a All Points Capital Corp.,
d/b/a Capital One Taxi Medallion Finance
c/o Troutman Sanders LLP
Att'n: Andrew L. Buck
875 Third Avenue
New York, NY 10022

RE: PUBLIC PASSENGER LICENSE NUMBER(s) <u>859TX, 884TX, 911TX & 995TX</u>

LICENSEE NAME: <u>Lucky Four Cab Corp.</u>

I, ___*Symon GARBER*___ , hereby swear that I own Taxicab Medallion License
<span style="font-size:smaller">Debtor Individual Name</span>

Number(s) <u>859TX, 884TX, 911TX & 995TX</u> either individually or through a company that I own and I have a defense to

the foreclosure of these licenses. I understand that this license(s) was sold at a foreclosure

sale on or about ___August 9, 2018___ and that sale is contingent upon approval by the Department of Business Affairs
<span style="font-size:smaller">List Date of Foreclosure Sale</span>

and Consumer Protection.

My defense to this foreclosure is: (Use additional pages if needed)_____

_____*see attached Defense Document*_____

_____

Signature: _____

Print Name: ____*Sheimin Edward*____

Relationship to Medallion License/Title ___*VP and authorized signature agent*___

Address: ___*2617 S. Wabash Ave Chicago IL 60616*___

Phone: ___*312 791-1255*___

Email Address: ___*edwards@chicagocarriagecab.com*___

Subscribed and Sworn to before me

this _22_ day of _Aug_____ , 20_18_ .

_____
Notary Public

## AFFIDAVIT OF DEFENSE TO CREDITOR

## DEFENSE DOCUMENT

In support of its Affidavit of Defense to Creditor, Licensee asserts the following defenses in opposition to the Creditor's ("Creditor" or "Capital One") request to transfer public passenger vehicle license upon foreclosure and to the foreclosure sale: (1) Capital One has no right to foreclose on the medallions at issue; (2) Licensee does not owe the amount claimed by Capital One and has not defaulted on the agreement at issue with Capital One; (3) the foreclosure resulted in an improper foreclosure sale purchase that violated the BACP Taxi Rules; (4) Capital One instituted an improper foreclosure sale process; (5) Capital One breached its fiduciary duty to Licensee; (6) Capital One breached the implied covenant of good faith and fair dealing; (7) Capital One's claim of breach of contract / default is barred by the doctrines of estoppel, waiver, ratification and/or acquiescence. Because Licensee has timely submitted a completed Affidavit of Defense, pursuant to the BACP Taxi Rules, no transfer upon foreclosure may be allowed except pursuant to an order of a court having jurisdiction. Therefore, Licensee respectfully requests that the BACP deny Creditor's Request to Transfer Taxicab Medallion License Upon Foreclosure.

## FACTUAL BACKGROUND

1.      Symon Garber formed Tri Global Financial Services, Inc. ("Tri Global") in 2004, along with Roman Sapino and others, to provide capital to taxicab medallion owners. Tri Global's principal, Roman Sapino, also has many years of experience in the taxicab financing industry and has been involved in successful taxicab enterprises in New York and Chicago. Tri Global's co-owners include Galina Garber-Sheinin and Valentina Zubok. Irene Gans and Maya Zubok are related to an owner of Tri Global.

2.      Tri Global is a corporation formed and existing under the laws of the State of

Illinois, maintaining offices at 2617 S. Wabash Avenue, Chicago, Illinois 60616. Tri Global is engaged in the business of financing and servicing Chicago-based taxi medallion loans as well as offering second-position financing to the taxi industry.

3.       Upon information and belief, Capital One is a corporation formed and existing under the laws of the State of New York, maintaining a principal place of business at 265 Broadhollow Road, Melville, New York 11747.

4.       Tri Global was formed to provide loans to purchasers of public passenger vehicle licenses and medallions in the Chicago market, which confers the right to operate a taxicab in Chicago pursuant to the regulations issued and regulated by the City of Chicago Department of Business Affairs and Consumer Protection ("BACP").

5.       Tri Global offered medallion and other financing to a wide-variety of borrowers, including taxicab businesses that rely on the medallion-secured loans to earn their livelihoods. Tri Global primarily focused its business on servicing taxi medallion loans for various lenders and also offered second-position financing to the taxi industry. In or around 2006 Tri Global was approached by North Fork Bank, which expressed interest in partnering with Tri Global to expand the scope of its lending platform.

6.       Over the next several years, Tri Global and North Fork Bank entered into numerous successful loan participations. When North Fork Bank was acquired by Capital One in or about 2006/2007, this practice continued with Capital One.

7.       Capital One was even more eager than North Fork Bank to capitalize upon Tri Global's contacts in the Chicago marketplace and strongly encouraged Tri Global to aggressively seek prospects for additional medallion loans. Capital One and Tri Global participated in the loans on a loan-by-loan basis for several years.

8.      In 2010, Capital One requested that Tri Global enter into a more formal arrangement by way of a master participation agreement, to which Tri Global agreed. The terms and conditions governing that relationship and Capital One's senior participation interests in the loans are more particularly set forth in a certain Master Joint Participation Agreement, dated August 2, 2010 (the "MJPA" or the "Tri Global MJPA").

9.      In connection with the Tri Global MJPA, Symon Garber, Roman Sapino, Ruben Giacomozzi, Valentina Zubok, and Galina Garber-Sheinin signed the Tri Global Guaranty, dated August 2, 2010.

10.      Pursuant to the terms of the MJPA, Tri Global generated business, handled collections, serviced the loans and remitted monthly payments to Capital One in accordance with the amount of its participation in each underlying loan while Capital One held senior participation interests in the various loans made and serviced by Tri Global to owners of Chicago taxicab medallions (the "Loans"). The Tri Global MJPA contemplates the sale of senior participation interests in loans issued and/or originated by Tri Global to owners and operators of taxi medallions. As reflected in the Tri Global MJPA, after Tri Global sells a participation interest, it continues to service the debt owed thereunder. In exchange for its services, Tri Global receives a servicing fee that is paid from the debt-service payments remitted to Tri Global each month.

11.      Since the inception of the Tri Global/Capital One relationship, the parties have participated in many loans. Although Tri Global originated the medallion-secured loans and served as the official loan servicer for the loan portfolio, Tri Global relied on and trusted Capital One and its commercial finance expertise. This relationship was often characterized by Capital One as a "team" and "partnership" and its officers and representatives, including David Cin ("Cin") and others, regularly commented that the success of the portfolio was the product of a "team effort."

12.     Although Capital One historically had no real presence in the Chicago medallion market, Capital One was eager to exploit Tri Global's connections to the taxicab medallion market and capitalize upon Tri Global's market dominance in the Chicago taxi-medallion economy. Capital One strongly encouraged Tri Global to aggressively acquire additional Chicago-based medallion loans.

13.     As the value of Chicago taxi medallion loans continued to rise, Capital One continued to aggressively press Tri Global to originate new loans so that Capital One could further capitalize on its market position and emerge as a leading taxi medallion lender in Chicago.

14.     Throughout the course of the Master Joint Participation Agreement, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin – whose interests were closely aligned with those of Capital One – worked with Capital One to maximize the return on the medallion loans.

15.     Tri Global originated the agreement/loan at issue between Licensee and Capital One based on Tri Global's relationship with Capital One.

16.     Despite its long-standing business venture with Tri Global, Capital One engaged in intentional and systematic efforts to line its own pockets to the detriment of Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin. As explained below, Capital One engaged in irreconcilable conflicts of interest, bad faith business practices, and intentionally disregarded its duty of good faith to Licensee and Tri Global when it partnered with a major taxi-industry competitor, Uber Technologies, Inc. ("Uber").

17.     In or about late 2013 and early 2014, and unbeknownst to Licensee and Tri Global (and many other Capital One loan participants and medallion-secured borrowers), Capital One began secretly planning to change course and exit the medallion market to partner with the

industry's most ominous competitor, Uber. Notwithstanding this new partnership, Capital One, either intentionally or recklessly, continued to encourage Tri Global to cultivate new medallion-secured loans while concealing its intention to partner with Uber.

18.     News of Capital One's partnership with Uber surfaced in approximately mid-2014, and was followed by an aggressive nationwide marketing campaign launched by Capital One. The marketing campaign and promotions touted Capital One's "unique new partnership" with Uber and underscored the "common focus" of both companies.

19.     Capital One began offering significant incentives to its consumers to choose Uber vehicles over properly licensed and regulated taxis – including offering free and discounted Uber rides and other similar promotions such as a 20% discount on all Uber rides when paid with a Capital One "Quicksilver" credit card. Capital One offered new customers two free Uber rides worth up to $60.00. Capital One created a new website promoting these incentives and further signaling its collaboration with Uber: "capitalone.com/uber".

20.     Capital One's partnership with Uber came as a great shock to Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin as the partnership was never disclosed to them prior to the 2014 marketing blitz. At no point in the parties' relationship was it ever contemplated that Capital One would undertake any action to undermine the taxi industry, the agreement at issue, or the value of Tri Global's and Capital One's loan portfolio.

21.     In partnering with and promoting Uber's ride-share services, Capital One and Uber's assault on the taxi industry has been instrumental in bringing about the destabilization of the Chicago taxi medallion market.

22.     In 2014, when Capital One began its partnership with Uber, the Chicago market softened dramatically. Sometime during mid-2014, funding to the medallion industry came to a

total halt. This was clearly tied to Capital One's partnership with Uber.

23. By 2015, Uber reported that taxi usage nationwide had precipitously decreased while the number of customers using Uber increased correspondingly.

24. The disruption of the taxi industry resulting from Capital One's partnership with Uber contributed to the reduction in value of the Chicago taxi medallions securing the loans.

25. In short, Capital One has caused the price of the Chicago taxi medallions that secure the loans to plummet.

26. Moreover, Capital One has sabotaged Tri Global, Symon Garber, Valentina Zubok, Galina Garber-Sheinin and Licensee's efforts to favorably restructure and/or modify the medallion-secured loans at issue.

27. Accordingly, Capital One has materially breached the credit agreement and Licensee is not liable for the amount allegedly owed pursuant to the credit agreement.

## **FIRST DEFENSE**
### **(No Right to Foreclose)**

28. Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

29. Capital One, through its partnership with Uber, precipitated the collapse of the Chicago taxi medallion industry and the medallion industry nationwide, in addition to the corresponding decline in the value of the taxi medallions at issue.

30. Based on Capital One's willful misconduct, breach of contract, malfeasance, wrongdoing and/or other intentional and/or reckless conduct, Capital One has no right to foreclose on the medallions at issue.

## SECOND DEFENSE
### (No Default by Licensee)

31.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

32.     Licensee does not owe the amount claimed by Capital One and has not defaulted on the agreement at issue with Capital One.

33.     Therefore, Capital One has no right to foreclose on the medallions at issue.

## THIRD DEFENSE
### (Improper Foreclosure Sale Purchase)

34.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

35.     On August 9, 2018, to start the foreclosure, Capital One opened the auction with an initial credit bid of $23,000.00.

36.     Capital One won the foreclosure auction with its initial $23,000.00 credit bid.

37.     Pursuant to Rule TX13.03(b), "[t]he [foreclosure] purchaser must meet all the criteria for licensing as set out in the Municipal Code of Chicago and [the BACP's] rules and regulations, including payment of the license transfer fee, license fees and any other fees, fines or taxes due and owing to the City." Rule TX13.03(b).

38.     Pursuant to Rule TX13.04(d), "[t]he taxicab medallion license must be sold to a person believed to be a qualified applicant . . ." Rule TX13.04(d); *see also* TX13.06(a).

39.     Upon information and belief, Capital One is not a qualified applicant and has no intention of ever seeking licensure under the Municipal Code of Chicago or BACP Taxi Rules.

40.     The purpose behind the BACP Taxi Rules' foreclosure process is to facilitate keeping medallions operating on the street. If Capital One is allowed to purchase the medallions,

with no intention of ever becoming licensed by the BACP, Capital One would be allowed to cause further harm to the taxicab industry and further benefit Uber.

41.     Therefore, the foreclosure sale did not comply with Rules TX13.03 and TX13.04 and the foreclosure auction resulted in an improper sale/purchase that violated the BACP Taxi Rules.

42.     Moreover, Capital One's intent behind the foreclosure sale is to destroy and cause further harm to Licensee, Tri Global, and Tri Global's owners and guarantors. Capital One has filed multiple actions against Licensee, Tri Global, and/or Tri Global's owners and guarantors and instead of allowing any of these cases to reach their natural conclusion, Capital One instead seeks to implement destructive tactics by foreclosing on the medallions in order to further destroy the medallion market by setting the prices and discouraging bids, all in violation of the Taxi Rules simply to inflict maximum damage and cause irreparable harm. In a recent case that was filed in the Circuit Court of Cook County, *Capital One Equipment Finance Corp. v. Chicago Elite Cab Corp., et al.*, No. 17 L 998, the Honorable Margaret A. Brennan dismissed Capital One's complaint but allowed Capital One leave to re-file its cause of action in another case currently pending in New York. That New York Action is *Capital One Equipment Finance Corp. v. The OSG Corp., Tri Global Financial Services, Inc. et al.*, No. 600749/2017. But, rather than re-file its case in the New York Action and pursue its alleged causes of action, Capital One instead chose to do an end run around the litigation process and seeks to foreclose on the medallions at issue in an attempt to destroy Licensee, Tri Global and Tri Global's owners and guarantors. Capital One did not re-file its Chicago cause of action in the New York Action because it knows that counterclaims would be filed against it, which would expose Capital One's bad faith conduct in abusing its partnership with Tri Global and expose Capital One's bad faith relationship with Uber. The reality is that

Capital One has filed numerous unsuccessful complaints in courts in New York and Chicago and, because these lawsuits have not been successful, Capital One is now attempting to cause as much harm as possible to Licensee and Tri Global before the counterclaims against Capital One are proven true and Capital One's bad faith is exposed.

## FOURTH DEFENSE
### (Improper Foreclosure Sale Process)

43.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

44.     On August 9, 2018, to start the foreclosure, Capital One opened the auction with an initial credit bid of $23,000.00.

45.     During the beginning part of the foreclosure auction, it became clear that no individuals were going to bid on the medallions because a foreclosure purchaser would have been liable for any and all liens on the medallions and such liability was unknown at the time of the auction. Capital One then stopped the foreclosure auction and announced to the individuals attending the auction that Capital One would work with any potential foreclosure purchasers and the bank to work out a deal on any liens on the medallion(s) bought at the auction. Capital One further stated that if the foreclosure purchaser and the bank could not work out an agreement concerning any liens on the medallions bought at the auction, Capital One would refund the foreclosure purchaser's money as if the foreclosure sale never took place. After this announcement, Capital One resumed the auction.

46.     By instituting this type of foreclosure auction, Capital One created an improper foreclosure process that created false values and did not bind the foreclosure purchasers.

61961691.v1                                             9

## FIFTH DEFENSE
### (Breach of Fiduciary Duty)

47.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

48.     As set forth above, Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin relied heavily on and trusted Capital One.

49.     By virtue of the parties' business relationship as set forth above, and by reason of the demonstrable level of trust and confidence upon which Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin depended and which Capital One knowingly accepted, Capital One owes certain fiduciary duties to Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin including, without limitation, a duty of good faith.

50.     As explained herein, for years Tri Global relied on Capital One to guide certain aspects of its taxi-medallion loan origination and servicing business. Although the Tri Global MJPA provided discretion to Capital One, that discretion did not include a right to abandon the lending market or purposely advance competing interests to destabilize the industry upon which the very loans that were being serviced were based.

51.     Ultimately, Capital One repudiated its commitments to Licensee and abandoned the Chicago medallion lending market so that it could pursue a competing venture with Uber.

52.     Capital One breached its duty of good faith, and the trust and confidence of Licensee by, among other things: precipitating, through its partnership with Uber, the collapse of the Chicago taxi medallion industry and the medallion industry nationwide, in addition to the corresponding decline in the value of the taxi medallions at issue.

53.     Capital One engaged in an intentional course of wrongful conduct orchestrated to harm Licensee.

54.     Capital One's conduct was willful, wanton and in reckless disregard of the Licensee's contractual rights and was otherwise wrongful.

55.     As a direct and proximate result of Capital One's breach of its fiduciary duties, Licensee has suffered, and will continue to suffer, substantial damages.

**SIXTH DEFENSE**
**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

56.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

57.     Pursuant to the covenant of good faith and fair dealing, Capital One could not undertake any action that has the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

58.     As explained herein, Capital One breached the duty of good faith and fair dealing implied in the contract with Licensee by, among other things: precipitating, through its partnership with Uber, the collapse of the taxi medallion industry and concomitant decline in the value of the taxi medallions at issue.

59.     As a direct and proximate result of Capital One's breach of the implied covenant of good faith and fair dealing thereunder, Licensee has suffered, and will continue to suffer, substantial damages.

**SEVENTH DEFENSE**
**(Estoppel, Waiver, Ratification and/or Acquiescence)**

60.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

61.     Capital One's claim of breach of contract / default is barred by the doctrines of estoppel, waiver, ratification and/or acquiescence.

## **CONCLUSION**

WHEREFORE, based upon the foregoing allegations and defenses and all reasons appearing of record, Licensee has timely submitted a completed Affidavit of Defense and, pursuant to the BACP Taxi Rules, no transfer upon foreclosure may be allowed except pursuant to an order of a court having jurisdiction. Licensee respectfully requests that the BACP deny Creditor's Request to Transfer Taxicab Medallion License Upon Foreclosure.

# AFFIDAVIT OF DEFENSE TO CREDITOR

**To City:**     City of Chicago – Public Vehicle Operations Division
Department of Business Affairs and Consumer Protection
2350 W. Ogden Avenue, 1st Floor
Chicago, IL 60608
Attention: Monique Davids

**To Creditor:**     Capital One Equipment Finance Corp., f/k/a All Points Capital Corp.,
d/b/a Capital One Taxi Medallion Finance
c/o Troutman Sanders LLP
Att'n: Andrew L. Buck
875 Third Avenue
New York, NY 10022

RE: PUBLIC PASSENGER LICENSE NUMBER(s) <u>124TX, 139TX, 141TX, 175TX, 286TX</u>

LICENSEE NAME: <u>Lucky In Chicago, Inc.</u>

I, _Valentina Zubon_ , hereby swear that I own Taxicab Medallion License
<span style="font-size:small">Debtor Individual Name</span>

Number(s) <u>124TX, 139TX, 141TX, 175TX, 286TX</u> either individually or through a company that I own and I have a

defense to the foreclosure of these licenses. I understand that this license(s) was sold at a foreclosure

sale on or about _____August 9, 2018_____ and that sale is contingent upon approval by the Department of Business Affairs
<span style="font-size:small">List Date of Foreclosure Sale</span>

and Consumer Protection.

My defense to this foreclosure is: (Use additional pages if needed)_____

_____ See attached Document Defense. _____

Signature: _____

Print Name: _____Shernin Edward_____

Relationship to Medallion License/Title _Vice President & Authorized Agent._

Address: _2617 S Wabash Chicago IL 60616_

Phone: _312-791-1255_

Email Address: _edwards@chicagocarriagecab.com._

Subscribed and Sworn to before me

this _22_ day of _Aug_ , 20_18_ .

_____ Notary Public

JANET DAVIS
Official Seal
Notary Public - State of ...
My Commission Expires Sep ... 019

## AFFIDAVIT OF DEFENSE TO CREDITOR

## DEFENSE DOCUMENT

In support of its Affidavit of Defense to Creditor, Licensee asserts the following defenses in opposition to the Creditor's ("Creditor" or "Capital One") request to transfer public passenger vehicle license upon foreclosure and to the foreclosure sale: (1) Capital One has no right to foreclose on the medallions at issue; (2) Licensee does not owe the amount claimed by Capital One and has not defaulted on the agreement at issue with Capital One; (3) the foreclosure resulted in an improper foreclosure sale purchase that violated the BACP Taxi Rules; (4) Capital One instituted an improper foreclosure sale process; (5) Capital One breached its fiduciary duty to Licensee; (6) Capital One breached the implied covenant of good faith and fair dealing; (7) Capital One's claim of breach of contract / default is barred by the doctrines of estoppel, waiver, ratification and/or acquiescence. Because Licensee has timely submitted a completed Affidavit of Defense, pursuant to the BACP Taxi Rules, no transfer upon foreclosure may be allowed except pursuant to an order of a court having jurisdiction. Therefore, Licensee respectfully requests that the BACP deny Creditor's Request to Transfer Taxicab Medallion License Upon Foreclosure.

## FACTUAL BACKGROUND

1.    Symon Garber formed Tri Global Financial Services, Inc. ("Tri Global") in 2004, along with Roman Sapino and others, to provide capital to taxicab medallion owners. Tri Global's principal, Roman Sapino, also has many years of experience in the taxicab financing industry and has been involved in successful taxicab enterprises in New York and Chicago. Tri Global's co-owners include Galina Garber-Sheinin and Valentina Zubok. Irene Gans and Maya Zubok are related to an owner of Tri Global.

2.    Tri Global is a corporation formed and existing under the laws of the State of

Illinois, maintaining offices at 2617 S. Wabash Avenue, Chicago, Illinois 60616. Tri Global is engaged in the business of financing and servicing Chicago-based taxi medallion loans as well as offering second-position financing to the taxi industry.

3.      Upon information and belief, Capital One is a corporation formed and existing under the laws of the State of New York, maintaining a principal place of business at 265 Broadhollow Road, Melville, New York 11747.

4.      Tri Global was formed to provide loans to purchasers of public passenger vehicle licenses and medallions in the Chicago market, which confers the right to operate a taxicab in Chicago pursuant to the regulations issued and regulated by the City of Chicago Department of Business Affairs and Consumer Protection ("BACP").

5.      Tri Global offered medallion and other financing to a wide-variety of borrowers, including taxicab businesses that rely on the medallion-secured loans to earn their livelihoods. Tri Global primarily focused its business on servicing taxi medallion loans for various lenders and also offered second-position financing to the taxi industry. In or around 2006 Tri Global was approached by North Fork Bank, which expressed interest in partnering with Tri Global to expand the scope of its lending platform.

6.      Over the next several years, Tri Global and North Fork Bank entered into numerous successful loan participations. When North Fork Bank was acquired by Capital One in or about 2006/2007, this practice continued with Capital One.

7.      Capital One was even more eager than North Fork Bank to capitalize upon Tri Global's contacts in the Chicago marketplace and strongly encouraged Tri Global to aggressively seek prospects for additional medallion loans. Capital One and Tri Global participated in the loans on a loan-by-loan basis for several years.

8.     In 2010, Capital One requested that Tri Global enter into a more formal arrangement by way of a master participation agreement, to which Tri Global agreed. The terms and conditions governing that relationship and Capital One's senior participation interests in the loans are more particularly set forth in a certain Master Joint Participation Agreement, dated August 2, 2010 (the "MJPA" or the "Tri Global MJPA").

9.     In connection with the Tri Global MJPA, Symon Garber, Roman Sapino, Ruben Giacomozzi, Valentina Zubok, and Galina Garber-Sheinin signed the Tri Global Guaranty, dated August 2, 2010.

10.     Pursuant to the terms of the MJPA, Tri Global generated business, handled collections, serviced the loans and remitted monthly payments to Capital One in accordance with the amount of its participation in each underlying loan while Capital One held senior participation interests in the various loans made and serviced by Tri Global to owners of Chicago taxicab medallions (the "Loans"). The Tri Global MJPA contemplates the sale of senior participation interests in loans issued and/or originated by Tri Global to owners and operators of taxi medallions. As reflected in the Tri Global MJPA, after Tri Global sells a participation interest, it continues to service the debt owed thereunder. In exchange for its services, Tri Global receives a servicing fee that is paid from the debt-service payments remitted to Tri Global each month.

11.     Since the inception of the Tri Global/Capital One relationship, the parties have participated in many loans. Although Tri Global originated the medallion-secured loans and served as the official loan servicer for the loan portfolio, Tri Global relied on and trusted Capital One and its commercial finance expertise. This relationship was often characterized by Capital One as a "team" and "partnership" and its officers and representatives, including David Cin ("Cin") and others, regularly commented that the success of the portfolio was the product of a "team effort."

12.     Although Capital One historically had no real presence in the Chicago medallion market, Capital One was eager to exploit Tri Global's connections to the taxicab medallion market and capitalize upon Tri Global's market dominance in the Chicago taxi-medallion economy. Capital One strongly encouraged Tri Global to aggressively acquire additional Chicago-based medallion loans.

13.     As the value of Chicago taxi medallion loans continued to rise, Capital One continued to aggressively press Tri Global to originate new loans so that Capital One could further capitalize on its market position and emerge as a leading taxi medallion lender in Chicago.

14.     Throughout the course of the Master Joint Participation Agreement, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin – whose interests were closely aligned with those of Capital One – worked with Capital One to maximize the return on the medallion loans.

15.     Tri Global originated the agreement/loan at issue between Licensee and Capital One based on Tri Global's relationship with Capital One.

16.     Despite its long-standing business venture with Tri Global, Capital One engaged in intentional and systematic efforts to line its own pockets to the detriment of Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin. As explained below, Capital One engaged in irreconcilable conflicts of interest, bad faith business practices, and intentionally disregarded its duty of good faith to Licensee and Tri Global when it partnered with a major taxi-industry competitor, Uber Technologies, Inc. ("Uber").

17.     In or about late 2013 and early 2014, and unbeknownst to Licensee and Tri Global (and many other Capital One loan participants and medallion-secured borrowers), Capital One began secretly planning to change course and exit the medallion market to partner with the

industry's most ominous competitor, Uber. Notwithstanding this new partnership, Capital One, either intentionally or recklessly, continued to encourage Tri Global to cultivate new medallion-secured loans while concealing its intention to partner with Uber.

18.     News of Capital One's partnership with Uber surfaced in approximately mid-2014, and was followed by an aggressive nationwide marketing campaign launched by Capital One. The marketing campaign and promotions touted Capital One's "unique new partnership" with Uber and underscored the "common focus" of both companies.

19.     Capital One began offering significant incentives to its consumers to choose Uber vehicles over properly licensed and regulated taxis – including offering free and discounted Uber rides and other similar promotions such as a 20% discount on all Uber rides when paid with a Capital One "Quicksilver" credit card. Capital One offered new customers two free Uber rides worth up to $60.00. Capital One created a new website promoting these incentives and further signaling its collaboration with Uber: "capitalone.com/uber".

20.     Capital One's partnership with Uber came as a great shock to Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin as the partnership was never disclosed to them prior to the 2014 marketing blitz. At no point in the parties' relationship was it ever contemplated that Capital One would undertake any action to undermine the taxi industry, the agreement at issue, or the value of Tri Global's and Capital One's loan portfolio.

21.     In partnering with and promoting Uber's ride-share services, Capital One and Uber's assault on the taxi industry has been instrumental in bringing about the destabilization of the Chicago taxi medallion market.

22.     In 2014, when Capital One began its partnership with Uber, the Chicago market softened dramatically. Sometime during mid-2014, funding to the medallion industry came to a

total halt. This was clearly tied to Capital One's partnership with Uber.

23.    By 2015, Uber reported that taxi usage nationwide had precipitously decreased while the number of customers using Uber increased correspondingly.

24.    The disruption of the taxi industry resulting from Capital One's partnership with Uber contributed to the reduction in value of the Chicago taxi medallions securing the loans.

25.    In short, Capital One has caused the price of the Chicago taxi medallions that secure the loans to plummet.

26.    Moreover, Capital One has sabotaged Tri Global, Symon Garber, Valentina Zubok, Galina Garber-Sheinin and Licensee's efforts to favorably restructure and/or modify the medallion-secured loans at issue.

27.    Accordingly, Capital One has materially breached the credit agreement and Licensee is not liable for the amount allegedly owed pursuant to the credit agreement.

## FIRST DEFENSE
### (No Right to Foreclose)

28.    Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

29.    Capital One, through its partnership with Uber, precipitated the collapse of the Chicago taxi medallion industry and the medallion industry nationwide, in addition to the corresponding decline in the value of the taxi medallions at issue.

30.    Based on Capital One's willful misconduct, breach of contract, malfeasance, wrongdoing and/or other intentional and/or reckless conduct, Capital One has no right to foreclose on the medallions at issue.

## SECOND DEFENSE
### (No Default by Licensee)

31.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

32.     Licensee does not owe the amount claimed by Capital One and has not defaulted on the agreement at issue with Capital One.

33.     Therefore, Capital One has no right to foreclose on the medallions at issue.

## THIRD DEFENSE
### (Improper Foreclosure Sale Purchase)

34.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

35.     On August 9, 2018, to start the foreclosure, Capital One opened the auction with an initial credit bid of $23,000.00.

36.     Capital One won the foreclosure auction with its initial $23,000.00 credit bid.

37.     Pursuant to Rule TX13.03(b), "[t]he [foreclosure] purchaser must meet all the criteria for licensing as set out in the Municipal Code of Chicago and [the BACP's] rules and regulations, including payment of the license transfer fee, license fees and any other fees, fines or taxes due and owing to the City." Rule TX13.03(b).

38.     Pursuant to Rule TX13.04(d), "[t]he taxicab medallion license must be sold to a person believed to be a qualified applicant . . ." Rule TX13.04(d); *see also* TX13.06(a).

39.     Upon information and belief, Capital One is not a qualified applicant and has no intention of ever seeking licensure under the Municipal Code of Chicago or BACP Taxi Rules.

40.     The purpose behind the BACP Taxi Rules' foreclosure process is to facilitate keeping medallions operating on the street. If Capital One is allowed to purchase the medallions,

with no intention of ever becoming licensed by the BACP, Capital One would be allowed to cause further harm to the taxicab industry and further benefit Uber.

41.     Therefore, the foreclosure sale did not comply with Rules TX13.03 and TX13.04 and the foreclosure auction resulted in an improper sale/purchase that violated the BACP Taxi Rules.

42.     Moreover, Capital One's intent behind the foreclosure sale is to destroy and cause further harm to Licensee, Tri Global, and Tri Global's owners and guarantors. Capital One has filed multiple actions against Licensee, Tri Global, and/or Tri Global's owners and guarantors and instead of allowing any of these cases to reach their natural conclusion, Capital One instead seeks to implement destructive tactics by foreclosing on the medallions in order to further destroy the medallion market by setting the prices and discouraging bids, all in violation of the Taxi Rules simply to inflict maximum damage and cause irreparable harm. In a recent case that was filed in the Circuit Court of Cook County, *Capital One Equipment Finance Corp. v. Chicago Elite Cab Corp., et al.*, No. 17 L 998, the Honorable Margaret A. Brennan dismissed Capital One's complaint but allowed Capital One leave to re-file its cause of action in another case currently pending in New York. That New York Action is *Capital One Equipment Finance Corp. v. The OSG Corp., Tri Global Financial Services, Inc. et al.*, No. 600749/2017. But, rather than re-file its case in the New York Action and pursue its alleged causes of action, Capital One instead chose to do an end run around the litigation process and seeks to foreclose on the medallions at issue in an attempt to destroy Licensee, Tri Global and Tri Global's owners and guarantors. Capital One did not re-file its Chicago cause of action in the New York Action because it knows that counterclaims would be filed against it, which would expose Capital One's bad faith conduct in abusing its partnership with Tri Global and expose Capital One's bad faith relationship with Uber. The reality is that

Capital One has filed numerous unsuccessful complaints in courts in New York and Chicago and, because these lawsuits have not been successful, Capital One is now attempting to cause as much harm as possible to Licensee and Tri Global before the counterclaims against Capital One are proven true and Capital One's bad faith is exposed.

## FOURTH DEFENSE
### (Improper Foreclosure Sale Process)

43.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

44.     On August 9, 2018, to start the foreclosure, Capital One opened the auction with an initial credit bid of $23,000.00.

45.     During the beginning part of the foreclosure auction, it became clear that no individuals were going to bid on the medallions because a foreclosure purchaser would have been liable for any and all liens on the medallions and such liability was unknown at the time of the auction. Capital One then stopped the foreclosure auction and announced to the individuals attending the auction that Capital One would work with any potential foreclosure purchasers and the bank to work out a deal on any liens on the medallion(s) bought at the auction. Capital One further stated that if the foreclosure purchaser and the bank could not work out an agreement concerning any liens on the medallions bought at the auction, Capital One would refund the foreclosure purchaser's money as if the foreclosure sale never took place. After this announcement, Capital One resumed the auction.

46.     By instituting this type of foreclosure auction, Capital One created an improper foreclosure process that created false values and did not bind the foreclosure purchasers.

## FIFTH DEFENSE
### (Breach of Fiduciary Duty)

47.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

48.     As set forth above, Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin relied heavily on and trusted Capital One.

49.     By virtue of the parties' business relationship as set forth above, and by reason of the demonstrable level of trust and confidence upon which Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin depended and which Capital One knowingly accepted, Capital One owes certain fiduciary duties to Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin including, without limitation, a duty of good faith.

50.     As explained herein, for years Tri Global relied on Capital One to guide certain aspects of its taxi-medallion loan origination and servicing business. Although the Tri Global MJPA provided discretion to Capital One, that discretion did not include a right to abandon the lending market or purposely advance competing interests to destabilize the industry upon which the very loans that were being serviced were based.

51.     Ultimately, Capital One repudiated its commitments to Licensee and abandoned the Chicago medallion lending market so that it could pursue a competing venture with Uber.

52.     Capital One breached its duty of good faith, and the trust and confidence of Licensee by, among other things: precipitating, through its partnership with Uber, the collapse of the Chicago taxi medallion industry and the medallion industry nationwide, in addition to the corresponding decline in the value of the taxi medallions at issue.

53.     Capital One engaged in an intentional course of wrongful conduct orchestrated to harm Licensee.

54. Capital One's conduct was willful, wanton and in reckless disregard of the Licensee's contractual rights and was otherwise wrongful.

55. As a direct and proximate result of Capital One's breach of its fiduciary duties, Licensee has suffered, and will continue to suffer, substantial damages.

### SIXTH DEFENSE
**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

56. Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

57. Pursuant to the covenant of good faith and fair dealing, Capital One could not undertake any action that has the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

58. As explained herein, Capital One breached the duty of good faith and fair dealing implied in the contract with Licensee by, among other things: precipitating, through its partnership with Uber, the collapse of the taxi medallion industry and concomitant decline in the value of the taxi medallions at issue.

59. As a direct and proximate result of Capital One's breach of the implied covenant of good faith and fair dealing thereunder, Licensee has suffered, and will continue to suffer, substantial damages.

### SEVENTH DEFENSE
**(Estoppel, Waiver, Ratification and/or Acquiescence)**

60. Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

61. Capital One's claim of breach of contract / default is barred by the doctrines of estoppel, waiver, ratification and/or acquiescence.

## **CONCLUSION**

WHEREFORE, based upon the foregoing allegations and defenses and all reasons appearing of record, Licensee has timely submitted a completed Affidavit of Defense and, pursuant to the BACP Taxi Rules, no transfer upon foreclosure may be allowed except pursuant to an order of a court having jurisdiction. Licensee respectfully requests that the BACP deny Creditor's Request to Transfer Taxicab Medallion License Upon Foreclosure.

# AFFIDAVIT OF DEFENSE TO CREDITOR

To City:    City of Chicago – Public Vehicle Operations Division
Department of Business Affairs and Consumer Protection
2350 W. Ogden Avenue, 1st Floor
Chicago, IL 60608
Attention: Monique Davids

To Creditor:    Capital One Equipment Finance Corp., f/k/a All Points Capital Corp.,
d/b/a Capital One Taxi Medallion Finance
c/o Troutman Sanders LLP
Att'n: Andrew L. Buck
875 Third Avenue
New York, NY 10022

RE: PUBLIC PASSENGER LICENSE NUMBER(s) <u>4071TX, 4121TX & 4137TX</u>

LICENSEE NAME: <u>Magenta Zone Cab Co.</u>

I, _Galina Gaber Sheinin_ hereby swear that I own Taxicab Medallion License
<span style="font-size:smaller">Debtor Individual Name</span>

Number(s) <u>4071TX, 4121TX & 4137TX</u> either individually or through a company that I own and I have a defense to the

foreclosure of these licenses. I understand that this license(s) was sold at a foreclosure

sale on or about _____August 9, 2018_____ and that sale is contingent upon approval by the Department of Business Affairs
<span style="font-size:smaller">List Date of Foreclosure Sale</span>
and Consumer Protection.

My defense to this foreclosure is: (Use additional pages if needed)_____

_See attached Defense Document_

Signature: _____

Print Name: _Sheinin Edward_

Relationship to Medallion License/Title _Vice President & Authorized Agent_

Address: _2617 S Wabash Chicago IL 60616_

Phone: _312·791·1255_

Email Address: _edwards@chicagocarriagecab.com_

Subscribed and Sworn to before me

this _22_ day of _Aug_____, 20 _18_.

_____ Notary Public

## AFFIDAVIT OF DEFENSE TO CREDITOR

## DEFENSE DOCUMENT

In support of its Affidavit of Defense to Creditor, Licensee asserts the following defenses in opposition to the Creditor's ("Creditor" or "Capital One") request to transfer public passenger vehicle license upon foreclosure and to the foreclosure sale: (1) Capital One has no right to foreclose on the medallions at issue; (2) Licensee does not owe the amount claimed by Capital One and has not defaulted on the agreement at issue with Capital One; (3) the foreclosure resulted in an improper foreclosure sale purchase that violated the BACP Taxi Rules; (4) Capital One instituted an improper foreclosure sale process; (5) Capital One breached its fiduciary duty to Licensee; (6) Capital One breached the implied covenant of good faith and fair dealing; (7) Capital One's claim of breach of contract / default is barred by the doctrines of estoppel, waiver, ratification and/or acquiescence. Because Licensee has timely submitted a completed Affidavit of Defense, pursuant to the BACP Taxi Rules, no transfer upon foreclosure may be allowed except pursuant to an order of a court having jurisdiction. Therefore, Licensee respectfully requests that the BACP deny Creditor's Request to Transfer Taxicab Medallion License Upon Foreclosure.

## FACTUAL BACKGROUND

1.      Symon Garber formed Tri Global Financial Services, Inc. ("Tri Global") in 2004, along with Roman Sapino and others, to provide capital to taxicab medallion owners. Tri Global's principal, Roman Sapino, also has many years of experience in the taxicab financing industry and has been involved in successful taxicab enterprises in New York and Chicago. Tri Global's co-owners include Galina Garber-Sheinin and Valentina Zubok. Irene Gans and Maya Zubok are related to an owner of Tri Global.

2.      Tri Global is a corporation formed and existing under the laws of the State of

Illinois, maintaining offices at 2617 S. Wabash Avenue, Chicago, Illinois 60616. Tri Global is engaged in the business of financing and servicing Chicago-based taxi medallion loans as well as offering second-position financing to the taxi industry.

3.    Upon information and belief, Capital One is a corporation formed and existing under the laws of the State of New York, maintaining a principal place of business at 265 Broadhollow Road, Melville, New York 11747.

4.    Tri Global was formed to provide loans to purchasers of public passenger vehicle licenses and medallions in the Chicago market, which confers the right to operate a taxicab in Chicago pursuant to the regulations issued and regulated by the City of Chicago Department of Business Affairs and Consumer Protection ("BACP").

5.    Tri Global offered medallion and other financing to a wide-variety of borrowers, including taxicab businesses that rely on the medallion-secured loans to earn their livelihoods. Tri Global primarily focused its business on servicing taxi medallion loans for various lenders and also offered second-position financing to the taxi industry. In or around 2006 Tri Global was approached by North Fork Bank, which expressed interest in partnering with Tri Global to expand the scope of its lending platform.

6.    Over the next several years, Tri Global and North Fork Bank entered into numerous successful loan participations. When North Fork Bank was acquired by Capital One in or about 2006/2007, this practice continued with Capital One.

7.    Capital One was even more eager than North Fork Bank to capitalize upon Tri Global's contacts in the Chicago marketplace and strongly encouraged Tri Global to aggressively seek prospects for additional medallion loans. Capital One and Tri Global participated in the loans on a loan-by-loan basis for several years.

8.      In 2010, Capital One requested that Tri Global enter into a more formal arrangement by way of a master participation agreement, to which Tri Global agreed. The terms and conditions governing that relationship and Capital One's senior participation interests in the loans are more particularly set forth in a certain Master Joint Participation Agreement, dated August 2, 2010 (the "MJPA" or the "Tri Global MJPA").

9.      In connection with the Tri Global MJPA, Symon Garber, Roman Sapino, Ruben Giacomozzi, Valentina Zubok, and Galina Garber-Sheinin signed the Tri Global Guaranty, dated August 2, 2010.

10.     Pursuant to the terms of the MJPA, Tri Global generated business, handled collections, serviced the loans and remitted monthly payments to Capital One in accordance with the amount of its participation in each underlying loan while Capital One held senior participation interests in the various loans made and serviced by Tri Global to owners of Chicago taxicab medallions (the "Loans"). The Tri Global MJPA contemplates the sale of senior participation interests in loans issued and/or originated by Tri Global to owners and operators of taxi medallions. As reflected in the Tri Global MJPA, after Tri Global sells a participation interest, it continues to service the debt owed thereunder. In exchange for its services, Tri Global receives a servicing fee that is paid from the debt-service payments remitted to Tri Global each month.

11.     Since the inception of the Tri Global/Capital One relationship, the parties have participated in many loans. Although Tri Global originated the medallion-secured loans and served as the official loan servicer for the loan portfolio, Tri Global relied on and trusted Capital One and its commercial finance expertise. This relationship was often characterized by Capital One as a "team" and "partnership" and its officers and representatives, including David Cin ("Cin") and others, regularly commented that the success of the portfolio was the product of a "team effort."

12.     Although Capital One historically had no real presence in the Chicago medallion market, Capital One was eager to exploit Tri Global's connections to the taxicab medallion market and capitalize upon Tri Global's market dominance in the Chicago taxi-medallion economy. Capital One strongly encouraged Tri Global to aggressively acquire additional Chicago-based medallion loans.

13.     As the value of Chicago taxi medallion loans continued to rise, Capital One continued to aggressively press Tri Global to originate new loans so that Capital One could further capitalize on its market position and emerge as a leading taxi medallion lender in Chicago.

14.     Throughout the course of the Master Joint Participation Agreement, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin – whose interests were closely aligned with those of Capital One – worked with Capital One to maximize the return on the medallion loans.

15.     Tri Global originated the agreement/loan at issue between Licensee and Capital One based on Tri Global's relationship with Capital One.

16.     Despite its long-standing business venture with Tri Global, Capital One engaged in intentional and systematic efforts to line its own pockets to the detriment of Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin. As explained below, Capital One engaged in irreconcilable conflicts of interest, bad faith business practices, and intentionally disregarded its duty of good faith to Licensee and Tri Global when it partnered with a major taxi-industry competitor, Uber Technologies, Inc. ("Uber").

17.     In or about late 2013 and early 2014, and unbeknownst to Licensee and Tri Global (and many other Capital One loan participants and medallion-secured borrowers), Capital One began secretly planning to change course and exit the medallion market to partner with the

industry's most ominous competitor, Uber. Notwithstanding this new partnership, Capital One, either intentionally or recklessly, continued to encourage Tri Global to cultivate new medallion-secured loans while concealing its intention to partner with Uber.

18.     News of Capital One's partnership with Uber surfaced in approximately mid-2014, and was followed by an aggressive nationwide marketing campaign launched by Capital One. The marketing campaign and promotions touted Capital One's "unique new partnership" with Uber and underscored the "common focus" of both companies.

19.     Capital One began offering significant incentives to its consumers to choose Uber vehicles over properly licensed and regulated taxis – including offering free and discounted Uber rides and other similar promotions such as a 20% discount on all Uber rides when paid with a Capital One "Quicksilver" credit card. Capital One offered new customers two free Uber rides worth up to $60.00. Capital One created a new website promoting these incentives and further signaling its collaboration with Uber: "capitalone.com/uber".

20.     Capital One's partnership with Uber came as a great shock to Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin as the partnership was never disclosed to them prior to the 2014 marketing blitz. At no point in the parties' relationship was it ever contemplated that Capital One would undertake any action to undermine the taxi industry, the agreement at issue, or the value of Tri Global's and Capital One's loan portfolio.

21.     In partnering with and promoting Uber's ride-share services, Capital One and Uber's assault on the taxi industry has been instrumental in bringing about the destabilization of the Chicago taxi medallion market.

22.     In 2014, when Capital One began its partnership with Uber, the Chicago market softened dramatically. Sometime during mid-2014, funding to the medallion industry came to a

total halt. This was clearly tied to Capital One's partnership with Uber.

23.     By 2015, Uber reported that taxi usage nationwide had precipitously decreased while the number of customers using Uber increased correspondingly.

24.     The disruption of the taxi industry resulting from Capital One's partnership with Uber contributed to the reduction in value of the Chicago taxi medallions securing the loans.

25.     In short, Capital One has caused the price of the Chicago taxi medallions that secure the loans to plummet.

26.     Moreover, Capital One has sabotaged Tri Global, Symon Garber, Valentina Zubok, Galina Garber-Sheinin and Licensee's efforts to favorably restructure and/or modify the medallion-secured loans at issue.

27.     Accordingly, Capital One has materially breached the credit agreement and Licensee is not liable for the amount allegedly owed pursuant to the credit agreement.

## FIRST DEFENSE
### (No Right to Foreclose)

28.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

29.     Capital One, through its partnership with Uber, precipitated the collapse of the Chicago taxi medallion industry and the medallion industry nationwide, in addition to the corresponding decline in the value of the taxi medallions at issue.

30.     Based on Capital One's willful misconduct, breach of contract, malfeasance, wrongdoing and/or other intentional and/or reckless conduct, Capital One has no right to foreclose on the medallions at issue.

**SECOND DEFENSE**
**(No Default by Licensee)**

31.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

32.     Licensee does not owe the amount claimed by Capital One and has not defaulted on the agreement at issue with Capital One.

33.     Therefore, Capital One has no right to foreclose on the medallions at issue.

**THIRD DEFENSE**
**(Improper Foreclosure Sale Purchase)**

34.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

35.     On August 9, 2018, to start the foreclosure, Capital One opened the auction with an initial credit bid of $23,000.00.

36.     Capital One won the foreclosure auction with its initial $23,000.00 credit bid.

37.     Pursuant to Rule TX13.03(b), "[t]he [foreclosure] purchaser must meet all the criteria for licensing as set out in the Municipal Code of Chicago and [the BACP's] rules and regulations, including payment of the license transfer fee, license fees and any other fees, fines or taxes due and owing to the City." Rule TX13.03(b).

38.     Pursuant to Rule TX13.04(d), "[t]he taxicab medallion license must be sold to a person believed to be a qualified applicant . . ." Rule TX13.04(d); *see also* TX13.06(a).

39.     Upon information and belief, Capital One is not a qualified applicant and has no intention of ever seeking licensure under the Municipal Code of Chicago or BACP Taxi Rules.

40.     The purpose behind the BACP Taxi Rules' foreclosure process is to facilitate keeping medallions operating on the street. If Capital One is allowed to purchase the medallions,

with no intention of ever becoming licensed by the BACP, Capital One would be allowed to cause further harm to the taxicab industry and further benefit Uber.

41.     Therefore, the foreclosure sale did not comply with Rules TX13.03 and TX13.04 and the foreclosure auction resulted in an improper sale/purchase that violated the BACP Taxi Rules.

42.     Moreover, Capital One's intent behind the foreclosure sale is to destroy and cause further harm to Licensee, Tri Global, and Tri Global's owners and guarantors. Capital One has filed multiple actions against Licensee, Tri Global, and/or Tri Global's owners and guarantors and instead of allowing any of these cases to reach their natural conclusion, Capital One instead seeks to implement destructive tactics by foreclosing on the medallions in order to further destroy the medallion market by setting the prices and discouraging bids, all in violation of the Taxi Rules simply to inflict maximum damage and cause irreparable harm. In a recent case that was filed in the Circuit Court of Cook County, *Capital One Equipment Finance Corp. v. Chicago Elite Cab Corp., et al.*, No. 17 L 998, the Honorable Margaret A. Brennan dismissed Capital One's complaint but allowed Capital One leave to re-file its cause of action in another case currently pending in New York. That New York Action is *Capital One Equipment Finance Corp. v. The OSG Corp., Tri Global Financial Services, Inc. et al.*, No. 600749/2017. But, rather than re-file its case in the New York Action and pursue its alleged causes of action, Capital One instead chose to do an end run around the litigation process and seeks to foreclose on the medallions at issue in an attempt to destroy Licensee, Tri Global and Tri Global's owners and guarantors. Capital One did not re-file its Chicago cause of action in the New York Action because it knows that counterclaims would be filed against it, which would expose Capital One's bad faith conduct in abusing its partnership with Tri Global and expose Capital One's bad faith relationship with Uber. The reality is that

Capital One has filed numerous unsuccessful complaints in courts in New York and Chicago and, because these lawsuits have not been successful, Capital One is now attempting to cause as much harm as possible to Licensee and Tri Global before the counterclaims against Capital One are proven true and Capital One's bad faith is exposed.

## FOURTH DEFENSE
### (Improper Foreclosure Sale Process)

43.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

44.     On August 9, 2018, to start the foreclosure, Capital One opened the auction with an initial credit bid of $23,000.00.

45.     During the beginning part of the foreclosure auction, it became clear that no individuals were going to bid on the medallions because a foreclosure purchaser would have been liable for any and all liens on the medallions and such liability was unknown at the time of the auction. Capital One then stopped the foreclosure auction and announced to the individuals attending the auction that Capital One would work with any potential foreclosure purchasers and the bank to work out a deal on any liens on the medallion(s) bought at the auction. Capital One further stated that if the foreclosure purchaser and the bank could not work out an agreement concerning any liens on the medallions bought at the auction, Capital One would refund the foreclosure purchaser's money as if the foreclosure sale never took place. After this announcement, Capital One resumed the auction.

46.     By instituting this type of foreclosure auction, Capital One created an improper foreclosure process that created false values and did not bind the foreclosure purchasers.

## FIFTH DEFENSE
### (Breach of Fiduciary Duty)

47.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

48.     As set forth above, Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin relied heavily on and trusted Capital One.

49.     By virtue of the parties' business relationship as set forth above, and by reason of the demonstrable level of trust and confidence upon which Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin depended and which Capital One knowingly accepted, Capital One owes certain fiduciary duties to Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin including, without limitation, a duty of good faith.

50.     As explained herein, for years Tri Global relied on Capital One to guide certain aspects of its taxi-medallion loan origination and servicing business. Although the Tri Global MJPA provided discretion to Capital One, that discretion did not include a right to abandon the lending market or purposely advance competing interests to destabilize the industry upon which the very loans that were being serviced were based.

51.     Ultimately, Capital One repudiated its commitments to Licensee and abandoned the Chicago medallion lending market so that it could pursue a competing venture with Uber.

52.     Capital One breached its duty of good faith, and the trust and confidence of Licensee by, among other things: precipitating, through its partnership with Uber, the collapse of the Chicago taxi medallion industry and the medallion industry nationwide, in addition to the corresponding decline in the value of the taxi medallions at issue.

53.     Capital One engaged in an intentional course of wrongful conduct orchestrated to harm Licensee.

54.     Capital One's conduct was willful, wanton and in reckless disregard of the Licensee's contractual rights and was otherwise wrongful.

55.     As a direct and proximate result of Capital One's breach of its fiduciary duties, Licensee has suffered, and will continue to suffer, substantial damages.

## SIXTH DEFENSE
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

56.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

57.     Pursuant to the covenant of good faith and fair dealing, Capital One could not undertake any action that has the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

58.     As explained herein, Capital One breached the duty of good faith and fair dealing implied in the contract with Licensee by, among other things: precipitating, through its partnership with Uber, the collapse of the taxi medallion industry and concomitant decline in the value of the taxi medallions at issue.

59.     As a direct and proximate result of Capital One's breach of the implied covenant of good faith and fair dealing thereunder, Licensee has suffered, and will continue to suffer, substantial damages.

## SEVENTH DEFENSE
### (Estoppel, Waiver, Ratification and/or Acquiescence)

60.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

61.     Capital One's claim of breach of contract / default is barred by the doctrines of estoppel, waiver, ratification and/or acquiescence.

## **CONCLUSION**

WHEREFORE, based upon the foregoing allegations and defenses and all reasons appearing of record, Licensee has timely submitted a completed Affidavit of Defense and, pursuant to the BACP Taxi Rules, no transfer upon foreclosure may be allowed except pursuant to an order of a court having jurisdiction. Licensee respectfully requests that the BACP deny Creditor's Request to Transfer Taxicab Medallion License Upon Foreclosure.

## AFFIDAVIT OF DEFENSE TO CREDITOR

**To City:**   City of Chicago – Public Vehicle Operations Division
Department of Business Affairs and Consumer Protection
2350 W. Ogden Avenue, 1st Floor
Chicago, IL 60608
Attention: Monique Davids

**To Creditor:**   Capital One Equipment Finance Corp., f/k/a All Points Capital Corp.,
d/b/a Capital One Taxi Medallion Finance
c/o Troutman Sanders LLP
Att'n: Andrew L. Buck
875 Third Avenue
New York, NY 10022

RE: PUBLIC PASSENGER LICENSE NUMBER(s) <u>4286TX</u>

LICENSEE NAME: <u>Magenta Zone Cab Corp.</u>

I, _Galina Garber Sheinin_, hereby swear that I own Taxicab Medallion License
<span style="font-size:smaller">Debtor Individual Name</span>

Number(s) <u>4286TX</u> either individually or through a company that I own and I have a defense to the foreclosure of these

licenses. I understand that this license(s) was sold at a foreclosure

sale on or about _____August 9, 2018_____ and that sale is contingent upon approval by the Department of Business Affairs
<span style="font-size:smaller">List Date of Foreclosure Sale</span>
and Consumer Protection.

My defense to this foreclosure is: (Use additional pages if needed)_____

_____See attached Defense Document._____

_____

_____

Signature: _____

Print Name: _Sheinin Edward_

Relationship to Medallion License/Title _Vice President & Authorized Agent_

Address: _2617 S Wabash Chicago IL 60616_

Phone: _312·791·1255_

Email Address: _edwards@chicagocarriagecab.com_

Subscribed and Sworn to before me

this _22_ day of _Aug_ , 20 _19_ .

_____ Notary Public

<span style="font-size:smaller">JANET DAVIS
Official Seal
Notary Public - State of ...
My Commission Expires Sep...</span>

## AFFIDAVIT OF DEFENSE TO CREDITOR

## DEFENSE DOCUMENT

In support of its Affidavit of Defense to Creditor, Licensee asserts the following defenses in opposition to the Creditor's ("Creditor" or "Capital One") request to transfer public passenger vehicle license upon foreclosure and to the foreclosure sale: (1) Capital One has no right to foreclose on the medallion at issue; (2) Licensee does not owe the amount claimed by Capital One and has not defaulted on the agreement at issue with Capital One; (3) the foreclosure resulted in an improper foreclosure sale purchase that violated the BACP Taxi Rules; (4) Capital One instituted an improper foreclosure sale process; (5) Capital One breached its fiduciary duty to Licensee; (6) Capital One breached the implied covenant of good faith and fair dealing; (7) Capital One's claim of breach of contract / default is barred by the doctrines of estoppel, waiver, ratification and/or acquiescence. Because Licensee has timely submitted a completed Affidavit of Defense, pursuant to the BACP Taxi Rules, no transfer upon foreclosure may be allowed except pursuant to an order of a court having jurisdiction. Therefore, Licensee respectfully requests that the BACP deny Creditor's Request to Transfer Taxicab Medallion License Upon Foreclosure.

## FACTUAL BACKGROUND

1.      Symon Garber formed Tri Global Financial Services, Inc. ("Tri Global") in 2004, along with Roman Sapino and others, to provide capital to taxicab medallion owners. Tri Global's principal, Roman Sapino, also has many years of experience in the taxicab financing industry and has been involved in successful taxicab enterprises in New York and Chicago. Tri Global's co-owners include Galina Garber-Sheinin and Valentina Zubok. Irene Gans and Maya Zubok are related to an owner of Tri Global.

2.      Tri Global is a corporation formed and existing under the laws of the State of

Illinois, maintaining offices at 2617 S. Wabash Avenue, Chicago, Illinois 60616. Tri Global is engaged in the business of financing and servicing Chicago-based taxi medallion loans as well as offering second-position financing to the taxi industry.

3.    Upon information and belief, Capital One is a corporation formed and existing under the laws of the State of New York, maintaining a principal place of business at 265 Broadhollow Road, Melville, New York 11747.

4.    Tri Global was formed to provide loans to purchasers of public passenger vehicle licenses and medallions in the Chicago market, which confers the right to operate a taxicab in Chicago pursuant to the regulations issued and regulated by the City of Chicago Department of Business Affairs and Consumer Protection ("BACP").

5.    Tri Global offered medallion and other financing to a wide-variety of borrowers, including taxicab businesses that rely on the medallion-secured loans to earn their livelihoods. Tri Global primarily focused its business on servicing taxi medallion loans for various lenders and also offered second-position financing to the taxi industry. In or around 2006 Tri Global was approached by North Fork Bank, which expressed interest in partnering with Tri Global to expand the scope of its lending platform.

6.    Over the next several years, Tri Global and North Fork Bank entered into numerous successful loan participations. When North Fork Bank was acquired by Capital One in or about 2006/2007, this practice continued with Capital One.

7.    Capital One was even more eager than North Fork Bank to capitalize upon Tri Global's contacts in the Chicago marketplace and strongly encouraged Tri Global to aggressively seek prospects for additional medallion loans. Capital One and Tri Global participated in the loans on a loan-by-loan basis for several years.

8. In 2010, Capital One requested that Tri Global enter into a more formal arrangement by way of a master participation agreement, to which Tri Global agreed. The terms and conditions governing that relationship and Capital One's senior participation interests in the loans are more particularly set forth in a certain Master Joint Participation Agreement, dated August 2, 2010 (the "MJPA" or the "Tri Global MJPA").

9. In connection with the Tri Global MJPA, Symon Garber, Roman Sapino, Ruben Giacomozzi, Valentina Zubok, and Galina Garber-Sheinin signed the Tri Global Guaranty, dated August 2, 2010.

10. Pursuant to the terms of the MJPA, Tri Global generated business, handled collections, serviced the loans and remitted monthly payments to Capital One in accordance with the amount of its participation in each underlying loan while Capital One held senior participation interests in the various loans made and serviced by Tri Global to owners of Chicago taxicab medallions (the "Loans"). The Tri Global MJPA contemplates the sale of senior participation interests in loans issued and/or originated by Tri Global to owners and operators of taxi medallions. As reflected in the Tri Global MJPA, after Tri Global sells a participation interest, it continues to service the debt owed thereunder. In exchange for its services, Tri Global receives a servicing fee that is paid from the debt-service payments remitted to Tri Global each month.

11. Since the inception of the Tri Global/Capital One relationship, the parties have participated in many loans. Although Tri Global originated the medallion-secured loans and served as the official loan servicer for the loan portfolio, Tri Global relied on and trusted Capital One and its commercial finance expertise. This relationship was often characterized by Capital One as a "team" and "partnership" and its officers and representatives, including David Cin ("Cin") and others, regularly commented that the success of the portfolio was the product of a "team effort."

12. Although Capital One historically had no real presence in the Chicago medallion market, Capital One was eager to exploit Tri Global's connections to the taxicab medallion market and capitalize upon Tri Global's market dominance in the Chicago taxi-medallion economy. Capital One strongly encouraged Tri Global to aggressively acquire additional Chicago-based medallion loans.

13. As the value of Chicago taxi medallion loans continued to rise, Capital One continued to aggressively press Tri Global to originate new loans so that Capital One could further capitalize on its market position and emerge as a leading taxi medallion lender in Chicago.

14. Throughout the course of the Master Joint Participation Agreement, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin – whose interests were closely aligned with those of Capital One – worked with Capital One to maximize the return on the medallion loans.

15. Tri Global originated the agreement/loan at issue between Licensee and Capital One based on Tri Global's relationship with Capital One.

16. Despite its long-standing business venture with Tri Global, Capital One engaged in intentional and systematic efforts to line its own pockets to the detriment of Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin. As explained below, Capital One engaged in irreconcilable conflicts of interest, bad faith business practices, and intentionally disregarded its duty of good faith to Licensee and Tri Global when it partnered with a major taxi-industry competitor, Uber Technologies, Inc. ("Uber").

17. In or about late 2013 and early 2014, and unbeknownst to Licensee and Tri Global (and many other Capital One loan participants and medallion-secured borrowers), Capital One began secretly planning to change course and exit the medallion market to partner with the

industry's most ominous competitor, Uber. Notwithstanding this new partnership, Capital One, either intentionally or recklessly, continued to encourage Tri Global to cultivate new medallion-secured loans while concealing its intention to partner with Uber.

18.     News of Capital One's partnership with Uber surfaced in approximately mid-2014, and was followed by an aggressive nationwide marketing campaign launched by Capital One. The marketing campaign and promotions touted Capital One's "unique new partnership" with Uber and underscored the "common focus" of both companies.

19.     Capital One began offering significant incentives to its consumers to choose Uber vehicles over properly licensed and regulated taxis – including offering free and discounted Uber rides and other similar promotions such as a 20% discount on all Uber rides when paid with a Capital One "Quicksilver" credit card. Capital One offered new customers two free Uber rides worth up to $60.00. Capital One created a new website promoting these incentives and further signaling its collaboration with Uber: "capitalone.com/uber".

20.     Capital One's partnership with Uber came as a great shock to Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin as the partnership was never disclosed to them prior to the 2014 marketing blitz. At no point in the parties' relationship was it ever contemplated that Capital One would undertake any action to undermine the taxi industry, the agreement at issue, or the value of Tri Global's and Capital One's loan portfolio.

21.     In partnering with and promoting Uber's ride-share services, Capital One and Uber's assault on the taxi industry has been instrumental in bringing about the destabilization of the Chicago taxi medallion market.

22.     In 2014, when Capital One began its partnership with Uber, the Chicago market softened dramatically. Sometime during mid-2014, funding to the medallion industry came to a

total halt. This was clearly tied to Capital One's partnership with Uber.

23.     By 2015, Uber reported that taxi usage nationwide had precipitously decreased while the number of customers using Uber increased correspondingly.

24.     The disruption of the taxi industry resulting from Capital One's partnership with Uber contributed to the reduction in value of the Chicago taxi medallions securing the loans.

25.     In short, Capital One has caused the price of the Chicago taxi medallions that secure the loans to plummet.

26.     Moreover, Capital One has sabotaged Tri Global, Symon Garber, Valentina Zubok, Galina Garber-Sheinin and Licensee's efforts to favorably restructure and/or modify the medallion-secured loans at issue.

27.     Accordingly, Capital One has materially breached the credit agreement and Licensee is not liable for the amount allegedly owed pursuant to the credit agreement.

## FIRST DEFENSE
### (No Right to Foreclose)

28.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

29.     Capital One, through its partnership with Uber, precipitated the collapse of the Chicago taxi medallion industry and the medallion industry nationwide, in addition to the corresponding decline in the value of the taxi medallions at issue.

30.     Based on Capital One's willful misconduct, breach of contract, malfeasance, wrongdoing and/or other intentional and/or reckless conduct, Capital One has no right to foreclose on the medallions at issue.

## SECOND DEFENSE
### (No Default by Licensee)

31.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

32.     Licensee does not owe the amount claimed by Capital One and has not defaulted on the agreement at issue with Capital One.

33.     Therefore, Capital One has no right to foreclose on the medallions at issue.

## THIRD DEFENSE
### (Improper Foreclosure Sale Purchase)

34.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

35.     On August 9, 2018, to start the foreclosure, Capital One opened the auction with an initial credit bid of $23,000.00.

36.     An individual won the foreclosure auction with a bid of approximately $23,100.00.

37.     Pursuant to Rule TX13.03(b), "[t]he [foreclosure] purchaser must meet all the criteria for licensing as set out in the Municipal Code of Chicago and [the BACP's] rules and regulations, including payment of the license transfer fee, license fees and any other fees, fines or taxes due and owing to the City." Rule TX13.03(b).

38.     Pursuant to Rule TX13.04(d), "[t]he taxicab medallion license must be sold to a person believed to be a qualified applicant . . ." Rule TX13.04(d); *see also* TX13.06(a).

39.     It is unclear if the individual purchaser of the medallion at the foreclosure auction is a qualified applicant under the Municipal Code of Chicago or BACP Taxi Rules. Regardless, because of the improper auction process instituted by Capital One, there is a strong likelihood that the individual purchaser will ultimately decide not to go forward with the foreclosure sale, thus

making Capital One the potential purchaser.

40.     Upon information and belief, Capital One is not a qualified applicant and has no intention of ever seeking licensure under the Municipal Code of Chicago or BACP Taxi Rules.

41.     The purpose behind the BACP Taxi Rules' foreclosure process is to facilitate keeping medallions operating on the street. If Capital One is allowed to purchase the medallions, with no intention of ever becoming licensed by the BACP, Capital One would be allowed to cause further harm to the taxicab industry and further benefit Uber.

42.     Therefore, the foreclosure sale did not comply with Rules TX13.03 and TX13.04 and the foreclosure auction resulted in an improper sale/purchase that violated the BACP Taxi Rules.

43.     Moreover, Capital One's intent behind the foreclosure sale is to destroy and cause further harm to Licensee, Tri Global, and Tri Global's owners and guarantors. Capital One has filed multiple actions against Licensee, Tri Global, and/or Tri Global's owners and guarantors and instead of allowing any of these cases to reach their natural conclusion, Capital One instead seeks to implement destructive tactics by foreclosing on the medallions in order to further destroy the medallion market by setting the prices and discouraging bids, all in violation of the Taxi Rules simply to inflict maximum damage and cause irreparable harm. In a recent case that was filed in the Circuit Court of Cook County, *Capital One Equipment Finance Corp. v. Chicago Elite Cab Corp., et al.*, No. 17 L 998, the Honorable Margaret A. Brennan dismissed Capital One's complaint but allowed Capital One leave to re-file its cause of action in another case currently pending in New York. That New York Action is *Capital One Equipment Finance Corp. v. The OSG Corp., Tri Global Financial Services, Inc. et al.*, No. 600749/2017. But, rather than re-file its case in the New York Action and pursue its alleged causes of action, Capital One instead chose to do an end

run around the litigation process and seeks to foreclose on the medallions at issue in an attempt to destroy Licensee, Tri Global and Tri Global's owners and guarantors. Capital One did not re-file its Chicago cause of action in the New York Action because it knows that counterclaims would be filed against it, which would expose Capital One's bad faith conduct in abusing its partnership with Tri Global and expose Capital One's bad faith relationship with Uber. The reality is that Capital One has filed numerous unsuccessful complaints in courts in New York and Chicago and, because these lawsuits have not been successful, Capital One is now attempting to cause as much harm as possible to Licensee and Tri Global before the counterclaims against Capital One are proven true and Capital One's bad faith is exposed.

## FOURTH DEFENSE
### (Improper Foreclosure Sale Process)

44.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

45.     On August 9, 2018, to start the foreclosure, Capital One opened the auction with an initial credit bid of $23,000.00.

46.     During the beginning part of the foreclosure auction, it became clear that no individuals were going to bid on the medallions because a foreclosure purchaser would have been liable for any and all liens on the medallions and such liability was unknown at the time of the auction. Capital One then stopped the foreclosure auction and announced to the individuals attending the auction that Capital One would work with any potential foreclosure purchasers and the bank to work out a deal on any liens on the medallion(s) bought at the auction. Capital One further stated that if the foreclosure purchaser and the bank could not work out an agreement concerning any liens on the medallions bought at the auction, Capital One would refund the foreclosure purchaser's money as if the foreclosure sale never took place. After this announcement,

Capital One resumed the auction.

47.     By instituting this type of foreclosure auction, Capital One created an improper foreclosure process that created false values and did not bind the foreclosure purchasers.

## FIFTH DEFENSE
### (Breach of Fiduciary Duty)

48.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

49.     As set forth above, Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin relied heavily on and trusted Capital One.

50.     By virtue of the parties' business relationship as set forth above, and by reason of the demonstrable level of trust and confidence upon which Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin depended and which Capital One knowingly accepted, Capital One owes certain fiduciary duties to Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin including, without limitation, a duty of good faith.

51.     As explained herein, for years Tri Global relied on Capital One to guide certain aspects of its taxi-medallion loan origination and servicing business. Although the Tri Global MJPA provided discretion to Capital One, that discretion did not include a right to abandon the lending market or purposely advance competing interests to destabilize the industry upon which the very loans that were being serviced were based.

52.     Ultimately, Capital One repudiated its commitments to Licensee and abandoned the Chicago medallion lending market so that it could pursue a competing venture with Uber.

53.     Capital One breached its duty of good faith, and the trust and confidence of Licensee by, among other things: precipitating, through its partnership with Uber, the collapse of the Chicago taxi medallion industry and the medallion industry nationwide, in addition to the

corresponding decline in the value of the taxi medallions at issue.

54.     Capital One engaged in an intentional course of wrongful conduct orchestrated to harm Licensee.

55.     Capital One's conduct was willful, wanton and in reckless disregard of the Licensee's contractual rights and was otherwise wrongful.

56.     As a direct and proximate result of Capital One's breach of its fiduciary duties, Licensee has suffered, and will continue to suffer, substantial damages.

## SIXTH DEFENSE
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

57.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

58.     Pursuant to the covenant of good faith and fair dealing, Capital One could not undertake any action that has the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

59.     As explained herein, Capital One breached the duty of good faith and fair dealing implied in the contract with Licensee by, among other things: precipitating, through its partnership with Uber, the collapse of the taxi medallion industry and concomitant decline in the value of the taxi medallions at issue.

60.     As a direct and proximate result of Capital One's breach of the implied covenant of good faith and fair dealing thereunder, Licensee has suffered, and will continue to suffer, substantial damages.

## SEVENTH DEFENSE
### (Estoppel, Waiver, Ratification and/or Acquiescence)

61.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

62.     Capital One's claim of breach of contract / default is barred by the doctrines of estoppel, waiver, ratification and/or acquiescence.

## CONCLUSION

WHEREFORE, based upon the foregoing allegations and defenses and all reasons appearing of record, Licensee has timely submitted a completed Affidavit of Defense and, pursuant to the BACP Taxi Rules, no transfer upon foreclosure may be allowed except pursuant to an order of a court having jurisdiction. Licensee respectfully requests that the BACP deny Creditor's Request to Transfer Taxicab Medallion License Upon Foreclosure.

# AFFIDAVIT OF DEFENSE TO CREDITOR

**To City:**  City of Chicago – Public Vehicle Operations Division
Department of Business Affairs and Consumer Protection
2350 W. Ogden Avenue, 1st Floor
Chicago, IL 60608
Attention: Monique Davids

**To Creditor:**  Capital One Equipment Finance Corp., f/k/a All Points Capital Corp.,
d/b/a Capital One Taxi Medallion Finance
c/o Troutman Sanders LLP
Att'n: Andrew L. Buck
875 Third Avenue
New York, NY 10022

RE: PUBLIC PASSENGER LICENSE NUMBER(s) <u>1945TX, 4364TX, 4463TX, 4475TX & 4528TX</u>

LICENSEE NAME: <u>Mauve Zone Cab Co.</u>

I, <u>Galina Garber Shanin</u>, hereby swear that I own Taxicab Medallion License
<small>Debtor Individual Name</small>

Number(s) <u>1945TX, 4364TX, 4463TX, 4475TX & 4528TX</u> either individually or through a company that I own and I

have a defense to the foreclosure of these licenses. I understand that this license(s) was sold at a foreclosure

sale on or about _____<u>August 9, 2018</u>_____ and that sale is contingent upon approval by the Department of Business Affairs
<small>List Date of Foreclosure Sale</small>
and Consumer Protection.

My defense to this foreclosure is: (Use additional pages if needed)_____

____See attached Defense Document_____

_____

_____

Signature: _____

Print Name: <u>Shanin Edward</u>

Relationship to Medallion License/Title <u>Vice President $ Authorized Agent</u>

Address: <u>360 S Wabash, Chicago, IL 60606</u>

Phone: <u>312·791·1255</u>

Email Address: <u>edwards@chicagocarriagecab.com</u>

Subscribed and Sworn to before me

this <u>22</u> day of <u>Aug</u>_____, 20 <u>18</u>.

_____ Notary Public

<small>JANET DAVIS
Official Seal
Notary Public - State of ...
My Commission Expires Sep 20 ...9</small>

## AFFIDAVIT OF DEFENSE TO CREDITOR

## DEFENSE DOCUMENT

In support of its Affidavit of Defense to Creditor, Licensee asserts the following defenses in opposition to the Creditor's ("Creditor" or "Capital One") request to transfer public passenger vehicle license upon foreclosure and to the foreclosure sale: (1) Capital One has no right to foreclose on the medallions at issue; (2) Licensee does not owe the amount claimed by Capital One and has not defaulted on the agreement at issue with Capital One; (3) the foreclosure resulted in an improper foreclosure sale purchase that violated the BACP Taxi Rules; (4) Capital One instituted an improper foreclosure sale process; (5) Capital One breached its fiduciary duty to Licensee; (6) Capital One breached the implied covenant of good faith and fair dealing; (7) Capital One's claim of breach of contract / default is barred by the doctrines of estoppel, waiver, ratification and/or acquiescence. Because Licensee has timely submitted a completed Affidavit of Defense, pursuant to the BACP Taxi Rules, no transfer upon foreclosure may be allowed except pursuant to an order of a court having jurisdiction. Therefore, Licensee respectfully requests that the BACP deny Creditor's Request to Transfer Taxicab Medallion License Upon Foreclosure.

## FACTUAL BACKGROUND

1.     Symon Garber formed Tri Global Financial Services, Inc. ("Tri Global") in 2004, along with Roman Sapino and others, to provide capital to taxicab medallion owners. Tri Global's principal, Roman Sapino, also has many years of experience in the taxicab financing industry and has been involved in successful taxicab enterprises in New York and Chicago. Tri Global's co-owners include Galina Garber-Sheinin and Valentina Zubok. Irene Gans and Maya Zubok are related to an owner of Tri Global.

2.     Tri Global is a corporation formed and existing under the laws of the State of

Illinois, maintaining offices at 2617 S. Wabash Avenue, Chicago, Illinois 60616. Tri Global is engaged in the business of financing and servicing Chicago-based taxi medallion loans as well as offering second-position financing to the taxi industry.

3.       Upon information and belief, Capital One is a corporation formed and existing under the laws of the State of New York, maintaining a principal place of business at 265 Broadhollow Road, Melville, New York 11747.

4.       Tri Global was formed to provide loans to purchasers of public passenger vehicle licenses and medallions in the Chicago market, which confers the right to operate a taxicab in Chicago pursuant to the regulations issued and regulated by the City of Chicago Department of Business Affairs and Consumer Protection ("BACP").

5.       Tri Global offered medallion and other financing to a wide-variety of borrowers, including taxicab businesses that rely on the medallion-secured loans to earn their livelihoods. Tri Global primarily focused its business on servicing taxi medallion loans for various lenders and also offered second-position financing to the taxi industry. In or around 2006 Tri Global was approached by North Fork Bank, which expressed interest in partnering with Tri Global to expand the scope of its lending platform.

6.       Over the next several years, Tri Global and North Fork Bank entered into numerous successful loan participations. When North Fork Bank was acquired by Capital One in or about 2006/2007, this practice continued with Capital One.

7.       Capital One was even more eager than North Fork Bank to capitalize upon Tri Global's contacts in the Chicago marketplace and strongly encouraged Tri Global to aggressively seek prospects for additional medallion loans. Capital One and Tri Global participated in the loans on a loan-by-loan basis for several years.

8.     In 2010, Capital One requested that Tri Global enter into a more formal arrangement by way of a master participation agreement, to which Tri Global agreed. The terms and conditions governing that relationship and Capital One's senior participation interests in the loans are more particularly set forth in a certain Master Joint Participation Agreement, dated August 2, 2010 (the "MJPA" or the "Tri Global MJPA").

9.     In connection with the Tri Global MJPA, Symon Garber, Roman Sapino, Ruben Giacomozzi, Valentina Zubok, and Galina Garber-Sheinin signed the Tri Global Guaranty, dated August 2, 2010.

10.     Pursuant to the terms of the MJPA, Tri Global generated business, handled collections, serviced the loans and remitted monthly payments to Capital One in accordance with the amount of its participation in each underlying loan while Capital One held senior participation interests in the various loans made and serviced by Tri Global to owners of Chicago taxicab medallions (the "Loans"). The Tri Global MJPA contemplates the sale of senior participation interests in loans issued and/or originated by Tri Global to owners and operators of taxi medallions. As reflected in the Tri Global MJPA, after Tri Global sells a participation interest, it continues to service the debt owed thereunder. In exchange for its services, Tri Global receives a servicing fee that is paid from the debt-service payments remitted to Tri Global each month.

11.     Since the inception of the Tri Global/Capital One relationship, the parties have participated in many loans. Although Tri Global originated the medallion-secured loans and served as the official loan servicer for the loan portfolio, Tri Global relied on and trusted Capital One and its commercial finance expertise. This relationship was often characterized by Capital One as a "team" and "partnership" and its officers and representatives, including David Cin ("Cin") and others, regularly commented that the success of the portfolio was the product of a "team effort."

12.     Although Capital One historically had no real presence in the Chicago medallion market, Capital One was eager to exploit Tri Global's connections to the taxicab medallion market and capitalize upon Tri Global's market dominance in the Chicago taxi-medallion economy. Capital One strongly encouraged Tri Global to aggressively acquire additional Chicago-based medallion loans.

13.     As the value of Chicago taxi medallion loans continued to rise, Capital One continued to aggressively press Tri Global to originate new loans so that Capital One could further capitalize on its market position and emerge as a leading taxi medallion lender in Chicago.

14.     Throughout the course of the Master Joint Participation Agreement, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin – whose interests were closely aligned with those of Capital One – worked with Capital One to maximize the return on the medallion loans.

15.     Tri Global originated the agreement/loan at issue between Licensee and Capital One based on Tri Global's relationship with Capital One.

16.     Despite its long-standing business venture with Tri Global, Capital One engaged in intentional and systematic efforts to line its own pockets to the detriment of Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin. As explained below, Capital One engaged in irreconcilable conflicts of interest, bad faith business practices, and intentionally disregarded its duty of good faith to Licensee and Tri Global when it partnered with a major taxi-industry competitor, Uber Technologies, Inc. ("Uber").

17.     In or about late 2013 and early 2014, and unbeknownst to Licensee and Tri Global (and many other Capital One loan participants and medallion-secured borrowers), Capital One began secretly planning to change course and exit the medallion market to partner with the

industry's most ominous competitor, Uber. Notwithstanding this new partnership, Capital One, either intentionally or recklessly, continued to encourage Tri Global to cultivate new medallion-secured loans while concealing its intention to partner with Uber.

18.     News of Capital One's partnership with Uber surfaced in approximately mid-2014, and was followed by an aggressive nationwide marketing campaign launched by Capital One. The marketing campaign and promotions touted Capital One's "unique new partnership" with Uber and underscored the "common focus" of both companies.

19.     Capital One began offering significant incentives to its consumers to choose Uber vehicles over properly licensed and regulated taxis – including offering free and discounted Uber rides and other similar promotions such as a 20% discount on all Uber rides when paid with a Capital One "Quicksilver" credit card. Capital One offered new customers two free Uber rides worth up to $60.00. Capital One created a new website promoting these incentives and further signaling its collaboration with Uber: "capitalone.com/uber".

20.     Capital One's partnership with Uber came as a great shock to Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin as the partnership was never disclosed to them prior to the 2014 marketing blitz. At no point in the parties' relationship was it ever contemplated that Capital One would undertake any action to undermine the taxi industry, the agreement at issue, or the value of Tri Global's and Capital One's loan portfolio.

21.     In partnering with and promoting Uber's ride-share services, Capital One and Uber's assault on the taxi industry has been instrumental in bringing about the destabilization of the Chicago taxi medallion market.

22.     In 2014, when Capital One began its partnership with Uber, the Chicago market softened dramatically. Sometime during mid-2014, funding to the medallion industry came to a

total halt. This was clearly tied to Capital One's partnership with Uber.

23.     By 2015, Uber reported that taxi usage nationwide had precipitously decreased while the number of customers using Uber increased correspondingly.

24.     The disruption of the taxi industry resulting from Capital One's partnership with Uber contributed to the reduction in value of the Chicago taxi medallions securing the loans.

25.     In short, Capital One has caused the price of the Chicago taxi medallions that secure the loans to plummet.

26.     Moreover, Capital One has sabotaged Tri Global, Symon Garber, Valentina Zubok, Galina Garber-Sheinin and Licensee's efforts to favorably restructure and/or modify the medallion-secured loans at issue.

27.     Accordingly, Capital One has materially breached the credit agreement and Licensee is not liable for the amount allegedly owed pursuant to the credit agreement.

### FIRST DEFENSE
### (No Right to Foreclose)

28.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

29.     Capital One, through its partnership with Uber, precipitated the collapse of the Chicago taxi medallion industry and the medallion industry nationwide, in addition to the corresponding decline in the value of the taxi medallions at issue.

30.     Based on Capital One's willful misconduct, breach of contract, malfeasance, wrongdoing and/or other intentional and/or reckless conduct, Capital One has no right to foreclose on the medallions at issue.

## SECOND DEFENSE
### (No Default by Licensee)

31.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

32.     Licensee does not owe the amount claimed by Capital One and has not defaulted on the agreement at issue with Capital One.

33.     Therefore, Capital One has no right to foreclose on the medallions at issue.

## THIRD DEFENSE
### (Improper Foreclosure Sale Purchase)

34.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

35.     On August 9, 2018, to start the foreclosure, Capital One opened the auction with an initial credit bid of $23,000.00.

36.     Capital One won the foreclosure auction with its initial $23,000.00 credit bid.

37.     Pursuant to Rule TX13.03(b), "[t]he [foreclosure] purchaser must meet all the criteria for licensing as set out in the Municipal Code of Chicago and [the BACP's] rules and regulations, including payment of the license transfer fee, license fees and any other fees, fines or taxes due and owing to the City." Rule TX13.03(b).

38.     Pursuant to Rule TX13.04(d), "[t]he taxicab medallion license must be sold to a person believed to be a qualified applicant . . ." Rule TX13.04(d); *see also* TX13.06(a).

39.     Upon information and belief, Capital One is not a qualified applicant and has no intention of ever seeking licensure under the Municipal Code of Chicago or BACP Taxi Rules.

40.     The purpose behind the BACP Taxi Rules' foreclosure process is to facilitate keeping medallions operating on the street. If Capital One is allowed to purchase the medallions,

with no intention of ever becoming licensed by the BACP, Capital One would be allowed to cause further harm to the taxicab industry and further benefit Uber.

41.     Therefore, the foreclosure sale did not comply with Rules TX13.03 and TX13.04 and the foreclosure auction resulted in an improper sale/purchase that violated the BACP Taxi Rules.

42.     Moreover, Capital One's intent behind the foreclosure sale is to destroy and cause further harm to Licensee, Tri Global, and Tri Global's owners and guarantors. Capital One has filed multiple actions against Licensee, Tri Global, and/or Tri Global's owners and guarantors and instead of allowing any of these cases to reach their natural conclusion, Capital One instead seeks to implement destructive tactics by foreclosing on the medallions in order to further destroy the medallion market by setting the prices and discouraging bids, all in violation of the Taxi Rules simply to inflict maximum damage and cause irreparable harm. In a recent case that was filed in the Circuit Court of Cook County, *Capital One Equipment Finance Corp. v. Chicago Elite Cab Corp., et al.*, No. 17 L 998, the Honorable Margaret A. Brennan dismissed Capital One's complaint but allowed Capital One leave to re-file its cause of action in another case currently pending in New York. That New York Action is *Capital One Equipment Finance Corp. v. The OSG Corp., Tri Global Financial Services, Inc. et al.*, No. 600749/2017. But, rather than re-file its case in the New York Action and pursue its alleged causes of action, Capital One instead chose to do an end run around the litigation process and seeks to foreclose on the medallions at issue in an attempt to destroy Licensee, Tri Global and Tri Global's owners and guarantors. Capital One did not re-file its Chicago cause of action in the New York Action because it knows that counterclaims would be filed against it, which would expose Capital One's bad faith conduct in abusing its partnership with Tri Global and expose Capital One's bad faith relationship with Uber. The reality is that

Capital One has filed numerous unsuccessful complaints in courts in New York and Chicago and, because these lawsuits have not been successful, Capital One is now attempting to cause as much harm as possible to Licensee and Tri Global before the counterclaims against Capital One are proven true and Capital One's bad faith is exposed.

## FOURTH DEFENSE
### (Improper Foreclosure Sale Process)

43.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

44.     On August 9, 2018, to start the foreclosure, Capital One opened the auction with an initial credit bid of $23,000.00.

45.     During the beginning part of the foreclosure auction, it became clear that no individuals were going to bid on the medallions because a foreclosure purchaser would have been liable for any and all liens on the medallions and such liability was unknown at the time of the auction. Capital One then stopped the foreclosure auction and announced to the individuals attending the auction that Capital One would work with any potential foreclosure purchasers and the bank to work out a deal on any liens on the medallion(s) bought at the auction. Capital One further stated that if the foreclosure purchaser and the bank could not work out an agreement concerning any liens on the medallions bought at the auction, Capital One would refund the foreclosure purchaser's money as if the foreclosure sale never took place. After this announcement, Capital One resumed the auction.

46.     By instituting this type of foreclosure auction, Capital One created an improper foreclosure process that created false values and did not bind the foreclosure purchasers.

## FIFTH DEFENSE
### (Breach of Fiduciary Duty)

47.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

48.     As set forth above, Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin relied heavily on and trusted Capital One.

49.     By virtue of the parties' business relationship as set forth above, and by reason of the demonstrable level of trust and confidence upon which Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin depended and which Capital One knowingly accepted, Capital One owes certain fiduciary duties to Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin including, without limitation, a duty of good faith.

50.     As explained herein, for years Tri Global relied on Capital One to guide certain aspects of its taxi-medallion loan origination and servicing business. Although the Tri Global MJPA provided discretion to Capital One, that discretion did not include a right to abandon the lending market or purposely advance competing interests to destabilize the industry upon which the very loans that were being serviced were based.

51.     Ultimately, Capital One repudiated its commitments to Licensee and abandoned the Chicago medallion lending market so that it could pursue a competing venture with Uber.

52.     Capital One breached its duty of good faith, and the trust and confidence of Licensee by, among other things: precipitating, through its partnership with Uber, the collapse of the Chicago taxi medallion industry and the medallion industry nationwide, in addition to the corresponding decline in the value of the taxi medallions at issue.

53.     Capital One engaged in an intentional course of wrongful conduct orchestrated to harm Licensee.

54.     Capital One's conduct was willful, wanton and in reckless disregard of the Licensee's contractual rights and was otherwise wrongful.

55.     As a direct and proximate result of Capital One's breach of its fiduciary duties, Licensee has suffered, and will continue to suffer, substantial damages.

### SIXTH DEFENSE
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

56.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

57.     Pursuant to the covenant of good faith and fair dealing, Capital One could not undertake any action that has the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

58.     As explained herein, Capital One breached the duty of good faith and fair dealing implied in the contract with Licensee by, among other things: precipitating, through its partnership with Uber, the collapse of the taxi medallion industry and concomitant decline in the value of the taxi medallions at issue.

59.     As a direct and proximate result of Capital One's breach of the implied covenant of good faith and fair dealing thereunder, Licensee has suffered, and will continue to suffer, substantial damages.

### SEVENTH DEFENSE
### (Estoppel, Waiver, Ratification and/or Acquiescence)

60.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

61.     Capital One's claim of breach of contract / default is barred by the doctrines of estoppel, waiver, ratification and/or acquiescence.

## CONCLUSION

WHEREFORE, based upon the foregoing allegations and defenses and all reasons appearing of record, Licensee has timely submitted a completed Affidavit of Defense and, pursuant to the BACP Taxi Rules, no transfer upon foreclosure may be allowed except pursuant to an order of a court having jurisdiction. Licensee respectfully requests that the BACP deny Creditor's Request to Transfer Taxicab Medallion License Upon Foreclosure.

# AFFIDAVIT OF DEFENSE TO CREDITOR

**To City:** City of Chicago – Public Vehicle Operations Division
Department of Business Affairs and Consumer Protection
2350 W. Ogden Avenue, 1st Floor
Chicago, IL 60608
Attention: Monique Davids

**To Creditor:** Capital One Equipment Finance Corp., f/k/a All Points Capital Corp.,
d/b/a Capital One Taxi Medallion Finance
c/o Troutman Sanders LLP
Att'n: Andrew L. Buck
875 Third Avenue
New York, NY 10022

RE: PUBLIC PASSENGER LICENSE NUMBER(s) <u>4769TX, 4775TX, 4778TX, 4782TX</u>

LICENSEE NAME: <u>Misha Cat Cab Corp.</u>

I, <u>Valentina Zubch</u>, hereby swear that I own Taxicab Medallion License
<span style="font-size:smaller">Debtor Individual Name</span>

Number(s) <u>4769TX, 4775TX, 4778TX, 4782TX</u> either individually or through a company that I own and I have a defense

to the foreclosure of these licenses. I understand that this license(s) was sold at a foreclosure

sale on or about _____ <u>August 9, 2018</u> _____ and that sale is contingent upon approval by the Department of Business Affairs
<span style="font-size:smaller">List Date of Foreclosure Sale</span>

and Consumer Protection.

My defense to this foreclosure is: (Use additional pages if needed) _____

_____ See attached Defense Document. _____

_____

_____

Signature: _____

Print Name: <u>Shinin Edward</u>

Relationship to Medallion License/Title <u>Vice President & Authorized Agent</u>

Address: <u>2617 S Wabash Chicago IL 60616</u>

Phone: <u>312-791-1255</u>

Email Address: <u>edwards@chicagocarriagecab.com</u>.

Subscribed and Sworn to before me

this <u>22</u> day of <u>Aug</u>, 20 <u>18</u>.

_____ Notary Public

JANET DAVIS
Official Seal
Notary Public - State o...
My Commission Expires Sep... 19

## AFFIDAVIT OF DEFENSE TO CREDITOR

## DEFENSE DOCUMENT

In support of its Affidavit of Defense to Creditor, Licensee asserts the following defenses in opposition to the Creditor's ("Creditor" or "Capital One") request to transfer public passenger vehicle license upon foreclosure and to the foreclosure sale: (1) Capital One has no right to foreclose on the medallions at issue; (2) Licensee does not owe the amount claimed by Capital One and has not defaulted on the agreement at issue with Capital One; (3) the foreclosure resulted in an improper foreclosure sale purchase that violated the BACP Taxi Rules; (4) Capital One instituted an improper foreclosure sale process; (5) Capital One breached its fiduciary duty to Licensee; (6) Capital One breached the implied covenant of good faith and fair dealing; (7) Capital One's claim of breach of contract / default is barred by the doctrines of estoppel, waiver, ratification and/or acquiescence. Because Licensee has timely submitted a completed Affidavit of Defense, pursuant to the BACP Taxi Rules, no transfer upon foreclosure may be allowed except pursuant to an order of a court having jurisdiction. Therefore, Licensee respectfully requests that the BACP deny Creditor's Request to Transfer Taxicab Medallion License Upon Foreclosure.

## FACTUAL BACKGROUND

1.      Symon Garber formed Tri Global Financial Services, Inc. ("Tri Global") in 2004, along with Roman Sapino and others, to provide capital to taxicab medallion owners. Tri Global's principal, Roman Sapino, also has many years of experience in the taxicab financing industry and has been involved in successful taxicab enterprises in New York and Chicago. Tri Global's co-owners include Galina Garber-Sheinin and Valentina Zubok. Irene Gans and Maya Zubok are related to an owner of Tri Global.

2.      Tri Global is a corporation formed and existing under the laws of the State of

Illinois, maintaining offices at 2617 S. Wabash Avenue, Chicago, Illinois 60616. Tri Global is engaged in the business of financing and servicing Chicago-based taxi medallion loans as well as offering second-position financing to the taxi industry.

3.      Upon information and belief, Capital One is a corporation formed and existing under the laws of the State of New York, maintaining a principal place of business at 265 Broadhollow Road, Melville, New York 11747.

4.      Tri Global was formed to provide loans to purchasers of public passenger vehicle licenses and medallions in the Chicago market, which confers the right to operate a taxicab in Chicago pursuant to the regulations issued and regulated by the City of Chicago Department of Business Affairs and Consumer Protection ("BACP").

5.      Tri Global offered medallion and other financing to a wide-variety of borrowers, including taxicab businesses that rely on the medallion-secured loans to earn their livelihoods. Tri Global primarily focused its business on servicing taxi medallion loans for various lenders and also offered second-position financing to the taxi industry. In or around 2006 Tri Global was approached by North Fork Bank, which expressed interest in partnering with Tri Global to expand the scope of its lending platform.

6.      Over the next several years, Tri Global and North Fork Bank entered into numerous successful loan participations. When North Fork Bank was acquired by Capital One in or about 2006/2007, this practice continued with Capital One.

7.      Capital One was even more eager than North Fork Bank to capitalize upon Tri Global's contacts in the Chicago marketplace and strongly encouraged Tri Global to aggressively seek prospects for additional medallion loans. Capital One and Tri Global participated in the loans on a loan-by-loan basis for several years.

8.     In 2010, Capital One requested that Tri Global enter into a more formal arrangement by way of a master participation agreement, to which Tri Global agreed. The terms and conditions governing that relationship and Capital One's senior participation interests in the loans are more particularly set forth in a certain Master Joint Participation Agreement, dated August 2, 2010 (the "MJPA" or the "Tri Global MJPA").

9.     In connection with the Tri Global MJPA, Symon Garber, Roman Sapino, Ruben Giacomozzi, Valentina Zubok, and Galina Garber-Sheinin signed the Tri Global Guaranty, dated August 2, 2010.

10.     Pursuant to the terms of the MJPA, Tri Global generated business, handled collections, serviced the loans and remitted monthly payments to Capital One in accordance with the amount of its participation in each underlying loan while Capital One held senior participation interests in the various loans made and serviced by Tri Global to owners of Chicago taxicab medallions (the "Loans"). The Tri Global MJPA contemplates the sale of senior participation interests in loans issued and/or originated by Tri Global to owners and operators of taxi medallions. As reflected in the Tri Global MJPA, after Tri Global sells a participation interest, it continues to service the debt owed thereunder. In exchange for its services, Tri Global receives a servicing fee that is paid from the debt-service payments remitted to Tri Global each month.

11.     Since the inception of the Tri Global/Capital One relationship, the parties have participated in many loans. Although Tri Global originated the medallion-secured loans and served as the official loan servicer for the loan portfolio, Tri Global relied on and trusted Capital One and its commercial finance expertise. This relationship was often characterized by Capital One as a "team" and "partnership" and its officers and representatives, including David Cin ("Cin") and others, regularly commented that the success of the portfolio was the product of a "team effort."

12.     Although Capital One historically had no real presence in the Chicago medallion market, Capital One was eager to exploit Tri Global's connections to the taxicab medallion market and capitalize upon Tri Global's market dominance in the Chicago taxi-medallion economy. Capital One strongly encouraged Tri Global to aggressively acquire additional Chicago-based medallion loans.

13.     As the value of Chicago taxi medallion loans continued to rise, Capital One continued to aggressively press Tri Global to originate new loans so that Capital One could further capitalize on its market position and emerge as a leading taxi medallion lender in Chicago.

14.     Throughout the course of the Master Joint Participation Agreement, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin – whose interests were closely aligned with those of Capital One – worked with Capital One to maximize the return on the medallion loans.

15.     Tri Global originated the agreement/loan at issue between Licensee and Capital One based on Tri Global's relationship with Capital One.

16.     Despite its long-standing business venture with Tri Global, Capital One engaged in intentional and systematic efforts to line its own pockets to the detriment of Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin. As explained below, Capital One engaged in irreconcilable conflicts of interest, bad faith business practices, and intentionally disregarded its duty of good faith to Licensee and Tri Global when it partnered with a major taxi-industry competitor, Uber Technologies, Inc. ("Uber").

17.     In or about late 2013 and early 2014, and unbeknownst to Licensee and Tri Global (and many other Capital One loan participants and medallion-secured borrowers), Capital One began secretly planning to change course and exit the medallion market to partner with the

industry's most ominous competitor, Uber. Notwithstanding this new partnership, Capital One, either intentionally or recklessly, continued to encourage Tri Global to cultivate new medallion-secured loans while concealing its intention to partner with Uber.

18.     News of Capital One's partnership with Uber surfaced in approximately mid-2014, and was followed by an aggressive nationwide marketing campaign launched by Capital One. The marketing campaign and promotions touted Capital One's "unique new partnership" with Uber and underscored the "common focus" of both companies.

19.     Capital One began offering significant incentives to its consumers to choose Uber vehicles over properly licensed and regulated taxis – including offering free and discounted Uber rides and other similar promotions such as a 20% discount on all Uber rides when paid with a Capital One "Quicksilver" credit card. Capital One offered new customers two free Uber rides worth up to $60.00. Capital One created a new website promoting these incentives and further signaling its collaboration with Uber: "capitalone.com/uber".

20.     Capital One's partnership with Uber came as a great shock to Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin as the partnership was never disclosed to them prior to the 2014 marketing blitz. At no point in the parties' relationship was it ever contemplated that Capital One would undertake any action to undermine the taxi industry, the agreement at issue, or the value of Tri Global's and Capital One's loan portfolio.

21.     In partnering with and promoting Uber's ride-share services, Capital One and Uber's assault on the taxi industry has been instrumental in bringing about the destabilization of the Chicago taxi medallion market.

22.     In 2014, when Capital One began its partnership with Uber, the Chicago market softened dramatically. Sometime during mid-2014, funding to the medallion industry came to a

total halt. This was clearly tied to Capital One's partnership with Uber.

23. By 2015, Uber reported that taxi usage nationwide had precipitously decreased while the number of customers using Uber increased correspondingly.

24. The disruption of the taxi industry resulting from Capital One's partnership with Uber contributed to the reduction in value of the Chicago taxi medallions securing the loans.

25. In short, Capital One has caused the price of the Chicago taxi medallions that secure the loans to plummet.

26. Moreover, Capital One has sabotaged Tri Global, Symon Garber, Valentina Zubok, Galina Garber-Sheinin and Licensee's efforts to favorably restructure and/or modify the medallion-secured loans at issue.

27. Accordingly, Capital One has materially breached the credit agreement and Licensee is not liable for the amount allegedly owed pursuant to the credit agreement.

### FIRST DEFENSE
**(No Right to Foreclose)**

28. Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

29. Capital One, through its partnership with Uber, precipitated the collapse of the Chicago taxi medallion industry and the medallion industry nationwide, in addition to the corresponding decline in the value of the taxi medallions at issue.

30. Based on Capital One's willful misconduct, breach of contract, malfeasance, wrongdoing and/or other intentional and/or reckless conduct, Capital One has no right to foreclose on the medallions at issue.

## SECOND DEFENSE
### (No Default by Licensee)

31.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

32.     Licensee does not owe the amount claimed by Capital One and has not defaulted on the agreement at issue with Capital One.

33.     Therefore, Capital One has no right to foreclose on the medallions at issue.

## THIRD DEFENSE
### (Improper Foreclosure Sale Purchase)

34.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

35.     On August 9, 2018, to start the foreclosure, Capital One opened the auction with an initial credit bid of $23,000.00.

36.     Capital One won the foreclosure auction with its initial $23,000.00 credit bid.

37.     Pursuant to Rule TX13.03(b), "[t]he [foreclosure] purchaser must meet all the criteria for licensing as set out in the Municipal Code of Chicago and [the BACP's] rules and regulations, including payment of the license transfer fee, license fees and any other fees, fines or taxes due and owing to the City." Rule TX13.03(b).

38.     Pursuant to Rule TX13.04(d), "[t]he taxicab medallion license must be sold to a person believed to be a qualified applicant . . ." Rule TX13.04(d); *see also* TX13.06(a).

39.     Upon information and belief, Capital One is not a qualified applicant and has no intention of ever seeking licensure under the Municipal Code of Chicago or BACP Taxi Rules.

40.     The purpose behind the BACP Taxi Rules' foreclosure process is to facilitate keeping medallions operating on the street. If Capital One is allowed to purchase the medallions,

with no intention of ever becoming licensed by the BACP, Capital One would be allowed to cause further harm to the taxicab industry and further benefit Uber.

41.    Therefore, the foreclosure sale did not comply with Rules TX13.03 and TX13.04 and the foreclosure auction resulted in an improper sale/purchase that violated the BACP Taxi Rules.

42.    Moreover, Capital One's intent behind the foreclosure sale is to destroy and cause further harm to Licensee, Tri Global, and Tri Global's owners and guarantors. Capital One has filed multiple actions against Licensee, Tri Global, and/or Tri Global's owners and guarantors and instead of allowing any of these cases to reach their natural conclusion, Capital One instead seeks to implement destructive tactics by foreclosing on the medallions in order to further destroy the medallion market by setting the prices and discouraging bids, all in violation of the Taxi Rules simply to inflict maximum damage and cause irreparable harm. In a recent case that was filed in the Circuit Court of Cook County, *Capital One Equipment Finance Corp. v. Chicago Elite Cab Corp., et al.*, No. 17 L 998, the Honorable Margaret A. Brennan dismissed Capital One's complaint but allowed Capital One leave to re-file its cause of action in another case currently pending in New York. That New York Action is *Capital One Equipment Finance Corp. v. The OSG Corp., Tri Global Financial Services, Inc. et al.*, No. 600749/2017. But, rather than re-file its case in the New York Action and pursue its alleged causes of action, Capital One instead chose to do an end run around the litigation process and seeks to foreclose on the medallions at issue in an attempt to destroy Licensee, Tri Global and Tri Global's owners and guarantors. Capital One did not re-file its Chicago cause of action in the New York Action because it knows that counterclaims would be filed against it, which would expose Capital One's bad faith conduct in abusing its partnership with Tri Global and expose Capital One's bad faith relationship with Uber. The reality is that

Capital One has filed numerous unsuccessful complaints in courts in New York and Chicago and, because these lawsuits have not been successful, Capital One is now attempting to cause as much harm as possible to Licensee and Tri Global before the counterclaims against Capital One are proven true and Capital One's bad faith is exposed.

**FOURTH DEFENSE**
**(Improper Foreclosure Sale Process)**

43.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

44.     On August 9, 2018, to start the foreclosure, Capital One opened the auction with an initial credit bid of $23,000.00.

45.     During the beginning part of the foreclosure auction, it became clear that no individuals were going to bid on the medallions because a foreclosure purchaser would have been liable for any and all liens on the medallions and such liability was unknown at the time of the auction. Capital One then stopped the foreclosure auction and announced to the individuals attending the auction that Capital One would work with any potential foreclosure purchasers and the bank to work out a deal on any liens on the medallion(s) bought at the auction. Capital One further stated that if the foreclosure purchaser and the bank could not work out an agreement concerning any liens on the medallions bought at the auction, Capital One would refund the foreclosure purchaser's money as if the foreclosure sale never took place. After this announcement, Capital One resumed the auction.

46.     By instituting this type of foreclosure auction, Capital One created an improper foreclosure process that created false values and did not bind the foreclosure purchasers.

## FIFTH DEFENSE
### (Breach of Fiduciary Duty)

47.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

48.     As set forth above, Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin relied heavily on and trusted Capital One.

49.     By virtue of the parties' business relationship as set forth above, and by reason of the demonstrable level of trust and confidence upon which Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin depended and which Capital One knowingly accepted, Capital One owes certain fiduciary duties to Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin including, without limitation, a duty of good faith.

50.     As explained herein, for years Tri Global relied on Capital One to guide certain aspects of its taxi-medallion loan origination and servicing business. Although the Tri Global MJPA provided discretion to Capital One, that discretion did not include a right to abandon the lending market or purposely advance competing interests to destabilize the industry upon which the very loans that were being serviced were based.

51.     Ultimately, Capital One repudiated its commitments to Licensee and abandoned the Chicago medallion lending market so that it could pursue a competing venture with Uber.

52.     Capital One breached its duty of good faith, and the trust and confidence of Licensee by, among other things: precipitating, through its partnership with Uber, the collapse of the Chicago taxi medallion industry and the medallion industry nationwide, in addition to the corresponding decline in the value of the taxi medallions at issue.

53.     Capital One engaged in an intentional course of wrongful conduct orchestrated to harm Licensee.

54.     Capital One's conduct was willful, wanton and in reckless disregard of the Licensee's contractual rights and was otherwise wrongful.

55.     As a direct and proximate result of Capital One's breach of its fiduciary duties, Licensee has suffered, and will continue to suffer, substantial damages.

## SIXTH DEFENSE
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

56.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

57.     Pursuant to the covenant of good faith and fair dealing, Capital One could not undertake any action that has the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

58.     As explained herein, Capital One breached the duty of good faith and fair dealing implied in the contract with Licensee by, among other things: precipitating, through its partnership with Uber, the collapse of the taxi medallion industry and concomitant decline in the value of the taxi medallions at issue.

59.     As a direct and proximate result of Capital One's breach of the implied covenant of good faith and fair dealing thereunder, Licensee has suffered, and will continue to suffer, substantial damages.

## SEVENTH DEFENSE
### (Estoppel, Waiver, Ratification and/or Acquiescence)

60.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

61.     Capital One's claim of breach of contract / default is barred by the doctrines of estoppel, waiver, ratification and/or acquiescence.

## CONCLUSION

WHEREFORE, based upon the foregoing allegations and defenses and all reasons appearing of record, Licensee has timely submitted a completed Affidavit of Defense and, pursuant to the BACP Taxi Rules, no transfer upon foreclosure may be allowed except pursuant to an order of a court having jurisdiction. Licensee respectfully requests that the BACP deny Creditor's Request to Transfer Taxicab Medallion License Upon Foreclosure.

# AFFIDAVIT OF DEFENSE TO CREDITOR

To City:  City of Chicago – Public Vehicle Operations Division
Department of Business Affairs and Consumer Protection
2350 W. Ogden Avenue, 1st Floor
Chicago, IL 60608
Attention: Monique Davids

To Creditor:  Capital One Equipment Finance Corp., f/k/a All Points Capital Corp.,
d/b/a Capital One Taxi Medallion Finance
c/o Troutman Sanders LLP
Att'n: Andrew L. Buck
875 Third Avenue
New York, NY 10022

RE: PUBLIC PASSENGER LICENSE NUMBER(s) 4790TX, 4792TX, 4798TX, 4803TX & 4818TX

LICENSEE NAME: Monaco Taxi, Inc.

I, _Symon GARBER_, hereby swear that I own Taxicab Medallion License
        Debtor Individual Name
Number(s) 4790TX, 4792TX, 4798TX, 4803TX & 4818TX either individually or through a company that I own and I

have a defense to the foreclosure of these licenses. I understand that this license(s) was sold at a foreclosure

sale on or about _____August 9, 2018_____ and that sale is contingent upon approval by the Department of Business Affairs
                    List Date of Foreclosure Sale
and Consumer Protection.

My defense to this foreclosure is: (Use additional pages if needed) _____

_____ see attached Defense Document _____

_____

Signature: _____

Print Name: _____ Shimin Edward

Relationship to Medallion License/Title _VP and authorized signature agent_

Address: _2617 S. Wabash Ave, Chicago IL 60616_

Phone: _312 791-1255_

Email Address: _edwards@chicagocarriagecab.com_

Subscribed and Sworn to before me

this _22_ day of _Aug_____, 20 _18_.

_____
                        Notary Public

JANET DAVIS
Official Seal
Notary Public - State of Illinois
My Commission Expires Sep 20, 2019

Version Date June 5, 2018

## AFFIDAVIT OF DEFENSE TO CREDITOR

## DEFENSE DOCUMENT

In support of its Affidavit of Defense to Creditor, Licensee asserts the following defenses in opposition to the Creditor's ("Creditor" or "Capital One") request to transfer public passenger vehicle license upon foreclosure and to the foreclosure sale: (1) Capital One has no right to foreclose on the medallions at issue; (2) Licensee does not owe the amount claimed by Capital One and has not defaulted on the agreement at issue with Capital One; (3) the foreclosure resulted in an improper foreclosure sale purchase that violated the BACP Taxi Rules; (4) Capital One instituted an improper foreclosure sale process; (5) Capital One breached its fiduciary duty to Licensee; (6) Capital One breached the implied covenant of good faith and fair dealing; (7) Capital One's claim of breach of contract / default is barred by the doctrines of estoppel, waiver, ratification and/or acquiescence. Because Licensee has timely submitted a completed Affidavit of Defense, pursuant to the BACP Taxi Rules, no transfer upon foreclosure may be allowed except pursuant to an order of a court having jurisdiction. Therefore, Licensee respectfully requests that the BACP deny Creditor's Request to Transfer Taxicab Medallion License Upon Foreclosure.

## FACTUAL BACKGROUND

1.      Symon Garber formed Tri Global Financial Services, Inc. ("Tri Global") in 2004, along with Roman Sapino and others, to provide capital to taxicab medallion owners. Tri Global's principal, Roman Sapino, also has many years of experience in the taxicab financing industry and has been involved in successful taxicab enterprises in New York and Chicago. Tri Global's co-owners include Galina Garber-Sheinin and Valentina Zubok. Irene Gans and Maya Zubok are related to an owner of Tri Global.

2.      Tri Global is a corporation formed and existing under the laws of the State of

Illinois, maintaining offices at 2617 S. Wabash Avenue, Chicago, Illinois 60616. Tri Global is engaged in the business of financing and servicing Chicago-based taxi medallion loans as well as offering second-position financing to the taxi industry.

3.      Upon information and belief, Capital One is a corporation formed and existing under the laws of the State of New York, maintaining a principal place of business at 265 Broadhollow Road, Melville, New York 11747.

4.      Tri Global was formed to provide loans to purchasers of public passenger vehicle licenses and medallions in the Chicago market, which confers the right to operate a taxicab in Chicago pursuant to the regulations issued and regulated by the City of Chicago Department of Business Affairs and Consumer Protection ("BACP").

5.      Tri Global offered medallion and other financing to a wide-variety of borrowers, including taxicab businesses that rely on the medallion-secured loans to earn their livelihoods. Tri Global primarily focused its business on servicing taxi medallion loans for various lenders and also offered second-position financing to the taxi industry. In or around 2006 Tri Global was approached by North Fork Bank, which expressed interest in partnering with Tri Global to expand the scope of its lending platform.

6.      Over the next several years, Tri Global and North Fork Bank entered into numerous successful loan participations. When North Fork Bank was acquired by Capital One in or about 2006/2007, this practice continued with Capital One.

7.      Capital One was even more eager than North Fork Bank to capitalize upon Tri Global's contacts in the Chicago marketplace and strongly encouraged Tri Global to aggressively seek prospects for additional medallion loans. Capital One and Tri Global participated in the loans on a loan-by-loan basis for several years.

8.     In 2010, Capital One requested that Tri Global enter into a more formal arrangement by way of a master participation agreement, to which Tri Global agreed. The terms and conditions governing that relationship and Capital One's senior participation interests in the loans are more particularly set forth in a certain Master Joint Participation Agreement, dated August 2, 2010 (the "MJPA" or the "Tri Global MJPA").

9.     In connection with the Tri Global MJPA, Symon Garber, Roman Sapino, Ruben Giacomozzi, Valentina Zubok, and Galina Garber-Sheinin signed the Tri Global Guaranty, dated August 2, 2010.

10.    Pursuant to the terms of the MJPA, Tri Global generated business, handled collections, serviced the loans and remitted monthly payments to Capital One in accordance with the amount of its participation in each underlying loan while Capital One held senior participation interests in the various loans made and serviced by Tri Global to owners of Chicago taxicab medallions (the "Loans"). The Tri Global MJPA contemplates the sale of senior participation interests in loans issued and/or originated by Tri Global to owners and operators of taxi medallions. As reflected in the Tri Global MJPA, after Tri Global sells a participation interest, it continues to service the debt owed thereunder. In exchange for its services, Tri Global receives a servicing fee that is paid from the debt-service payments remitted to Tri Global each month.

11.    Since the inception of the Tri Global/Capital One relationship, the parties have participated in many loans. Although Tri Global originated the medallion-secured loans and served as the official loan servicer for the loan portfolio, Tri Global relied on and trusted Capital One and its commercial finance expertise. This relationship was often characterized by Capital One as a "team" and "partnership" and its officers and representatives, including David Cin ("Cin") and others, regularly commented that the success of the portfolio was the product of a "team effort."

12.     Although Capital One historically had no real presence in the Chicago medallion market, Capital One was eager to exploit Tri Global's connections to the taxicab medallion market and capitalize upon Tri Global's market dominance in the Chicago taxi-medallion economy. Capital One strongly encouraged Tri Global to aggressively acquire additional Chicago-based medallion loans.

13.     As the value of Chicago taxi medallion loans continued to rise, Capital One continued to aggressively press Tri Global to originate new loans so that Capital One could further capitalize on its market position and emerge as a leading taxi medallion lender in Chicago.

14.     Throughout the course of the Master Joint Participation Agreement, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin – whose interests were closely aligned with those of Capital One – worked with Capital One to maximize the return on the medallion loans.

15.     Tri Global originated the agreement/loan at issue between Licensee and Capital One based on Tri Global's relationship with Capital One.

16.     Despite its long-standing business venture with Tri Global, Capital One engaged in intentional and systematic efforts to line its own pockets to the detriment of Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin. As explained below, Capital One engaged in irreconcilable conflicts of interest, bad faith business practices, and intentionally disregarded its duty of good faith to Licensee and Tri Global when it partnered with a major taxi-industry competitor, Uber Technologies, Inc. ("Uber").

17.     In or about late 2013 and early 2014, and unbeknownst to Licensee and Tri Global (and many other Capital One loan participants and medallion-secured borrowers), Capital One began secretly planning to change course and exit the medallion market to partner with the

industry's most ominous competitor, Uber. Notwithstanding this new partnership, Capital One, either intentionally or recklessly, continued to encourage Tri Global to cultivate new medallion-secured loans while concealing its intention to partner with Uber.

18.     News of Capital One's partnership with Uber surfaced in approximately mid-2014, and was followed by an aggressive nationwide marketing campaign launched by Capital One. The marketing campaign and promotions touted Capital One's "unique new partnership" with Uber and underscored the "common focus" of both companies.

19.     Capital One began offering significant incentives to its consumers to choose Uber vehicles over properly licensed and regulated taxis – including offering free and discounted Uber rides and other similar promotions such as a 20% discount on all Uber rides when paid with a Capital One "Quicksilver" credit card. Capital One offered new customers two free Uber rides worth up to $60.00. Capital One created a new website promoting these incentives and further signaling its collaboration with Uber: "capitalone.com/uber".

20.     Capital One's partnership with Uber came as a great shock to Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin as the partnership was never disclosed to them prior to the 2014 marketing blitz. At no point in the parties' relationship was it ever contemplated that Capital One would undertake any action to undermine the taxi industry, the agreement at issue, or the value of Tri Global's and Capital One's loan portfolio.

21.     In partnering with and promoting Uber's ride-share services, Capital One and Uber's assault on the taxi industry has been instrumental in bringing about the destabilization of the Chicago taxi medallion market.

22.     In 2014, when Capital One began its partnership with Uber, the Chicago market softened dramatically. Sometime during mid-2014, funding to the medallion industry came to a

total halt. This was clearly tied to Capital One's partnership with Uber.

23.     By 2015, Uber reported that taxi usage nationwide had precipitously decreased while the number of customers using Uber increased correspondingly.

24.     The disruption of the taxi industry resulting from Capital One's partnership with Uber contributed to the reduction in value of the Chicago taxi medallions securing the loans.

25.     In short, Capital One has caused the price of the Chicago taxi medallions that secure the loans to plummet.

26.     Moreover, Capital One has sabotaged Tri Global, Symon Garber, Valentina Zubok, Galina Garber-Sheinin and Licensee's efforts to favorably restructure and/or modify the medallion-secured loans at issue.

27.     Accordingly, Capital One has materially breached the credit agreement and Licensee is not liable for the amount allegedly owed pursuant to the credit agreement.

**FIRST DEFENSE**
**(No Right to Foreclose)**

28.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

29.     Capital One, through its partnership with Uber, precipitated the collapse of the Chicago taxi medallion industry and the medallion industry nationwide, in addition to the corresponding decline in the value of the taxi medallions at issue.

30.     Based on Capital One's willful misconduct, breach of contract, malfeasance, wrongdoing and/or other intentional and/or reckless conduct, Capital One has no right to foreclose on the medallions at issue.

**SECOND DEFENSE**
**(No Default by Licensee)**

31.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

32.     Licensee does not owe the amount claimed by Capital One and has not defaulted on the agreement at issue with Capital One.

33.     Therefore, Capital One has no right to foreclose on the medallions at issue.

**THIRD DEFENSE**
**(Improper Foreclosure Sale Purchase)**

34.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

35.     On August 9, 2018, to start the foreclosure, Capital One opened the auction with an initial credit bid of $23,000.00.

36.     Capital One won the foreclosure auction with its initial $23,000.00 credit bid.

37.     Pursuant to Rule TX13.03(b), "[t]he [foreclosure] purchaser must meet all the criteria for licensing as set out in the Municipal Code of Chicago and [the BACP's] rules and regulations, including payment of the license transfer fee, license fees and any other fees, fines or taxes due and owing to the City." Rule TX13.03(b).

38.     Pursuant to Rule TX13.04(d), "[t]he taxicab medallion license must be sold to a person believed to be a qualified applicant . . ." Rule TX13.04(d); *see also* TX13.06(a).

39.     Upon information and belief, Capital One is not a qualified applicant and has no intention of ever seeking licensure under the Municipal Code of Chicago or BACP Taxi Rules.

40.     The purpose behind the BACP Taxi Rules' foreclosure process is to facilitate keeping medallions operating on the street. If Capital One is allowed to purchase the medallions,

with no intention of ever becoming licensed by the BACP, Capital One would be allowed to cause further harm to the taxicab industry and further benefit Uber.

41.     Therefore, the foreclosure sale did not comply with Rules TX13.03 and TX13.04 and the foreclosure auction resulted in an improper sale/purchase that violated the BACP Taxi Rules.

42.     Moreover, Capital One's intent behind the foreclosure sale is to destroy and cause further harm to Licensee, Tri Global, and Tri Global's owners and guarantors. Capital One has filed multiple actions against Licensee, Tri Global, and/or Tri Global's owners and guarantors and instead of allowing any of these cases to reach their natural conclusion, Capital One instead seeks to implement destructive tactics by foreclosing on the medallions in order to further destroy the medallion market by setting the prices and discouraging bids, all in violation of the Taxi Rules simply to inflict maximum damage and cause irreparable harm. In a recent case that was filed in the Circuit Court of Cook County, *Capital One Equipment Finance Corp. v. Chicago Elite Cab Corp., et al.*, No. 17 L 998, the Honorable Margaret A. Brennan dismissed Capital One's complaint but allowed Capital One leave to re-file its cause of action in another case currently pending in New York. That New York Action is *Capital One Equipment Finance Corp. v. The OSG Corp., Tri Global Financial Services, Inc. et al.*, No. 600749/2017. But, rather than re-file its case in the New York Action and pursue its alleged causes of action, Capital One instead chose to do an end run around the litigation process and seeks to foreclose on the medallions at issue in an attempt to destroy Licensee, Tri Global and Tri Global's owners and guarantors. Capital One did not re-file its Chicago cause of action in the New York Action because it knows that counterclaims would be filed against it, which would expose Capital One's bad faith conduct in abusing its partnership with Tri Global and expose Capital One's bad faith relationship with Uber. The reality is that

Capital One has filed numerous unsuccessful complaints in courts in New York and Chicago and, because these lawsuits have not been successful, Capital One is now attempting to cause as much harm as possible to Licensee and Tri Global before the counterclaims against Capital One are proven true and Capital One's bad faith is exposed.

### FOURTH DEFENSE
**(Improper Foreclosure Sale Process)**

43.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

44.     On August 9, 2018, to start the foreclosure, Capital One opened the auction with an initial credit bid of $23,000.00.

45.     During the beginning part of the foreclosure auction, it became clear that no individuals were going to bid on the medallions because a foreclosure purchaser would have been liable for any and all liens on the medallions and such liability was unknown at the time of the auction. Capital One then stopped the foreclosure auction and announced to the individuals attending the auction that Capital One would work with any potential foreclosure purchasers and the bank to work out a deal on any liens on the medallion(s) bought at the auction. Capital One further stated that if the foreclosure purchaser and the bank could not work out an agreement concerning any liens on the medallions bought at the auction, Capital One would refund the foreclosure purchaser's money as if the foreclosure sale never took place. After this announcement, Capital One resumed the auction.

46.     By instituting this type of foreclosure auction, Capital One created an improper foreclosure process that created false values and did not bind the foreclosure purchasers.

## FIFTH DEFENSE
### (Breach of Fiduciary Duty)

47.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

48.     As set forth above, Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin relied heavily on and trusted Capital One.

49.     By virtue of the parties' business relationship as set forth above, and by reason of the demonstrable level of trust and confidence upon which Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin depended and which Capital One knowingly accepted, Capital One owes certain fiduciary duties to Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin including, without limitation, a duty of good faith.

50.     As explained herein, for years Tri Global relied on Capital One to guide certain aspects of its taxi-medallion loan origination and servicing business. Although the Tri Global MJPA provided discretion to Capital One, that discretion did not include a right to abandon the lending market or purposely advance competing interests to destabilize the industry upon which the very loans that were being serviced were based.

51.     Ultimately, Capital One repudiated its commitments to Licensee and abandoned the Chicago medallion lending market so that it could pursue a competing venture with Uber.

52.     Capital One breached its duty of good faith, and the trust and confidence of Licensee by, among other things: precipitating, through its partnership with Uber, the collapse of the Chicago taxi medallion industry and the medallion industry nationwide, in addition to the corresponding decline in the value of the taxi medallions at issue.

53.     Capital One engaged in an intentional course of wrongful conduct orchestrated to harm Licensee.

54.     Capital One's conduct was willful, wanton and in reckless disregard of the Licensee's contractual rights and was otherwise wrongful.

55.     As a direct and proximate result of Capital One's breach of its fiduciary duties, Licensee has suffered, and will continue to suffer, substantial damages.

### SIXTH DEFENSE
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

56.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

57.     Pursuant to the covenant of good faith and fair dealing, Capital One could not undertake any action that has the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

58.     As explained herein, Capital One breached the duty of good faith and fair dealing implied in the contract with Licensee by, among other things: precipitating, through its partnership with Uber, the collapse of the taxi medallion industry and concomitant decline in the value of the taxi medallions at issue.

59.     As a direct and proximate result of Capital One's breach of the implied covenant of good faith and fair dealing thereunder, Licensee has suffered, and will continue to suffer, substantial damages.

### SEVENTH DEFENSE
### (Estoppel, Waiver, Ratification and/or Acquiescence)

60.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

61.     Capital One's claim of breach of contract / default is barred by the doctrines of estoppel, waiver, ratification and/or acquiescence.

## **CONCLUSION**

WHEREFORE, based upon the foregoing allegations and defenses and all reasons appearing of record, Licensee has timely submitted a completed Affidavit of Defense and, pursuant to the BACP Taxi Rules, no transfer upon foreclosure may be allowed except pursuant to an order of a court having jurisdiction. Licensee respectfully requests that the BACP deny Creditor's Request to Transfer Taxicab Medallion License Upon Foreclosure.

# AFFIDAVIT OF DEFENSE TO CREDITOR

To City:    City of Chicago – Public Vehicle Operations Division
Department of Business Affairs and Consumer Protection
2350 W. Ogden Avenue, 1st Floor
Chicago, IL 60608
Attention: Monique Davids

To Creditor:    Capital One Equipment Finance Corp., f/k/a All Points Capital Corp.,
d/b/a Capital One Taxi Medallion Finance
c/o Troutman Sanders LLP
Att'n: Andrew L. Buck
875 Third Avenue
New York, NY 10022

RE: PUBLIC PASSENGER LICENSE NUMBER(s) <u>1641TX, 2394TX & 2968TX</u>

LICENSEE NAME: <u>Moneta Taxi Inc.</u>

I, _Symon GARBER_ , hereby swear that I own Taxicab Medallion License
<span style="font-size:smaller">Debtor Individual Name</span>
Number(s) <u>1641TX, 2394TX & 2968TX</u> either individually or through a company that I own and I have a defense to the

foreclosure of these licenses. I understand that this license(s) was sold at a foreclosure

sale on or about _____August 9, 2018_____ and that sale is contingent upon approval by the Department of Business Affairs
<span style="font-size:smaller">List Date of Foreclosure Sale</span>
and Consumer Protection.

My defense to this foreclosure is: (Use additional pages if needed) _____

_see attached Defence Documents_

Signature: _____

Print Name: _Shinin Edward_

Relationship to Medallion License/Title _VP and authorized signature agent_

Address: _2617 S. Wabash Ave Chicago IL 60616_

Phone: _312 791-1255_

Email Address: _edwardsS@chicagocarriage cab.com_

Subscribed and Sworn to before me

this _22_ day of _Aug_____, 20 _18_.

_____ Notary Public

JANET DAVIS
Official Seal
Notary Public - State of Illinois
My Commission Expires Sep 20 2019

## AFFIDAVIT OF DEFENSE TO CREDITOR

## DEFENSE DOCUMENT

In support of its Affidavit of Defense to Creditor, Licensee asserts the following defenses in opposition to the Creditor's ("Creditor" or "Capital One") request to transfer public passenger vehicle license upon foreclosure and to the foreclosure sale: (1) Capital One has no right to foreclose on the medallions at issue; (2) Licensee does not owe the amount claimed by Capital One and has not defaulted on the agreement at issue with Capital One; (3) the foreclosure resulted in an improper foreclosure sale purchase that violated the BACP Taxi Rules; (4) Capital One instituted an improper foreclosure sale process; (5) Capital One breached its fiduciary duty to Licensee; (6) Capital One breached the implied covenant of good faith and fair dealing; (7) Capital One's claim of breach of contract / default is barred by the doctrines of estoppel, waiver, ratification and/or acquiescence. Because Licensee has timely submitted a completed Affidavit of Defense, pursuant to the BACP Taxi Rules, no transfer upon foreclosure may be allowed except pursuant to an order of a court having jurisdiction. Therefore, Licensee respectfully requests that the BACP deny Creditor's Request to Transfer Taxicab Medallion License Upon Foreclosure.

## FACTUAL BACKGROUND

1. Symon Garber formed Tri Global Financial Services, Inc. ("Tri Global") in 2004, along with Roman Sapino and others, to provide capital to taxicab medallion owners. Tri Global's principal, Roman Sapino, also has many years of experience in the taxicab financing industry and has been involved in successful taxicab enterprises in New York and Chicago. Tri Global's co-owners include Galina Garber-Sheinin and Valentina Zubok. Irene Gans and Maya Zubok are related to an owner of Tri Global.

2. Tri Global is a corporation formed and existing under the laws of the State of

Illinois, maintaining offices at 2617 S. Wabash Avenue, Chicago, Illinois 60616. Tri Global is engaged in the business of financing and servicing Chicago-based taxi medallion loans as well as offering second-position financing to the taxi industry.

3.      Upon information and belief, Capital One is a corporation formed and existing under the laws of the State of New York, maintaining a principal place of business at 265 Broadhollow Road, Melville, New York 11747.

4.      Tri Global was formed to provide loans to purchasers of public passenger vehicle licenses and medallions in the Chicago market, which confers the right to operate a taxicab in Chicago pursuant to the regulations issued and regulated by the City of Chicago Department of Business Affairs and Consumer Protection ("BACP").

5.      Tri Global offered medallion and other financing to a wide-variety of borrowers, including taxicab businesses that rely on the medallion-secured loans to earn their livelihoods. Tri Global primarily focused its business on servicing taxi medallion loans for various lenders and also offered second-position financing to the taxi industry. In or around 2006 Tri Global was approached by North Fork Bank, which expressed interest in partnering with Tri Global to expand the scope of its lending platform.

6.      Over the next several years, Tri Global and North Fork Bank entered into numerous successful loan participations. When North Fork Bank was acquired by Capital One in or about 2006/2007, this practice continued with Capital One.

7.      Capital One was even more eager than North Fork Bank to capitalize upon Tri Global's contacts in the Chicago marketplace and strongly encouraged Tri Global to aggressively seek prospects for additional medallion loans. Capital One and Tri Global participated in the loans on a loan-by-loan basis for several years.

8.     In 2010, Capital One requested that Tri Global enter into a more formal arrangement by way of a master participation agreement, to which Tri Global agreed. The terms and conditions governing that relationship and Capital One's senior participation interests in the loans are more particularly set forth in a certain Master Joint Participation Agreement, dated August 2, 2010 (the "MJPA" or the "Tri Global MJPA").

9.     In connection with the Tri Global MJPA, Symon Garber, Roman Sapino, Ruben Giacomozzi, Valentina Zubok, and Galina Garber-Sheinin signed the Tri Global Guaranty, dated August 2, 2010.

10.     Pursuant to the terms of the MJPA, Tri Global generated business, handled collections, serviced the loans and remitted monthly payments to Capital One in accordance with the amount of its participation in each underlying loan while Capital One held senior participation interests in the various loans made and serviced by Tri Global to owners of Chicago taxicab medallions (the "Loans"). The Tri Global MJPA contemplates the sale of senior participation interests in loans issued and/or originated by Tri Global to owners and operators of taxi medallions. As reflected in the Tri Global MJPA, after Tri Global sells a participation interest, it continues to service the debt owed thereunder. In exchange for its services, Tri Global receives a servicing fee that is paid from the debt-service payments remitted to Tri Global each month.

11.     Since the inception of the Tri Global/Capital One relationship, the parties have participated in many loans. Although Tri Global originated the medallion-secured loans and served as the official loan servicer for the loan portfolio, Tri Global relied on and trusted Capital One and its commercial finance expertise. This relationship was often characterized by Capital One as a "team" and "partnership" and its officers and representatives, including David Cin ("Cin") and others, regularly commented that the success of the portfolio was the product of a "team effort."

12.     Although Capital One historically had no real presence in the Chicago medallion market, Capital One was eager to exploit Tri Global's connections to the taxicab medallion market and capitalize upon Tri Global's market dominance in the Chicago taxi-medallion economy. Capital One strongly encouraged Tri Global to aggressively acquire additional Chicago-based medallion loans.

13.     As the value of Chicago taxi medallion loans continued to rise, Capital One continued to aggressively press Tri Global to originate new loans so that Capital One could further capitalize on its market position and emerge as a leading taxi medallion lender in Chicago.

14.     Throughout the course of the Master Joint Participation Agreement, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin – whose interests were closely aligned with those of Capital One – worked with Capital One to maximize the return on the medallion loans.

15.     Tri Global originated the agreement/loan at issue between Licensee and Capital One based on Tri Global's relationship with Capital One.

16.     Despite its long-standing business venture with Tri Global, Capital One engaged in intentional and systematic efforts to line its own pockets to the detriment of Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin. As explained below, Capital One engaged in irreconcilable conflicts of interest, bad faith business practices, and intentionally disregarded its duty of good faith to Licensee and Tri Global when it partnered with a major taxi-industry competitor, Uber Technologies, Inc. ("Uber").

17.     In or about late 2013 and early 2014, and unbeknownst to Licensee and Tri Global (and many other Capital One loan participants and medallion-secured borrowers), Capital One began secretly planning to change course and exit the medallion market to partner with the

industry's most ominous competitor, Uber. Notwithstanding this new partnership, Capital One, either intentionally or recklessly, continued to encourage Tri Global to cultivate new medallion-secured loans while concealing its intention to partner with Uber.

18.     News of Capital One's partnership with Uber surfaced in approximately mid-2014, and was followed by an aggressive nationwide marketing campaign launched by Capital One. The marketing campaign and promotions touted Capital One's "unique new partnership" with Uber and underscored the "common focus" of both companies.

19.     Capital One began offering significant incentives to its consumers to choose Uber vehicles over properly licensed and regulated taxis – including offering free and discounted Uber rides and other similar promotions such as a 20% discount on all Uber rides when paid with a Capital One "Quicksilver" credit card. Capital One offered new customers two free Uber rides worth up to $60.00. Capital One created a new website promoting these incentives and further signaling its collaboration with Uber: "capitalone.com/uber".

20.     Capital One's partnership with Uber came as a great shock to Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin as the partnership was never disclosed to them prior to the 2014 marketing blitz. At no point in the parties' relationship was it ever contemplated that Capital One would undertake any action to undermine the taxi industry, the agreement at issue, or the value of Tri Global's and Capital One's loan portfolio.

21.     In partnering with and promoting Uber's ride-share services, Capital One and Uber's assault on the taxi industry has been instrumental in bringing about the destabilization of the Chicago taxi medallion market.

22.     In 2014, when Capital One began its partnership with Uber, the Chicago market softened dramatically. Sometime during mid-2014, funding to the medallion industry came to a

total halt. This was clearly tied to Capital One's partnership with Uber.

23.     By 2015, Uber reported that taxi usage nationwide had precipitously decreased while the number of customers using Uber increased correspondingly.

24.     The disruption of the taxi industry resulting from Capital One's partnership with Uber contributed to the reduction in value of the Chicago taxi medallions securing the loans.

25.     In short, Capital One has caused the price of the Chicago taxi medallions that secure the loans to plummet.

26.     Moreover, Capital One has sabotaged Tri Global, Symon Garber, Valentina Zubok, Galina Garber-Sheinin and Licensee's efforts to favorably restructure and/or modify the medallion-secured loans at issue.

27.     Accordingly, Capital One has materially breached the credit agreement and Licensee is not liable for the amount allegedly owed pursuant to the credit agreement.

## **FIRST DEFENSE**
### **(No Right to Foreclose)**

28.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

29.     Capital One, through its partnership with Uber, precipitated the collapse of the Chicago taxi medallion industry and the medallion industry nationwide, in addition to the corresponding decline in the value of the taxi medallions at issue.

30.     Based on Capital One's willful misconduct, breach of contract, malfeasance, wrongdoing and/or other intentional and/or reckless conduct, Capital One has no right to foreclose on the medallions at issue.

**SECOND DEFENSE**
**(No Default by Licensee)**

31.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

32.     Licensee does not owe the amount claimed by Capital One and has not defaulted on the agreement at issue with Capital One.

33.     Therefore, Capital One has no right to foreclose on the medallions at issue.

**THIRD DEFENSE**
**(Improper Foreclosure Sale Purchase)**

34.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

35.     On August 9, 2018, to start the foreclosure, Capital One opened the auction with an initial credit bid of $23,000.00.

36.     Capital One won the foreclosure auction with its initial $23,000.00 credit bid.

37.     Pursuant to Rule TX13.03(b), "[t]he [foreclosure] purchaser must meet all the criteria for licensing as set out in the Municipal Code of Chicago and [the BACP's] rules and regulations, including payment of the license transfer fee, license fees and any other fees, fines or taxes due and owing to the City." Rule TX13.03(b).

38.     Pursuant to Rule TX13.04(d), "[t]he taxicab medallion license must be sold to a person believed to be a qualified applicant . . ." Rule TX13.04(d); *see also* TX13.06(a).

39.     Upon information and belief, Capital One is not a qualified applicant and has no intention of ever seeking licensure under the Municipal Code of Chicago or BACP Taxi Rules.

40.     The purpose behind the BACP Taxi Rules' foreclosure process is to facilitate keeping medallions operating on the street. If Capital One is allowed to purchase the medallions,

with no intention of ever becoming licensed by the BACP, Capital One would be allowed to cause further harm to the taxicab industry and further benefit Uber.

41.     Therefore, the foreclosure sale did not comply with Rules TX13.03 and TX13.04 and the foreclosure auction resulted in an improper sale/purchase that violated the BACP Taxi Rules.

42.     Moreover, Capital One's intent behind the foreclosure sale is to destroy and cause further harm to Licensee, Tri Global, and Tri Global's owners and guarantors. Capital One has filed multiple actions against Licensee, Tri Global, and/or Tri Global's owners and guarantors and instead of allowing any of these cases to reach their natural conclusion, Capital One instead seeks to implement destructive tactics by foreclosing on the medallions in order to further destroy the medallion market by setting the prices and discouraging bids, all in violation of the Taxi Rules simply to inflict maximum damage and cause irreparable harm. In a recent case that was filed in the Circuit Court of Cook County, *Capital One Equipment Finance Corp. v. Chicago Elite Cab Corp., et al.*, No. 17 L 998, the Honorable Margaret A. Brennan dismissed Capital One's complaint but allowed Capital One leave to re-file its cause of action in another case currently pending in New York. That New York Action is *Capital One Equipment Finance Corp. v. The OSG Corp., Tri Global Financial Services, Inc. et al.*, No. 600749/2017. But, rather than re-file its case in the New York Action and pursue its alleged causes of action, Capital One instead chose to do an end run around the litigation process and seeks to foreclose on the medallions at issue in an attempt to destroy Licensee, Tri Global and Tri Global's owners and guarantors. Capital One did not re-file its Chicago cause of action in the New York Action because it knows that counterclaims would be filed against it, which would expose Capital One's bad faith conduct in abusing its partnership with Tri Global and expose Capital One's bad faith relationship with Uber. The reality is that

Capital One has filed numerous unsuccessful complaints in courts in New York and Chicago and, because these lawsuits have not been successful, Capital One is now attempting to cause as much harm as possible to Licensee and Tri Global before the counterclaims against Capital One are proven true and Capital One's bad faith is exposed.

**FOURTH DEFENSE**
**(Improper Foreclosure Sale Process)**

43.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

44.     On August 9, 2018, to start the foreclosure, Capital One opened the auction with an initial credit bid of $23,000.00.

45.     During the beginning part of the foreclosure auction, it became clear that no individuals were going to bid on the medallions because a foreclosure purchaser would have been liable for any and all liens on the medallions and such liability was unknown at the time of the auction. Capital One then stopped the foreclosure auction and announced to the individuals attending the auction that Capital One would work with any potential foreclosure purchasers and the bank to work out a deal on any liens on the medallion(s) bought at the auction. Capital One further stated that if the foreclosure purchaser and the bank could not work out an agreement concerning any liens on the medallions bought at the auction, Capital One would refund the foreclosure purchaser's money as if the foreclosure sale never took place. After this announcement, Capital One resumed the auction.

46.     By instituting this type of foreclosure auction, Capital One created an improper foreclosure process that created false values and did not bind the foreclosure purchasers.

## FIFTH DEFENSE
### (Breach of Fiduciary Duty)

47.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

48.     As set forth above, Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin relied heavily on and trusted Capital One.

49.     By virtue of the parties' business relationship as set forth above, and by reason of the demonstrable level of trust and confidence upon which Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin depended and which Capital One knowingly accepted, Capital One owes certain fiduciary duties to Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin including, without limitation, a duty of good faith.

50.     As explained herein, for years Tri Global relied on Capital One to guide certain aspects of its taxi-medallion loan origination and servicing business. Although the Tri Global MJPA provided discretion to Capital One, that discretion did not include a right to abandon the lending market or purposely advance competing interests to destabilize the industry upon which the very loans that were being serviced were based.

51.     Ultimately, Capital One repudiated its commitments to Licensee and abandoned the Chicago medallion lending market so that it could pursue a competing venture with Uber.

52.     Capital One breached its duty of good faith, and the trust and confidence of Licensee by, among other things: precipitating, through its partnership with Uber, the collapse of the Chicago taxi medallion industry and the medallion industry nationwide, in addition to the corresponding decline in the value of the taxi medallions at issue.

53.     Capital One engaged in an intentional course of wrongful conduct orchestrated to harm Licensee.

54.     Capital One's conduct was willful, wanton and in reckless disregard of the Licensee's contractual rights and was otherwise wrongful.

55.     As a direct and proximate result of Capital One's breach of its fiduciary duties, Licensee has suffered, and will continue to suffer, substantial damages.

**SIXTH DEFENSE**
**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

56.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

57.     Pursuant to the covenant of good faith and fair dealing, Capital One could not undertake any action that has the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

58.     As explained herein, Capital One breached the duty of good faith and fair dealing implied in the contract with Licensee by, among other things: precipitating, through its partnership with Uber, the collapse of the taxi medallion industry and concomitant decline in the value of the taxi medallions at issue.

59.     As a direct and proximate result of Capital One's breach of the implied covenant of good faith and fair dealing thereunder, Licensee has suffered, and will continue to suffer, substantial damages.

**SEVENTH DEFENSE**
**(Estoppel, Waiver, Ratification and/or Acquiescence)**

60.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

61.     Capital One's claim of breach of contract / default is barred by the doctrines of estoppel, waiver, ratification and/or acquiescence.

## **CONCLUSION**

WHEREFORE, based upon the foregoing allegations and defenses and all reasons appearing of record, Licensee has timely submitted a completed Affidavit of Defense and, pursuant to the BACP Taxi Rules, no transfer upon foreclosure may be allowed except pursuant to an order of a court having jurisdiction. Licensee respectfully requests that the BACP deny Creditor's Request to Transfer Taxicab Medallion License Upon Foreclosure.

# AFFIDAVIT OF DEFENSE TO CREDITOR

**To City:** City of Chicago – Public Vehicle Operations Division
Department of Business Affairs and Consumer Protection
2350 W. Ogden Avenue, 1st Floor
Chicago, IL 60608
Attention: Monique Davids

**To Creditor:** Capital One Equipment Finance Corp., f/k/a All Points Capital Corp.,
d/b/a Capital One Taxi Medallion Finance
c/o Troutman Sanders LLP
Att'n: Andrew L. Buck
875 Third Avenue
New York, NY 10022

RE: PUBLIC PASSENGER LICENSE NUMBER(s) <u>3006TX</u>

LICENSEE NAME: <u>Moneta Taxi Inc.</u>

I, _____Simon GARBER_____, hereby swear that I own Taxicab Medallion License
<span style="font-size:smaller">Debtor Individual Name</span>
Number(s) <u>3006TX</u> either individually or through a company that I own and I have a defense to the foreclosure of these

licenses. I understand that this license(s) was sold at a foreclosure

sale on or about _____August 9, 2018_____ and that sale is contingent upon approval by the Department of Business Affairs
<span style="font-size:smaller">List Date of Foreclosure Sale</span>
and Consumer Protection.

My defense to this foreclosure is: (Use additional pages if needed)_____

_____see attached Defence Document_____

_____

Signature: _____

Print Name: _____Sheinfin Edflant_____

Relationship to Medallion License/Title _____VP and authorized signature agent_____

Address: _____2617 S. Wabash Ave Chicago IL 60616_____

Phone: _____312 791 – 1255_____

Email Address: _____edwards@chicagocarriagecab.com_____

Subscribed and Sworn to before me

this _22_ day of _Aug_____, 20 _18_.

_____ Notary Public

JANET DAVIS
Official Seal
Notary Public - State of Illinois
My Commission Expires Sep 20 2019

Version Date June 5, 2018

## AFFIDAVIT OF DEFENSE TO CREDITOR

## DEFENSE DOCUMENT

In support of its Affidavit of Defense to Creditor, Licensee asserts the following defenses in opposition to the Creditor's ("Creditor" or "Capital One") request to transfer public passenger vehicle license upon foreclosure and to the foreclosure sale: (1) Capital One has no right to foreclose on the medallion at issue; (2) Licensee does not owe the amount claimed by Capital One and has not defaulted on the agreement at issue with Capital One; (3) the foreclosure resulted in an improper foreclosure sale purchase that violated the BACP Taxi Rules; (4) Capital One instituted an improper foreclosure sale process; (5) Capital One breached its fiduciary duty to Licensee; (6) Capital One breached the implied covenant of good faith and fair dealing; (7) Capital One's claim of breach of contract / default is barred by the doctrines of estoppel, waiver, ratification and/or acquiescence. Because Licensee has timely submitted a completed Affidavit of Defense, pursuant to the BACP Taxi Rules, no transfer upon foreclosure may be allowed except pursuant to an order of a court having jurisdiction. Therefore, Licensee respectfully requests that the BACP deny Creditor's Request to Transfer Taxicab Medallion License Upon Foreclosure.

## FACTUAL BACKGROUND

1.      Symon Garber formed Tri Global Financial Services, Inc. ("Tri Global") in 2004, along with Roman Sapino and others, to provide capital to taxicab medallion owners. Tri Global's principal, Roman Sapino, also has many years of experience in the taxicab financing industry and has been involved in successful taxicab enterprises in New York and Chicago. Tri Global's co-owners include Galina Garber-Sheinin and Valentina Zubok. Irene Gans and Maya Zubok are related to an owner of Tri Global.

2.      Tri Global is a corporation formed and existing under the laws of the State of

Illinois, maintaining offices at 2617 S. Wabash Avenue, Chicago, Illinois 60616. Tri Global is engaged in the business of financing and servicing Chicago-based taxi medallion loans as well as offering second-position financing to the taxi industry.

3.     Upon information and belief, Capital One is a corporation formed and existing under the laws of the State of New York, maintaining a principal place of business at 265 Broadhollow Road, Melville, New York 11747.

4.     Tri Global was formed to provide loans to purchasers of public passenger vehicle licenses and medallions in the Chicago market, which confers the right to operate a taxicab in Chicago pursuant to the regulations issued and regulated by the City of Chicago Department of Business Affairs and Consumer Protection ("BACP").

5.     Tri Global offered medallion and other financing to a wide-variety of borrowers, including taxicab businesses that rely on the medallion-secured loans to earn their livelihoods. Tri Global primarily focused its business on servicing taxi medallion loans for various lenders and also offered second-position financing to the taxi industry. In or around 2006 Tri Global was approached by North Fork Bank, which expressed interest in partnering with Tri Global to expand the scope of its lending platform.

6.     Over the next several years, Tri Global and North Fork Bank entered into numerous successful loan participations. When North Fork Bank was acquired by Capital One in or about 2006/2007, this practice continued with Capital One.

7.     Capital One was even more eager than North Fork Bank to capitalize upon Tri Global's contacts in the Chicago marketplace and strongly encouraged Tri Global to aggressively seek prospects for additional medallion loans. Capital One and Tri Global participated in the loans on a loan-by-loan basis for several years.

8.     In 2010, Capital One requested that Tri Global enter into a more formal arrangement by way of a master participation agreement, to which Tri Global agreed. The terms and conditions governing that relationship and Capital One's senior participation interests in the loans are more particularly set forth in a certain Master Joint Participation Agreement, dated August 2, 2010 (the "MJPA" or the "Tri Global MJPA").

9.     In connection with the Tri Global MJPA, Symon Garber, Roman Sapino, Ruben Giacomozzi, Valentina Zubok, and Galina Garber-Sheinin signed the Tri Global Guaranty, dated August 2, 2010.

10.     Pursuant to the terms of the MJPA, Tri Global generated business, handled collections, serviced the loans and remitted monthly payments to Capital One in accordance with the amount of its participation in each underlying loan while Capital One held senior participation interests in the various loans made and serviced by Tri Global to owners of Chicago taxicab medallions (the "Loans"). The Tri Global MJPA contemplates the sale of senior participation interests in loans issued and/or originated by Tri Global to owners and operators of taxi medallions. As reflected in the Tri Global MJPA, after Tri Global sells a participation interest, it continues to service the debt owed thereunder. In exchange for its services, Tri Global receives a servicing fee that is paid from the debt-service payments remitted to Tri Global each month.

11.     Since the inception of the Tri Global/Capital One relationship, the parties have participated in many loans. Although Tri Global originated the medallion-secured loans and served as the official loan servicer for the loan portfolio, Tri Global relied on and trusted Capital One and its commercial finance expertise. This relationship was often characterized by Capital One as a "team" and "partnership" and its officers and representatives, including David Cin ("Cin") and others, regularly commented that the success of the portfolio was the product of a "team effort."

12.     Although Capital One historically had no real presence in the Chicago medallion market, Capital One was eager to exploit Tri Global's connections to the taxicab medallion market and capitalize upon Tri Global's market dominance in the Chicago taxi-medallion economy. Capital One strongly encouraged Tri Global to aggressively acquire additional Chicago-based medallion loans.

13.     As the value of Chicago taxi medallion loans continued to rise, Capital One continued to aggressively press Tri Global to originate new loans so that Capital One could further capitalize on its market position and emerge as a leading taxi medallion lender in Chicago.

14.     Throughout the course of the Master Joint Participation Agreement, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin – whose interests were closely aligned with those of Capital One – worked with Capital One to maximize the return on the medallion loans.

15.     Tri Global originated the agreement/loan at issue between Licensee and Capital One based on Tri Global's relationship with Capital One.

16.     Despite its long-standing business venture with Tri Global, Capital One engaged in intentional and systematic efforts to line its own pockets to the detriment of Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin. As explained below, Capital One engaged in irreconcilable conflicts of interest, bad faith business practices, and intentionally disregarded its duty of good faith to Licensee and Tri Global when it partnered with a major taxi-industry competitor, Uber Technologies, Inc. ("Uber").

17.     In or about late 2013 and early 2014, and unbeknownst to Licensee and Tri Global (and many other Capital One loan participants and medallion-secured borrowers), Capital One began secretly planning to change course and exit the medallion market to partner with the

industry's most ominous competitor, Uber. Notwithstanding this new partnership, Capital One, either intentionally or recklessly, continued to encourage Tri Global to cultivate new medallion-secured loans while concealing its intention to partner with Uber.

18.     News of Capital One's partnership with Uber surfaced in approximately mid-2014, and was followed by an aggressive nationwide marketing campaign launched by Capital One. The marketing campaign and promotions touted Capital One's "unique new partnership" with Uber and underscored the "common focus" of both companies.

19.     Capital One began offering significant incentives to its consumers to choose Uber vehicles over properly licensed and regulated taxis – including offering free and discounted Uber rides and other similar promotions such as a 20% discount on all Uber rides when paid with a Capital One "Quicksilver" credit card. Capital One offered new customers two free Uber rides worth up to $60.00. Capital One created a new website promoting these incentives and further signaling its collaboration with Uber: "capitalone.com/uber".

20.     Capital One's partnership with Uber came as a great shock to Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin as the partnership was never disclosed to them prior to the 2014 marketing blitz. At no point in the parties' relationship was it ever contemplated that Capital One would undertake any action to undermine the taxi industry, the agreement at issue, or the value of Tri Global's and Capital One's loan portfolio.

21.     In partnering with and promoting Uber's ride-share services, Capital One and Uber's assault on the taxi industry has been instrumental in bringing about the destabilization of the Chicago taxi medallion market.

22.     In 2014, when Capital One began its partnership with Uber, the Chicago market softened dramatically. Sometime during mid-2014, funding to the medallion industry came to a

total halt. This was clearly tied to Capital One's partnership with Uber.

23.    By 2015, Uber reported that taxi usage nationwide had precipitously decreased while the number of customers using Uber increased correspondingly.

24.    The disruption of the taxi industry resulting from Capital One's partnership with Uber contributed to the reduction in value of the Chicago taxi medallions securing the loans.

25.    In short, Capital One has caused the price of the Chicago taxi medallions that secure the loans to plummet.

26.    Moreover, Capital One has sabotaged Tri Global, Symon Garber, Valentina Zubok, Galina Garber-Sheinin and Licensee's efforts to favorably restructure and/or modify the medallion-secured loans at issue.

27.    Accordingly, Capital One has materially breached the credit agreement and Licensee is not liable for the amount allegedly owed pursuant to the credit agreement.

### FIRST DEFENSE
### (No Right to Foreclose)

28.    Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

29.    Capital One, through its partnership with Uber, precipitated the collapse of the Chicago taxi medallion industry and the medallion industry nationwide, in addition to the corresponding decline in the value of the taxi medallions at issue.

30.    Based on Capital One's willful misconduct, breach of contract, malfeasance, wrongdoing and/or other intentional and/or reckless conduct, Capital One has no right to foreclose on the medallions at issue.

## SECOND DEFENSE
**(No Default by Licensee)**

31.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

32.     Licensee does not owe the amount claimed by Capital One and has not defaulted on the agreement at issue with Capital One.

33.     Therefore, Capital One has no right to foreclose on the medallions at issue.

## THIRD DEFENSE
**(Improper Foreclosure Sale Purchase)**

34.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

35.     On August 9, 2018, to start the foreclosure, Capital One opened the auction with an initial credit bid of $23,000.00.

36.     An individual won the foreclosure auction with a bid of approximately $23,100.00.

37.     Pursuant to Rule TX13.03(b), "[t]he [foreclosure] purchaser must meet all the criteria for licensing as set out in the Municipal Code of Chicago and [the BACP's] rules and regulations, including payment of the license transfer fee, license fees and any other fees, fines or taxes due and owing to the City." Rule TX13.03(b).

38.     Pursuant to Rule TX13.04(d), "[t]he taxicab medallion license must be sold to a person believed to be a qualified applicant . . ." Rule TX13.04(d); *see also* TX13.06(a).

39.     It is unclear if the individual purchaser of the medallion at the foreclosure auction is a qualified applicant under the Municipal Code of Chicago or BACP Taxi Rules. Regardless, because of the improper auction process instituted by Capital One, there is a strong likelihood that the individual purchaser will ultimately decide not to go forward with the foreclosure sale, thus

making Capital One the potential purchaser.

40.     Upon information and belief, Capital One is not a qualified applicant and has no intention of ever seeking licensure under the Municipal Code of Chicago or BACP Taxi Rules.

41.     The purpose behind the BACP Taxi Rules' foreclosure process is to facilitate keeping medallions operating on the street. If Capital One is allowed to purchase the medallions, with no intention of ever becoming licensed by the BACP, Capital One would be allowed to cause further harm to the taxicab industry and further benefit Uber.

42.     Therefore, the foreclosure sale did not comply with Rules TX13.03 and TX13.04 and the foreclosure auction resulted in an improper sale/purchase that violated the BACP Taxi Rules.

43.     Moreover, Capital One's intent behind the foreclosure sale is to destroy and cause further harm to Licensee, Tri Global, and Tri Global's owners and guarantors. Capital One has filed multiple actions against Licensee, Tri Global, and/or Tri Global's owners and guarantors and instead of allowing any of these cases to reach their natural conclusion, Capital One instead seeks to implement destructive tactics by foreclosing on the medallions in order to further destroy the medallion market by setting the prices and discouraging bids, all in violation of the Taxi Rules simply to inflict maximum damage and cause irreparable harm. In a recent case that was filed in the Circuit Court of Cook County, *Capital One Equipment Finance Corp. v. Chicago Elite Cab Corp., et al.*, No. 17 L 998, the Honorable Margaret A. Brennan dismissed Capital One's complaint but allowed Capital One leave to re-file its cause of action in another case currently pending in New York. That New York Action is *Capital One Equipment Finance Corp. v. The OSG Corp., Tri Global Financial Services, Inc. et al.*, No. 600749/2017. But, rather than re-file its case in the New York Action and pursue its alleged causes of action, Capital One instead chose to do an end

run around the litigation process and seeks to foreclose on the medallions at issue in an attempt to destroy Licensee, Tri Global and Tri Global's owners and guarantors. Capital One did not re-file its Chicago cause of action in the New York Action because it knows that counterclaims would be filed against it, which would expose Capital One's bad faith conduct in abusing its partnership with Tri Global and expose Capital One's bad faith relationship with Uber. The reality is that Capital One has filed numerous unsuccessful complaints in courts in New York and Chicago and, because these lawsuits have not been successful, Capital One is now attempting to cause as much harm as possible to Licensee and Tri Global before the counterclaims against Capital One are proven true and Capital One's bad faith is exposed.

**FOURTH DEFENSE**
**(Improper Foreclosure Sale Process)**

44.  Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

45.  On August 9, 2018, to start the foreclosure, Capital One opened the auction with an initial credit bid of $23,000.00.

46.  During the beginning part of the foreclosure auction, it became clear that no individuals were going to bid on the medallions because a foreclosure purchaser would have been liable for any and all liens on the medallions and such liability was unknown at the time of the auction. Capital One then stopped the foreclosure auction and announced to the individuals attending the auction that Capital One would work with any potential foreclosure purchasers and the bank to work out a deal on any liens on the medallion(s) bought at the auction. Capital One further stated that if the foreclosure purchaser and the bank could not work out an agreement concerning any liens on the medallions bought at the auction, Capital One would refund the foreclosure purchaser's money as if the foreclosure sale never took place. After this announcement,

Capital One resumed the auction.

47.     By instituting this type of foreclosure auction, Capital One created an improper foreclosure process that created false values and did not bind the foreclosure purchasers.

### FIFTH DEFENSE
#### (Breach of Fiduciary Duty)

48.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

49.     As set forth above, Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin relied heavily on and trusted Capital One.

50.     By virtue of the parties' business relationship as set forth above, and by reason of the demonstrable level of trust and confidence upon which Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin depended and which Capital One knowingly accepted, Capital One owes certain fiduciary duties to Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin including, without limitation, a duty of good faith.

51.     As explained herein, for years Tri Global relied on Capital One to guide certain aspects of its taxi-medallion loan origination and servicing business. Although the Tri Global MJPA provided discretion to Capital One, that discretion did not include a right to abandon the lending market or purposely advance competing interests to destabilize the industry upon which the very loans that were being serviced were based.

52.     Ultimately, Capital One repudiated its commitments to Licensee and abandoned the Chicago medallion lending market so that it could pursue a competing venture with Uber.

53.     Capital One breached its duty of good faith, and the trust and confidence of Licensee by, among other things: precipitating, through its partnership with Uber, the collapse of the Chicago taxi medallion industry and the medallion industry nationwide, in addition to the

corresponding decline in the value of the taxi medallions at issue.

54. Capital One engaged in an intentional course of wrongful conduct orchestrated to harm Licensee.

55. Capital One's conduct was willful, wanton and in reckless disregard of the Licensee's contractual rights and was otherwise wrongful.

56. As a direct and proximate result of Capital One's breach of its fiduciary duties, Licensee has suffered, and will continue to suffer, substantial damages.

## SIXTH DEFENSE
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

57. Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

58. Pursuant to the covenant of good faith and fair dealing, Capital One could not undertake any action that has the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

59. As explained herein, Capital One breached the duty of good faith and fair dealing implied in the contract with Licensee by, among other things: precipitating, through its partnership with Uber, the collapse of the taxi medallion industry and concomitant decline in the value of the taxi medallions at issue.

60. As a direct and proximate result of Capital One's breach of the implied covenant of good faith and fair dealing thereunder, Licensee has suffered, and will continue to suffer, substantial damages.

## SEVENTH DEFENSE
### (Estoppel, Waiver, Ratification and/or Acquiescence)

61.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

62.     Capital One's claim of breach of contract / default is barred by the doctrines of estoppel, waiver, ratification and/or acquiescence.

## CONCLUSION

WHEREFORE, based upon the foregoing allegations and defenses and all reasons appearing of record, Licensee has timely submitted a completed Affidavit of Defense and, pursuant to the BACP Taxi Rules, no transfer upon foreclosure may be allowed except pursuant to an order of a court having jurisdiction. Licensee respectfully requests that the BACP deny Creditor's Request to Transfer Taxicab Medallion License Upon Foreclosure.

# AFFIDAVIT OF DEFENSE TO CREDITOR

To City:   City of Chicago – Public Vehicle Operations Division
           Department of Business Affairs and Consumer Protection
           2350 W. Ogden Avenue, 1st Floor
           Chicago, IL 60608
           Attention: Monique Davids

To Creditor:   Capital One Equipment Finance Corp., f/k/a All Points Capital Corp.,
               d/b/a Capital One Taxi Medallion Finance
               c/o Troutman Sanders LLP
               Att'n: Andrew L. Buck
               875 Third Avenue
               New York, NY 10022

RE: PUBLIC PASSENGER LICENSE NUMBER(s) <u>3745TX, 3774TX, 3786TX & 3840TX</u>

LICENSEE NAME: <u>Pink Zone Cab Co.</u>

I, <u>Galina Garber Shenin</u> , hereby swear that I own Taxicab Medallion License
<span style="font-size:small">Debtor Individual Name</span>
Number(s) <u>3745TX, 3774TX, 3786TX & 3840TX</u> either individually or through a company that I own and I have a

defense to the foreclosure of these licenses. I understand that this license(s) was sold at a foreclosure

sale on or about _____<u>August 9, 2018</u>_____ and that sale is contingent upon approval by the Department of Business Affairs
<span style="font-size:small">List Date of Foreclosure Sale</span>
and Consumer Protection.

My defense to this foreclosure is: (Use additional pages if needed)_____

_____ See attached Defense Document. _____

_____

_____

Signature: _____

Print Name: <u>Shenin Edward</u>

Relationship to Medallion License/Title <u>Vice President & Authorized Agent</u>

Address: <u>3617 S Wabash Ave Chicago IL 60616</u>

Phone: <u>312 · 791 · 1255</u>

Email Address: <u>edwards @ chicagocarriagecab.com</u> ·

Subscribed and Sworn to before me

this <u>22</u> day of <u>Aug</u> , 20 <u>18</u> .

_____ Notary Public

JANET DAVIS
Official Seal
Notary Public - State of
My Commission Expires Sep 5, 2019

Version Date June 5, 2018

## AFFIDAVIT OF DEFENSE TO CREDITOR

## DEFENSE DOCUMENT

In support of its Affidavit of Defense to Creditor, Licensee asserts the following defenses in opposition to the Creditor's ("Creditor" or "Capital One") request to transfer public passenger vehicle license upon foreclosure and to the foreclosure sale: (1) Capital One has no right to foreclose on the medallions at issue; (2) Licensee does not owe the amount claimed by Capital One and has not defaulted on the agreement at issue with Capital One; (3) the foreclosure resulted in an improper foreclosure sale purchase that violated the BACP Taxi Rules; (4) Capital One instituted an improper foreclosure sale process; (5) Capital One breached its fiduciary duty to Licensee; (6) Capital One breached the implied covenant of good faith and fair dealing; (7) Capital One's claim of breach of contract / default is barred by the doctrines of estoppel, waiver, ratification and/or acquiescence. Because Licensee has timely submitted a completed Affidavit of Defense, pursuant to the BACP Taxi Rules, no transfer upon foreclosure may be allowed except pursuant to an order of a court having jurisdiction. Therefore, Licensee respectfully requests that the BACP deny Creditor's Request to Transfer Taxicab Medallion License Upon Foreclosure.

## FACTUAL BACKGROUND

1.      Symon Garber formed Tri Global Financial Services, Inc. ("Tri Global") in 2004, along with Roman Sapino and others, to provide capital to taxicab medallion owners. Tri Global's principal, Roman Sapino, also has many years of experience in the taxicab financing industry and has been involved in successful taxicab enterprises in New York and Chicago. Tri Global's co-owners include Galina Garber-Sheinin and Valentina Zubok. Irene Gans and Maya Zubok are related to an owner of Tri Global.

2.      Tri Global is a corporation formed and existing under the laws of the State of

Illinois, maintaining offices at 2617 S. Wabash Avenue, Chicago, Illinois 60616. Tri Global is engaged in the business of financing and servicing Chicago-based taxi medallion loans as well as offering second-position financing to the taxi industry.

3.  Upon information and belief, Capital One is a corporation formed and existing under the laws of the State of New York, maintaining a principal place of business at 265 Broadhollow Road, Melville, New York 11747.

4.  Tri Global was formed to provide loans to purchasers of public passenger vehicle licenses and medallions in the Chicago market, which confers the right to operate a taxicab in Chicago pursuant to the regulations issued and regulated by the City of Chicago Department of Business Affairs and Consumer Protection ("BACP").

5.  Tri Global offered medallion and other financing to a wide-variety of borrowers, including taxicab businesses that rely on the medallion-secured loans to earn their livelihoods. Tri Global primarily focused its business on servicing taxi medallion loans for various lenders and also offered second-position financing to the taxi industry. In or around 2006 Tri Global was approached by North Fork Bank, which expressed interest in partnering with Tri Global to expand the scope of its lending platform.

6.  Over the next several years, Tri Global and North Fork Bank entered into numerous successful loan participations. When North Fork Bank was acquired by Capital One in or about 2006/2007, this practice continued with Capital One.

7.  Capital One was even more eager than North Fork Bank to capitalize upon Tri Global's contacts in the Chicago marketplace and strongly encouraged Tri Global to aggressively seek prospects for additional medallion loans. Capital One and Tri Global participated in the loans on a loan-by-loan basis for several years.

8.    In 2010, Capital One requested that Tri Global enter into a more formal arrangement by way of a master participation agreement, to which Tri Global agreed. The terms and conditions governing that relationship and Capital One's senior participation interests in the loans are more particularly set forth in a certain Master Joint Participation Agreement, dated August 2, 2010 (the "MJPA" or the "Tri Global MJPA").

9.    In connection with the Tri Global MJPA, Symon Garber, Roman Sapino, Ruben Giacomozzi, Valentina Zubok, and Galina Garber-Sheinin signed the Tri Global Guaranty, dated August 2, 2010.

10.    Pursuant to the terms of the MJPA, Tri Global generated business, handled collections, serviced the loans and remitted monthly payments to Capital One in accordance with the amount of its participation in each underlying loan while Capital One held senior participation interests in the various loans made and serviced by Tri Global to owners of Chicago taxicab medallions (the "Loans"). The Tri Global MJPA contemplates the sale of senior participation interests in loans issued and/or originated by Tri Global to owners and operators of taxi medallions. As reflected in the Tri Global MJPA, after Tri Global sells a participation interest, it continues to service the debt owed thereunder. In exchange for its services, Tri Global receives a servicing fee that is paid from the debt-service payments remitted to Tri Global each month.

11.    Since the inception of the Tri Global/Capital One relationship, the parties have participated in many loans. Although Tri Global originated the medallion-secured loans and served as the official loan servicer for the loan portfolio, Tri Global relied on and trusted Capital One and its commercial finance expertise. This relationship was often characterized by Capital One as a "team" and "partnership" and its officers and representatives, including David Cin ("Cin") and others, regularly commented that the success of the portfolio was the product of a "team effort."

12.     Although Capital One historically had no real presence in the Chicago medallion market, Capital One was eager to exploit Tri Global's connections to the taxicab medallion market and capitalize upon Tri Global's market dominance in the Chicago taxi-medallion economy. Capital One strongly encouraged Tri Global to aggressively acquire additional Chicago-based medallion loans.

13.     As the value of Chicago taxi medallion loans continued to rise, Capital One continued to aggressively press Tri Global to originate new loans so that Capital One could further capitalize on its market position and emerge as a leading taxi medallion lender in Chicago.

14.     Throughout the course of the Master Joint Participation Agreement, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin – whose interests were closely aligned with those of Capital One – worked with Capital One to maximize the return on the medallion loans.

15.     Tri Global originated the agreement/loan at issue between Licensee and Capital One based on Tri Global's relationship with Capital One.

16.     Despite its long-standing business venture with Tri Global, Capital One engaged in intentional and systematic efforts to line its own pockets to the detriment of Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin. As explained below, Capital One engaged in irreconcilable conflicts of interest, bad faith business practices, and intentionally disregarded its duty of good faith to Licensee and Tri Global when it partnered with a major taxi-industry competitor, Uber Technologies, Inc. ("Uber").

17.     In or about late 2013 and early 2014, and unbeknownst to Licensee and Tri Global (and many other Capital One loan participants and medallion-secured borrowers), Capital One began secretly planning to change course and exit the medallion market to partner with the

industry's most ominous competitor, Uber. Notwithstanding this new partnership, Capital One, either intentionally or recklessly, continued to encourage Tri Global to cultivate new medallion-secured loans while concealing its intention to partner with Uber.

18.     News of Capital One's partnership with Uber surfaced in approximately mid-2014, and was followed by an aggressive nationwide marketing campaign launched by Capital One. The marketing campaign and promotions touted Capital One's "unique new partnership" with Uber and underscored the "common focus" of both companies.

19.     Capital One began offering significant incentives to its consumers to choose Uber vehicles over properly licensed and regulated taxis – including offering free and discounted Uber rides and other similar promotions such as a 20% discount on all Uber rides when paid with a Capital One "Quicksilver" credit card. Capital One offered new customers two free Uber rides worth up to $60.00. Capital One created a new website promoting these incentives and further signaling its collaboration with Uber: "capitalone.com/uber".

20.     Capital One's partnership with Uber came as a great shock to Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin as the partnership was never disclosed to them prior to the 2014 marketing blitz. At no point in the parties' relationship was it ever contemplated that Capital One would undertake any action to undermine the taxi industry, the agreement at issue, or the value of Tri Global's and Capital One's loan portfolio.

21.     In partnering with and promoting Uber's ride-share services, Capital One and Uber's assault on the taxi industry has been instrumental in bringing about the destabilization of the Chicago taxi medallion market.

22.     In 2014, when Capital One began its partnership with Uber, the Chicago market softened dramatically. Sometime during mid-2014, funding to the medallion industry came to a

total halt. This was clearly tied to Capital One's partnership with Uber.

23.     By 2015, Uber reported that taxi usage nationwide had precipitously decreased while the number of customers using Uber increased correspondingly.

24.     The disruption of the taxi industry resulting from Capital One's partnership with Uber contributed to the reduction in value of the Chicago taxi medallions securing the loans.

25.     In short, Capital One has caused the price of the Chicago taxi medallions that secure the loans to plummet.

26.     Moreover, Capital One has sabotaged Tri Global, Symon Garber, Valentina Zubok, Galina Garber-Sheinin and Licensee's efforts to favorably restructure and/or modify the medallion-secured loans at issue.

27.     Accordingly, Capital One has materially breached the credit agreement and Licensee is not liable for the amount allegedly owed pursuant to the credit agreement.

**FIRST DEFENSE**
**(No Right to Foreclose)**

28.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

29.     Capital One, through its partnership with Uber, precipitated the collapse of the Chicago taxi medallion industry and the medallion industry nationwide, in addition to the corresponding decline in the value of the taxi medallions at issue.

30.     Based on Capital One's willful misconduct, breach of contract, malfeasance, wrongdoing and/or other intentional and/or reckless conduct, Capital One has no right to foreclose on the medallions at issue.

## SECOND DEFENSE
### (No Default by Licensee)

31.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

32.     Licensee does not owe the amount claimed by Capital One and has not defaulted on the agreement at issue with Capital One.

33.     Therefore, Capital One has no right to foreclose on the medallions at issue.

## THIRD DEFENSE
### (Improper Foreclosure Sale Purchase)

34.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

35.     On August 9, 2018, to start the foreclosure, Capital One opened the auction with an initial credit bid of $23,000.00.

36.     Capital One won the foreclosure auction with its initial $23,000.00 credit bid.

37.     Pursuant to Rule TX13.03(b), "[t]he [foreclosure] purchaser must meet all the criteria for licensing as set out in the Municipal Code of Chicago and [the BACP's] rules and regulations, including payment of the license transfer fee, license fees and any other fees, fines or taxes due and owing to the City." Rule TX13.03(b).

38.     Pursuant to Rule TX13.04(d), "[t]he taxicab medallion license must be sold to a person believed to be a qualified applicant . . ." Rule TX13.04(d); *see also* TX13.06(a).

39.     Upon information and belief, Capital One is not a qualified applicant and has no intention of ever seeking licensure under the Municipal Code of Chicago or BACP Taxi Rules.

40.     The purpose behind the BACP Taxi Rules' foreclosure process is to facilitate keeping medallions operating on the street. If Capital One is allowed to purchase the medallions,

with no intention of ever becoming licensed by the BACP, Capital One would be allowed to cause further harm to the taxicab industry and further benefit Uber.

41. Therefore, the foreclosure sale did not comply with Rules TX13.03 and TX13.04 and the foreclosure auction resulted in an improper sale/purchase that violated the BACP Taxi Rules.

42. Moreover, Capital One's intent behind the foreclosure sale is to destroy and cause further harm to Licensee, Tri Global, and Tri Global's owners and guarantors. Capital One has filed multiple actions against Licensee, Tri Global, and/or Tri Global's owners and guarantors and instead of allowing any of these cases to reach their natural conclusion, Capital One instead seeks to implement destructive tactics by foreclosing on the medallions in order to further destroy the medallion market by setting the prices and discouraging bids, all in violation of the Taxi Rules simply to inflict maximum damage and cause irreparable harm. In a recent case that was filed in the Circuit Court of Cook County, *Capital One Equipment Finance Corp. v. Chicago Elite Cab Corp., et al.*, No. 17 L 998, the Honorable Margaret A. Brennan dismissed Capital One's complaint but allowed Capital One leave to re-file its cause of action in another case currently pending in New York. That New York Action is *Capital One Equipment Finance Corp. v. The OSG Corp., Tri Global Financial Services, Inc. et al.*, No. 600749/2017. But, rather than re-file its case in the New York Action and pursue its alleged causes of action, Capital One instead chose to do an end run around the litigation process and seeks to foreclose on the medallions at issue in an attempt to destroy Licensee, Tri Global and Tri Global's owners and guarantors. Capital One did not re-file its Chicago cause of action in the New York Action because it knows that counterclaims would be filed against it, which would expose Capital One's bad faith conduct in abusing its partnership with Tri Global and expose Capital One's bad faith relationship with Uber. The reality is that

Capital One has filed numerous unsuccessful complaints in courts in New York and Chicago and, because these lawsuits have not been successful, Capital One is now attempting to cause as much harm as possible to Licensee and Tri Global before the counterclaims against Capital One are proven true and Capital One's bad faith is exposed.

## FOURTH DEFENSE
### (Improper Foreclosure Sale Process)

43.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

44.     On August 9, 2018, to start the foreclosure, Capital One opened the auction with an initial credit bid of $23,000.00.

45.     During the beginning part of the foreclosure auction, it became clear that no individuals were going to bid on the medallions because a foreclosure purchaser would have been liable for any and all liens on the medallions and such liability was unknown at the time of the auction. Capital One then stopped the foreclosure auction and announced to the individuals attending the auction that Capital One would work with any potential foreclosure purchasers and the bank to work out a deal on any liens on the medallion(s) bought at the auction. Capital One further stated that if the foreclosure purchaser and the bank could not work out an agreement concerning any liens on the medallions bought at the auction, Capital One would refund the foreclosure purchaser's money as if the foreclosure sale never took place. After this announcement, Capital One resumed the auction.

46.     By instituting this type of foreclosure auction, Capital One created an improper foreclosure process that created false values and did not bind the foreclosure purchasers.

## FIFTH DEFENSE
### (Breach of Fiduciary Duty)

47.    Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

48.    As set forth above, Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin relied heavily on and trusted Capital One.

49.    By virtue of the parties' business relationship as set forth above, and by reason of the demonstrable level of trust and confidence upon which Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin depended and which Capital One knowingly accepted, Capital One owes certain fiduciary duties to Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin including, without limitation, a duty of good faith.

50.    As explained herein, for years Tri Global relied on Capital One to guide certain aspects of its taxi-medallion loan origination and servicing business. Although the Tri Global MJPA provided discretion to Capital One, that discretion did not include a right to abandon the lending market or purposely advance competing interests to destabilize the industry upon which the very loans that were being serviced were based.

51.    Ultimately, Capital One repudiated its commitments to Licensee and abandoned the Chicago medallion lending market so that it could pursue a competing venture with Uber.

52.    Capital One breached its duty of good faith, and the trust and confidence of Licensee by, among other things: precipitating, through its partnership with Uber, the collapse of the Chicago taxi medallion industry and the medallion industry nationwide, in addition to the corresponding decline in the value of the taxi medallions at issue.

53.    Capital One engaged in an intentional course of wrongful conduct orchestrated to harm Licensee.

54.     Capital One's conduct was willful, wanton and in reckless disregard of the Licensee's contractual rights and was otherwise wrongful.

55.     As a direct and proximate result of Capital One's breach of its fiduciary duties, Licensee has suffered, and will continue to suffer, substantial damages.

## SIXTH DEFENSE
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

56.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

57.     Pursuant to the covenant of good faith and fair dealing, Capital One could not undertake any action that has the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

58.     As explained herein, Capital One breached the duty of good faith and fair dealing implied in the contract with Licensee by, among other things: precipitating, through its partnership with Uber, the collapse of the taxi medallion industry and concomitant decline in the value of the taxi medallions at issue.

59.     As a direct and proximate result of Capital One's breach of the implied covenant of good faith and fair dealing thereunder, Licensee has suffered, and will continue to suffer, substantial damages.

## SEVENTH DEFENSE
### (Estoppel, Waiver, Ratification and/or Acquiescence)

60.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

61.     Capital One's claim of breach of contract / default is barred by the doctrines of estoppel, waiver, ratification and/or acquiescence.

## CONCLUSION

WHEREFORE, based upon the foregoing allegations and defenses and all reasons appearing of record, Licensee has timely submitted a completed Affidavit of Defense and, pursuant to the BACP Taxi Rules, no transfer upon foreclosure may be allowed except pursuant to an order of a court having jurisdiction. Licensee respectfully requests that the BACP deny Creditor's Request to Transfer Taxicab Medallion License Upon Foreclosure.

## AFFIDAVIT OF DEFENSE TO CREDITOR

To City:      City of Chicago – Public Vehicle Operations Division
                Department of Business Affairs and Consumer Protection
                2350 W. Ogden Avenue, 1st Floor
                Chicago, IL 60608
                Attention: Monique Davids

To Creditor:   Capital One Equipment Finance Corp., f/k/a All Points Capital Corp.,
                d/b/a Capital One Taxi Medallion Finance
                c/o Troutman Sanders LLP
                Att'n: Andrew L. Buck
                875 Third Avenue
                New York, NY 10022

RE: PUBLIC PASSENGER LICENSE NUMBER(s) <u>213TX, 216TX, 218TX & 221TX</u>

LICENSEE NAME: <u>Pretty Rachel In Chicago, Inc.</u>

I, <u>Galina Gacher Sheinin</u> hereby swear that I own Taxicab Medallion License
    Debtor Individual Name

Number(s) <u>213TX, 216TX, 218TX & 221TX</u> either individually or through a company that I own and I have a defense to

the foreclosure of these licenses. I understand that this license(s) was sold at a foreclosure

sale on or about _____<u>August 9, 2018</u>_____ and that sale is contingent upon approval by the Department of Business Affairs
          List Date of Foreclosure Sale
and Consumer Protection.

My defense to this foreclosure is: (Use additional pages if needed) _____

_____See attached Defense Document_____

_____

_____

Signature: _____

Print Name: _____Sheinin Edward_____

Relationship to Medallion License/Title _Vice President & Authorized Agent_

Address: _2617 S Wabash Chicago, IL 60616_

Phone: _773-791-1255_

Email Address: _edwards@chicagocarriagecab.com_

                                Subscribed and Sworn to before me

                              this _22_ day of _Aug_____, 20 _19_.

                                            Notary Public

JANET DAVIS
Official Seal
Notary Public - State of Illinois
My Commission Expires Sep. ... 2019

Version Date June 5, 2018

## AFFIDAVIT OF DEFENSE TO CREDITOR

## DEFENSE DOCUMENT

In support of its Affidavit of Defense to Creditor, Licensee asserts the following defenses in opposition to the Creditor's ("Creditor" or "Capital One") request to transfer public passenger vehicle license upon foreclosure and to the foreclosure sale: (1) Capital One has no right to foreclose on the medallions at issue; (2) Licensee does not owe the amount claimed by Capital One and has not defaulted on the agreement at issue with Capital One; (3) the foreclosure resulted in an improper foreclosure sale purchase that violated the BACP Taxi Rules; (4) Capital One instituted an improper foreclosure sale process; (5) Capital One breached its fiduciary duty to Licensee; (6) Capital One breached the implied covenant of good faith and fair dealing; (7) Capital One's claim of breach of contract / default is barred by the doctrines of estoppel, waiver, ratification and/or acquiescence. Because Licensee has timely submitted a completed Affidavit of Defense, pursuant to the BACP Taxi Rules, no transfer upon foreclosure may be allowed except pursuant to an order of a court having jurisdiction. Therefore, Licensee respectfully requests that the BACP deny Creditor's Request to Transfer Taxicab Medallion License Upon Foreclosure.

## FACTUAL BACKGROUND

1.      Symon Garber formed Tri Global Financial Services, Inc. ("Tri Global") in 2004, along with Roman Sapino and others, to provide capital to taxicab medallion owners. Tri Global's principal, Roman Sapino, also has many years of experience in the taxicab financing industry and has been involved in successful taxicab enterprises in New York and Chicago. Tri Global's co-owners include Galina Garber-Sheinin and Valentina Zubok. Irene Gans and Maya Zubok are related to an owner of Tri Global.

2.      Tri Global is a corporation formed and existing under the laws of the State of

Illinois, maintaining offices at 2617 S. Wabash Avenue, Chicago, Illinois 60616. Tri Global is engaged in the business of financing and servicing Chicago-based taxi medallion loans as well as offering second-position financing to the taxi industry.

3.  Upon information and belief, Capital One is a corporation formed and existing under the laws of the State of New York, maintaining a principal place of business at 265 Broadhollow Road, Melville, New York 11747.

4.  Tri Global was formed to provide loans to purchasers of public passenger vehicle licenses and medallions in the Chicago market, which confers the right to operate a taxicab in Chicago pursuant to the regulations issued and regulated by the City of Chicago Department of Business Affairs and Consumer Protection ("BACP").

5.  Tri Global offered medallion and other financing to a wide-variety of borrowers, including taxicab businesses that rely on the medallion-secured loans to earn their livelihoods. Tri Global primarily focused its business on servicing taxi medallion loans for various lenders and also offered second-position financing to the taxi industry. In or around 2006 Tri Global was approached by North Fork Bank, which expressed interest in partnering with Tri Global to expand the scope of its lending platform.

6.  Over the next several years, Tri Global and North Fork Bank entered into numerous successful loan participations. When North Fork Bank was acquired by Capital One in or about 2006/2007, this practice continued with Capital One.

7.  Capital One was even more eager than North Fork Bank to capitalize upon Tri Global's contacts in the Chicago marketplace and strongly encouraged Tri Global to aggressively seek prospects for additional medallion loans. Capital One and Tri Global participated in the loans on a loan-by-loan basis for several years.

8.     In 2010, Capital One requested that Tri Global enter into a more formal arrangement by way of a master participation agreement, to which Tri Global agreed. The terms and conditions governing that relationship and Capital One's senior participation interests in the loans are more particularly set forth in a certain Master Joint Participation Agreement, dated August 2, 2010 (the "MJPA" or the "Tri Global MJPA").

9.     In connection with the Tri Global MJPA, Symon Garber, Roman Sapino, Ruben Giacomozzi, Valentina Zubok, and Galina Garber-Sheinin signed the Tri Global Guaranty, dated August 2, 2010.

10.     Pursuant to the terms of the MJPA, Tri Global generated business, handled collections, serviced the loans and remitted monthly payments to Capital One in accordance with the amount of its participation in each underlying loan while Capital One held senior participation interests in the various loans made and serviced by Tri Global to owners of Chicago taxicab medallions (the "Loans"). The Tri Global MJPA contemplates the sale of senior participation interests in loans issued and/or originated by Tri Global to owners and operators of taxi medallions. As reflected in the Tri Global MJPA, after Tri Global sells a participation interest, it continues to service the debt owed thereunder. In exchange for its services, Tri Global receives a servicing fee that is paid from the debt-service payments remitted to Tri Global each month.

11.     Since the inception of the Tri Global/Capital One relationship, the parties have participated in many loans. Although Tri Global originated the medallion-secured loans and served as the official loan servicer for the loan portfolio, Tri Global relied on and trusted Capital One and its commercial finance expertise. This relationship was often characterized by Capital One as a "team" and "partnership" and its officers and representatives, including David Cin ("Cin") and others, regularly commented that the success of the portfolio was the product of a "team effort."

12.     Although Capital One historically had no real presence in the Chicago medallion market, Capital One was eager to exploit Tri Global's connections to the taxicab medallion market and capitalize upon Tri Global's market dominance in the Chicago taxi-medallion economy. Capital One strongly encouraged Tri Global to aggressively acquire additional Chicago-based medallion loans.

13.     As the value of Chicago taxi medallion loans continued to rise, Capital One continued to aggressively press Tri Global to originate new loans so that Capital One could further capitalize on its market position and emerge as a leading taxi medallion lender in Chicago.

14.     Throughout the course of the Master Joint Participation Agreement, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin – whose interests were closely aligned with those of Capital One – worked with Capital One to maximize the return on the medallion loans.

15.     Tri Global originated the agreement/loan at issue between Licensee and Capital One based on Tri Global's relationship with Capital One.

16.     Despite its long-standing business venture with Tri Global, Capital One engaged in intentional and systematic efforts to line its own pockets to the detriment of Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin. As explained below, Capital One engaged in irreconcilable conflicts of interest, bad faith business practices, and intentionally disregarded its duty of good faith to Licensee and Tri Global when it partnered with a major taxi-industry competitor, Uber Technologies, Inc. ("Uber").

17.     In or about late 2013 and early 2014, and unbeknownst to Licensee and Tri Global (and many other Capital One loan participants and medallion-secured borrowers), Capital One began secretly planning to change course and exit the medallion market to partner with the

industry's most ominous competitor, Uber. Notwithstanding this new partnership, Capital One, either intentionally or recklessly, continued to encourage Tri Global to cultivate new medallion-secured loans while concealing its intention to partner with Uber.

18. News of Capital One's partnership with Uber surfaced in approximately mid-2014, and was followed by an aggressive nationwide marketing campaign launched by Capital One. The marketing campaign and promotions touted Capital One's "unique new partnership" with Uber and underscored the "common focus" of both companies.

19. Capital One began offering significant incentives to its consumers to choose Uber vehicles over properly licensed and regulated taxis – including offering free and discounted Uber rides and other similar promotions such as a 20% discount on all Uber rides when paid with a Capital One "Quicksilver" credit card. Capital One offered new customers two free Uber rides worth up to $60.00. Capital One created a new website promoting these incentives and further signaling its collaboration with Uber: "capitalone.com/uber".

20. Capital One's partnership with Uber came as a great shock to Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin as the partnership was never disclosed to them prior to the 2014 marketing blitz. At no point in the parties' relationship was it ever contemplated that Capital One would undertake any action to undermine the taxi industry, the agreement at issue, or the value of Tri Global's and Capital One's loan portfolio.

21. In partnering with and promoting Uber's ride-share services, Capital One and Uber's assault on the taxi industry has been instrumental in bringing about the destabilization of the Chicago taxi medallion market.

22. In 2014, when Capital One began its partnership with Uber, the Chicago market softened dramatically. Sometime during mid-2014, funding to the medallion industry came to a

total halt. This was clearly tied to Capital One's partnership with Uber.

23.     By 2015, Uber reported that taxi usage nationwide had precipitously decreased while the number of customers using Uber increased correspondingly.

24.     The disruption of the taxi industry resulting from Capital One's partnership with Uber contributed to the reduction in value of the Chicago taxi medallions securing the loans.

25.     In short, Capital One has caused the price of the Chicago taxi medallions that secure the loans to plummet.

26.     Moreover, Capital One has sabotaged Tri Global, Symon Garber, Valentina Zubok, Galina Garber-Sheinin and Licensee's efforts to favorably restructure and/or modify the medallion-secured loans at issue.

27.     Accordingly, Capital One has materially breached the credit agreement and Licensee is not liable for the amount allegedly owed pursuant to the credit agreement.

## FIRST DEFENSE
### (No Right to Foreclose)

28.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

29.     Capital One, through its partnership with Uber, precipitated the collapse of the Chicago taxi medallion industry and the medallion industry nationwide, in addition to the corresponding decline in the value of the taxi medallions at issue.

30.     Based on Capital One's willful misconduct, breach of contract, malfeasance, wrongdoing and/or other intentional and/or reckless conduct, Capital One has no right to foreclose on the medallions at issue.

## SECOND DEFENSE
### (No Default by Licensee)

31.    Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

32.    Licensee does not owe the amount claimed by Capital One and has not defaulted on the agreement at issue with Capital One.

33.    Therefore, Capital One has no right to foreclose on the medallions at issue.

## THIRD DEFENSE
### (Improper Foreclosure Sale Purchase)

34.    Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

35.    On August 9, 2018, to start the foreclosure, Capital One opened the auction with an initial credit bid of $23,000.00.

36.    Capital One won the foreclosure auction with its initial $23,000.00 credit bid.

37.    Pursuant to Rule TX13.03(b), "[t]he [foreclosure] purchaser must meet all the criteria for licensing as set out in the Municipal Code of Chicago and [the BACP's] rules and regulations, including payment of the license transfer fee, license fees and any other fees, fines or taxes due and owing to the City." Rule TX13.03(b).

38.    Pursuant to Rule TX13.04(d), "[t]he taxicab medallion license must be sold to a person believed to be a qualified applicant . . ." Rule TX13.04(d); *see also* TX13.06(a).

39.    Upon information and belief, Capital One is not a qualified applicant and has no intention of ever seeking licensure under the Municipal Code of Chicago or BACP Taxi Rules.

40.    The purpose behind the BACP Taxi Rules' foreclosure process is to facilitate keeping medallions operating on the street. If Capital One is allowed to purchase the medallions,

with no intention of ever becoming licensed by the BACP, Capital One would be allowed to cause further harm to the taxicab industry and further benefit Uber.

41.     Therefore, the foreclosure sale did not comply with Rules TX13.03 and TX13.04 and the foreclosure auction resulted in an improper sale/purchase that violated the BACP Taxi Rules.

42.     Moreover, Capital One's intent behind the foreclosure sale is to destroy and cause further harm to Licensee, Tri Global, and Tri Global's owners and guarantors. Capital One has filed multiple actions against Licensee, Tri Global, and/or Tri Global's owners and guarantors and instead of allowing any of these cases to reach their natural conclusion, Capital One instead seeks to implement destructive tactics by foreclosing on the medallions in order to further destroy the medallion market by setting the prices and discouraging bids, all in violation of the Taxi Rules simply to inflict maximum damage and cause irreparable harm. In a recent case that was filed in the Circuit Court of Cook County, *Capital One Equipment Finance Corp. v. Chicago Elite Cab Corp., et al.*, No. 17 L 998, the Honorable Margaret A. Brennan dismissed Capital One's complaint but allowed Capital One leave to re-file its cause of action in another case currently pending in New York. That New York Action is *Capital One Equipment Finance Corp. v. The OSG Corp., Tri Global Financial Services, Inc. et al.*, No. 600749/2017. But, rather than re-file its case in the New York Action and pursue its alleged causes of action, Capital One instead chose to do an end run around the litigation process and seeks to foreclose on the medallions at issue in an attempt to destroy Licensee, Tri Global and Tri Global's owners and guarantors. Capital One did not re-file its Chicago cause of action in the New York Action because it knows that counterclaims would be filed against it, which would expose Capital One's bad faith conduct in abusing its partnership with Tri Global and expose Capital One's bad faith relationship with Uber. The reality is that

Capital One has filed numerous unsuccessful complaints in courts in New York and Chicago and, because these lawsuits have not been successful, Capital One is now attempting to cause as much harm as possible to Licensee and Tri Global before the counterclaims against Capital One are proven true and Capital One's bad faith is exposed.

## FOURTH DEFENSE
### (Improper Foreclosure Sale Process)

43.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

44.     On August 9, 2018, to start the foreclosure, Capital One opened the auction with an initial credit bid of $23,000.00.

45.     During the beginning part of the foreclosure auction, it became clear that no individuals were going to bid on the medallions because a foreclosure purchaser would have been liable for any and all liens on the medallions and such liability was unknown at the time of the auction. Capital One then stopped the foreclosure auction and announced to the individuals attending the auction that Capital One would work with any potential foreclosure purchasers and the bank to work out a deal on any liens on the medallion(s) bought at the auction. Capital One further stated that if the foreclosure purchaser and the bank could not work out an agreement concerning any liens on the medallions bought at the auction, Capital One would refund the foreclosure purchaser's money as if the foreclosure sale never took place. After this announcement, Capital One resumed the auction.

46.     By instituting this type of foreclosure auction, Capital One created an improper foreclosure process that created false values and did not bind the foreclosure purchasers.

## FIFTH DEFENSE
### (Breach of Fiduciary Duty)

47.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

48.     As set forth above, Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin relied heavily on and trusted Capital One.

49.     By virtue of the parties' business relationship as set forth above, and by reason of the demonstrable level of trust and confidence upon which Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin depended and which Capital One knowingly accepted, Capital One owes certain fiduciary duties to Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin including, without limitation, a duty of good faith.

50.     As explained herein, for years Tri Global relied on Capital One to guide certain aspects of its taxi-medallion loan origination and servicing business. Although the Tri Global MJPA provided discretion to Capital One, that discretion did not include a right to abandon the lending market or purposely advance competing interests to destabilize the industry upon which the very loans that were being serviced were based.

51.     Ultimately, Capital One repudiated its commitments to Licensee and abandoned the Chicago medallion lending market so that it could pursue a competing venture with Uber.

52.     Capital One breached its duty of good faith, and the trust and confidence of Licensee by, among other things: precipitating, through its partnership with Uber, the collapse of the Chicago taxi medallion industry and the medallion industry nationwide, in addition to the corresponding decline in the value of the taxi medallions at issue.

53.     Capital One engaged in an intentional course of wrongful conduct orchestrated to harm Licensee.

54.     Capital One's conduct was willful, wanton and in reckless disregard of the Licensee's contractual rights and was otherwise wrongful.

55.     As a direct and proximate result of Capital One's breach of its fiduciary duties, Licensee has suffered, and will continue to suffer, substantial damages.

## SIXTH DEFENSE
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

56.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

57.     Pursuant to the covenant of good faith and fair dealing, Capital One could not undertake any action that has the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

58.     As explained herein, Capital One breached the duty of good faith and fair dealing implied in the contract with Licensee by, among other things: precipitating, through its partnership with Uber, the collapse of the taxi medallion industry and concomitant decline in the value of the taxi medallions at issue.

59.     As a direct and proximate result of Capital One's breach of the implied covenant of good faith and fair dealing thereunder, Licensee has suffered, and will continue to suffer, substantial damages.

## SEVENTH DEFENSE
### (Estoppel, Waiver, Ratification and/or Acquiescence)

60.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

61.     Capital One's claim of breach of contract / default is barred by the doctrines of estoppel, waiver, ratification and/or acquiescence.

## CONCLUSION

WHEREFORE, based upon the foregoing allegations and defenses and all reasons appearing of record, Licensee has timely submitted a completed Affidavit of Defense and, pursuant to the BACP Taxi Rules, no transfer upon foreclosure may be allowed except pursuant to an order of a court having jurisdiction. Licensee respectfully requests that the BACP deny Creditor's Request to Transfer Taxicab Medallion License Upon Foreclosure.

# AFFIDAVIT OF DEFENSE TO CREDITOR

**To City:**  City of Chicago – Public Vehicle Operations Division
Department of Business Affairs and Consumer Protection
2350 W. Ogden Avenue, 1st Floor
Chicago, IL 60608
Attention: Monique Davids

**To Creditor:**  Capital One Equipment Finance Corp., f/k/a All Points Capital Corp.,
d/b/a Capital One Taxi Medallion Finance
c/o Troutman Sanders LLP
Att'n: Andrew L. Buck
875 Third Avenue
New York, NY 10022

RE: PUBLIC PASSENGER LICENSE NUMBER(s) <u>1207TX, 1189TX, 1174TX & 1169TX</u>

LICENSEE NAME: <u>Princess Taxi Inc.</u>

I, ___<u>Syrinon GARBER</u>___ , hereby swear that I own Taxicab Medallion License
<span style="font-size:smaller">Debtor Individual Name</span>
Number(s) <u>1207TX, 1189TX, 1174TX & 1169TX</u> either individually or through a company that I own and I have a

defense to the foreclosure of these licenses. I understand that this license(s) was sold at a foreclosure

sale on or about ___<u>August 9, 2018</u>___ and that sale is contingent upon approval by the Department of Business Affairs
<span style="font-size:smaller">List Date of Foreclosure Sale</span>
and Consumer Protection.

My defense to this foreclosure is: (Use additional pages if needed)_____

_____ *see attached Defense Document* _____

_____

_____

Signature: _____

Print Name: _____ *Shimin Edward* _____

Relationship to Medallion License/Title ___ *VP and authorized signature agent* ___

Address: *2617 S. Wabash Ave Chicago IL 60616*

Phone: *312 791-1255*

Email Address: *edwards@chicagocarriagecab.com*

Subscribed and Sworn to before me

this *22* day of *Aug* _____, 20*18* .

_____
Notary Public

JANET DAVIS
Official Seal
Notary Public · State of Illinois
My Commission Expires Sep 20, 2019

## AFFIDAVIT OF DEFENSE TO CREDITOR

### DEFENSE DOCUMENT

In support of its Affidavit of Defense to Creditor, Licensee asserts the following defenses in opposition to the Creditor's ("Creditor" or "Capital One") request to transfer public passenger vehicle license upon foreclosure and to the foreclosure sale: (1) Capital One has no right to foreclose on the medallions at issue; (2) Licensee does not owe the amount claimed by Capital One and has not defaulted on the agreement at issue with Capital One; (3) the foreclosure resulted in an improper foreclosure sale purchase that violated the BACP Taxi Rules; (4) Capital One instituted an improper foreclosure sale process; (5) Capital One breached its fiduciary duty to Licensee; (6) Capital One breached the implied covenant of good faith and fair dealing; (7) Capital One's claim of breach of contract / default is barred by the doctrines of estoppel, waiver, ratification and/or acquiescence. Because Licensee has timely submitted a completed Affidavit of Defense, pursuant to the BACP Taxi Rules, no transfer upon foreclosure may be allowed except pursuant to an order of a court having jurisdiction. Therefore, Licensee respectfully requests that the BACP deny Creditor's Request to Transfer Taxicab Medallion License Upon Foreclosure.

### FACTUAL BACKGROUND

1.      Symon Garber formed Tri Global Financial Services, Inc. ("Tri Global") in 2004, along with Roman Sapino and others, to provide capital to taxicab medallion owners. Tri Global's principal, Roman Sapino, also has many years of experience in the taxicab financing industry and has been involved in successful taxicab enterprises in New York and Chicago. Tri Global's co-owners include Galina Garber-Sheinin and Valentina Zubok. Irene Gans and Maya Zubok are related to an owner of Tri Global.

2.      Tri Global is a corporation formed and existing under the laws of the State of

Illinois, maintaining offices at 2617 S. Wabash Avenue, Chicago, Illinois 60616. Tri Global is engaged in the business of financing and servicing Chicago-based taxi medallion loans as well as offering second-position financing to the taxi industry.

3. Upon information and belief, Capital One is a corporation formed and existing under the laws of the State of New York, maintaining a principal place of business at 265 Broadhollow Road, Melville, New York 11747.

4. Tri Global was formed to provide loans to purchasers of public passenger vehicle licenses and medallions in the Chicago market, which confers the right to operate a taxicab in Chicago pursuant to the regulations issued and regulated by the City of Chicago Department of Business Affairs and Consumer Protection ("BACP").

5. Tri Global offered medallion and other financing to a wide-variety of borrowers, including taxicab businesses that rely on the medallion-secured loans to earn their livelihoods. Tri Global primarily focused its business on servicing taxi medallion loans for various lenders and also offered second-position financing to the taxi industry. In or around 2006 Tri Global was approached by North Fork Bank, which expressed interest in partnering with Tri Global to expand the scope of its lending platform.

6. Over the next several years, Tri Global and North Fork Bank entered into numerous successful loan participations. When North Fork Bank was acquired by Capital One in or about 2006/2007, this practice continued with Capital One.

7. Capital One was even more eager than North Fork Bank to capitalize upon Tri Global's contacts in the Chicago marketplace and strongly encouraged Tri Global to aggressively seek prospects for additional medallion loans. Capital One and Tri Global participated in the loans on a loan-by-loan basis for several years.

8.      In 2010, Capital One requested that Tri Global enter into a more formal arrangement by way of a master participation agreement, to which Tri Global agreed. The terms and conditions governing that relationship and Capital One's senior participation interests in the loans are more particularly set forth in a certain Master Joint Participation Agreement, dated August 2, 2010 (the "MJPA" or the "Tri Global MJPA").

9.      In connection with the Tri Global MJPA, Symon Garber, Roman Sapino, Ruben Giacomozzi, Valentina Zubok, and Galina Garber-Sheinin signed the Tri Global Guaranty, dated August 2, 2010.

10.     Pursuant to the terms of the MJPA, Tri Global generated business, handled collections, serviced the loans and remitted monthly payments to Capital One in accordance with the amount of its participation in each underlying loan while Capital One held senior participation interests in the various loans made and serviced by Tri Global to owners of Chicago taxicab medallions (the "Loans"). The Tri Global MJPA contemplates the sale of senior participation interests in loans issued and/or originated by Tri Global to owners and operators of taxi medallions. As reflected in the Tri Global MJPA, after Tri Global sells a participation interest, it continues to service the debt owed thereunder. In exchange for its services, Tri Global receives a servicing fee that is paid from the debt-service payments remitted to Tri Global each month.

11.     Since the inception of the Tri Global/Capital One relationship, the parties have participated in many loans. Although Tri Global originated the medallion-secured loans and served as the official loan servicer for the loan portfolio, Tri Global relied on and trusted Capital One and its commercial finance expertise. This relationship was often characterized by Capital One as a "team" and "partnership" and its officers and representatives, including David Cin ("Cin") and others, regularly commented that the success of the portfolio was the product of a "team effort."

12.     Although Capital One historically had no real presence in the Chicago medallion market, Capital One was eager to exploit Tri Global's connections to the taxicab medallion market and capitalize upon Tri Global's market dominance in the Chicago taxi-medallion economy. Capital One strongly encouraged Tri Global to aggressively acquire additional Chicago-based medallion loans.

13.     As the value of Chicago taxi medallion loans continued to rise, Capital One continued to aggressively press Tri Global to originate new loans so that Capital One could further capitalize on its market position and emerge as a leading taxi medallion lender in Chicago.

14.     Throughout the course of the Master Joint Participation Agreement, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin – whose interests were closely aligned with those of Capital One – worked with Capital One to maximize the return on the medallion loans.

15.     Tri Global originated the agreement/loan at issue between Licensee and Capital One based on Tri Global's relationship with Capital One.

16.     Despite its long-standing business venture with Tri Global, Capital One engaged in intentional and systematic efforts to line its own pockets to the detriment of Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin. As explained below, Capital One engaged in irreconcilable conflicts of interest, bad faith business practices, and intentionally disregarded its duty of good faith to Licensee and Tri Global when it partnered with a major taxi-industry competitor, Uber Technologies, Inc. ("Uber").

17.     In or about late 2013 and early 2014, and unbeknownst to Licensee and Tri Global (and many other Capital One loan participants and medallion-secured borrowers), Capital One began secretly planning to change course and exit the medallion market to partner with the

industry's most ominous competitor, Uber. Notwithstanding this new partnership, Capital One, either intentionally or recklessly, continued to encourage Tri Global to cultivate new medallion-secured loans while concealing its intention to partner with Uber.

18.     News of Capital One's partnership with Uber surfaced in approximately mid-2014, and was followed by an aggressive nationwide marketing campaign launched by Capital One. The marketing campaign and promotions touted Capital One's "unique new partnership" with Uber and underscored the "common focus" of both companies.

19.     Capital One began offering significant incentives to its consumers to choose Uber vehicles over properly licensed and regulated taxis – including offering free and discounted Uber rides and other similar promotions such as a 20% discount on all Uber rides when paid with a Capital One "Quicksilver" credit card. Capital One offered new customers two free Uber rides worth up to $60.00. Capital One created a new website promoting these incentives and further signaling its collaboration with Uber: "capitalone.com/uber".

20.     Capital One's partnership with Uber came as a great shock to Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin as the partnership was never disclosed to them prior to the 2014 marketing blitz. At no point in the parties' relationship was it ever contemplated that Capital One would undertake any action to undermine the taxi industry, the agreement at issue, or the value of Tri Global's and Capital One's loan portfolio.

21.     In partnering with and promoting Uber's ride-share services, Capital One and Uber's assault on the taxi industry has been instrumental in bringing about the destabilization of the Chicago taxi medallion market.

22.     In 2014, when Capital One began its partnership with Uber, the Chicago market softened dramatically. Sometime during mid-2014, funding to the medallion industry came to a

total halt. This was clearly tied to Capital One's partnership with Uber.

23.     By 2015, Uber reported that taxi usage nationwide had precipitously decreased while the number of customers using Uber increased correspondingly.

24.     The disruption of the taxi industry resulting from Capital One's partnership with Uber contributed to the reduction in value of the Chicago taxi medallions securing the loans.

25.     In short, Capital One has caused the price of the Chicago taxi medallions that secure the loans to plummet.

26.     Moreover, Capital One has sabotaged Tri Global, Symon Garber, Valentina Zubok, Galina Garber-Sheinin and Licensee's efforts to favorably restructure and/or modify the medallion-secured loans at issue.

27.     Accordingly, Capital One has materially breached the credit agreement and Licensee is not liable for the amount allegedly owed pursuant to the credit agreement.

### FIRST DEFENSE
### (No Right to Foreclose)

28.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

29.     Capital One, through its partnership with Uber, precipitated the collapse of the Chicago taxi medallion industry and the medallion industry nationwide, in addition to the corresponding decline in the value of the taxi medallions at issue.

30.     Based on Capital One's willful misconduct, breach of contract, malfeasance, wrongdoing and/or other intentional and/or reckless conduct, Capital One has no right to foreclose on the medallions at issue.

**SECOND DEFENSE**
**(No Default by Licensee)**

31.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

32.     Licensee does not owe the amount claimed by Capital One and has not defaulted on the agreement at issue with Capital One.

33.     Therefore, Capital One has no right to foreclose on the medallions at issue.

**THIRD DEFENSE**
**(Improper Foreclosure Sale Purchase)**

34.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

35.     On August 9, 2018, to start the foreclosure, Capital One opened the auction with an initial credit bid of $23,000.00.

36.     Capital One won the foreclosure auction with its initial $23,000.00 credit bid.

37.     Pursuant to Rule TX13.03(b), "[t]he [foreclosure] purchaser must meet all the criteria for licensing as set out in the Municipal Code of Chicago and [the BACP's] rules and regulations, including payment of the license transfer fee, license fees and any other fees, fines or taxes due and owing to the City." Rule TX13.03(b).

38.     Pursuant to Rule TX13.04(d), "[t]he taxicab medallion license must be sold to a person believed to be a qualified applicant . . ." Rule TX13.04(d); *see also* TX13.06(a).

39.     Upon information and belief, Capital One is not a qualified applicant and has no intention of ever seeking licensure under the Municipal Code of Chicago or BACP Taxi Rules.

40.     The purpose behind the BACP Taxi Rules' foreclosure process is to facilitate keeping medallions operating on the street. If Capital One is allowed to purchase the medallions,

with no intention of ever becoming licensed by the BACP, Capital One would be allowed to cause further harm to the taxicab industry and further benefit Uber.

41.     Therefore, the foreclosure sale did not comply with Rules TX13.03 and TX13.04 and the foreclosure auction resulted in an improper sale/purchase that violated the BACP Taxi Rules.

42.     Moreover, Capital One's intent behind the foreclosure sale is to destroy and cause further harm to Licensee, Tri Global, and Tri Global's owners and guarantors. Capital One has filed multiple actions against Licensee, Tri Global, and/or Tri Global's owners and guarantors and instead of allowing any of these cases to reach their natural conclusion, Capital One instead seeks to implement destructive tactics by foreclosing on the medallions in order to further destroy the medallion market by setting the prices and discouraging bids, all in violation of the Taxi Rules simply to inflict maximum damage and cause irreparable harm. In a recent case that was filed in the Circuit Court of Cook County, *Capital One Equipment Finance Corp. v. Chicago Elite Cab Corp., et al.*, No. 17 L 998, the Honorable Margaret A. Brennan dismissed Capital One's complaint but allowed Capital One leave to re-file its cause of action in another case currently pending in New York. That New York Action is *Capital One Equipment Finance Corp. v. The OSG Corp., Tri Global Financial Services, Inc. et al.*, No. 600749/2017. But, rather than re-file its case in the New York Action and pursue its alleged causes of action, Capital One instead chose to do an end run around the litigation process and seeks to foreclose on the medallions at issue in an attempt to destroy Licensee, Tri Global and Tri Global's owners and guarantors. Capital One did not re-file its Chicago cause of action in the New York Action because it knows that counterclaims would be filed against it, which would expose Capital One's bad faith conduct in abusing its partnership with Tri Global and expose Capital One's bad faith relationship with Uber. The reality is that

Capital One has filed numerous unsuccessful complaints in courts in New York and Chicago and, because these lawsuits have not been successful, Capital One is now attempting to cause as much harm as possible to Licensee and Tri Global before the counterclaims against Capital One are proven true and Capital One's bad faith is exposed.

### FOURTH DEFENSE
**(Improper Foreclosure Sale Process)**

43.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

44.     On August 9, 2018, to start the foreclosure, Capital One opened the auction with an initial credit bid of $23,000.00.

45.     During the beginning part of the foreclosure auction, it became clear that no individuals were going to bid on the medallions because a foreclosure purchaser would have been liable for any and all liens on the medallions and such liability was unknown at the time of the auction. Capital One then stopped the foreclosure auction and announced to the individuals attending the auction that Capital One would work with any potential foreclosure purchasers and the bank to work out a deal on any liens on the medallion(s) bought at the auction. Capital One further stated that if the foreclosure purchaser and the bank could not work out an agreement concerning any liens on the medallions bought at the auction, Capital One would refund the foreclosure purchaser's money as if the foreclosure sale never took place. After this announcement, Capital One resumed the auction.

46.     By instituting this type of foreclosure auction, Capital One created an improper foreclosure process that created false values and did not bind the foreclosure purchasers.

## FIFTH DEFENSE
### (Breach of Fiduciary Duty)

47.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

48.     As set forth above, Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin relied heavily on and trusted Capital One.

49.     By virtue of the parties' business relationship as set forth above, and by reason of the demonstrable level of trust and confidence upon which Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin depended and which Capital One knowingly accepted, Capital One owes certain fiduciary duties to Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin including, without limitation, a duty of good faith.

50.     As explained herein, for years Tri Global relied on Capital One to guide certain aspects of its taxi-medallion loan origination and servicing business. Although the Tri Global MJPA provided discretion to Capital One, that discretion did not include a right to abandon the lending market or purposely advance competing interests to destabilize the industry upon which the very loans that were being serviced were based.

51.     Ultimately, Capital One repudiated its commitments to Licensee and abandoned the Chicago medallion lending market so that it could pursue a competing venture with Uber.

52.     Capital One breached its duty of good faith, and the trust and confidence of Licensee by, among other things: precipitating, through its partnership with Uber, the collapse of the Chicago taxi medallion industry and the medallion industry nationwide, in addition to the corresponding decline in the value of the taxi medallions at issue.

53.     Capital One engaged in an intentional course of wrongful conduct orchestrated to harm Licensee.

54.    Capital One's conduct was willful, wanton and in reckless disregard of the Licensee's contractual rights and was otherwise wrongful.

55.    As a direct and proximate result of Capital One's breach of its fiduciary duties, Licensee has suffered, and will continue to suffer, substantial damages.

**SIXTH DEFENSE**
**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

56.    Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

57.    Pursuant to the covenant of good faith and fair dealing, Capital One could not undertake any action that has the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

58.    As explained herein, Capital One breached the duty of good faith and fair dealing implied in the contract with Licensee by, among other things: precipitating, through its partnership with Uber, the collapse of the taxi medallion industry and concomitant decline in the value of the taxi medallions at issue.

59.    As a direct and proximate result of Capital One's breach of the implied covenant of good faith and fair dealing thereunder, Licensee has suffered, and will continue to suffer, substantial damages.

**SEVENTH DEFENSE**
**(Estoppel, Waiver, Ratification and/or Acquiescence)**

60.    Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

61.    Capital One's claim of breach of contract / default is barred by the doctrines of estoppel, waiver, ratification and/or acquiescence.

## CONCLUSION

WHEREFORE, based upon the foregoing allegations and defenses and all reasons appearing of record, Licensee has timely submitted a completed Affidavit of Defense and, pursuant to the BACP Taxi Rules, no transfer upon foreclosure may be allowed except pursuant to an order of a court having jurisdiction. Licensee respectfully requests that the BACP deny Creditor's Request to Transfer Taxicab Medallion License Upon Foreclosure.

# AFFIDAVIT OF DEFENSE TO CREDITOR

**To City:**  City of Chicago – Public Vehicle Operations Division
Department of Business Affairs and Consumer Protection
2350 W. Ogden Avenue, 1st Floor
Chicago, IL 60608
Attention: Monique Davids

**To Creditor:**  Capital One Equipment Finance Corp., f/k/a All Points Capital Corp.,
d/b/a Capital One Taxi Medallion Finance
c/o Troutman Sanders LLP
Att'n: Andrew L. Buck
875 Third Avenue
New York, NY 10022

RE: PUBLIC PASSENGER LICENSE NUMBER(s) <u>1291TX, 1273TX, 1262TX & 1230TX</u>

LICENSEE NAME: <u>Rachel Taxi Inc.</u>

I, <u>Galina Garber Shemin</u>, hereby swear that I own Taxicab Medallion License
<span style="font-size:smaller">Debtor Individual Name</span>
Number(s) <u>1291TX, 1273TX, 1262TX & 1230TX</u> either individually or through a company that I own and I have a

defense to the foreclosure of these licenses. I understand that this license(s) was sold at a foreclosure

sale on or about _____<u>August 9, 2018</u>_____ and that sale is contingent upon approval by the Department of Business Affairs
<span style="font-size:smaller">List Date of Foreclosure Sale</span>
and Consumer Protection.

My defense to this foreclosure is: (Use additional pages if needed)_____

_____ See attached Defense Document. _____

_____

Signature: _____

Print Name: Shemin Edward.

Relationship to Medallion License/Title Vice President & Authorized Agent

Address: 2617 S Wabash Chicago IL 60616

Phone: 312. 791. 1255

Email Address: Edwards@chicagocarriagecab.com.

Subscribed and Sworn to before me

this 22 day of Aug , 20 18.

JANET DAVIS
Official Seal
Notary Public - State of Illinois
My Commission Expires Sep 20 2019

_____ Notary Public

Version Date June 5, 2018

## AFFIDAVIT OF DEFENSE TO CREDITOR

## DEFENSE DOCUMENT

In support of its Affidavit of Defense to Creditor, Licensee asserts the following defenses in opposition to the Creditor's ("Creditor" or "Capital One") request to transfer public passenger vehicle license upon foreclosure and to the foreclosure sale: (1) Capital One has no right to foreclose on the medallions at issue; (2) Licensee does not owe the amount claimed by Capital One and has not defaulted on the agreement at issue with Capital One; (3) the foreclosure resulted in an improper foreclosure sale purchase that violated the BACP Taxi Rules; (4) Capital One instituted an improper foreclosure sale process; (5) Capital One breached its fiduciary duty to Licensee; (6) Capital One breached the implied covenant of good faith and fair dealing; (7) Capital One's claim of breach of contract / default is barred by the doctrines of estoppel, waiver, ratification and/or acquiescence. Because Licensee has timely submitted a completed Affidavit of Defense, pursuant to the BACP Taxi Rules, no transfer upon foreclosure may be allowed except pursuant to an order of a court having jurisdiction. Therefore, Licensee respectfully requests that the BACP deny Creditor's Request to Transfer Taxicab Medallion License Upon Foreclosure.

## FACTUAL BACKGROUND

1.      Symon Garber formed Tri Global Financial Services, Inc. ("Tri Global") in 2004, along with Roman Sapino and others, to provide capital to taxicab medallion owners. Tri Global's principal, Roman Sapino, also has many years of experience in the taxicab financing industry and has been involved in successful taxicab enterprises in New York and Chicago. Tri Global's co-owners include Galina Garber-Sheinin and Valentina Zubok. Irene Gans and Maya Zubok are related to an owner of Tri Global.

2.      Tri Global is a corporation formed and existing under the laws of the State of

Illinois, maintaining offices at 2617 S. Wabash Avenue, Chicago, Illinois 60616. Tri Global is engaged in the business of financing and servicing Chicago-based taxi medallion loans as well as offering second-position financing to the taxi industry.

3.     Upon information and belief, Capital One is a corporation formed and existing under the laws of the State of New York, maintaining a principal place of business at 265 Broadhollow Road, Melville, New York 11747.

4.     Tri Global was formed to provide loans to purchasers of public passenger vehicle licenses and medallions in the Chicago market, which confers the right to operate a taxicab in Chicago pursuant to the regulations issued and regulated by the City of Chicago Department of Business Affairs and Consumer Protection ("BACP").

5.     Tri Global offered medallion and other financing to a wide-variety of borrowers, including taxicab businesses that rely on the medallion-secured loans to earn their livelihoods. Tri Global primarily focused its business on servicing taxi medallion loans for various lenders and also offered second-position financing to the taxi industry. In or around 2006 Tri Global was approached by North Fork Bank, which expressed interest in partnering with Tri Global to expand the scope of its lending platform.

6.     Over the next several years, Tri Global and North Fork Bank entered into numerous successful loan participations. When North Fork Bank was acquired by Capital One in or about 2006/2007, this practice continued with Capital One.

7.     Capital One was even more eager than North Fork Bank to capitalize upon Tri Global's contacts in the Chicago marketplace and strongly encouraged Tri Global to aggressively seek prospects for additional medallion loans. Capital One and Tri Global participated in the loans on a loan-by-loan basis for several years.

8.      In 2010, Capital One requested that Tri Global enter into a more formal arrangement by way of a master participation agreement, to which Tri Global agreed. The terms and conditions governing that relationship and Capital One's senior participation interests in the loans are more particularly set forth in a certain Master Joint Participation Agreement, dated August 2, 2010 (the "MJPA" or the "Tri Global MJPA").

9.      In connection with the Tri Global MJPA, Symon Garber, Roman Sapino, Ruben Giacomozzi, Valentina Zubok, and Galina Garber-Sheinin signed the Tri Global Guaranty, dated August 2, 2010.

10.      Pursuant to the terms of the MJPA, Tri Global generated business, handled collections, serviced the loans and remitted monthly payments to Capital One in accordance with the amount of its participation in each underlying loan while Capital One held senior participation interests in the various loans made and serviced by Tri Global to owners of Chicago taxicab medallions (the "Loans"). The Tri Global MJPA contemplates the sale of senior participation interests in loans issued and/or originated by Tri Global to owners and operators of taxi medallions. As reflected in the Tri Global MJPA, after Tri Global sells a participation interest, it continues to service the debt owed thereunder. In exchange for its services, Tri Global receives a servicing fee that is paid from the debt-service payments remitted to Tri Global each month.

11.      Since the inception of the Tri Global/Capital One relationship, the parties have participated in many loans. Although Tri Global originated the medallion-secured loans and served as the official loan servicer for the loan portfolio, Tri Global relied on and trusted Capital One and its commercial finance expertise. This relationship was often characterized by Capital One as a "team" and "partnership" and its officers and representatives, including David Cin ("Cin") and others, regularly commented that the success of the portfolio was the product of a "team effort."

12.    Although Capital One historically had no real presence in the Chicago medallion market, Capital One was eager to exploit Tri Global's connections to the taxicab medallion market and capitalize upon Tri Global's market dominance in the Chicago taxi-medallion economy. Capital One strongly encouraged Tri Global to aggressively acquire additional Chicago-based medallion loans.

13.    As the value of Chicago taxi medallion loans continued to rise, Capital One continued to aggressively press Tri Global to originate new loans so that Capital One could further capitalize on its market position and emerge as a leading taxi medallion lender in Chicago.

14.    Throughout the course of the Master Joint Participation Agreement, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin – whose interests were closely aligned with those of Capital One – worked with Capital One to maximize the return on the medallion loans.

15.    Tri Global originated the agreement/loan at issue between Licensee and Capital One based on Tri Global's relationship with Capital One.

16.    Despite its long-standing business venture with Tri Global, Capital One engaged in intentional and systematic efforts to line its own pockets to the detriment of Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin. As explained below, Capital One engaged in irreconcilable conflicts of interest, bad faith business practices, and intentionally disregarded its duty of good faith to Licensee and Tri Global when it partnered with a major taxi-industry competitor, Uber Technologies, Inc. ("Uber").

17.    In or about late 2013 and early 2014, and unbeknownst to Licensee and Tri Global (and many other Capital One loan participants and medallion-secured borrowers), Capital One began secretly planning to change course and exit the medallion market to partner with the

industry's most ominous competitor, Uber. Notwithstanding this new partnership, Capital One, either intentionally or recklessly, continued to encourage Tri Global to cultivate new medallion-secured loans while concealing its intention to partner with Uber.

18.     News of Capital One's partnership with Uber surfaced in approximately mid-2014, and was followed by an aggressive nationwide marketing campaign launched by Capital One. The marketing campaign and promotions touted Capital One's "unique new partnership" with Uber and underscored the "common focus" of both companies.

19.     Capital One began offering significant incentives to its consumers to choose Uber vehicles over properly licensed and regulated taxis – including offering free and discounted Uber rides and other similar promotions such as a 20% discount on all Uber rides when paid with a Capital One "Quicksilver" credit card. Capital One offered new customers two free Uber rides worth up to $60.00. Capital One created a new website promoting these incentives and further signaling its collaboration with Uber: "capitalone.com/uber".

20.     Capital One's partnership with Uber came as a great shock to Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin as the partnership was never disclosed to them prior to the 2014 marketing blitz. At no point in the parties' relationship was it ever contemplated that Capital One would undertake any action to undermine the taxi industry, the agreement at issue, or the value of Tri Global's and Capital One's loan portfolio.

21.     In partnering with and promoting Uber's ride-share services, Capital One and Uber's assault on the taxi industry has been instrumental in bringing about the destabilization of the Chicago taxi medallion market.

22.     In 2014, when Capital One began its partnership with Uber, the Chicago market softened dramatically. Sometime during mid-2014, funding to the medallion industry came to a

total halt. This was clearly tied to Capital One's partnership with Uber.

23.     By 2015, Uber reported that taxi usage nationwide had precipitously decreased while the number of customers using Uber increased correspondingly.

24.     The disruption of the taxi industry resulting from Capital One's partnership with Uber contributed to the reduction in value of the Chicago taxi medallions securing the loans.

25.     In short, Capital One has caused the price of the Chicago taxi medallions that secure the loans to plummet.

26.     Moreover, Capital One has sabotaged Tri Global, Symon Garber, Valentina Zubok, Galina Garber-Sheinin and Licensee's efforts to favorably restructure and/or modify the medallion-secured loans at issue.

27.     Accordingly, Capital One has materially breached the credit agreement and Licensee is not liable for the amount allegedly owed pursuant to the credit agreement.

### FIRST DEFENSE
**(No Right to Foreclose)**

28.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

29.     Capital One, through its partnership with Uber, precipitated the collapse of the Chicago taxi medallion industry and the medallion industry nationwide, in addition to the corresponding decline in the value of the taxi medallions at issue.

30.     Based on Capital One's willful misconduct, breach of contract, malfeasance, wrongdoing and/or other intentional and/or reckless conduct, Capital One has no right to foreclose on the medallions at issue.

## SECOND DEFENSE
### (No Default by Licensee)

31.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

32.     Licensee does not owe the amount claimed by Capital One and has not defaulted on the agreement at issue with Capital One.

33.     Therefore, Capital One has no right to foreclose on the medallions at issue.

## THIRD DEFENSE
### (Improper Foreclosure Sale Purchase)

34.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

35.     On August 9, 2018, to start the foreclosure, Capital One opened the auction with an initial credit bid of $23,000.00.

36.     Capital One won the foreclosure auction with its initial $23,000.00 credit bid.

37.     Pursuant to Rule TX13.03(b), "[t]he [foreclosure] purchaser must meet all the criteria for licensing as set out in the Municipal Code of Chicago and [the BACP's] rules and regulations, including payment of the license transfer fee, license fees and any other fees, fines or taxes due and owing to the City." Rule TX13.03(b).

38.     Pursuant to Rule TX13.04(d), "[t]he taxicab medallion license must be sold to a person believed to be a qualified applicant . . ." Rule TX13.04(d); *see also* TX13.06(a).

39.     Upon information and belief, Capital One is not a qualified applicant and has no intention of ever seeking licensure under the Municipal Code of Chicago or BACP Taxi Rules.

40.     The purpose behind the BACP Taxi Rules' foreclosure process is to facilitate keeping medallions operating on the street. If Capital One is allowed to purchase the medallions,

with no intention of ever becoming licensed by the BACP, Capital One would be allowed to cause further harm to the taxicab industry and further benefit Uber.

41.    Therefore, the foreclosure sale did not comply with Rules TX13.03 and TX13.04 and the foreclosure auction resulted in an improper sale/purchase that violated the BACP Taxi Rules.

42.    Moreover, Capital One's intent behind the foreclosure sale is to destroy and cause further harm to Licensee, Tri Global, and Tri Global's owners and guarantors. Capital One has filed multiple actions against Licensee, Tri Global, and/or Tri Global's owners and guarantors and instead of allowing any of these cases to reach their natural conclusion, Capital One instead seeks to implement destructive tactics by foreclosing on the medallions in order to further destroy the medallion market by setting the prices and discouraging bids, all in violation of the Taxi Rules simply to inflict maximum damage and cause irreparable harm. In a recent case that was filed in the Circuit Court of Cook County, *Capital One Equipment Finance Corp. v. Chicago Elite Cab Corp., et al.*, No. 17 L 998, the Honorable Margaret A. Brennan dismissed Capital One's complaint but allowed Capital One leave to re-file its cause of action in another case currently pending in New York. That New York Action is *Capital One Equipment Finance Corp. v. The OSG Corp., Tri Global Financial Services, Inc. et al.*, No. 600749/2017. But, rather than re-file its case in the New York Action and pursue its alleged causes of action, Capital One instead chose to do an end run around the litigation process and seeks to foreclose on the medallions at issue in an attempt to destroy Licensee, Tri Global and Tri Global's owners and guarantors. Capital One did not re-file its Chicago cause of action in the New York Action because it knows that counterclaims would be filed against it, which would expose Capital One's bad faith conduct in abusing its partnership with Tri Global and expose Capital One's bad faith relationship with Uber. The reality is that

Capital One has filed numerous unsuccessful complaints in courts in New York and Chicago and, because these lawsuits have not been successful, Capital One is now attempting to cause as much harm as possible to Licensee and Tri Global before the counterclaims against Capital One are proven true and Capital One's bad faith is exposed.

## FOURTH DEFENSE
### (Improper Foreclosure Sale Process)

43.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

44.     On August 9, 2018, to start the foreclosure, Capital One opened the auction with an initial credit bid of $23,000.00.

45.     During the beginning part of the foreclosure auction, it became clear that no individuals were going to bid on the medallions because a foreclosure purchaser would have been liable for any and all liens on the medallions and such liability was unknown at the time of the auction. Capital One then stopped the foreclosure auction and announced to the individuals attending the auction that Capital One would work with any potential foreclosure purchasers and the bank to work out a deal on any liens on the medallion(s) bought at the auction. Capital One further stated that if the foreclosure purchaser and the bank could not work out an agreement concerning any liens on the medallions bought at the auction, Capital One would refund the foreclosure purchaser's money as if the foreclosure sale never took place. After this announcement, Capital One resumed the auction.

46.     By instituting this type of foreclosure auction, Capital One created an improper foreclosure process that created false values and did not bind the foreclosure purchasers.

## FIFTH DEFENSE
### (Breach of Fiduciary Duty)

47.    Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

48.    As set forth above, Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin relied heavily on and trusted Capital One.

49.    By virtue of the parties' business relationship as set forth above, and by reason of the demonstrable level of trust and confidence upon which Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin depended and which Capital One knowingly accepted, Capital One owes certain fiduciary duties to Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin including, without limitation, a duty of good faith.

50.    As explained herein, for years Tri Global relied on Capital One to guide certain aspects of its taxi-medallion loan origination and servicing business. Although the Tri Global MJPA provided discretion to Capital One, that discretion did not include a right to abandon the lending market or purposely advance competing interests to destabilize the industry upon which the very loans that were being serviced were based.

51.    Ultimately, Capital One repudiated its commitments to Licensee and abandoned the Chicago medallion lending market so that it could pursue a competing venture with Uber.

52.    Capital One breached its duty of good faith, and the trust and confidence of Licensee by, among other things: precipitating, through its partnership with Uber, the collapse of the Chicago taxi medallion industry and the medallion industry nationwide, in addition to the corresponding decline in the value of the taxi medallions at issue.

53.    Capital One engaged in an intentional course of wrongful conduct orchestrated to harm Licensee.

54.     Capital One's conduct was willful, wanton and in reckless disregard of the Licensee's contractual rights and was otherwise wrongful.

55.     As a direct and proximate result of Capital One's breach of its fiduciary duties, Licensee has suffered, and will continue to suffer, substantial damages.

### SIXTH DEFENSE
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

56.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

57.     Pursuant to the covenant of good faith and fair dealing, Capital One could not undertake any action that has the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

58.     As explained herein, Capital One breached the duty of good faith and fair dealing implied in the contract with Licensee by, among other things: precipitating, through its partnership with Uber, the collapse of the taxi medallion industry and concomitant decline in the value of the taxi medallions at issue.

59.     As a direct and proximate result of Capital One's breach of the implied covenant of good faith and fair dealing thereunder, Licensee has suffered, and will continue to suffer, substantial damages.

### SEVENTH DEFENSE
### (Estoppel, Waiver, Ratification and/or Acquiescence)

60.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

61.     Capital One's claim of breach of contract / default is barred by the doctrines of estoppel, waiver, ratification and/or acquiescence.

## CONCLUSION

WHEREFORE, based upon the foregoing allegations and defenses and all reasons appearing of record, Licensee has timely submitted a completed Affidavit of Defense and, pursuant to the BACP Taxi Rules, no transfer upon foreclosure may be allowed except pursuant to an order of a court having jurisdiction. Licensee respectfully requests that the BACP deny Creditor's Request to Transfer Taxicab Medallion License Upon Foreclosure.

## AFFIDAVIT OF DEFENSE TO CREDITOR

**To City:** City of Chicago – Public Vehicle Operations Division
Department of Business Affairs and Consumer Protection
2350 W. Ogden Avenue, 1st Floor
Chicago, IL 60608
Attention: Monique Davids

**To Creditor:** Capital One Equipment Finance Corp., f/k/a All Points Capital Corp.,
d/b/a Capital One Taxi Medallion Finance
c/o Troutman Sanders LLP
Att'n: Andrew L. Buck
875 Third Avenue
New York, NY 10022

RE: PUBLIC PASSENGER LICENSE NUMBER(s) <u>1717TX, 1784TX, 1805TX, 1832TX & 1849TX</u>

LICENSEE NAME: <u>Reservior II Hacking Corp.</u>

I, _Symon GARBER_ , hereby swear that I own Taxicab Medallion License
    <span style="font-size:smaller">Debtor Individual Name</span>

Number(s) <u>1717TX, 1784TX, 1805TX, 1832TX & 1849TX</u> either individually or through a company that I own and I

have a defense to the foreclosure of these licenses. I understand that this license(s) was sold at a foreclosure

sale on or about _____August 9, 2018_____ and that sale is contingent upon approval by the Department of Business Affairs
    <span style="font-size:smaller">List Date of Foreclosure Sale</span>
and Consumer Protection.

My defense to this foreclosure is: (Use additional pages if needed)_____

_see attached Defense Document_

Signature: _____

Print Name: _Sherwin Edward_

Relationship to Medallion License/Title _VP and authorized signature agent_

Address: _2617 S. Wabash Ave Chicago IL 60616_

Phone: _312 791-1255_

Email Address: _edward@chicagocarriagecab.com_

Subscribed and Sworn to before me

this _22_ day of _Aug_ , 20_18_ .

_____
Notary Public

JANET DAVIS
Official Seal
Notary Public - State of Illinois
My Commission Expires Sep 20 2019

Version Date June 5, 2018

## AFFIDAVIT OF DEFENSE TO CREDITOR

## DEFENSE DOCUMENT

In support of its Affidavit of Defense to Creditor, Licensee asserts the following defenses in opposition to the Creditor's ("Creditor" or "Capital One") request to transfer public passenger vehicle license upon foreclosure and to the foreclosure sale: (1) Capital One has no right to foreclose on the medallions at issue; (2) Licensee does not owe the amount claimed by Capital One and has not defaulted on the agreement at issue with Capital One; (3) the foreclosure resulted in an improper foreclosure sale purchase that violated the BACP Taxi Rules; (4) Capital One instituted an improper foreclosure sale process; (5) Capital One breached its fiduciary duty to Licensee; (6) Capital One breached the implied covenant of good faith and fair dealing; (7) Capital One's claim of breach of contract / default is barred by the doctrines of estoppel, waiver, ratification and/or acquiescence. Because Licensee has timely submitted a completed Affidavit of Defense, pursuant to the BACP Taxi Rules, no transfer upon foreclosure may be allowed except pursuant to an order of a court having jurisdiction. Therefore, Licensee respectfully requests that the BACP deny Creditor's Request to Transfer Taxicab Medallion License Upon Foreclosure.

## FACTUAL BACKGROUND

1.     Symon Garber formed Tri Global Financial Services, Inc. ("Tri Global") in 2004, along with Roman Sapino and others, to provide capital to taxicab medallion owners. Tri Global's principal, Roman Sapino, also has many years of experience in the taxicab financing industry and has been involved in successful taxicab enterprises in New York and Chicago. Tri Global's co-owners include Galina Garber-Sheinin and Valentina Zubok. Irene Gans and Maya Zubok are related to an owner of Tri Global.

2.     Tri Global is a corporation formed and existing under the laws of the State of

Illinois, maintaining offices at 2617 S. Wabash Avenue, Chicago, Illinois 60616. Tri Global is engaged in the business of financing and servicing Chicago-based taxi medallion loans as well as offering second-position financing to the taxi industry.

3.     Upon information and belief, Capital One is a corporation formed and existing under the laws of the State of New York, maintaining a principal place of business at 265 Broadhollow Road, Melville, New York 11747.

4.     Tri Global was formed to provide loans to purchasers of public passenger vehicle licenses and medallions in the Chicago market, which confers the right to operate a taxicab in Chicago pursuant to the regulations issued and regulated by the City of Chicago Department of Business Affairs and Consumer Protection ("BACP").

5.     Tri Global offered medallion and other financing to a wide-variety of borrowers, including taxicab businesses that rely on the medallion-secured loans to earn their livelihoods. Tri Global primarily focused its business on servicing taxi medallion loans for various lenders and also offered second-position financing to the taxi industry. In or around 2006 Tri Global was approached by North Fork Bank, which expressed interest in partnering with Tri Global to expand the scope of its lending platform.

6.     Over the next several years, Tri Global and North Fork Bank entered into numerous successful loan participations. When North Fork Bank was acquired by Capital One in or about 2006/2007, this practice continued with Capital One.

7.     Capital One was even more eager than North Fork Bank to capitalize upon Tri Global's contacts in the Chicago marketplace and strongly encouraged Tri Global to aggressively seek prospects for additional medallion loans. Capital One and Tri Global participated in the loans on a loan-by-loan basis for several years.

8.     In 2010, Capital One requested that Tri Global enter into a more formal arrangement by way of a master participation agreement, to which Tri Global agreed. The terms and conditions governing that relationship and Capital One's senior participation interests in the loans are more particularly set forth in a certain Master Joint Participation Agreement, dated August 2, 2010 (the "MJPA" or the "Tri Global MJPA").

9.     In connection with the Tri Global MJPA, Symon Garber, Roman Sapino, Ruben Giacomozzi, Valentina Zubok, and Galina Garber-Sheinin signed the Tri Global Guaranty, dated August 2, 2010.

10.     Pursuant to the terms of the MJPA, Tri Global generated business, handled collections, serviced the loans and remitted monthly payments to Capital One in accordance with the amount of its participation in each underlying loan while Capital One held senior participation interests in the various loans made and serviced by Tri Global to owners of Chicago taxicab medallions (the "Loans"). The Tri Global MJPA contemplates the sale of senior participation interests in loans issued and/or originated by Tri Global to owners and operators of taxi medallions. As reflected in the Tri Global MJPA, after Tri Global sells a participation interest, it continues to service the debt owed thereunder. In exchange for its services, Tri Global receives a servicing fee that is paid from the debt-service payments remitted to Tri Global each month.

11.     Since the inception of the Tri Global/Capital One relationship, the parties have participated in many loans. Although Tri Global originated the medallion-secured loans and served as the official loan servicer for the loan portfolio, Tri Global relied on and trusted Capital One and its commercial finance expertise. This relationship was often characterized by Capital One as a "team" and "partnership" and its officers and representatives, including David Cin ("Cin") and others, regularly commented that the success of the portfolio was the product of a "team effort."

12.     Although Capital One historically had no real presence in the Chicago medallion market, Capital One was eager to exploit Tri Global's connections to the taxicab medallion market and capitalize upon Tri Global's market dominance in the Chicago taxi-medallion economy. Capital One strongly encouraged Tri Global to aggressively acquire additional Chicago-based medallion loans.

13.     As the value of Chicago taxi medallion loans continued to rise, Capital One continued to aggressively press Tri Global to originate new loans so that Capital One could further capitalize on its market position and emerge as a leading taxi medallion lender in Chicago.

14.     Throughout the course of the Master Joint Participation Agreement, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin – whose interests were closely aligned with those of Capital One – worked with Capital One to maximize the return on the medallion loans.

15.     Tri Global originated the agreement/loan at issue between Licensee and Capital One based on Tri Global's relationship with Capital One.

16.     Despite its long-standing business venture with Tri Global, Capital One engaged in intentional and systematic efforts to line its own pockets to the detriment of Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin. As explained below, Capital One engaged in irreconcilable conflicts of interest, bad faith business practices, and intentionally disregarded its duty of good faith to Licensee and Tri Global when it partnered with a major taxi-industry competitor, Uber Technologies, Inc. ("Uber").

17.     In or about late 2013 and early 2014, and unbeknownst to Licensee and Tri Global (and many other Capital One loan participants and medallion-secured borrowers), Capital One began secretly planning to change course and exit the medallion market to partner with the

industry's most ominous competitor, Uber. Notwithstanding this new partnership, Capital One, either intentionally or recklessly, continued to encourage Tri Global to cultivate new medallion-secured loans while concealing its intention to partner with Uber.

18.     News of Capital One's partnership with Uber surfaced in approximately mid-2014, and was followed by an aggressive nationwide marketing campaign launched by Capital One. The marketing campaign and promotions touted Capital One's "unique new partnership" with Uber and underscored the "common focus" of both companies.

19.     Capital One began offering significant incentives to its consumers to choose Uber vehicles over properly licensed and regulated taxis – including offering free and discounted Uber rides and other similar promotions such as a 20% discount on all Uber rides when paid with a Capital One "Quicksilver" credit card. Capital One offered new customers two free Uber rides worth up to $60.00. Capital One created a new website promoting these incentives and further signaling its collaboration with Uber: "capitalone.com/uber".

20.     Capital One's partnership with Uber came as a great shock to Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin as the partnership was never disclosed to them prior to the 2014 marketing blitz. At no point in the parties' relationship was it ever contemplated that Capital One would undertake any action to undermine the taxi industry, the agreement at issue, or the value of Tri Global's and Capital One's loan portfolio.

21.     In partnering with and promoting Uber's ride-share services, Capital One and Uber's assault on the taxi industry has been instrumental in bringing about the destabilization of the Chicago taxi medallion market.

22.     In 2014, when Capital One began its partnership with Uber, the Chicago market softened dramatically. Sometime during mid-2014, funding to the medallion industry came to a

total halt. This was clearly tied to Capital One's partnership with Uber.

23.     By 2015, Uber reported that taxi usage nationwide had precipitously decreased while the number of customers using Uber increased correspondingly.

24.     The disruption of the taxi industry resulting from Capital One's partnership with Uber contributed to the reduction in value of the Chicago taxi medallions securing the loans.

25.     In short, Capital One has caused the price of the Chicago taxi medallions that secure the loans to plummet.

26.     Moreover, Capital One has sabotaged Tri Global, Symon Garber, Valentina Zubok, Galina Garber-Sheinin and Licensee's efforts to favorably restructure and/or modify the medallion-secured loans at issue.

27.     Accordingly, Capital One has materially breached the credit agreement and Licensee is not liable for the amount allegedly owed pursuant to the credit agreement.

### FIRST DEFENSE
**(No Right to Foreclose)**

28.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

29.     Capital One, through its partnership with Uber, precipitated the collapse of the Chicago taxi medallion industry and the medallion industry nationwide, in addition to the corresponding decline in the value of the taxi medallions at issue.

30.     Based on Capital One's willful misconduct, breach of contract, malfeasance, wrongdoing and/or other intentional and/or reckless conduct, Capital One has no right to foreclose on the medallions at issue.

## SECOND DEFENSE
### (No Default by Licensee)

31.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

32.     Licensee does not owe the amount claimed by Capital One and has not defaulted on the agreement at issue with Capital One.

33.     Therefore, Capital One has no right to foreclose on the medallions at issue.

## THIRD DEFENSE
### (Improper Foreclosure Sale Purchase)

34.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

35.     On August 9, 2018, to start the foreclosure, Capital One opened the auction with an initial credit bid of $23,000.00.

36.     Capital One won the foreclosure auction with its initial $23,000.00 credit bid.

37.     Pursuant to Rule TX13.03(b), "[t]he [foreclosure] purchaser must meet all the criteria for licensing as set out in the Municipal Code of Chicago and [the BACP's] rules and regulations, including payment of the license transfer fee, license fees and any other fees, fines or taxes due and owing to the City." Rule TX13.03(b).

38.     Pursuant to Rule TX13.04(d), "[t]he taxicab medallion license must be sold to a person believed to be a qualified applicant . . ." Rule TX13.04(d); *see also* TX13.06(a).

39.     Upon information and belief, Capital One is not a qualified applicant and has no intention of ever seeking licensure under the Municipal Code of Chicago or BACP Taxi Rules.

40.     The purpose behind the BACP Taxi Rules' foreclosure process is to facilitate keeping medallions operating on the street. If Capital One is allowed to purchase the medallions,

with no intention of ever becoming licensed by the BACP, Capital One would be allowed to cause further harm to the taxicab industry and further benefit Uber.

41.    Therefore, the foreclosure sale did not comply with Rules TX13.03 and TX13.04 and the foreclosure auction resulted in an improper sale/purchase that violated the BACP Taxi Rules.

42.    Moreover, Capital One's intent behind the foreclosure sale is to destroy and cause further harm to Licensee, Tri Global, and Tri Global's owners and guarantors. Capital One has filed multiple actions against Licensee, Tri Global, and/or Tri Global's owners and guarantors and instead of allowing any of these cases to reach their natural conclusion, Capital One instead seeks to implement destructive tactics by foreclosing on the medallions in order to further destroy the medallion market by setting the prices and discouraging bids, all in violation of the Taxi Rules simply to inflict maximum damage and cause irreparable harm. In a recent case that was filed in the Circuit Court of Cook County, *Capital One Equipment Finance Corp. v. Chicago Elite Cab Corp., et al.*, No. 17 L 998, the Honorable Margaret A. Brennan dismissed Capital One's complaint but allowed Capital One leave to re-file its cause of action in another case currently pending in New York. That New York Action is *Capital One Equipment Finance Corp. v. The OSG Corp., Tri Global Financial Services, Inc. et al.*, No. 600749/2017. But, rather than re-file its case in the New York Action and pursue its alleged causes of action, Capital One instead chose to do an end run around the litigation process and seeks to foreclose on the medallions at issue in an attempt to destroy Licensee, Tri Global and Tri Global's owners and guarantors. Capital One did not re-file its Chicago cause of action in the New York Action because it knows that counterclaims would be filed against it, which would expose Capital One's bad faith conduct in abusing its partnership with Tri Global and expose Capital One's bad faith relationship with Uber. The reality is that

Capital One has filed numerous unsuccessful complaints in courts in New York and Chicago and, because these lawsuits have not been successful, Capital One is now attempting to cause as much harm as possible to Licensee and Tri Global before the counterclaims against Capital One are proven true and Capital One's bad faith is exposed.

## FOURTH DEFENSE
### (Improper Foreclosure Sale Process)

43.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

44.     On August 9, 2018, to start the foreclosure, Capital One opened the auction with an initial credit bid of $23,000.00.

45.     During the beginning part of the foreclosure auction, it became clear that no individuals were going to bid on the medallions because a foreclosure purchaser would have been liable for any and all liens on the medallions and such liability was unknown at the time of the auction. Capital One then stopped the foreclosure auction and announced to the individuals attending the auction that Capital One would work with any potential foreclosure purchasers and the bank to work out a deal on any liens on the medallion(s) bought at the auction. Capital One further stated that if the foreclosure purchaser and the bank could not work out an agreement concerning any liens on the medallions bought at the auction, Capital One would refund the foreclosure purchaser's money as if the foreclosure sale never took place. After this announcement, Capital One resumed the auction.

46.     By instituting this type of foreclosure auction, Capital One created an improper foreclosure process that created false values and did not bind the foreclosure purchasers.

## FIFTH DEFENSE
### (Breach of Fiduciary Duty)

47.    Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

48.    As set forth above, Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin relied heavily on and trusted Capital One.

49.    By virtue of the parties' business relationship as set forth above, and by reason of the demonstrable level of trust and confidence upon which Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin depended and which Capital One knowingly accepted, Capital One owes certain fiduciary duties to Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin including, without limitation, a duty of good faith.

50.    As explained herein, for years Tri Global relied on Capital One to guide certain aspects of its taxi-medallion loan origination and servicing business. Although the Tri Global MJPA provided discretion to Capital One, that discretion did not include a right to abandon the lending market or purposely advance competing interests to destabilize the industry upon which the very loans that were being serviced were based.

51.    Ultimately, Capital One repudiated its commitments to Licensee and abandoned the Chicago medallion lending market so that it could pursue a competing venture with Uber.

52.    Capital One breached its duty of good faith, and the trust and confidence of Licensee by, among other things: precipitating, through its partnership with Uber, the collapse of the Chicago taxi medallion industry and the medallion industry nationwide, in addition to the corresponding decline in the value of the taxi medallions at issue.

53.    Capital One engaged in an intentional course of wrongful conduct orchestrated to harm Licensee.

54.     Capital One's conduct was willful, wanton and in reckless disregard of the Licensee's contractual rights and was otherwise wrongful.

55.     As a direct and proximate result of Capital One's breach of its fiduciary duties, Licensee has suffered, and will continue to suffer, substantial damages.

## SIXTH DEFENSE
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

56.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

57.     Pursuant to the covenant of good faith and fair dealing, Capital One could not undertake any action that has the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

58.     As explained herein, Capital One breached the duty of good faith and fair dealing implied in the contract with Licensee by, among other things: precipitating, through its partnership with Uber, the collapse of the taxi medallion industry and concomitant decline in the value of the taxi medallions at issue.

59.     As a direct and proximate result of Capital One's breach of the implied covenant of good faith and fair dealing thereunder, Licensee has suffered, and will continue to suffer, substantial damages.

## SEVENTH DEFENSE
### (Estoppel, Waiver, Ratification and/or Acquiescence)

60.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

61.     Capital One's claim of breach of contract / default is barred by the doctrines of estoppel, waiver, ratification and/or acquiescence.

## **CONCLUSION**

WHEREFORE, based upon the foregoing allegations and defenses and all reasons appearing of record, Licensee has timely submitted a completed Affidavit of Defense and, pursuant to the BACP Taxi Rules, no transfer upon foreclosure may be allowed except pursuant to an order of a court having jurisdiction. Licensee respectfully requests that the BACP deny Creditor's Request to Transfer Taxicab Medallion License Upon Foreclosure.

# AFFIDAVIT OF DEFENSE TO CREDITOR

To City:    City of Chicago – Public Vehicle Operations Division
Department of Business Affairs and Consumer Protection
2350 W. Ogden Avenue, 1st Floor
Chicago, IL 60608
Attention: Monique Davids

To Creditor:    Capital One Equipment Finance Corp., f/k/a All Points Capital Corp.,
d/b/a Capital One Taxi Medallion Finance
c/o Troutman Sanders LLP
Att'n: Andrew L. Buck
875 Third Avenue
New York, NY 10022

RE: PUBLIC PASSENGER LICENSE NUMBER(s) 1866TX, 1867TX, 1870TX, 1910TX, 1938TX & 1951TX

LICENSEE NAME: Samuel Taxi Corp.

I, _____Symon GARBER_____, hereby swear that I own Taxicab Medallion License
Debtor Individual Name

Number(s) 1866TX, 1867TX, 1870TX, 1910TX, 1938TX & 1951TX either individually or through a company that I own

and I have a defense to the foreclosure of these licenses. I understand that this license(s) was sold at a foreclosure

sale on or about _____August 9, 2018_____ and that sale is contingent upon approval by the Department of Business Affairs
List Date of Foreclosure Sale

and Consumer Protection.

My defense to this foreclosure is: (Use additional pages if needed)_____

_____see attached Defense Document_____

_____

_____

Signature: _____

Print Name: _____Shemin Edward_____

Relationship to Medallion License/Title ___VP and authorized signatair agent___

Address: __2617 S. Wabash Ave Chicago IL 60616__

Phone: __312 791 - 1255__

Email Address: __edwards@chicagocarriagecab.com__

Subscribed and Sworn to before me

this __22__ day of __Aug_____, 20_18_.

JANET DAVIS
Official Seal
Notary Public - State of Illinois
My Commission Expires Sep 20, 2019

Notary Public

Version Date June 5, 2018

## AFFIDAVIT OF DEFENSE TO CREDITOR

## DEFENSE DOCUMENT

In support of its Affidavit of Defense to Creditor, Licensee asserts the following defenses in opposition to the Creditor's ("Creditor" or "Capital One") request to transfer public passenger vehicle license upon foreclosure and to the foreclosure sale: (1) Capital One has no right to foreclose on the medallions at issue; (2) Licensee does not owe the amount claimed by Capital One and has not defaulted on the agreement at issue with Capital One; (3) the foreclosure resulted in an improper foreclosure sale purchase that violated the BACP Taxi Rules; (4) Capital One instituted an improper foreclosure sale process; (5) Capital One breached its fiduciary duty to Licensee; (6) Capital One breached the implied covenant of good faith and fair dealing; (7) Capital One's claim of breach of contract / default is barred by the doctrines of estoppel, waiver, ratification and/or acquiescence. Because Licensee has timely submitted a completed Affidavit of Defense, pursuant to the BACP Taxi Rules, no transfer upon foreclosure may be allowed except pursuant to an order of a court having jurisdiction. Therefore, Licensee respectfully requests that the BACP deny Creditor's Request to Transfer Taxicab Medallion License Upon Foreclosure.

## FACTUAL BACKGROUND

1.      Symon Garber formed Tri Global Financial Services, Inc. ("Tri Global") in 2004, along with Roman Sapino and others, to provide capital to taxicab medallion owners. Tri Global's principal, Roman Sapino, also has many years of experience in the taxicab financing industry and has been involved in successful taxicab enterprises in New York and Chicago. Tri Global's co-owners include Galina Garber-Sheinin and Valentina Zubok. Irene Gans and Maya Zubok are related to an owner of Tri Global.

2.      Tri Global is a corporation formed and existing under the laws of the State of

Illinois, maintaining offices at 2617 S. Wabash Avenue, Chicago, Illinois 60616. Tri Global is engaged in the business of financing and servicing Chicago-based taxi medallion loans as well as offering second-position financing to the taxi industry.

3.     Upon information and belief, Capital One is a corporation formed and existing under the laws of the State of New York, maintaining a principal place of business at 265 Broadhollow Road, Melville, New York 11747.

4.     Tri Global was formed to provide loans to purchasers of public passenger vehicle licenses and medallions in the Chicago market, which confers the right to operate a taxicab in Chicago pursuant to the regulations issued and regulated by the City of Chicago Department of Business Affairs and Consumer Protection ("BACP").

5.     Tri Global offered medallion and other financing to a wide-variety of borrowers, including taxicab businesses that rely on the medallion-secured loans to earn their livelihoods. Tri Global primarily focused its business on servicing taxi medallion loans for various lenders and also offered second-position financing to the taxi industry. In or around 2006 Tri Global was approached by North Fork Bank, which expressed interest in partnering with Tri Global to expand the scope of its lending platform.

6.     Over the next several years, Tri Global and North Fork Bank entered into numerous successful loan participations. When North Fork Bank was acquired by Capital One in or about 2006/2007, this practice continued with Capital One.

7.     Capital One was even more eager than North Fork Bank to capitalize upon Tri Global's contacts in the Chicago marketplace and strongly encouraged Tri Global to aggressively seek prospects for additional medallion loans. Capital One and Tri Global participated in the loans on a loan-by-loan basis for several years.

8.    In 2010, Capital One requested that Tri Global enter into a more formal arrangement by way of a master participation agreement, to which Tri Global agreed. The terms and conditions governing that relationship and Capital One's senior participation interests in the loans are more particularly set forth in a certain Master Joint Participation Agreement, dated August 2, 2010 (the "MJPA" or the "Tri Global MJPA").

9.    In connection with the Tri Global MJPA, Symon Garber, Roman Sapino, Ruben Giacomozzi, Valentina Zubok, and Galina Garber-Sheinin signed the Tri Global Guaranty, dated August 2, 2010.

10.    Pursuant to the terms of the MJPA, Tri Global generated business, handled collections, serviced the loans and remitted monthly payments to Capital One in accordance with the amount of its participation in each underlying loan while Capital One held senior participation interests in the various loans made and serviced by Tri Global to owners of Chicago taxicab medallions (the "Loans"). The Tri Global MJPA contemplates the sale of senior participation interests in loans issued and/or originated by Tri Global to owners and operators of taxi medallions. As reflected in the Tri Global MJPA, after Tri Global sells a participation interest, it continues to service the debt owed thereunder. In exchange for its services, Tri Global receives a servicing fee that is paid from the debt-service payments remitted to Tri Global each month.

11.    Since the inception of the Tri Global/Capital One relationship, the parties have participated in many loans. Although Tri Global originated the medallion-secured loans and served as the official loan servicer for the loan portfolio, Tri Global relied on and trusted Capital One and its commercial finance expertise. This relationship was often characterized by Capital One as a "team" and "partnership" and its officers and representatives, including David Cin ("Cin") and others, regularly commented that the success of the portfolio was the product of a "team effort."

12.    Although Capital One historically had no real presence in the Chicago medallion market, Capital One was eager to exploit Tri Global's connections to the taxicab medallion market and capitalize upon Tri Global's market dominance in the Chicago taxi-medallion economy. Capital One strongly encouraged Tri Global to aggressively acquire additional Chicago-based medallion loans.

13.    As the value of Chicago taxi medallion loans continued to rise, Capital One continued to aggressively press Tri Global to originate new loans so that Capital One could further capitalize on its market position and emerge as a leading taxi medallion lender in Chicago.

14.    Throughout the course of the Master Joint Participation Agreement, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin – whose interests were closely aligned with those of Capital One – worked with Capital One to maximize the return on the medallion loans.

15.    Tri Global originated the agreement/loan at issue between Licensee and Capital One based on Tri Global's relationship with Capital One.

16.    Despite its long-standing business venture with Tri Global, Capital One engaged in intentional and systematic efforts to line its own pockets to the detriment of Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin. As explained below, Capital One engaged in irreconcilable conflicts of interest, bad faith business practices, and intentionally disregarded its duty of good faith to Licensee and Tri Global when it partnered with a major taxi-industry competitor, Uber Technologies, Inc. ("Uber").

17.    In or about late 2013 and early 2014, and unbeknownst to Licensee and Tri Global (and many other Capital One loan participants and medallion-secured borrowers), Capital One began secretly planning to change course and exit the medallion market to partner with the

industry's most ominous competitor, Uber. Notwithstanding this new partnership, Capital One, either intentionally or recklessly, continued to encourage Tri Global to cultivate new medallion-secured loans while concealing its intention to partner with Uber.

18.     News of Capital One's partnership with Uber surfaced in approximately mid-2014, and was followed by an aggressive nationwide marketing campaign launched by Capital One. The marketing campaign and promotions touted Capital One's "unique new partnership" with Uber and underscored the "common focus" of both companies.

19.     Capital One began offering significant incentives to its consumers to choose Uber vehicles over properly licensed and regulated taxis – including offering free and discounted Uber rides and other similar promotions such as a 20% discount on all Uber rides when paid with a Capital One "Quicksilver" credit card. Capital One offered new customers two free Uber rides worth up to $60.00. Capital One created a new website promoting these incentives and further signaling its collaboration with Uber: "capitalone.com/uber".

20.     Capital One's partnership with Uber came as a great shock to Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin as the partnership was never disclosed to them prior to the 2014 marketing blitz. At no point in the parties' relationship was it ever contemplated that Capital One would undertake any action to undermine the taxi industry, the agreement at issue, or the value of Tri Global's and Capital One's loan portfolio.

21.     In partnering with and promoting Uber's ride-share services, Capital One and Uber's assault on the taxi industry has been instrumental in bringing about the destabilization of the Chicago taxi medallion market.

22.     In 2014, when Capital One began its partnership with Uber, the Chicago market softened dramatically. Sometime during mid-2014, funding to the medallion industry came to a

total halt. This was clearly tied to Capital One's partnership with Uber.

23.     By 2015, Uber reported that taxi usage nationwide had precipitously decreased while the number of customers using Uber increased correspondingly.

24.     The disruption of the taxi industry resulting from Capital One's partnership with Uber contributed to the reduction in value of the Chicago taxi medallions securing the loans.

25.     In short, Capital One has caused the price of the Chicago taxi medallions that secure the loans to plummet.

26.     Moreover, Capital One has sabotaged Tri Global, Symon Garber, Valentina Zubok, Galina Garber-Sheinin and Licensee's efforts to favorably restructure and/or modify the medallion-secured loans at issue.

27.     Accordingly, Capital One has materially breached the credit agreement and Licensee is not liable for the amount allegedly owed pursuant to the credit agreement.

### FIRST DEFENSE
### (No Right to Foreclose)

28.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

29.     Capital One, through its partnership with Uber, precipitated the collapse of the Chicago taxi medallion industry and the medallion industry nationwide, in addition to the corresponding decline in the value of the taxi medallions at issue.

30.     Based on Capital One's willful misconduct, breach of contract, malfeasance, wrongdoing and/or other intentional and/or reckless conduct, Capital One has no right to foreclose on the medallions at issue.

## SECOND DEFENSE
### (No Default by Licensee)

31.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

32.     Licensee does not owe the amount claimed by Capital One and has not defaulted on the agreement at issue with Capital One.

33.     Therefore, Capital One has no right to foreclose on the medallions at issue.

## THIRD DEFENSE
### (Improper Foreclosure Sale Purchase)

34.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

35.     On August 9, 2018, to start the foreclosure, Capital One opened the auction with an initial credit bid of $23,000.00.

36.     Capital One won the foreclosure auction with its initial $23,000.00 credit bid.

37.     Pursuant to Rule TX13.03(b), "[t]he [foreclosure] purchaser must meet all the criteria for licensing as set out in the Municipal Code of Chicago and [the BACP's] rules and regulations, including payment of the license transfer fee, license fees and any other fees, fines or taxes due and owing to the City." Rule TX13.03(b).

38.     Pursuant to Rule TX13.04(d), "[t]he taxicab medallion license must be sold to a person believed to be a qualified applicant . . ." Rule TX13.04(d); *see also* TX13.06(a).

39.     Upon information and belief, Capital One is not a qualified applicant and has no intention of ever seeking licensure under the Municipal Code of Chicago or BACP Taxi Rules.

40.     The purpose behind the BACP Taxi Rules' foreclosure process is to facilitate keeping medallions operating on the street. If Capital One is allowed to purchase the medallions,

with no intention of ever becoming licensed by the BACP, Capital One would be allowed to cause further harm to the taxicab industry and further benefit Uber.

41.     Therefore, the foreclosure sale did not comply with Rules TX13.03 and TX13.04 and the foreclosure auction resulted in an improper sale/purchase that violated the BACP Taxi Rules.

42.     Moreover, Capital One's intent behind the foreclosure sale is to destroy and cause further harm to Licensee, Tri Global, and Tri Global's owners and guarantors. Capital One has filed multiple actions against Licensee, Tri Global, and/or Tri Global's owners and guarantors and instead of allowing any of these cases to reach their natural conclusion, Capital One instead seeks to implement destructive tactics by foreclosing on the medallions in order to further destroy the medallion market by setting the prices and discouraging bids, all in violation of the Taxi Rules simply to inflict maximum damage and cause irreparable harm. In a recent case that was filed in the Circuit Court of Cook County, *Capital One Equipment Finance Corp. v. Chicago Elite Cab Corp., et al.*, No. 17 L 998, the Honorable Margaret A. Brennan dismissed Capital One's complaint but allowed Capital One leave to re-file its cause of action in another case currently pending in New York. That New York Action is *Capital One Equipment Finance Corp. v. The OSG Corp., Tri Global Financial Services, Inc. et al.*, No. 600749/2017. But, rather than re-file its case in the New York Action and pursue its alleged causes of action, Capital One instead chose to do an end run around the litigation process and seeks to foreclose on the medallions at issue in an attempt to destroy Licensee, Tri Global and Tri Global's owners and guarantors. Capital One did not re-file its Chicago cause of action in the New York Action because it knows that counterclaims would be filed against it, which would expose Capital One's bad faith conduct in abusing its partnership with Tri Global and expose Capital One's bad faith relationship with Uber. The reality is that

Capital One has filed numerous unsuccessful complaints in courts in New York and Chicago and, because these lawsuits have not been successful, Capital One is now attempting to cause as much harm as possible to Licensee and Tri Global before the counterclaims against Capital One are proven true and Capital One's bad faith is exposed.

### FOURTH DEFENSE
**(Improper Foreclosure Sale Process)**

43.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

44.     On August 9, 2018, to start the foreclosure, Capital One opened the auction with an initial credit bid of $23,000.00.

45.     During the beginning part of the foreclosure auction, it became clear that no individuals were going to bid on the medallions because a foreclosure purchaser would have been liable for any and all liens on the medallions and such liability was unknown at the time of the auction. Capital One then stopped the foreclosure auction and announced to the individuals attending the auction that Capital One would work with any potential foreclosure purchasers and the bank to work out a deal on any liens on the medallion(s) bought at the auction. Capital One further stated that if the foreclosure purchaser and the bank could not work out an agreement concerning any liens on the medallions bought at the auction, Capital One would refund the foreclosure purchaser's money as if the foreclosure sale never took place. After this announcement, Capital One resumed the auction.

46.     By instituting this type of foreclosure auction, Capital One created an improper foreclosure process that created false values and did not bind the foreclosure purchasers.

**FIFTH DEFENSE**
**(Breach of Fiduciary Duty)**

47.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

48.     As set forth above, Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin relied heavily on and trusted Capital One.

49.     By virtue of the parties' business relationship as set forth above, and by reason of the demonstrable level of trust and confidence upon which Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin depended and which Capital One knowingly accepted, Capital One owes certain fiduciary duties to Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin including, without limitation, a duty of good faith.

50.     As explained herein, for years Tri Global relied on Capital One to guide certain aspects of its taxi-medallion loan origination and servicing business. Although the Tri Global MJPA provided discretion to Capital One, that discretion did not include a right to abandon the lending market or purposely advance competing interests to destabilize the industry upon which the very loans that were being serviced were based.

51.     Ultimately, Capital One repudiated its commitments to Licensee and abandoned the Chicago medallion lending market so that it could pursue a competing venture with Uber.

52.     Capital One breached its duty of good faith, and the trust and confidence of Licensee by, among other things: precipitating, through its partnership with Uber, the collapse of the Chicago taxi medallion industry and the medallion industry nationwide, in addition to the corresponding decline in the value of the taxi medallions at issue.

53.     Capital One engaged in an intentional course of wrongful conduct orchestrated to harm Licensee.

54. Capital One's conduct was willful, wanton and in reckless disregard of the Licensee's contractual rights and was otherwise wrongful.

55. As a direct and proximate result of Capital One's breach of its fiduciary duties, Licensee has suffered, and will continue to suffer, substantial damages.

### SIXTH DEFENSE
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

56. Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

57. Pursuant to the covenant of good faith and fair dealing, Capital One could not undertake any action that has the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

58. As explained herein, Capital One breached the duty of good faith and fair dealing implied in the contract with Licensee by, among other things: precipitating, through its partnership with Uber, the collapse of the taxi medallion industry and concomitant decline in the value of the taxi medallions at issue.

59. As a direct and proximate result of Capital One's breach of the implied covenant of good faith and fair dealing thereunder, Licensee has suffered, and will continue to suffer, substantial damages.

### SEVENTH DEFENSE
### (Estoppel, Waiver, Ratification and/or Acquiescence)

60. Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

61. Capital One's claim of breach of contract / default is barred by the doctrines of estoppel, waiver, ratification and/or acquiescence.

## CONCLUSION

WHEREFORE, based upon the foregoing allegations and defenses and all reasons appearing of record, Licensee has timely submitted a completed Affidavit of Defense and, pursuant to the BACP Taxi Rules, no transfer upon foreclosure may be allowed except pursuant to an order of a court having jurisdiction. Licensee respectfully requests that the BACP deny Creditor's Request to Transfer Taxicab Medallion License Upon Foreclosure.

# AFFIDAVIT OF DEFENSE TO CREDITOR

To City:    City of Chicago – Public Vehicle Operations Division
Department of Business Affairs and Consumer Protection
2350 W. Ogden Avenue, 1st Floor
Chicago, IL 60608
Attention: Monique Davids

To Creditor:    Capital One Equipment Finance Corp., f/k/a All Points Capital Corp.,
d/b/a Capital One Taxi Medallion Finance
c/o Troutman Sanders LLP
Att'n: Andrew L. Buck
875 Third Avenue
New York, NY 10022

RE: PUBLIC PASSENGER LICENSE NUMBER(s) <u>4764TX, 4114TX, 6318TX, 2273TX, 1793TX, 1491TX,</u>
<u>1275TX, 1164TX, 915TX, 6230TX, 6122TX & 5625TX</u>

LICENSEE NAME: <u>Siro, Inc.</u>

I, ___Symon Gu ~~ARBER~~___ , hereby swear that I own Taxicab Medallion License
    <span style="font-size:small">Debtor Individual Name</span>

Number(s) <u>4764TX, 4114TX, 6318TX, 2273TX, 1793TX, 1491TX, 1275TX, 1164TX, 915TX, 6230TX, 6122TX &</u>

<u>5625TX</u> either individually or through a company that I own and I have a defense to the foreclosure of these licenses. I

understand that this license(s) was sold at a foreclosure sale on or about _____August 9, 2018_____ and that sale is
    <span style="font-size:small">List Date of Foreclosure Sale</span>

contingent upon approval by the Department of Business Affairs and Consumer Protection.

My defense to this foreclosure is: (Use additional pages if needed)_____

_____*see attached Defense Document*_____

_____

Signature: _____

Print Name: _____*Shimin Edward*_____

Relationship to Medallion License/Title _____*VP and authorized signature agent*_____

Address: _____*2617 S. Wabash Ave Chicago IL 60616*_____

Phone: _____*312 791-1265*_____

Email Address: _____*edwards@chicagocarriagecab.com*_____

Subscribed and Sworn to before me

this _22_ day of _Aug_____, 20_18_.

_____

Notary Public

<span style="font-size:small">JANET DAVIS<br>Official Seal<br>Notary Public - State of Illinois<br>My Commission Expires Sep 26, 2019</span>

Version Date June 5, 2018

## AFFIDAVIT OF DEFENSE TO CREDITOR

## DEFENSE DOCUMENT

In support of its Affidavit of Defense to Creditor, Licensee asserts the following defenses in opposition to the Creditor's ("Creditor" or "Capital One") request to transfer public passenger vehicle license upon foreclosure and to the foreclosure sale: (1) Capital One has no right to foreclose on the medallions at issue; (2) Licensee does not owe the amount claimed by Capital One and has not defaulted on the agreement at issue with Capital One; (3) the foreclosure resulted in an improper foreclosure sale purchase that violated the BACP Taxi Rules; (4) Capital One instituted an improper foreclosure sale process; (5) Capital One breached its fiduciary duty to Licensee; (6) Capital One breached the implied covenant of good faith and fair dealing; (7) Capital One's claim of breach of contract / default is barred by the doctrines of estoppel, waiver, ratification and/or acquiescence. Because Licensee has timely submitted a completed Affidavit of Defense, pursuant to the BACP Taxi Rules, no transfer upon foreclosure may be allowed except pursuant to an order of a court having jurisdiction. Therefore, Licensee respectfully requests that the BACP deny Creditor's Request to Transfer Taxicab Medallion License Upon Foreclosure.

## FACTUAL BACKGROUND

1.      Symon Garber formed Tri Global Financial Services, Inc. ("Tri Global") in 2004, along with Roman Sapino and others, to provide capital to taxicab medallion owners. Tri Global's principal, Roman Sapino, also has many years of experience in the taxicab financing industry and has been involved in successful taxicab enterprises in New York and Chicago. Tri Global's co-owners include Galina Garber-Sheinin and Valentina Zubok. Irene Gans and Maya Zubok are related to an owner of Tri Global.

2.      Tri Global is a corporation formed and existing under the laws of the State of

Illinois, maintaining offices at 2617 S. Wabash Avenue, Chicago, Illinois 60616. Tri Global is engaged in the business of financing and servicing Chicago-based taxi medallion loans as well as offering second-position financing to the taxi industry.

3.      Upon information and belief, Capital One is a corporation formed and existing under the laws of the State of New York, maintaining a principal place of business at 265 Broadhollow Road, Melville, New York 11747.

4.      Tri Global was formed to provide loans to purchasers of public passenger vehicle licenses and medallions in the Chicago market, which confers the right to operate a taxicab in Chicago pursuant to the regulations issued and regulated by the City of Chicago Department of Business Affairs and Consumer Protection ("BACP").

5.      Tri Global offered medallion and other financing to a wide-variety of borrowers, including taxicab businesses that rely on the medallion-secured loans to earn their livelihoods. Tri Global primarily focused its business on servicing taxi medallion loans for various lenders and also offered second-position financing to the taxi industry. In or around 2006 Tri Global was approached by North Fork Bank, which expressed interest in partnering with Tri Global to expand the scope of its lending platform.

6.      Over the next several years, Tri Global and North Fork Bank entered into numerous successful loan participations. When North Fork Bank was acquired by Capital One in or about 2006/2007, this practice continued with Capital One.

7.      Capital One was even more eager than North Fork Bank to capitalize upon Tri Global's contacts in the Chicago marketplace and strongly encouraged Tri Global to aggressively seek prospects for additional medallion loans. Capital One and Tri Global participated in the loans on a loan-by-loan basis for several years.

8.    In 2010, Capital One requested that Tri Global enter into a more formal arrangement by way of a master participation agreement, to which Tri Global agreed. The terms and conditions governing that relationship and Capital One's senior participation interests in the loans are more particularly set forth in a certain Master Joint Participation Agreement, dated August 2, 2010 (the "MJPA" or the "Tri Global MJPA").

9.    In connection with the Tri Global MJPA, Symon Garber, Roman Sapino, Ruben Giacomozzi, Valentina Zubok, and Galina Garber-Sheinin signed the Tri Global Guaranty, dated August 2, 2010.

10.    Pursuant to the terms of the MJPA, Tri Global generated business, handled collections, serviced the loans and remitted monthly payments to Capital One in accordance with the amount of its participation in each underlying loan while Capital One held senior participation interests in the various loans made and serviced by Tri Global to owners of Chicago taxicab medallions (the "Loans"). The Tri Global MJPA contemplates the sale of senior participation interests in loans issued and/or originated by Tri Global to owners and operators of taxi medallions. As reflected in the Tri Global MJPA, after Tri Global sells a participation interest, it continues to service the debt owed thereunder. In exchange for its services, Tri Global receives a servicing fee that is paid from the debt-service payments remitted to Tri Global each month.

11.    Since the inception of the Tri Global/Capital One relationship, the parties have participated in many loans. Although Tri Global originated the medallion-secured loans and served as the official loan servicer for the loan portfolio, Tri Global relied on and trusted Capital One and its commercial finance expertise. This relationship was often characterized by Capital One as a "team" and "partnership" and its officers and representatives, including David Cin ("Cin") and others, regularly commented that the success of the portfolio was the product of a "team effort."

12.    Although Capital One historically had no real presence in the Chicago medallion market, Capital One was eager to exploit Tri Global's connections to the taxicab medallion market and capitalize upon Tri Global's market dominance in the Chicago taxi-medallion economy. Capital One strongly encouraged Tri Global to aggressively acquire additional Chicago-based medallion loans.

13.    As the value of Chicago taxi medallion loans continued to rise, Capital One continued to aggressively press Tri Global to originate new loans so that Capital One could further capitalize on its market position and emerge as a leading taxi medallion lender in Chicago.

14.    Throughout the course of the Master Joint Participation Agreement, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin – whose interests were closely aligned with those of Capital One – worked with Capital One to maximize the return on the medallion loans.

15.    Tri Global originated the agreement/loan at issue between Licensee and Capital One based on Tri Global's relationship with Capital One.

16.    Despite its long-standing business venture with Tri Global, Capital One engaged in intentional and systematic efforts to line its own pockets to the detriment of Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin. As explained below, Capital One engaged in irreconcilable conflicts of interest, bad faith business practices, and intentionally disregarded its duty of good faith to Licensee and Tri Global when it partnered with a major taxi-industry competitor, Uber Technologies, Inc. ("Uber").

17.    In or about late 2013 and early 2014, and unbeknownst to Licensee and Tri Global (and many other Capital One loan participants and medallion-secured borrowers), Capital One began secretly planning to change course and exit the medallion market to partner with the

industry's most ominous competitor, Uber. Notwithstanding this new partnership, Capital One, either intentionally or recklessly, continued to encourage Tri Global to cultivate new medallion-secured loans while concealing its intention to partner with Uber.

18.     News of Capital One's partnership with Uber surfaced in approximately mid-2014, and was followed by an aggressive nationwide marketing campaign launched by Capital One. The marketing campaign and promotions touted Capital One's "unique new partnership" with Uber and underscored the "common focus" of both companies.

19.     Capital One began offering significant incentives to its consumers to choose Uber vehicles over properly licensed and regulated taxis – including offering free and discounted Uber rides and other similar promotions such as a 20% discount on all Uber rides when paid with a Capital One "Quicksilver" credit card. Capital One offered new customers two free Uber rides worth up to $60.00. Capital One created a new website promoting these incentives and further signaling its collaboration with Uber: "capitalone.com/uber".

20.     Capital One's partnership with Uber came as a great shock to Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin as the partnership was never disclosed to them prior to the 2014 marketing blitz. At no point in the parties' relationship was it ever contemplated that Capital One would undertake any action to undermine the taxi industry, the agreement at issue, or the value of Tri Global's and Capital One's loan portfolio.

21.     In partnering with and promoting Uber's ride-share services, Capital One and Uber's assault on the taxi industry has been instrumental in bringing about the destabilization of the Chicago taxi medallion market.

22.     In 2014, when Capital One began its partnership with Uber, the Chicago market softened dramatically. Sometime during mid-2014, funding to the medallion industry came to a

total halt. This was clearly tied to Capital One's partnership with Uber.

23.     By 2015, Uber reported that taxi usage nationwide had precipitously decreased while the number of customers using Uber increased correspondingly.

24.     The disruption of the taxi industry resulting from Capital One's partnership with Uber contributed to the reduction in value of the Chicago taxi medallions securing the loans.

25.     In short, Capital One has caused the price of the Chicago taxi medallions that secure the loans to plummet.

26.     Moreover, Capital One has sabotaged Tri Global, Symon Garber, Valentina Zubok, Galina Garber-Sheinin and Licensee's efforts to favorably restructure and/or modify the medallion-secured loans at issue.

27.     Accordingly, Capital One has materially breached the credit agreement and Licensee is not liable for the amount allegedly owed pursuant to the credit agreement.

## FIRST DEFENSE
### (No Right to Foreclose)

28.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

29.     Capital One, through its partnership with Uber, precipitated the collapse of the Chicago taxi medallion industry and the medallion industry nationwide, in addition to the corresponding decline in the value of the taxi medallions at issue.

30.     Based on Capital One's willful misconduct, breach of contract, malfeasance, wrongdoing and/or other intentional and/or reckless conduct, Capital One has no right to foreclose on the medallions at issue.

## SECOND DEFENSE
### (No Default by Licensee)

31.    Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

32.    Licensee does not owe the amount claimed by Capital One and has not defaulted on the agreement at issue with Capital One.

33.    Therefore, Capital One has no right to foreclose on the medallions at issue.

## THIRD DEFENSE
### (Improper Foreclosure Sale Purchase)

34.    Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

35.    On August 9, 2018, to start the foreclosure, Capital One opened the auction with an initial credit bid of $23,000.00.

36.    Capital One won the foreclosure auction with its initial $23,000.00 credit bid.

37.    Pursuant to Rule TX13.03(b), "[t]he [foreclosure] purchaser must meet all the criteria for licensing as set out in the Municipal Code of Chicago and [the BACP's] rules and regulations, including payment of the license transfer fee, license fees and any other fees, fines or taxes due and owing to the City." Rule TX13.03(b).

38.    Pursuant to Rule TX13.04(d), "[t]he taxicab medallion license must be sold to a person believed to be a qualified applicant . . ." Rule TX13.04(d); *see also* TX13.06(a).

39.    Upon information and belief, Capital One is not a qualified applicant and has no intention of ever seeking licensure under the Municipal Code of Chicago or BACP Taxi Rules.

40.    The purpose behind the BACP Taxi Rules' foreclosure process is to facilitate keeping medallions operating on the street. If Capital One is allowed to purchase the medallions,

with no intention of ever becoming licensed by the BACP, Capital One would be allowed to cause further harm to the taxicab industry and further benefit Uber.

41.     Therefore, the foreclosure sale did not comply with Rules TX13.03 and TX13.04 and the foreclosure auction resulted in an improper sale/purchase that violated the BACP Taxi Rules.

42.     Moreover, Capital One's intent behind the foreclosure sale is to destroy and cause further harm to Licensee, Tri Global, and Tri Global's owners and guarantors. Capital One has filed multiple actions against Licensee, Tri Global, and/or Tri Global's owners and guarantors and instead of allowing any of these cases to reach their natural conclusion, Capital One instead seeks to implement destructive tactics by foreclosing on the medallions in order to further destroy the medallion market by setting the prices and discouraging bids, all in violation of the Taxi Rules simply to inflict maximum damage and cause irreparable harm. In a recent case that was filed in the Circuit Court of Cook County, *Capital One Equipment Finance Corp. v. Chicago Elite Cab Corp., et al.*, No. 17 L 998, the Honorable Margaret A. Brennan dismissed Capital One's complaint but allowed Capital One leave to re-file its cause of action in another case currently pending in New York. That New York Action is *Capital One Equipment Finance Corp. v. The OSG Corp., Tri Global Financial Services, Inc. et al.*, No. 600749/2017. But, rather than re-file its case in the New York Action and pursue its alleged causes of action, Capital One instead chose to do an end run around the litigation process and seeks to foreclose on the medallions at issue in an attempt to destroy Licensee, Tri Global and Tri Global's owners and guarantors. Capital One did not re-file its Chicago cause of action in the New York Action because it knows that counterclaims would be filed against it, which would expose Capital One's bad faith conduct in abusing its partnership with Tri Global and expose Capital One's bad faith relationship with Uber. The reality is that

Capital One has filed numerous unsuccessful complaints in courts in New York and Chicago and, because these lawsuits have not been successful, Capital One is now attempting to cause as much harm as possible to Licensee and Tri Global before the counterclaims against Capital One are proven true and Capital One's bad faith is exposed.

**FOURTH DEFENSE**
**(Improper Foreclosure Sale Process)**

43.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

44.     On August 9, 2018, to start the foreclosure, Capital One opened the auction with an initial credit bid of $23,000.00.

45.     During the beginning part of the foreclosure auction, it became clear that no individuals were going to bid on the medallions because a foreclosure purchaser would have been liable for any and all liens on the medallions and such liability was unknown at the time of the auction. Capital One then stopped the foreclosure auction and announced to the individuals attending the auction that Capital One would work with any potential foreclosure purchasers and the bank to work out a deal on any liens on the medallion(s) bought at the auction. Capital One further stated that if the foreclosure purchaser and the bank could not work out an agreement concerning any liens on the medallions bought at the auction, Capital One would refund the foreclosure purchaser's money as if the foreclosure sale never took place. After this announcement, Capital One resumed the auction.

46.     By instituting this type of foreclosure auction, Capital One created an improper foreclosure process that created false values and did not bind the foreclosure purchasers.

## FIFTH DEFENSE
### (Breach of Fiduciary Duty)

47.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

48.     As set forth above, Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin relied heavily on and trusted Capital One.

49.     By virtue of the parties' business relationship as set forth above, and by reason of the demonstrable level of trust and confidence upon which Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin depended and which Capital One knowingly accepted, Capital One owes certain fiduciary duties to Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin including, without limitation, a duty of good faith.

50.     As explained herein, for years Tri Global relied on Capital One to guide certain aspects of its taxi-medallion loan origination and servicing business. Although the Tri Global MJPA provided discretion to Capital One, that discretion did not include a right to abandon the lending market or purposely advance competing interests to destabilize the industry upon which the very loans that were being serviced were based.

51.     Ultimately, Capital One repudiated its commitments to Licensee and abandoned the Chicago medallion lending market so that it could pursue a competing venture with Uber.

52.     Capital One breached its duty of good faith, and the trust and confidence of Licensee by, among other things: precipitating, through its partnership with Uber, the collapse of the Chicago taxi medallion industry and the medallion industry nationwide, in addition to the corresponding decline in the value of the taxi medallions at issue.

53.     Capital One engaged in an intentional course of wrongful conduct orchestrated to harm Licensee.

54.     Capital One's conduct was willful, wanton and in reckless disregard of the Licensee's contractual rights and was otherwise wrongful.

55.     As a direct and proximate result of Capital One's breach of its fiduciary duties, Licensee has suffered, and will continue to suffer, substantial damages.

## SIXTH DEFENSE
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

56.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

57.     Pursuant to the covenant of good faith and fair dealing, Capital One could not undertake any action that has the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

58.     As explained herein, Capital One breached the duty of good faith and fair dealing implied in the contract with Licensee by, among other things: precipitating, through its partnership with Uber, the collapse of the taxi medallion industry and concomitant decline in the value of the taxi medallions at issue.

59.     As a direct and proximate result of Capital One's breach of the implied covenant of good faith and fair dealing thereunder, Licensee has suffered, and will continue to suffer, substantial damages.

## SEVENTH DEFENSE
### (Estoppel, Waiver, Ratification and/or Acquiescence)

60.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

61.     Capital One's claim of breach of contract / default is barred by the doctrines of estoppel, waiver, ratification and/or acquiescence.

## CONCLUSION

WHEREFORE, based upon the foregoing allegations and defenses and all reasons appearing of record, Licensee has timely submitted a completed Affidavit of Defense and, pursuant to the BACP Taxi Rules, no transfer upon foreclosure may be allowed except pursuant to an order of a court having jurisdiction. Licensee respectfully requests that the BACP deny Creditor's Request to Transfer Taxicab Medallion License Upon Foreclosure.

# AFFIDAVIT OF DEFENSE TO CREDITOR

**To City:**     City of Chicago – Public Vehicle Operations Division
Department of Business Affairs and Consumer Protection
2350 W. Ogden Avenue, 1st Floor
Chicago, IL 60608
Attention: Monique Davids

**To Creditor:**     **Capital One Equipment Finance Corp., f/k/a All Points Capital Corp.,**
d/b/a Capital One Taxi Medallion Finance
c/o Troutman Sanders LLP
Att'n: Andrew L. Buck
875 Third Avenue
New York, NY 10022

RE: PUBLIC PASSENGER LICENSE NUMBER(s) <u>2149TX</u>

LICENSEE NAME: <u>Valex Cab Corp.</u>

I, <u>Valentina Zubok</u>, hereby swear that I own Taxicab Medallion License
<span style="font-size:smaller">Debtor Individual Name</span>

Number(s) <u>2149TX</u> either individually or through a company that I own and I have a defense to the foreclosure of these

licenses. I understand that this license(s) was sold at a foreclosure

sale on or about _____<u>August 9, 2018</u>_____ and that sale is contingent upon approval by the Department of Business Affairs
<span style="font-size:smaller">List Date of Foreclosure Sale</span>
and Consumer Protection.

My defense to this foreclosure is: (Use additional pages if needed) _____

_____ See attached Defense Document. _____

_____

_____

Signature: _____

Print Name: _____ Sheinin Edward

Relationship to Medallion License/Title <u>Vice President & Authorized Agent</u>

Address: <u>2617 S Wabash Chicago IL 60616</u>

Phone: <u>312.791.1255</u>

Email Address: <u>edwards@chicagocarriagecab.com.</u>

Subscribed and Sworn to before me

this <u>22</u> day of <u>Aug</u>, 20<u>18</u>.

_____ Notary Public

JANET DAVIS
Official Seal
Notary Public - State of ...
My Commission Expires Sep ... 2019

## AFFIDAVIT OF DEFENSE TO CREDITOR

### DEFENSE DOCUMENT

In support of its Affidavit of Defense to Creditor, Licensee asserts the following defenses in opposition to the Creditor's ("Creditor" or "Capital One") request to transfer public passenger vehicle license upon foreclosure and to the foreclosure sale: (1) Capital One has no right to foreclose on the medallion at issue; (2) Licensee does not owe the amount claimed by Capital One and has not defaulted on the agreement at issue with Capital One; (3) the foreclosure resulted in an improper foreclosure sale purchase that violated the BACP Taxi Rules; (4) Capital One instituted an improper foreclosure sale process; (5) Capital One breached its fiduciary duty to Licensee; (6) Capital One breached the implied covenant of good faith and fair dealing; (7) Capital One's claim of breach of contract / default is barred by the doctrines of estoppel, waiver, ratification and/or acquiescence. Because Licensee has timely submitted a completed Affidavit of Defense, pursuant to the BACP Taxi Rules, no transfer upon foreclosure may be allowed except pursuant to an order of a court having jurisdiction. Therefore, Licensee respectfully requests that the BACP deny Creditor's Request to Transfer Taxicab Medallion License Upon Foreclosure.

### FACTUAL BACKGROUND

1.      Symon Garber formed Tri Global Financial Services, Inc. ("Tri Global") in 2004, along with Roman Sapino and others, to provide capital to taxicab medallion owners. Tri Global's principal, Roman Sapino, also has many years of experience in the taxicab financing industry and has been involved in successful taxicab enterprises in New York and Chicago. Tri Global's co-owners include Galina Garber-Sheinin and Valentina Zubok. Irene Gans and Maya Zubok are related to an owner of Tri Global.

2.      Tri Global is a corporation formed and existing under the laws of the State of

Illinois, maintaining offices at 2617 S. Wabash Avenue, Chicago, Illinois 60616. Tri Global is engaged in the business of financing and servicing Chicago-based taxi medallion loans as well as offering second-position financing to the taxi industry.

3.     Upon information and belief, Capital One is a corporation formed and existing under the laws of the State of New York, maintaining a principal place of business at 265 Broadhollow Road, Melville, New York 11747.

4.     Tri Global was formed to provide loans to purchasers of public passenger vehicle licenses and medallions in the Chicago market, which confers the right to operate a taxicab in Chicago pursuant to the regulations issued and regulated by the City of Chicago Department of Business Affairs and Consumer Protection ("BACP").

5.     Tri Global offered medallion and other financing to a wide-variety of borrowers, including taxicab businesses that rely on the medallion-secured loans to earn their livelihoods. Tri Global primarily focused its business on servicing taxi medallion loans for various lenders and also offered second-position financing to the taxi industry. In or around 2006 Tri Global was approached by North Fork Bank, which expressed interest in partnering with Tri Global to expand the scope of its lending platform.

6.     Over the next several years, Tri Global and North Fork Bank entered into numerous successful loan participations. When North Fork Bank was acquired by Capital One in or about 2006/2007, this practice continued with Capital One.

7.     Capital One was even more eager than North Fork Bank to capitalize upon Tri Global's contacts in the Chicago marketplace and strongly encouraged Tri Global to aggressively seek prospects for additional medallion loans. Capital One and Tri Global participated in the loans on a loan-by-loan basis for several years.

8.    In 2010, Capital One requested that Tri Global enter into a more formal arrangement by way of a master participation agreement, to which Tri Global agreed. The terms and conditions governing that relationship and Capital One's senior participation interests in the loans are more particularly set forth in a certain Master Joint Participation Agreement, dated August 2, 2010 (the "MJPA" or the "Tri Global MJPA").

9.    In connection with the Tri Global MJPA, Symon Garber, Roman Sapino, Ruben Giacomozzi, Valentina Zubok, and Galina Garber-Sheinin signed the Tri Global Guaranty, dated August 2, 2010.

10.    Pursuant to the terms of the MJPA, Tri Global generated business, handled collections, serviced the loans and remitted monthly payments to Capital One in accordance with the amount of its participation in each underlying loan while Capital One held senior participation interests in the various loans made and serviced by Tri Global to owners of Chicago taxicab medallions (the "Loans"). The Tri Global MJPA contemplates the sale of senior participation interests in loans issued and/or originated by Tri Global to owners and operators of taxi medallions. As reflected in the Tri Global MJPA, after Tri Global sells a participation interest, it continues to service the debt owed thereunder. In exchange for its services, Tri Global receives a servicing fee that is paid from the debt-service payments remitted to Tri Global each month.

11.    Since the inception of the Tri Global/Capital One relationship, the parties have participated in many loans. Although Tri Global originated the medallion-secured loans and served as the official loan servicer for the loan portfolio, Tri Global relied on and trusted Capital One and its commercial finance expertise. This relationship was often characterized by Capital One as a "team" and "partnership" and its officers and representatives, including David Cin ("Cin") and others, regularly commented that the success of the portfolio was the product of a "team effort."

12.     Although Capital One historically had no real presence in the Chicago medallion market, Capital One was eager to exploit Tri Global's connections to the taxicab medallion market and capitalize upon Tri Global's market dominance in the Chicago taxi-medallion economy. Capital One strongly encouraged Tri Global to aggressively acquire additional Chicago-based medallion loans.

13.     As the value of Chicago taxi medallion loans continued to rise, Capital One continued to aggressively press Tri Global to originate new loans so that Capital One could further capitalize on its market position and emerge as a leading taxi medallion lender in Chicago.

14.     Throughout the course of the Master Joint Participation Agreement, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin – whose interests were closely aligned with those of Capital One – worked with Capital One to maximize the return on the medallion loans.

15.     Tri Global originated the agreement/loan at issue between Licensee and Capital One based on Tri Global's relationship with Capital One.

16.     Despite its long-standing business venture with Tri Global, Capital One engaged in intentional and systematic efforts to line its own pockets to the detriment of Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin. As explained below, Capital One engaged in irreconcilable conflicts of interest, bad faith business practices, and intentionally disregarded its duty of good faith to Licensee and Tri Global when it partnered with a major taxi-industry competitor, Uber Technologies, Inc. ("Uber").

17.     In or about late 2013 and early 2014, and unbeknownst to Licensee and Tri Global (and many other Capital One loan participants and medallion-secured borrowers), Capital One began secretly planning to change course and exit the medallion market to partner with the

industry's most ominous competitor, Uber. Notwithstanding this new partnership, Capital One, either intentionally or recklessly, continued to encourage Tri Global to cultivate new medallion-secured loans while concealing its intention to partner with Uber.

18.     News of Capital One's partnership with Uber surfaced in approximately mid-2014, and was followed by an aggressive nationwide marketing campaign launched by Capital One. The marketing campaign and promotions touted Capital One's "unique new partnership" with Uber and underscored the "common focus" of both companies.

19.     Capital One began offering significant incentives to its consumers to choose Uber vehicles over properly licensed and regulated taxis – including offering free and discounted Uber rides and other similar promotions such as a 20% discount on all Uber rides when paid with a Capital One "Quicksilver" credit card. Capital One offered new customers two free Uber rides worth up to $60.00. Capital One created a new website promoting these incentives and further signaling its collaboration with Uber: "capitalone.com/uber".

20.     Capital One's partnership with Uber came as a great shock to Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin as the partnership was never disclosed to them prior to the 2014 marketing blitz. At no point in the parties' relationship was it ever contemplated that Capital One would undertake any action to undermine the taxi industry, the agreement at issue, or the value of Tri Global's and Capital One's loan portfolio.

21.     In partnering with and promoting Uber's ride-share services, Capital One and Uber's assault on the taxi industry has been instrumental in bringing about the destabilization of the Chicago taxi medallion market.

22.     In 2014, when Capital One began its partnership with Uber, the Chicago market softened dramatically. Sometime during mid-2014, funding to the medallion industry came to a

total halt. This was clearly tied to Capital One's partnership with Uber.

23.    By 2015, Uber reported that taxi usage nationwide had precipitously decreased while the number of customers using Uber increased correspondingly.

24.    The disruption of the taxi industry resulting from Capital One's partnership with Uber contributed to the reduction in value of the Chicago taxi medallions securing the loans.

25.    In short, Capital One has caused the price of the Chicago taxi medallions that secure the loans to plummet.

26.    Moreover, Capital One has sabotaged Tri Global, Symon Garber, Valentina Zubok, Galina Garber-Sheinin and Licensee's efforts to favorably restructure and/or modify the medallion-secured loans at issue.

27.    Accordingly, Capital One has materially breached the credit agreement and Licensee is not liable for the amount allegedly owed pursuant to the credit agreement.

## FIRST DEFENSE
### (No Right to Foreclose)

28.    Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

29.    Capital One, through its partnership with Uber, precipitated the collapse of the Chicago taxi medallion industry and the medallion industry nationwide, in addition to the corresponding decline in the value of the taxi medallions at issue.

30.    Based on Capital One's willful misconduct, breach of contract, malfeasance, wrongdoing and/or other intentional and/or reckless conduct, Capital One has no right to foreclose on the medallions at issue.

## SECOND DEFENSE
### (No Default by Licensee)

31.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

32.     Licensee does not owe the amount claimed by Capital One and has not defaulted on the agreement at issue with Capital One.

33.     Therefore, Capital One has no right to foreclose on the medallions at issue.

## THIRD DEFENSE
### (Improper Foreclosure Sale Purchase)

34.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

35.     On August 9, 2018, to start the foreclosure, Capital One opened the auction with an initial credit bid of $23,000.00.

36.     An individual won the foreclosure auction with a bid of approximately $23,100.00.

37.     Pursuant to Rule TX13.03(b), "[t]he [foreclosure] purchaser must meet all the criteria for licensing as set out in the Municipal Code of Chicago and [the BACP's] rules and regulations, including payment of the license transfer fee, license fees and any other fees, fines or taxes due and owing to the City." Rule TX13.03(b).

38.     Pursuant to Rule TX13.04(d), "[t]he taxicab medallion license must be sold to a person believed to be a qualified applicant . . ." Rule TX13.04(d); *see also* TX13.06(a).

39.     It is unclear if the individual purchaser of the medallion at the foreclosure auction is a qualified applicant under the Municipal Code of Chicago or BACP Taxi Rules. Regardless, because of the improper auction process instituted by Capital One, there is a strong likelihood that the individual purchaser will ultimately decide not to go forward with the foreclosure sale, thus

making Capital One the potential purchaser.

40.     Upon information and belief, Capital One is not a qualified applicant and has no intention of ever seeking licensure under the Municipal Code of Chicago or BACP Taxi Rules.

41.     The purpose behind the BACP Taxi Rules' foreclosure process is to facilitate keeping medallions operating on the street. If Capital One is allowed to purchase the medallions, with no intention of ever becoming licensed by the BACP, Capital One would be allowed to cause further harm to the taxicab industry and further benefit Uber.

42.     Therefore, the foreclosure sale did not comply with Rules TX13.03 and TX13.04 and the foreclosure auction resulted in an improper sale/purchase that violated the BACP Taxi Rules.

43.     Moreover, Capital One's intent behind the foreclosure sale is to destroy and cause further harm to Licensee, Tri Global, and Tri Global's owners and guarantors. Capital One has filed multiple actions against Licensee, Tri Global, and/or Tri Global's owners and guarantors and instead of allowing any of these cases to reach their natural conclusion, Capital One instead seeks to implement destructive tactics by foreclosing on the medallions in order to further destroy the medallion market by setting the prices and discouraging bids, all in violation of the Taxi Rules simply to inflict maximum damage and cause irreparable harm. In a recent case that was filed in the Circuit Court of Cook County, *Capital One Equipment Finance Corp. v. Chicago Elite Cab Corp., et al.*, No. 17 L 998, the Honorable Margaret A. Brennan dismissed Capital One's complaint but allowed Capital One leave to re-file its cause of action in another case currently pending in New York. That New York Action is *Capital One Equipment Finance Corp. v. The OSG Corp., Tri Global Financial Services, Inc. et al.*, No. 600749/2017. But, rather than re-file its case in the New York Action and pursue its alleged causes of action, Capital One instead chose to do an end

run around the litigation process and seeks to foreclose on the medallions at issue in an attempt to destroy Licensee, Tri Global and Tri Global's owners and guarantors. Capital One did not re-file its Chicago cause of action in the New York Action because it knows that counterclaims would be filed against it, which would expose Capital One's bad faith conduct in abusing its partnership with Tri Global and expose Capital One's bad faith relationship with Uber. The reality is that Capital One has filed numerous unsuccessful complaints in courts in New York and Chicago and, because these lawsuits have not been successful, Capital One is now attempting to cause as much harm as possible to Licensee and Tri Global before the counterclaims against Capital One are proven true and Capital One's bad faith is exposed.

## FOURTH DEFENSE
### (Improper Foreclosure Sale Process)

44.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

45.     On August 9, 2018, to start the foreclosure, Capital One opened the auction with an initial credit bid of $23,000.00.

46.     During the beginning part of the foreclosure auction, it became clear that no individuals were going to bid on the medallions because a foreclosure purchaser would have been liable for any and all liens on the medallions and such liability was unknown at the time of the auction. Capital One then stopped the foreclosure auction and announced to the individuals attending the auction that Capital One would work with any potential foreclosure purchasers and the bank to work out a deal on any liens on the medallion(s) bought at the auction. Capital One further stated that if the foreclosure purchaser and the bank could not work out an agreement concerning any liens on the medallions bought at the auction, Capital One would refund the foreclosure purchaser's money as if the foreclosure sale never took place. After this announcement,

Capital One resumed the auction.

47.     By instituting this type of foreclosure auction, Capital One created an improper foreclosure process that created false values and did not bind the foreclosure purchasers.

**FIFTH DEFENSE**
**(Breach of Fiduciary Duty)**

48.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

49.     As set forth above, Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin relied heavily on and trusted Capital One.

50.     By virtue of the parties' business relationship as set forth above, and by reason of the demonstrable level of trust and confidence upon which Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin depended and which Capital One knowingly accepted, Capital One owes certain fiduciary duties to Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin including, without limitation, a duty of good faith.

51.     As explained herein, for years Tri Global relied on Capital One to guide certain aspects of its taxi-medallion loan origination and servicing business. Although the Tri Global MJPA provided discretion to Capital One, that discretion did not include a right to abandon the lending market or purposely advance competing interests to destabilize the industry upon which the very loans that were being serviced were based.

52.     Ultimately, Capital One repudiated its commitments to Licensee and abandoned the Chicago medallion lending market so that it could pursue a competing venture with Uber.

53.     Capital One breached its duty of good faith, and the trust and confidence of Licensee by, among other things: precipitating, through its partnership with Uber, the collapse of the Chicago taxi medallion industry and the medallion industry nationwide, in addition to the

corresponding decline in the value of the taxi medallions at issue.

54.     Capital One engaged in an intentional course of wrongful conduct orchestrated to harm Licensee.

55.     Capital One's conduct was willful, wanton and in reckless disregard of the Licensee's contractual rights and was otherwise wrongful.

56.     As a direct and proximate result of Capital One's breach of its fiduciary duties, Licensee has suffered, and will continue to suffer, substantial damages.

**SIXTH DEFENSE**
**(Breach of the Implied Covenant of Good Faith and Fair Dealing)**

57.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

58.     Pursuant to the covenant of good faith and fair dealing, Capital One could not undertake any action that has the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

59.     As explained herein, Capital One breached the duty of good faith and fair dealing implied in the contract with Licensee by, among other things: precipitating, through its partnership with Uber, the collapse of the taxi medallion industry and concomitant decline in the value of the taxi medallions at issue.

60.     As a direct and proximate result of Capital One's breach of the implied covenant of good faith and fair dealing thereunder, Licensee has suffered, and will continue to suffer, substantial damages.

## SEVENTH DEFENSE
### (Estoppel, Waiver, Ratification and/or Acquiescence)

61.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

62.     Capital One's claim of breach of contract / default is barred by the doctrines of estoppel, waiver, ratification and/or acquiescence.

## CONCLUSION

WHEREFORE, based upon the foregoing allegations and defenses and all reasons appearing of record, Licensee has timely submitted a completed Affidavit of Defense and, pursuant to the BACP Taxi Rules, no transfer upon foreclosure may be allowed except pursuant to an order of a court having jurisdiction. Licensee respectfully requests that the BACP deny Creditor's Request to Transfer Taxicab Medallion License Upon Foreclosure.

# AFFIDAVIT OF DEFENSE TO CREDITOR

**To City:**     **City of Chicago – Public Vehicle Operations Division**
**Department of Business Affairs and Consumer Protection**
**2350 W. Ogden Avenue, 1st Floor**
**Chicago, IL 60608**
**Attention: Monique Davids**

**To Creditor:**    **Capital One Equipment Finance Corp., f/k/a All Points Capital Corp.,**
**d/b/a Capital One Taxi Medallion Finance**
**c/o Troutman Sanders LLP**
**Att'n: Andrew L. Buck**
**875 Third Avenue**
**New York, NY 10022**

**RE: PUBLIC PASSENGER LICENSE NUMBER(s) 1970TX, 622TX, 1952TX, 1653TX, 886TX**

**LICENSEE NAME: Valex Cab Corp.**

I, _Valentina Zubok_, hereby swear that I own Taxicab Medallion License
<span style="font-size:smaller">Debtor Individual Name</span>

Number(s) 1970TX, 622TX, 1952TX, 1653TX, 886TX either individually or through a company that I own and I have a

defense to the foreclosure of these licenses. I understand that this license(s) was sold at a foreclosure

sale on or about _____August 9, 2018_____ and that sale is contingent upon approval by the Department of Business Affairs
<span style="font-size:smaller">List Date of Foreclosure Sale</span>
and Consumer Protection.

My defense to this foreclosure is: (Use additional pages if needed)_____

_____See attached Defense Document._____

_____

_____

Signature: _____

Print Name: _Sheinin Edward_

Relationship to Medallion License/Title _Vice President & Authorized Agent._

Address: _2617 S Wabash Chicago IL 606016_

Phone: _312.791.1255_

Email Address: _edwards@chicagocarriagecab.com._

Subscribed and Sworn to before me

this _22_ day of _Aug_____, 20_18_.

_____ Notary Public

## AFFIDAVIT OF DEFENSE TO CREDITOR

### DEFENSE DOCUMENT

In support of its Affidavit of Defense to Creditor, Licensee asserts the following defenses in opposition to the Creditor's ("Creditor" or "Capital One") request to transfer public passenger vehicle license upon foreclosure and to the foreclosure sale: (1) Capital One has no right to foreclose on the medallions at issue; (2) Licensee does not owe the amount claimed by Capital One and has not defaulted on the agreement at issue with Capital One; (3) the foreclosure resulted in an improper foreclosure sale purchase that violated the BACP Taxi Rules; (4) Capital One instituted an improper foreclosure sale process; (5) Capital One breached its fiduciary duty to Licensee; (6) Capital One breached the implied covenant of good faith and fair dealing; (7) Capital One's claim of breach of contract / default is barred by the doctrines of estoppel, waiver, ratification and/or acquiescence. Because Licensee has timely submitted a completed Affidavit of Defense, pursuant to the BACP Taxi Rules, no transfer upon foreclosure may be allowed except pursuant to an order of a court having jurisdiction. Therefore, Licensee respectfully requests that the BACP deny Creditor's Request to Transfer Taxicab Medallion License Upon Foreclosure.

### FACTUAL BACKGROUND

1.      Symon Garber formed Tri Global Financial Services, Inc. ("Tri Global") in 2004, along with Roman Sapino and others, to provide capital to taxicab medallion owners. Tri Global's principal, Roman Sapino, also has many years of experience in the taxicab financing industry and has been involved in successful taxicab enterprises in New York and Chicago. Tri Global's co-owners include Galina Garber-Sheinin and Valentina Zubok. Irene Gans and Maya Zubok are related to an owner of Tri Global.

2.      Tri Global is a corporation formed and existing under the laws of the State of

Illinois, maintaining offices at 2617 S. Wabash Avenue, Chicago, Illinois 60616. Tri Global is engaged in the business of financing and servicing Chicago-based taxi medallion loans as well as offering second-position financing to the taxi industry.

3.     Upon information and belief, Capital One is a corporation formed and existing under the laws of the State of New York, maintaining a principal place of business at 265 Broadhollow Road, Melville, New York 11747.

4.     Tri Global was formed to provide loans to purchasers of public passenger vehicle licenses and medallions in the Chicago market, which confers the right to operate a taxicab in Chicago pursuant to the regulations issued and regulated by the City of Chicago Department of Business Affairs and Consumer Protection ("BACP").

5.     Tri Global offered medallion and other financing to a wide-variety of borrowers, including taxicab businesses that rely on the medallion-secured loans to earn their livelihoods. Tri Global primarily focused its business on servicing taxi medallion loans for various lenders and also offered second-position financing to the taxi industry. In or around 2006 Tri Global was approached by North Fork Bank, which expressed interest in partnering with Tri Global to expand the scope of its lending platform.

6.     Over the next several years, Tri Global and North Fork Bank entered into numerous successful loan participations. When North Fork Bank was acquired by Capital One in or about 2006/2007, this practice continued with Capital One.

7.     Capital One was even more eager than North Fork Bank to capitalize upon Tri Global's contacts in the Chicago marketplace and strongly encouraged Tri Global to aggressively seek prospects for additional medallion loans. Capital One and Tri Global participated in the loans on a loan-by-loan basis for several years.

8. In 2010, Capital One requested that Tri Global enter into a more formal arrangement by way of a master participation agreement, to which Tri Global agreed. The terms and conditions governing that relationship and Capital One's senior participation interests in the loans are more particularly set forth in a certain Master Joint Participation Agreement, dated August 2, 2010 (the "MJPA" or the "Tri Global MJPA").

9. In connection with the Tri Global MJPA, Symon Garber, Roman Sapino, Ruben Giacomozzi, Valentina Zubok, and Galina Garber-Sheinin signed the Tri Global Guaranty, dated August 2, 2010.

10. Pursuant to the terms of the MJPA, Tri Global generated business, handled collections, serviced the loans and remitted monthly payments to Capital One in accordance with the amount of its participation in each underlying loan while Capital One held senior participation interests in the various loans made and serviced by Tri Global to owners of Chicago taxicab medallions (the "Loans"). The Tri Global MJPA contemplates the sale of senior participation interests in loans issued and/or originated by Tri Global to owners and operators of taxi medallions. As reflected in the Tri Global MJPA, after Tri Global sells a participation interest, it continues to service the debt owed thereunder. In exchange for its services, Tri Global receives a servicing fee that is paid from the debt-service payments remitted to Tri Global each month.

11. Since the inception of the Tri Global/Capital One relationship, the parties have participated in many loans. Although Tri Global originated the medallion-secured loans and served as the official loan servicer for the loan portfolio, Tri Global relied on and trusted Capital One and its commercial finance expertise. This relationship was often characterized by Capital One as a "team" and "partnership" and its officers and representatives, including David Cin ("Cin") and others, regularly commented that the success of the portfolio was the product of a "team effort."

12.     Although Capital One historically had no real presence in the Chicago medallion market, Capital One was eager to exploit Tri Global's connections to the taxicab medallion market and capitalize upon Tri Global's market dominance in the Chicago taxi-medallion economy. Capital One strongly encouraged Tri Global to aggressively acquire additional Chicago-based medallion loans.

13.     As the value of Chicago taxi medallion loans continued to rise, Capital One continued to aggressively press Tri Global to originate new loans so that Capital One could further capitalize on its market position and emerge as a leading taxi medallion lender in Chicago.

14.     Throughout the course of the Master Joint Participation Agreement, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin – whose interests were closely aligned with those of Capital One – worked with Capital One to maximize the return on the medallion loans.

15.     Tri Global originated the agreement/loan at issue between Licensee and Capital One based on Tri Global's relationship with Capital One.

16.     Despite its long-standing business venture with Tri Global, Capital One engaged in intentional and systematic efforts to line its own pockets to the detriment of Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin. As explained below, Capital One engaged in irreconcilable conflicts of interest, bad faith business practices, and intentionally disregarded its duty of good faith to Licensee and Tri Global when it partnered with a major taxi-industry competitor, Uber Technologies, Inc. ("Uber").

17.     In or about late 2013 and early 2014, and unbeknownst to Licensee and Tri Global (and many other Capital One loan participants and medallion-secured borrowers), Capital One began secretly planning to change course and exit the medallion market to partner with the

industry's most ominous competitor, Uber. Notwithstanding this new partnership, Capital One, either intentionally or recklessly, continued to encourage Tri Global to cultivate new medallion-secured loans while concealing its intention to partner with Uber.

18.     News of Capital One's partnership with Uber surfaced in approximately mid-2014, and was followed by an aggressive nationwide marketing campaign launched by Capital One. The marketing campaign and promotions touted Capital One's "unique new partnership" with Uber and underscored the "common focus" of both companies.

19.     Capital One began offering significant incentives to its consumers to choose Uber vehicles over properly licensed and regulated taxis – including offering free and discounted Uber rides and other similar promotions such as a 20% discount on all Uber rides when paid with a Capital One "Quicksilver" credit card. Capital One offered new customers two free Uber rides worth up to $60.00. Capital One created a new website promoting these incentives and further signaling its collaboration with Uber: "capitalone.com/uber".

20.     Capital One's partnership with Uber came as a great shock to Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin as the partnership was never disclosed to them prior to the 2014 marketing blitz. At no point in the parties' relationship was it ever contemplated that Capital One would undertake any action to undermine the taxi industry, the agreement at issue, or the value of Tri Global's and Capital One's loan portfolio.

21.     In partnering with and promoting Uber's ride-share services, Capital One and Uber's assault on the taxi industry has been instrumental in bringing about the destabilization of the Chicago taxi medallion market.

22.     In 2014, when Capital One began its partnership with Uber, the Chicago market softened dramatically. Sometime during mid-2014, funding to the medallion industry came to a

total halt. This was clearly tied to Capital One's partnership with Uber.

23.     By 2015, Uber reported that taxi usage nationwide had precipitously decreased while the number of customers using Uber increased correspondingly.

24.     The disruption of the taxi industry resulting from Capital One's partnership with Uber contributed to the reduction in value of the Chicago taxi medallions securing the loans.

25.     In short, Capital One has caused the price of the Chicago taxi medallions that secure the loans to plummet.

26.     Moreover, Capital One has sabotaged Tri Global, Symon Garber, Valentina Zubok, Galina Garber-Sheinin and Licensee's efforts to favorably restructure and/or modify the medallion-secured loans at issue.

27.     Accordingly, Capital One has materially breached the credit agreement and Licensee is not liable for the amount allegedly owed pursuant to the credit agreement.

## **FIRST DEFENSE**
### **(No Right to Foreclose)**

28.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

29.     Capital One, through its partnership with Uber, precipitated the collapse of the Chicago taxi medallion industry and the medallion industry nationwide, in addition to the corresponding decline in the value of the taxi medallions at issue.

30.     Based on Capital One's willful misconduct, breach of contract, malfeasance, wrongdoing and/or other intentional and/or reckless conduct, Capital One has no right to foreclose on the medallions at issue.

## SECOND DEFENSE
### (No Default by Licensee)

31.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

32.     Licensee does not owe the amount claimed by Capital One and has not defaulted on the agreement at issue with Capital One.

33.     Therefore, Capital One has no right to foreclose on the medallions at issue.

## THIRD DEFENSE
### (Improper Foreclosure Sale Purchase)

34.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

35.     On August 9, 2018, to start the foreclosure, Capital One opened the auction with an initial credit bid of $23,000.00.

36.     Capital One won the foreclosure auction with its initial $23,000.00 credit bid.

37.     Pursuant to Rule TX13.03(b), "[t]he [foreclosure] purchaser must meet all the criteria for licensing as set out in the Municipal Code of Chicago and [the BACP's] rules and regulations, including payment of the license transfer fee, license fees and any other fees, fines or taxes due and owing to the City." Rule TX13.03(b).

38.     Pursuant to Rule TX13.04(d), "[t]he taxicab medallion license must be sold to a person believed to be a qualified applicant . . ." Rule TX13.04(d); *see also* TX13.06(a).

39.     Upon information and belief, Capital One is not a qualified applicant and has no intention of ever seeking licensure under the Municipal Code of Chicago or BACP Taxi Rules.

40.     The purpose behind the BACP Taxi Rules' foreclosure process is to facilitate keeping medallions operating on the street. If Capital One is allowed to purchase the medallions,

with no intention of ever becoming licensed by the BACP, Capital One would be allowed to cause further harm to the taxicab industry and further benefit Uber.

41.     Therefore, the foreclosure sale did not comply with Rules TX13.03 and TX13.04 and the foreclosure auction resulted in an improper sale/purchase that violated the BACP Taxi Rules.

42.     Moreover, Capital One's intent behind the foreclosure sale is to destroy and cause further harm to Licensee, Tri Global, and Tri Global's owners and guarantors. Capital One has filed multiple actions against Licensee, Tri Global, and/or Tri Global's owners and guarantors and instead of allowing any of these cases to reach their natural conclusion, Capital One instead seeks to implement destructive tactics by foreclosing on the medallions in order to further destroy the medallion market by setting the prices and discouraging bids, all in violation of the Taxi Rules simply to inflict maximum damage and cause irreparable harm. In a recent case that was filed in the Circuit Court of Cook County, *Capital One Equipment Finance Corp. v. Chicago Elite Cab Corp., et al.*, No. 17 L 998, the Honorable Margaret A. Brennan dismissed Capital One's complaint but allowed Capital One leave to re-file its cause of action in another case currently pending in New York. That New York Action is *Capital One Equipment Finance Corp. v. The OSG Corp., Tri Global Financial Services, Inc. et al.*, No. 600749/2017. But, rather than re-file its case in the New York Action and pursue its alleged causes of action, Capital One instead chose to do an end run around the litigation process and seeks to foreclose on the medallions at issue in an attempt to destroy Licensee, Tri Global and Tri Global's owners and guarantors. Capital One did not re-file its Chicago cause of action in the New York Action because it knows that counterclaims would be filed against it, which would expose Capital One's bad faith conduct in abusing its partnership with Tri Global and expose Capital One's bad faith relationship with Uber. The reality is that

Capital One has filed numerous unsuccessful complaints in courts in New York and Chicago and, because these lawsuits have not been successful, Capital One is now attempting to cause as much harm as possible to Licensee and Tri Global before the counterclaims against Capital One are proven true and Capital One's bad faith is exposed.

## FOURTH DEFENSE
### (Improper Foreclosure Sale Process)

43.    Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

44.    On August 9, 2018, to start the foreclosure, Capital One opened the auction with an initial credit bid of $23,000.00.

45.    During the beginning part of the foreclosure auction, it became clear that no individuals were going to bid on the medallions because a foreclosure purchaser would have been liable for any and all liens on the medallions and such liability was unknown at the time of the auction. Capital One then stopped the foreclosure auction and announced to the individuals attending the auction that Capital One would work with any potential foreclosure purchasers and the bank to work out a deal on any liens on the medallion(s) bought at the auction. Capital One further stated that if the foreclosure purchaser and the bank could not work out an agreement concerning any liens on the medallions bought at the auction, Capital One would refund the foreclosure purchaser's money as if the foreclosure sale never took place. After this announcement, Capital One resumed the auction.

46.    By instituting this type of foreclosure auction, Capital One created an improper foreclosure process that created false values and did not bind the foreclosure purchasers.

## FIFTH DEFENSE
### (Breach of Fiduciary Duty)

47.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

48.     As set forth above, Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin relied heavily on and trusted Capital One.

49.     By virtue of the parties' business relationship as set forth above, and by reason of the demonstrable level of trust and confidence upon which Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin depended and which Capital One knowingly accepted, Capital One owes certain fiduciary duties to Licensee, Tri Global, Symon Garber, Valentina Zubok, and Galina Garber-Sheinin including, without limitation, a duty of good faith.

50.     As explained herein, for years Tri Global relied on Capital One to guide certain aspects of its taxi-medallion loan origination and servicing business. Although the Tri Global MJPA provided discretion to Capital One, that discretion did not include a right to abandon the lending market or purposely advance competing interests to destabilize the industry upon which the very loans that were being serviced were based.

51.     Ultimately, Capital One repudiated its commitments to Licensee and abandoned the Chicago medallion lending market so that it could pursue a competing venture with Uber.

52.     Capital One breached its duty of good faith, and the trust and confidence of Licensee by, among other things: precipitating, through its partnership with Uber, the collapse of the Chicago taxi medallion industry and the medallion industry nationwide, in addition to the corresponding decline in the value of the taxi medallions at issue.

53.     Capital One engaged in an intentional course of wrongful conduct orchestrated to harm Licensee.

54.     Capital One's conduct was willful, wanton and in reckless disregard of the Licensee's contractual rights and was otherwise wrongful.

55.     As a direct and proximate result of Capital One's breach of its fiduciary duties, Licensee has suffered, and will continue to suffer, substantial damages.

## SIXTH DEFENSE
### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

56.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

57.     Pursuant to the covenant of good faith and fair dealing, Capital One could not undertake any action that has the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

58.     As explained herein, Capital One breached the duty of good faith and fair dealing implied in the contract with Licensee by, among other things: precipitating, through its partnership with Uber, the collapse of the taxi medallion industry and concomitant decline in the value of the taxi medallions at issue.

59.     As a direct and proximate result of Capital One's breach of the implied covenant of good faith and fair dealing thereunder, Licensee has suffered, and will continue to suffer, substantial damages.

## SEVENTH DEFENSE
### (Estoppel, Waiver, Ratification and/or Acquiescence)

60.     Licensee repeats, realleges and incorporates each of the preceding allegations as if set forth at length herein.

61.     Capital One's claim of breach of contract / default is barred by the doctrines of estoppel, waiver, ratification and/or acquiescence.

## **CONCLUSION**

WHEREFORE, based upon the foregoing allegations and defenses and all reasons appearing of record, Licensee has timely submitted a completed Affidavit of Defense and, pursuant to the BACP Taxi Rules, no transfer upon foreclosure may be allowed except pursuant to an order of a court having jurisdiction. Licensee respectfully requests that the BACP deny Creditor's Request to Transfer Taxicab Medallion License Upon Foreclosure.